# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GUSTAVO AGUILAR,           )
    Plaintiff,             )
                           )
VS.                        ) Case No. 4:16-cv-00118
                           )
ALLIANCE RESIDENTIAL,      )
LLC,                       )
    Defendant.             )


**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF

SASHA R. IVERSEN, D.O.

APRIL 4, 2017

**********************************************************

ORAL AND VIDEOTAPED DEPOSITION OF SASHA R. IVERSEN,

D.O., produced as a witness at the instance of the

DEFENDANT, and duly sworn, was taken in the above-styled

and numbered cause on the 4th of April, 2017, from

9:32 a.m. to 2:45 p.m., before Mona S. Whitmarsh, CSR,

in and for the State of Texas, reported by machine

shorthand, at the offices of the Daspit Law Firm, 440

Louisiana, Suite 1400, Houston, Texas, pursuant to the

Federal Rules and the provisions stated on the record or

attached hereto.

MAGNA LEGAL SERVICES
(866)624-6221
www.MagnaLS.com



## Page 2

```
 1              A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
         Mr. Kiernan A. McAlpine
 4       DASPIT LAW FIRM
         The Lyric Centre
 5       440 Louisiana Street, Suite 1400
         Houston, Texas  77002
 6       713-322-4878
         713-587-9086 (fax)
 7       kier@daspitlaw.com
 8
     FOR THE DEFENDANT:
 9       Mr. Adraon D. Greene
         GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH
10       1301 McKinney Street, Suite 1400
         Houston, Texas  77010
11       713-599-0700
         713-599-0777 (fax)
12       agreene@gallowaylawfirm.com
13
     VIDEO TECHNICIAN:
14       Ms. Patty Valencia
         MAGNA LEGAL SERVICES
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                    INDEX
                              PAGE
 2
     Appearances.................................   2
 3
     Stipulations.................................   5
 4
     SASHA R. IVERSEN, D.O.
 5       Examination by Mr. Greene.........   6
 6   Signature and Changes........................ 258
 7   Reporter's Certificate....................... 260
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
 1                    EXHIBITS
     NO.  DESCRIPTION                     PAGE
 2
     1   ......................................  12
 3       Renotice of Deposition
     2   ......................................  14
 4       Medical Records Review
     3   ......................................  17
 5       Physician Consultation
     4   ......................................  17
 6       Subpoena
     5   ......................................  29
 7       Dr. Iversen's File on Mr. Aguilar, partial
         (Also Contains Exhibits 6, 7, 9 and 11)
 8   6   ......................................  30
         CV of Dr. Iversen
 9   7   ......................................  31
         Deposition and Court Appearances List
10   8   ......................................  42
         Current Deposition and Court Appearances
11       List
     9   ......................................  58
12       Invoices
     10  ......................................  59
13       Invoices
     11  ......................................  95
14       Catastrophic Life Care Plan for Mr. Aguilar
     12  ...................................... 257
15       Dr. Iversen's Handwritten Notes
16
17       REQUESTED DOCUMENTS/INFORMATION
     NO.  DESCRIPTION
18
     1   See Page 34, Lines 5-23
19
     2   See Page 99, Lines 23-25 through Page 100, Line 4
20
21
22
23
24
25
```

## Page 5

```
 1           THE VIDEOGRAPHER:  We are now on the
 2   record.  This begins Session No. 1 in the deposition of
 3   Dr. Sasha Iversen in Case No. 4:16-cv-00118 styled
 4   Gustavo Aguilar versus Alliance Residential, LLC,
 5   pending in the U.S. District Court for the Southern
 6   District of Texas, Houston Division.
 7           Today is April 4th, 2017, and the time is
 8   9:32 a.m., Central Time.  We are at the Daspit Law Firm
 9   in Houston.  The court reporter and videographer are
10   with Magna.
11           Will counsel, please, state their
12   appearances and whom they represent.
13           MR. GREENE:  Adraon Greene for Alliance
14   Residential, LLC.
15           MR. McALPINE:  Kiernan McAlpine for
16   Plaintiff, Gustavo Aguilar.
17           THE VIDEOGRAPHER:  Will the court
18   reporter please swear in the witness.
19           SASHA R. IVERSEN, D.O.,
20   having been first duly sworn, testified as follows:
21           THE REPORTER:  Are there any
22   stipulations?
23           MR. McALPINE:  By the Rules.
24           MR. GREENE:  No.
25           THE REPORTER:  And signature of the
```



Page 6

1  witness?
2         Would you like to read and sign your
3  deposition?
4         THE WITNESS:  Yes.
5         EXAMINATION
6  BY MR. GREENE:
7     Q   Ma'am, can you state your full name for the
8  record?
9     A   Sasha R. Iversen.
10    Q   And what does the "R" stand for?
11    A   Ringdahl, R-i-n-g-d-a-h-l.
12    Q   And you are a doctor, correct?
13    A   Yes.
14    Q   So I will assume you prefer "Dr. Iversen"?
15    A   Yes.
16    Q   Dr. Iversen, my name is Adraon Greene.  You
17 and I just met this morning, true?
18    A   Yes.
19    Q   And you understand you are here today to give
20 some deposition based on a life care plan and your work
21 and opinions regarding that life care plan, in the case
22 of Gustavo Aguilar?
23    A   Yes.
24    Q   Now, based on your CV and the information that
25 you have produced to us in response to the subpoena

Page 7

1  duces tecum, I understand that you have been deposed
2  quite a few times before?
3     A   I have.
4     Q   Okay.  So I will just briefly go over the
5  rules for a deposition just so that you and I are on the
6  same page.
7         You understand that I am going to ask you
8  questions, you are going to provide me answers to those
9  questions, the court reporter is going to take down the
10 questions and answers?
11    A   Yes.
12    Q   And I will ask that you let me finish my
13 question before you provide your answer and I, in turn,
14 will let you finish your answer before I move on to the
15 next question, for the purposes of the court reporter.
16 Okay?
17    A   Okay.
18    Q   You understand that you are sworn under oath,
19 just as you would be in front of a jury?
20    A   Yes.
21    Q   If you need a break at any time, just let me
22 know you need a break and we can take a break.  The only
23 caveat is if I have a question on the table, I just need
24 you to answer that question for me.  Okay?
25    A   Yes.

Page 8

1     Q   What's your current address?
2     A   My work address?  Office address or home
3  address?
4     Q   Give me both.
5     A   Okay.  I practice at 14770 Memorial Drive in
6  Houston, Texas  77079.
7     Q   That is your work address?
8     A   Yes, sir.
9     Q   Home address?
10    A   I live at 814 Ivy Wall Drive, Houston, Texas
11 77079.
12    Q   How long have you lived in Houston?
13    A   Since 2012.
14    Q   And what do you do for a living?
15    A   I am a physician.
16    Q   What type of physician?
17    A   I am a physical medicine and rehab physician.
18    Q   Do you do anything other than perform work as
19 a physical rehab physician?
20    A   I do the life care planning work as well.
21    Q   And the life care planning work is work that
22 you are paid for by law firms to perform?
23    A   For the most part, yes.
24    Q   What do you mean "for the most part"?
25    A   Well, I am paid directly through -- I am not

Page 9

1  paid directly from the law firm.  I'm paid by an entity
2  that I am associated with, Physician Life Care Planning.
3     Q   And how are you associated with Physician Life
4  Care Planning?
5     A   I am an associate physician, so I am basically
6  a 1099 employee.
7     Q   And what is an "associate physician"?
8     A   I am not an employee of theirs, but I am
9  associated with them in the physician role.
10    Q   And is it part of your job function at
11 Physician Life Care Planning to be involved in
12 litigation matters?
13    A   What do you mean by that?
14        I prepare life care plans for whoever is
15 requesting them through Physician Life Care Planning, so
16 mostly litigation.
17    Q   What percentage?
18    A   All of the life care plans that I have done, I
19 believe, have been for some sort of litigation.  I know
20 that other physicians associated with them have done
21 life care plans for other reasons.
22    Q   Well, we are just talking about you today.  So
23 for you, it's 100 percent of your work with Physician
24 Life Care Planning is litigation, right?
25        MR. McALPINE:  Objection.  Asked and



Page 10

1 answered.
2 A Yes.
3 Q (BY MR. GREENE) 100 percent?
4 A I believe so. I mean, yeah.
5 Q I was just clarifying because he objected.
6 That's all.
7 Now, this particular case, you were retained
8 for a litigation matter, correct?
9 A Yes.
10 Q And how did you find out about this case?
11 A I was contacted by one of the case managers at
12 Physician Life Care Planning.
13 Q Do you recall that case manager's name?
14 A No, sir, I don't.
15 Q So explain to me how that works, your
16 understanding of how that works?
17 MR. McALPINE: Object to vagueness.
18 A So basically I --
19 Q (BY MR. GREENE) You understand what my
20 question is?
21 A How I get a case basically?
22 Q Absolutely.
23 A So basically a law firm or entity will contact
24 Physician Life Care Planning. They are in need of a
25 life care plan. Physician Life Care Plan- -- Physician

Page 11

1 Life Care Planning will then assign that specific case
2 to a doctor in -- usually in that specific area. So if
3 it's in Houston, usually they contact an expert in
4 Houston.
5 I will be notified electronically and then, as
6 long as I don't have any conflicts, I will go ahead with
7 that case. And then scheduling of, you know, the
8 patient appointment and everything is done as well.
9 Q Do you schedule the patient appointment?
10 A That is all done through Physician Life Care
11 Planning.
12 Q And would that be the case manager who handles
13 that?
14 A It's electronic, as well as the case manager,
15 so it's -- you know, I put in my available dates and
16 then the law firm will select what they would like.
17 Q And is that what happened in this case?
18 A Yes.
19 Q Do you know who contacted the case manager in
20 this particular case?
21 A No, I don't.
22 Q Have you ever worked with Mr. McAlpine before?
23 A I don't believe. Maybe one case before. I
24 don't recall. I don't know.
25 Q Do you recall working for the Daspit Law Firm

Page 12

1 before?
2 A Yes, I think I have worked with them.
3 Q Did you work with him, Mr. McAlpine?
4 A I don't recall specifically.
5 Q Okay. How long have you been an associate
6 physician at Physician Life Care Planning?
7 A Since 2014.
8 Q We are going to mark some exhibits to your
9 deposition. First one we are going to mark is your
10 notice of deposition -- actually, the renotice of
11 deposition, we will mark this as Exhibit No. 1.
12 (EXHIBIT 1 WAS MARKED.)
13 Q (BY MR. GREENE) And I have to apologize to you
14 because this identifies you as "Sarah Iversen" as
15 opposed to "Dr. Sasha Iversen," but that's that.
16 And the next thing we are going to mark is a
17 subpoena duces tecum. Do you recall receiving a
18 subpoena in this case?
19 A I don't know if I have seen the subpoena. I
20 believe I received it, but it might have been through
21 Physician Life Care Planning. I have just seen this,
22 actually.
23 Q So you have never seen the deposition notice
24 before today?
25 A I did see the deposition notice, this one, but

Page 13

1 I don't recall seeing that portion of it.
2 Q Oh, no, no, no. I apologize if I am confusing
3 you.
4 We served a subpoena on you prior to the
5 deposition notice. Do you recall that?
6 A I believe I have seen it. I just -- I
7 don't -- I haven't seen it recently so...
8 Q Let me back up a little bit. Before coming in
9 here today, did you meet with Mr. McAlpine to prepare
10 for your deposition?
11 A No.
12 Q Did you review any documents to prepare for
13 your deposition?
14 A Yes, I did.
15 Q What did you review?
16 A I have a list of everything that I have
17 reviewed. So obviously all the documents listed in my
18 life care plan were reviewed, and then we were provided
19 with subsequent documents after the life care plan was
20 completed. So there is a list of those as well.
21 Q Let me see that.
22 A (Witness tendering.)
23 MR. McALPINE: Can I see that when you
24 are done?
25 MR. GREENE: Sure.





Page 14

1    Q   (BY MR. GREENE) And the life care plan that
2  you handed me is dated December 1, 2016?
3    A   Yes, sir.
4    Q   That's the same one that was produced in this
5  case, as far as you are aware?
6    A   Yes.
7    Q   There you go.  You can have that.
8        And you have also produced, or you have handed
9  to me, what's marked -- we will mark this as Exhibit
10 No. 2.
11       (EXHIBIT 2 WAS MARKED.)
12   Q   (BY MR. GREENE) And this is the complete list
13 of documents that you have reviewed in preparation for
14 your deposition today?
15   A   In addition to -- yeah, so together they will
16 be the complete list.
17   Q   And this is an 11-page document, right?
18   A   Yes.
19       MR. GREENE:  On a break, can I get a copy
20 of that?
21       MR. McALPINE:  Sure.  Yeah, I need one,
22 too.
23       MR. GREENE:  Not front and back.  And
24 actually, we will mark the one that's not front and back
25 as Exhibit 2.  That will assist the court reporter in

Page 15

1  copying it.
2    Q   (BY MR. GREENE) All right.  Are there any
3  documents in Exhibit No. 3 that in any way change any of
4  your opinions?
5    A   I don't know specifically.  That's kind of a
6  broad question.
7    Q   Okay.  Let me ask you a different way:  You
8  authored your report on December 1st, 2016, correct?
9    A   Right.
10   Q   Have you authored a supplemental report?
11   A   No, I have not.
12   Q   Do you plan on offering a supplemental report?
13   A   I have not been asked to do that.  I have
14 contemplated doing that because, in addition to the life
15 care plan that was done, I also got the chance to see
16 Mr. Aguilar in person while he was admitted at a
17 facility.  So I had not had the opportunity to do that
18 prior to the life care plan being completed.
19   Q   So if I understand your testimony, you did not
20 conduct an examination of Mr. Aguilar prior to authoring
21 your report?
22   A   No.  We had one scheduled and then because of
23 Mr. Aguilar's condition, he was not able to make that
24 appointment.  And the life care plan deadline date was
25 still on so -- and, you know, sometimes I will do that.

Page 16

1    If -- if -- I will include everything except the exam.
2  Obviously I like to have the exam as well, but I can do
3  it without.
4    Q   So the answer to my question, though, is your
5  life care plan that you wrote in December, 2016, you did
6  not rely on the exam to formulate any of those opinions;
7  is that true?
8    A   Correct.
9    Q   All right.  And there is another document that
10 you have been pointing to, that's sitting down in front
11 of you.  What is that document?
12   A   This is basically my summary of my visit with
13 Mr. Aguilar.
14   Q   Can I see that?
15   A   Yes (tendering).
16   Q   And have you ever given this summary to
17 Mr. Aguilar's lawyers before today?
18   A   No.
19   Q   Why not?
20   A   I wasn't asked for it, and basically I -- I
21 guess I wasn't asked for it until -- I assumed I would
22 bring it to deposition.  That's normally what I do, if
23 there is any extra documents.
24   Q   Well, you do -- we will mark this one as
25 Exhibit No. 3.

Page 17

1        (EXHIBIT 3 WAS MARKED.)
2        MR. GREENE:  And I will need a copy of
3  this, too, on the break.
4        MR. McALPINE:  Sure.  I would like to
5  read this.
6    Q   (BY MR. GREENE) Exhibit No. 4 we are going to
7  mark as the subpoena that I referenced earlier.
8        (EXHIBIT 4 WAS MARKED.)
9    Q   (BY MR. GREENE) And the subpoena contains an
10 Exhibit A that required you to produce certain
11 documents.  Okay?  If I understand your testimony, you
12 did not see Exhibit 4, or you have not seen Exhibit 4
13 before today, have you?
14   A   I believe I have.  It wasn't included in the
15 most recent things that I have reviewed, though.  But I
16 do have, you know, all my file with me today.
17   Q   So you brought your entire file with you
18 today?
19   A   Yes, I did.
20   Q   Can you get that out for me?
21   A   Yes.  I have -- I have some handwritten notes
22 from when I actually saw Mr. Aguilar, and then I have a
23 USB drive which contains all the invoices and any other
24 documents basically.  So it's all in here.
25   Q   Okay.  The information on that USB drive, has



Page 18

1  it been given to your lawyer -- to Mr. Aguilar's lawyers
2  before?
3      A   No.  I prepare it, like, before I go to
4  deposition.
5      Q   Let me see that subpoena, Exhibit --
6          MR. McALPINE:  I mean, you have got a
7  bunch of documents in response to the subpoena already.
8      Q   (BY MR. GREENE) So Exhibit No. 4 is the
9  subpoena.  You understand this is the subpoena that was
10 handed out pursuant to the lawsuit that was filed, and
11 you are required to comply with it, yes?
12     A   Yes.
13     Q   And this was sent to you, yes?
14     A   It's sent to Physician Life Care Planning
15 usually.
16     Q   No.  This is sent to Dr. -- to Sasha Iversen,
17 D.O., 1321 Park Bayou Drive, Houston, Texas, or --
18     A   That's --
19     Q   -- 814 Ivy Wall Drive, Houston, Texas.
20         Have you ever lived at either of those
21 addresses?
22     A   Yeah.  814 Ivy Wall, yes.
23     Q   So this was sent to you, not to Physician Life
24 Care Planning.  Do you understand that?
25     A   Yes, I did get that actually at my house.  I

Page 19

1  remember now.  I got it at my house a while back, and
2  then I forwarded it on to Physician Life Care Planning,
3  because they will help me kind of send any documents on.
4      Q   This was served on December 30th, 2016.
5      A   December 30th?
6      Q   Yes, ma'am.  Date (indicating).  Not that you
7  received it on that date, but --
8      A   Yeah.  I wasn't --
9      Q   -- that's the date it was served.
10     A   -- there on that date.
11     Q   Okay.  And it commanded that you provide
12 documents to us, the defendants, the defendant's
13 attorneys, by January 10th, 2016, [sic] at 4:00 p.m.
14         Whether you met that deadline or not, you did
15 supply us with documents, right?
16     A   Right.
17     Q   The documents that you supplied us with were
18 in response to Exhibit A, true?
19     A   Right.
20     Q   And you understand that based on the subpoena,
21 everything that was in your possession at the time, you
22 were supposed to give to us, right?
23     A   Correct.
24     Q   You understand that you have a continuing duty
25 to supplement this and give us any additional documents,

Page 20

1  right?
2      A   Yes.
3      Q   Okay.  You haven't done that until today,
4  though, have you?
5      A   Let me clarify something.
6          I didn't see Mr. Aguilar until after the
7  subpoena was served, and I also didn't receive
8  subsequent documents until February of this year, so
9  everything that I had in my possession was supplied to
10 you.
11     Q   But before today, you didn't supplement with
12 any of that information; is that right?
13     A   No, and I typically do not do a supplemental
14 report, because that's an extra cost to the attorneys,
15 so I will not just do that, unless I am requested to do
16 so.
17     Q   Well, did you advise the attorneys that you
18 had additional documents that were responsive to
19 Exhibit A of the subpoena?
20     A   Usually -- I don't see what the issue is,
21 because usually I will bring those things to
22 depositions.  They know that I have seen the individual.
23     Q   No, no, I understand what you usually do, but
24 my question is:  For this case, did you provide the
25 attorneys, Mr. Aguilar's attorneys, with the

Page 21

1  supplemental information that you either received or
2  created after you initially responded to the subpoena?
3          MR. McALPINE:  Objection.  Argumentative,
4  misleading.  The witness is complying with her duty to
5  reasonably, promptly supplement.
6      A   So I can --
7          MR. GREENE:  All you have to do is
8  object, thank you.
9      A   I do -- I can let you know that I finished the
10 physician consultation final yesterday, as well as the
11 record review.  I received the final yesterday, so I did
12 let Mr. McAlpine know that I will be bringing those
13 things with me today.
14     Q   (BY MR. GREENE) And what is the "physician
15 review"?
16     A   This is the physician consultation, my final
17 copy of my notes with him.  Obviously, I make notes, do
18 a dictation, and then, you know, work on it.  And then
19 the medical records review as well.
20     Q   And you are talking about Exhibit No. 3 is
21 the --
22     A   Two and --
23     Q   -- physician consultation, right?
24     A   Yes.
25     Q   When did you perform this physician



Page 22

1  consultation?
2      A   I interviewed and examined Mr. Aguilar
3  January 26, 2017.
4      Q   And did you obtain any information based on
5  this physician consultation that changes any of your
6  opinions in your report from December 1st, 2016?
7      A   Again, I -- since I did get the opportunity to
8  examine him after my life care plan was done and review
9  subsequent records, I do believe that there will be a
10  few changes to the life care plan, and we did talk about
11  a possibility of a supplemental report.  However, again,
12  I don't -- you know, I don't just go and do those
13  without being asked to do so, but I do think there will
14  be some changes.
15      Q   What changes do you anticipate making?
16      A   I can -- do you want me to go through the
17  whole thing and...
18      Q   No, no.
19      A   Okay.
20      Q   Just sitting here right now --
21      A   Oh, okay.
22      Q   We will get to your report.
23      A   Yeah, okay.
24      Q   But they are not in your report now, so I'm
25  wondering --

Page 23

1      A   Correct.
2      Q   You are sitting here and you just told me that
3  you do anticipate --
4      A   So basically --
5      Q   Let me finish, please, ma'am.
6      A   Sorry.
7      Q   Thank you.
8          You anticipate making a few changes, so you
9  have already contemplated that.  Tell me what you have
10  contemplated.
11      A   So, broadly, without going into detail, when I
12  saw Mr. Aguilar, he is at a level of disability
13  currently that I did not -- that was not impressed upon
14  me based on the initial records.  And due to his
15  comorbidities, including ankylosing spondylitis and a
16  subsequent injury that he sustained, I am going to
17  decrease the life expectancy in my report.
18      Q   Anything else?
19          And we'll talk -- I'm sorry.  Let me interrupt
20  you real quick.  We will talk about the specifics of
21  what you are going to change --
22      A   Okay.
23      Q   -- when we go through the report.
24      A   I believe that's generally the biggest change
25  that I will be making.

Page 24

1      Q   And you are decreasing the life expectancy
2  because of the ankylosing spondylitis?
3      A   The comorbidities, the subsequent injury that
4  caused him to be -- to have further paralysis of his
5  upper extremities, as well as the ankylosing
6  spondylitis, and his general medical and rehab
7  potential.
8          You know, when I saw him, basically he is --
9  he is bed-bound now.  He is going to have -- he is going
10  to have, you know, specific complications likely due to
11  his immobility, which will, in turn, cause him to have a
12  decreased life expectancy, in my opinion.
13      Q   And when is the first time that you told
14  Mr. McAlpine about your desire to provide a subsequent
15  life care plan that would decrease his life expectancy?
16      A   He requested a call yesterday, and I expressed
17  that to him on the phone yesterday.
18      Q   Okay.  So you didn't meet with Mr. McAlpine
19  before your deposition, but you did talk to him?
20      A   Yes.
21      Q   When did you guys talk?
22      A   Yesterday around 5:15 or so, p.m.
23      Q   For how long?
24      A   About half an hour.
25      Q   What did you guys talk about?

Page 25

1      A   He asked me what records I had, what records I
2  had reviewed, if I had any changes to my report, and
3  then basically, you know, confirmed where I was going to
4  be meeting him today.
5      Q   And how does decreasing the life expectancy in
6  the report affect your ultimate opinions?
7      A   Basically, in my opinion, he will need the
8  same things that I have outlined in this life care plan.
9  None of the actual items are going to be taken out, but
10  because I am decreasing the life expectancy, the overall
11  future medical costs are going to go down obviously,
12  because there is fewer years that he is going to need to
13  be covered.
14      Q   The number will go down?
15      A   Right.
16      Q   And when you saw Mr. Aguilar in January of
17  2017, how did you describe his condition?
18      A   I saw him at a subacute rehab facility in
19  Pasadena.  He is basically -- he is awake, alert,
20  oriented.  I mean, you can read my physician
21  consultation, but he is actually not able to feed
22  himself, at least when I saw him.
23          He needs 24-hour care for positioning for --
24  you know, his only -- when I -- you know, what he
25  reported to me was his only kind of activity right now



Page 26

1   is being picked up and put in a chair for, you know,
2   maybe an hour every day and then put back in bed.
3         He needs full assistance for any type of, you
4   know, cleaning or bathing or anything like that, so he
5   is 24-hour care right now.  He is unable to do anything.
6   He couldn't even reach his cell phone so...
7       Q   And on December 1st, 2016, does your report
8   reflect that level of care --
9       A   No.
10      Q   -- your life care plan?
11      A   No, because I -- I basically had all these
12  initial records from the injury in 2013, and I was aware
13  that he had had a subsequent injury, because that's why
14  he had missed his appointment to see me in the office.
15  So I did kind of get some information as far as, "Okay.
16  He had his accident.  He is a little worse.  He had
17  cervical injuries," but I didn't have any specific
18  detail about his function.
19        And, obviously, you know, when you see
20  somebody in person, it's different than if you are just
21  reviewing a few records.  So after seeing him, it was
22  clear to me that he is going to need much more
23  assistance than what I originally put in the life care
24  plan, but what I put in the life care plan is related to
25  the injury that -- that initial injury.  I didn't

Page 27

1   outline, you know, 24-hour care, for example, for the
2   rest of his life.  I did less than that, because,
3   basically, you know, after this accident he was
4   paraplegic.  He was, from the waist down, paralyzed.
5       Q   Okay.  And let me clarify what you just said.
6       When you say, "after this accident," you are
7   talking about the October 11, 2013, accident, correct?
8       A   Yes, sir.
9       Q   After the October 11, 2013, accident, he was
10  paralyzed from the waist down?
11      A   Correct.
12      Q   And then you said he had a subsequent
13  accident, correct?
14      A   Correct.
15      Q   And you said, based on that subsequent
16  accident, your words, he was a "little worse" now than
17  he was after the October 11, 2013.
18        Do you recall saying that?
19      A   Yes.  That's one of the things I said --
20          MR. McALPINE:  Objection.  Misstates.
21      A   -- but I also said he -- he -- you know, he
22  basically can't feed himself.  I went through a whole
23  set of examples.
24      Q   (BY MR. GREENE)  Right.  And that's -- he is
25  more than a little worse, right?

Page 28

1       A   He is basically quadriplegic or tetraplegic
2   now.  He was paraplegic before.
3       Q   Okay.
4       A   So the things that go along with those
5   specific diagnoses, yes.  But, again, you know, the
6   things that I outlined in my initial life care plan, I
7   did basically outline the things that, in my opinion,
8   were going to be treating that initial injury.
9       Q   Okay.
10      A   Obviously, there is some overlap in a spinal
11  cord injury, but, you know, if I -- my -- the best way
12  to explain that is I didn't put him at 24-hour care, for
13  example, which is actually what he is going to need, but
14  I am saying, based on that initial accident in 2013, he
15  will need some care.
16      Q   Right.  If I understand your testimony,
17  24-hour -- the 24-hour care that you are saying he
18  currently needs is not related to the initial accident
19  on October 11, 2013?
20      A   No.  I believe he will need less than -- I
21  believe he will need some care, which I have outlined,
22  but obviously he will need above and beyond what's going
23  to be in the life care plan.
24      Q   My question, though:  As a result of the
25  October 11, 2013, incident, in December of 2016, did you

Page 29

1   opine that he needed 24-hour care?
2       A   No.  I said eight hours a day.  And then, you
3   know, with a spinal cord injury, as you age, you are
4   going to need more and more care.
5       Q   Let me hand you back Exhibit A.
6       A   Uh-huh.
7       Q   And Exhibit A is part of Exhibit No. 4, the
8   subpoena.  In response to Exhibit A, you produced a file
9   to us.
10        Do you remember that?
11      A   The -- which file?  Well, yes.
12      Q   Well, the documents --
13      A   The USB?  The USB drive or the...
14      Q   I don't know what's on the USB drive so I
15  can't -- I don't know.
16      A   Oh, you are saying, "initially."  I'm sorry.
17  Yes, yes.
18      Q   In response to the subpoena and in response to
19  Exhibit A, you produced a file to us, which I am holding
20  right now, and we will mark this entire file as Exhibit
21  No. 5.  Okay?
22      A   Okay.
23          (EXHIBIT 5 WAS MARKED.)
24      Q   (BY MR. GREENE)  And we are going to go through
25  the file, and what I am going to do is mark exhibits



1   contained in the file as separate exhibits for us today.
2      A  Okay.
3      Q  All right?
4      The first thing that you produced -- and we
5   will mark it as Exhibit No. 6 -- is your CV.
6      (EXHIBIT 6 WAS MARKED.)
7      Q  (BY MR. GREENE) Does Exhibit No. 6 fairly and
8   accurately reflect your CV?
9      A  Yes. There was a change, actually. There was
10   an error that I found a while back, if I can -- well, I
11   will just tell you. So under "Specialties," I am
12   currently going to sit for the pain medicine boards.
13   That should be integrative medicine, integrative
14   holistic medicine. So in my -- the first page, do you
15   have the first page there?
16      Q  Yes.
17      A  So -- of my bio? Do you have my bio?
18      Q  I do not have the bio in front of me, no.
19      A  So basically I am board certified in physical
20   medicine and rehab and integrative holistic medicine and
21   life care planning, and I am not currently certified in
22   pain medicine. I am sitting for the boards in a couple
23   of months, so that's the only change.
24      Q  All right. The next thing that you produced
25   in response to the subpoena, we will mark it as

1   Exhibit 7.
2      (EXHIBIT 7 WAS MARKED.)
3      Q  (BY MR. GREENE) It's a case list. Is that the
4   case list that you produced in response to the subpoena?
5      A  Yes, sir.
6      Q  Okay. Let's go back to your CV really
7   quickly. Is there anything else on your CV that's not
8   current?
9      A  The only additional thing would be on Page 2.
10   I also was participating in the board examiner role for
11   2014, 2015, and 2016, so that wasn't updated at the time
12   you had -- at the time you got this.
13      Q  I'm sorry. And where does that belong on
14   Page 2?
15      A  Under "Noteworthy Professional Contributions,"
16   I was also doing the American Osteopathic Board of
17   Physical Medicine and Rehab observer for future oral
18   board examiner role from -- in October, 2014, 2015, and
19   2016. So I have done it for the past three years.
20   Otherwise, everything is up to date.
21      Q  And when was it prepared? When was your CV
22   prepared?
23      A  We update it, like, all the time. So this
24   would have been probably end of 2016 sometime.
25      Q  Do you know for sure when it was prepared?

1      A  No, I do not.
2      Q  But you think it was probably prepared at the
3   end of 2016?
4      A  I mean, it was prepared, you know, back in
5   2014, and then I constantly add things to it so...
6      Q  Okay. When is the last time it was updated?
7      A  I am not sure the exact date of that, but the
8   last time this copy was updated was sometime in 2016. I
9   have updated it. And that's actually on the USB drive,
10   so it has the changes that I talked about.
11      Q  So on the USB drive, there is an updated
12   version of your CV?
13      A  Yes, sir.
14      Q  And it contains the information that you told
15   us -- told me about earlier today, correct?
16      A  Yes, sir.
17      Q  What's the last thing you added to your CV
18   that's in front of you here?
19      A  It was the change for the board certification
20   and then adding on the board examiner role.
21      Q  I'm sorry. My question wasn't clear. I'm
22   sorry.
23      Not your current CV. The CV that you produced
24   in response to the subpoena, what was the last thing you
25   added on to that CV, which is marked as Exhibit No. 5?

1      A  Maybe I am not understanding you. I would say
2   the board examiner role. I have done it the last three
3   years, so that was the last thing I added on.
4      Q  Okay. When was your last publication?
5      A  Probably back in 2012. I was -- 2012, 2013, I
6   was contributing -- an author -- a contributing author
7   to several books that, during my residency, I was a part
8   of.
9      Q  And if we look at the first page of your CV --
10   I'm sorry, second page of your CV -- your "Professional
11   Appointments," are those what most people commonly refer
12   to as their jobs right now?
13      A  Yes.
14      Q  All right. And currently, as you said, you
15   are an associate physician at Physician Life Care
16   Planning, right?
17      A  Yes, sir.
18      Q  All right. And did you explain -- tell me all
19   the duties and responsibilities you have as an associate
20   physician at Physician Life Care Planning.
21      A  Basically, I am available for life care plans
22   and the preparation of those life care plans, as well as
23   expert witness duties, which usually tie into the life
24   care plans.
25      I have been retained by, you know, a few



MAGNA ▶
LEGAL SERVICES

Page 34

1  defense attorneys for, like, reviewing other life care
2  plans or just reviewing documents and doing kind of a
3  record review, but not for life care plans so... Expert
4  witness, as well as life care planning.
5      Q   Have you ever been retained by a defense firm
6  to write a life care plan?
7      A   No, I have not. Well, actually, yes. I take
8  that back. One time I have. Normally, it's just
9  reviewing others', but I did do a life care plan for the
10  defense.
11     Q   When -- well, we will get to your -- is it on
12  your --
13     A   No. This is just my testimony list that you
14  have here, but I don't have a case list of all my plans.
15  But I did it probably end of 2016.
16     Q   What was the defense firm?
17     A   It was somebody in Dallas. I'm sorry. I
18  don't remember the name.
19     Q   What was the name of the case?
20     A   I can get that for you. I am not sure of it.
21     Q   What we will do is leave a blank in your
22  deposition so you can fill that in when you read and
23  sign it.
24         (REPORTER'S NOTE: The Witness will please
25  include this information on the errata sheet when she

Page 35

1  reads and signs the deposition.)
2      A   Okay.
3      Q   (BY MR. GREENE) But as I understand it, there
4  is one defense firm and one defense case that you were
5  retained as a life care planner?
6      A   Yes, sir.
7      Q   And did you actually author a report?
8      A   Yes.
9      Q   We will also leave a space in the deposition
10  for the name of that defense firm. Okay?
11     A   Okay.
12     Q   Now, as a consulting physical medicine and
13  rehab physician, general --
14     A   General, musculoskeletal, and
15  neuro-rehabilitation.
16     Q   Yeah, thank you.
17         The "post-acute rehabilitation facilities,"
18  what is that?
19     A   So basically I have an office practice where I
20  see people who have rehabilitation needs, so anybody
21  with injuries or pain or post-orthopedic injuries. So
22  that's in the outpatient setting. And then I also go to
23  post-acute facilities. So "post-acute" just means they
24  are out of the hospital.
25         So either they go -- you know, an example is

Page 36

1  the facility that Mr. Aguilar was in when I saw him -- I
2  saw him at -- you know, I wasn't treating him then, but
3  those are the types of facilities where I will go see
4  patients on consultation, so I go to two or three
5  facilities here in Houston and do PM&R consults and am
6  involved in their rehabilitation care and their
7  discharge planning, et cetera.
8      Q   All right. So --
9      A   So it's both the inpatient -- in a post-acute,
10  inpatient and then outpatient.
11     Q   How many patients do you currently treat?
12     A   I don't have like a -- I don't keep a running
13  number, but I have, you know, I would say, like a
14  part-time practice, office -- split between the office
15  and the facilities. And then I also am supervising a
16  nurse practitioner who helps me in the facilities as
17  well.
18     Q   Let me ask you a different way: Do you treat
19  any patients currently?
20     A   Yes, sir.
21     Q   Give me an estimate of how many patients you
22  currently treat.
23     A   You know, every week is different. It depends
24  on if I get consults or if they need follow-up, so I
25  don't know if I can really give you a number.

Page 37

1      Q   Is it more than ten?
2      A   Yes.
3      Q   Is it more than 20?
4      A   I would say per week it's probably between 10
5  and 20 patients, depending on if it's follow-ups and
6  then I also am oversighting patients through a nurse
7  practitioner, so that's, you know, 50 to 100 patients
8  per week as well as, you know, reviewing all the records
9  of people that are on the home health, because I also am
10  a part of that as well.
11     Q   Well, right now, I am just limiting it to your
12  work in PM&R. Okay?
13     A   This is all PM&R, yeah.
14     Q   All of it?
15     A   Yeah, yeah, all of it is PM&R.
16     Q   So the biggest number I heard you mention was
17  100?
18     A   Right. Through my nurse practitioner and the
19  home health and we have -- we have a pretty big
20  caseload. I mean, I can't -- that's why it's hard to
21  break up week per week because some of these patients we
22  have been following for a couple of years so -- and they
23  may not need something now, but they may need something
24  in a couple of months. And if they need prescriptions
25  or devices or anything, that's who they call is me.



1    Q   So you actually write prescriptions for
2  devices for these patients that you see?
3    A   Yes, sir, and medications as well.
4    Q   And what does your treatment of these patients
5  include?
6    A   Physical medicine and rehab is a very diverse
7  specialty, so it will be younger patients who need, you
8  know, pain medication or devices or prescriptions for
9  therapy because they have had injuries, like
10  workers'-comp-type patients, up, you know -- and then
11  when you go to facilities, it's people who either have,
12  like, elective orthopedic procedures or they were just
13  in the hospital and they are severely debilitated and
14  they need rehabilitation before they can go home.  Or if
15  they can't go home, they are going to go to whatever
16  facility.  So I will help transition them to whatever
17  facility or home or whatever level of care is going to
18  be the best and safest for them.
19        I think I answered you but...
20    Q   You kind of got lost in your answer, too?
21    A   Yeah.
22    Q   Post-acute rehabilitation facilities, is that
23  more than one facility?
24    A   Right.  I go to -- it changes all the time,
25  but there is about three that I go to now and, you know,

1  I am probably credentialed at, like, five different
2  ones.  It just depends on when I get consults.
3    Q   And what does this title mean:  "Consulting
4  Physical Medicine and Rehabilitation Physician"?
5    A   Basically they have their medical doctor --
6  you know, their internist or their family doctor --
7  treating their hypertension and their -- most of their
8  medication needs.  I will assist with the physical
9  therapy, occupational therapy.  I will oversee those
10  individuals, so I am kind of oversighting the
11  rehabilitation.
12        And I am a consultant, because I am not
13  their -- I am not going to be the one discharging them
14  from the facility, for example, but I am the one who
15  is -- they will call me if, like, somebody is not making
16  progress in rehabilitation or in PT and OT, if I have
17  any suggestions, or if they need medication changes for,
18  you know, poststroke treatment, because I have the
19  expertise to treat the spasticity and treat the
20  comorbidities of stroke as well because, again, PM&R is
21  a very broad specialty.
22        So anything from, you know, neuro-rehab like a
23  stroke and TBI, to post-orthopedic to, you know,
24  nonsurgical interventions for orthopedic, injections and
25  things like that.

1    Q   What is the difference between "PT" and "OT"?
2    A   So "PT" is physical therapy.  It focuses on
3  ambulation and more the gross motor movements.  Walking,
4  transfers, maybe, you know, some type -- sometimes they
5  will help with bracing of the lower extremities.
6        And then occupational therapy is more fine
7  motor movements, upper extremity.  Also the OT is the
8  individual who is going to assist with any type of
9  device for ADL, activities of daily living, so they are
10  more focused on ADLs and upper extremities.
11        And then speech therapy --
12    Q   I didn't ask about speech.
13    A   No.  I just want to say that that's one of the
14  other things that I oversight so --
15    Q   Okay.
16    A   -- that's --
17    Q   Speech therapy has nothing to do with this
18  case, though, does it?
19    A   Only the cognitive aspect.  I did recommend he
20  have an evaluation, so that's -- you are correct.
21    Q   Okay.
22    A   I just want to kind of go over, that's also
23  what I do.
24    Q   All right.  Now, you mentioned your
25  specialties earlier.  Were you mentioning specialties or

1  board certifications?
2    A   Board certification.
3    Q   So do you have any subspecialties?
4    A   No.  I am board certified in physical medicine
5  and rehabilitation.
6    Q   I understand that, but you don't have any
7  subspecialty certifications, do you?
8    A   No.  I chose not to complete a fellowship, so
9  I just did the four years of physical medicine and rehab
10  residency and then did my boards after that.
11    Q   Now, is there a subspecialty certification in
12  spinal cord injury medicine?
13    A   Yes.  There are several subspecialties in
14  PM- -- under PM&R.
15    Q   But in this particular case, Mr. Aguilar
16  suffered from a spinal cord injury, correct?
17    A   That's correct.
18    Q   All right.
19    A   And, again, just to be clear, a physical
20  medicine and rehab physician, a general PM&R, we treat
21  spinal cord injury.  Obviously, you know, in the last
22  few years now, they have had -- now they have
23  fellowships and now they have, you know, doctors who
24  only want to do spinal cord injury and they will go
25  ahead and do the fellowship and do the boards in that.



Page 42

1      Q   All right.  Let me see that, please
2  (indicating).
3      A   (Witness tendering.)
4      Q   Thank you.
5          I want to show you what's been marked as
6  Exhibit No. 7.  And I think I called it a "case list"
7  earlier, but you said you don't maintain a case list,
8  correct?
9      A   Correct -- excuse me.  Correct.
10     Q   What do you maintain?
11     A   This is the list I maintain, the
12  depositions --
13     Q   Right.  What is it?
14     A   The depositions and court appearances.
15     Q   And is that list current?
16     A   No.  I have brought a current one with me
17  today.
18     Q   Okay.  So today you brought another case list,
19  and we will mark this as Exhibit No. 8.
20         (EXHIBIT 8 WAS MARKED.)
21     Q   (BY MR. GREENE) Can I see Exhibit No. 7,
22  please, ma'am?
23     A   Yes (tendering).
24     Q   I mean, when you compare Exhibit 7 to
25  Exhibit 8, it looks like you added four more cases,

Page 43

1  right?
2      A   I believe so.  I would have to double-check.
3      Q   So this is only a list of depositions and
4  court appearances, true?
5      A   True.
6      Q   What is not included on this list, in terms of
7  the litigation work that you do?
8      A   I mean, all the life care plans that I have
9  done is not included or any time I have been retained as
10  an expert, just on a case where I didn't do a plan.
11     Q   For our purposes today, is it better that we
12  use Exhibit No. 8?
13     A   It's more current.
14     Q   Okay.  Now, you mentioned a Dallas firm that
15  retained you in 2016.  That Dallas firm is not on this
16  list; is that correct?
17     A   Yeah, it's not because it was -- I was not
18  called for a deposition or trial.
19     Q   So all the law firms on Exhibit No. 8 are all
20  the plaintiffs' law firms, right?
21     A   That's correct, yes.
22     Q   And all of the individuals identified in
23  Exhibit No. 8 are all plaintiffs, correct?
24     A   I believe so.  I think it has a...
25     Q   Well, there is no way to tell on here, unless

Page 44

1  you can...
2      A   I think... No, they are all plaintiff, yes.
3      Q   Okay.  So you have never given a deposition on
4  behalf of a defendant --
5      A   I have never --
6      Q   -- related to a life care plan that you wrote?
7      A   I have never been asked to do so, so, no, I
8  have not.
9      Q   So you have never given a deposition on behalf
10  of a defendant --
11     A   That's correct.
12     Q   -- related to a life care plan that you wrote?
13     A   That's correct.
14     Q   All right.  And you have never made a court
15  appearance on behalf of a defendant for a life care plan
16  that you wrote, correct?
17     A   Correct.
18     Q   And I see that you have been to trial twice.
19     A   Yes.
20     Q   The Ella Williams case -- and the date that
21  you have here is October 26, 2016 -- was that a state
22  court trial or a federal trial?
23     A   State.
24     Q   Did you actually testify?
25     A   Yes, sir.

Page 45

1      Q   And the next one you have, January 11, 2017,
2  Stephen Land.  That's also a trial.  Was that a state
3  trial or a federal trial?
4      A   State.
5      Q   State court?
6      A   I believe so, yeah.  That was at the same
7  courthouse, so I think it was -- I believe it was both
8  state.
9      Q   And both times you were retained by Pierce,
10  Skrabanek & Bruera, right?
11     A   Yes.
12     Q   You do a lot of work for Pierce, Skrabanek &
13  Bruera, correct?
14         MR. McALPINE:  Object to form.
15     A   Yeah, they have used me several times.
16         MR. McALPINE:  Vagueness.
17     Q   (BY MR. GREENE) Now, you told me about --
18  would it be safe to say your "clinical work"?  Is
19  that --
20     A   Yes.
21     Q   -- a fair estimation or fair characterization,
22  rather?
23     A   Yes.
24     Q   All right.  What percentage of your work is
25  spent on lawsuits or litigation matters?



Page 46

1    A   I would say it's about 50 percent doing the
2    litigation work.
3    Q   So is your practice 50 percent litigation, 50
4    percent clinical?
5    A   Right.
6    Q   And with respect to it being 50/50, is that on
7    a yearly basis or a monthly basis?  What is your
8    estimate for that?
9    A   I mean, it's just an estimate.  I think now
10   it's probably been a little bit less litigation but,
11   like, the beginning of the year, I had several
12   depositions, that you can see on that list.  So maybe it
13   was, you know, more close to 50/50, because I had, like,
14   two or three right in a row.  So I would say, on a
15   yearly basis, it's 50/50.  Monthly, it's kind of hard to
16   say.  It fluctuates.
17   Q   And is all of the litigation work through
18   Physician Life Care Planning?
19   A   I do see patients for treating.  I see a few
20   patients that I am paid directly through the law firm,
21   but that is -- so that's not related to Physician Life
22   Care Planning.  I have a few clients that have contacted
23   me through -- just directly to say, "Can you treat this
24   individual as their treating doctor?"
25   Q   Right.  I am not talking about your -- okay.

Page 47

1    A   So that's kind of --
2    Q   Well, let me ask you -- let me ask you this
3    way:  When you say you're a treating doctor -- as a
4    treating doctor, you are referring to your clinical
5    practice, right?
6    A   Right.
7    Q   Okay.  I am talking about your litigation
8    practice.
9    A   Okay.
10   Q   So all of your litigation and lawsuit matters,
11   do they come from Physician Life Care Planning?
12   A   Yes, I would say that's true.
13   Q   And on your list, the first one here is dated
14   August 26, 2015, Mario Ibarra, from and Simon O'Rourke
15   Law Firm.
16   A   Yes.
17   Q   Is that the first life care plan that you
18   wrote?
19   A   I don't believe it was the first life care
20   plan I wrote.  That was the first deposition that I had.
21   Q   Okay.  When did you first start writing life
22   care plans?
23   A   When I started working with Physician Life
24   Care Planning --
25   Q   20- --

Page 48

1    A   2014, yeah.
2    Q   And so according to this, you have taken --
3    you have given, rather, 26 depositions.  Does that sound
4    about right?
5    A   Sounds a little high, but I don't know if that
6    would be -- did you count the trials, too, or just
7    the --
8    Q   No.  I just counted --
9    A   Okay.  Yeah, I think that's about right.  I
10   know it was --
11   Q   I will count them again.
12   A   -- low 20s.  Yeah, low 20s.
13   Q   Well --
14   A   Some of the depositions were, like, two cases
15   on the same day, so I don't know if you want to count
16   that twice or not but --
17   Q   No.  I am counting each one that you list
18   so --
19   A   Yeah.
20   Q   -- it was 23 on this list.
21   A   Yeah.
22   Q   Let me count again for the sake of --
23   A   Oh, I was just saying that --
24       MR. McALPINE:  What about today?
25   A   -- there were a few cases that basically they

Page 49

1    took my deposition on the same day for two different
2    cases, so that's -- 26 sounds about right.
3    Q   (BY MR. GREENE) Based on Exhibit No. 8, you
4    have been deposed 26 times before today?
5    A   The list is correct so...
6    Q   All right.  Have you ever been deposed for any
7    reason that is not reflected on this list -- excuse
8    me -- that's not reflected in Exhibit No. 8?
9    A   No, sir.
10   Q   And all 26 of these depositions have been for
11   plaintiffs' firms, right?
12   A   Yes.
13   Q   And you have been to trial twice, correct?
14   A   Yes.
15   Q   100 percent of those trials were with
16   plaintiffs' firms?
17   A   Yes.
18   Q   All right.  Do you maintain copies of your
19   depositions?
20   A   No.  I don't keep them.  I usually just send
21   them back.  If I -- if I do read and sign, then I will
22   send them back, but I don't keep copies.
23   Q   Do you maintain copies for cases that are
24   still pending?
25   A   Again, I typically just will receive the



Page 50

1  deposition and then send it back.
2      Q   Okay. So you don't --
3      A   Yeah. I don't keep -- yeah. I can't, like,
4  keep -- I don't have the space.
5      Q   So for your trials, when you were getting
6  ready for those trials, did you review your depositions
7  to prepare for the trials?
8      A   Yeah. I mean, they are all -- so we have like
9  a database or like an online software that we use, like
10  a cloud-based software, so anything that I need, I can
11  just kind of get from there and then review it, but I
12  don't keep any of it, if that makes sense. It's all
13  available, but I don't -- I don't keep, like, copies of
14  everything.
15     Q   Who is "we"?
16     A   Physician Life Care Planning.
17     Q   So there is a -- what did you say? There is a
18  database?
19     A   It's like an online software that they have
20  developed specifically for their company, so basically
21  all the communication is done through that online
22  system. And then, like, the attorneys can upload
23  documents, I can download documents, I can up-- you
24  know, I can do my changes and things like that, so
25  everything is online.

Page 51

1      Q   All right. So your depositions that you have
2  given would be kept online with Physician Life Care
3  Planning?
4          MR. McALPINE: Objection.
5  Mischaracterizes --
6      A   Possibly --
7          MR. McALPINE: -- testimony.
8      A   -- because it's -- you know, if they have been
9  uploaded or if I have done depositions. I don't -- but,
10  again, like, if I have a trial -- like, the one trial, I
11  had not actually been deposed. Actually, neither one of
12  the -- the Ella Williams case, I had not been deposed,
13  so I didn't have to review any deposition.
14         The Stephen Land, I don't recall if I actually
15  had done a deposition for him either, so I don't know if
16  I have been in that position. I know -- you know, I
17  obviously review my life care plan or whatever documents
18  I am provided with.
19     Q   Do you know whether Physician Life Care
20  Planning has a database that stores your depositions
21  from previous --
22     A   I don't --
23     Q   -- cases?
24     A   I don't believe they do. It's basically they
25  have the individual involved in the case and then

Page 52

1  whatever people have uploaded for that case so...
2      Q   Who would be the person at Physician Life Care
3  Planning that would know that?
4      A   Probably any number of people.
5      Q   Well, who is the person you deal with mostly?
6      A   I deal with different case managers for
7  different cases so...
8      Q   Who is the case manager in this case?
9      A   It is Rebecca.
10     Q   Rebecca what?
11     A   Pese, P-e-s-e.
12     Q   P-e-s-e?
13     A   Yes.
14     Q   And is she the case manager that you were
15  referring to earlier in your testimony, with respect to
16  intaking the call from the Daspit Law Firm or whoever
17  regarding Mr. Aguilar's case?
18         MR. McALPINE: Objection. Calls for
19  speculation.
20     A   Right, yes.
21         MR. McALPINE: Mischaracterizes prior
22  testimony.
23     Q   (BY MR. GREENE) Other than Rebecca Pese, tell
24  me the other folks at Physician Life Care Planning who
25  are case managers.

Page 53

1      A   There are several of them. I mean, I'm not --
2      Q   Right. Tell me the ones that you remember.
3      A   Do you want, like, a list of --
4      Q   Yes, I do.
5      A   Okay. I do not have their last names
6  committed to memory.
7      Q   Well, I tell you what: Tell me the ones who
8  you remember. If you remember the last name, provide me
9  with the last name. If you don't remember the last
10  name, just give me the first name.
11     A   Okay. I mean, I have Lauren, I have Rebecca,
12  I have --
13     Q   Is that a different Rebecca or the same
14  Rebecca?
15     A   No. It's the same Rebecca. There is about
16  three that I deal with. There has been some changes, so
17  I don't know if...
18     Q   That's a good point.
19     A   Yeah.
20     Q   You deal with about three case managers?
21     A   At a time, yeah. Like, ongoing it's usually
22  about three. Oh, Jenny is another one.
23     Q   And do you know Jenny's last name?
24     A   No, I don't know.
25     Q   Do you know Lauren's last name?



1      A   No.  I just -- I will just ask for Lauren or
2   Jenny when I call them or e-mail.
3      Q   When you e-mail them, is there a last name
4   included in their e-mail address?
5      A   I think there is, but it just -- you know, it
6   just pops up.
7      Q   Autofill?
8      A   Yeah.  It's not something I need to commit to
9   memory so...
10      Q   Now, and the folks identified on Exhibit
11   No. 8, did any of these people suffer injuries similar
12   to the ones Mr. Aguilar suffered in this case?
13      A   Can I see it, please?
14      Q   Sure (tendering).
15      A   I don't recall specifically if anyone had the
16   same injuries as him.  I know that I don't think I have
17   done a life care plan with somebody -- for somebody with
18   ankylosing spondylitis before.  I have obviously, you
19   know, treated patients with spinal cord injury.
20          And one of the main areas of expertise in --
21   within PM&R is, for example, like our board exam is,
22   like, 30 percent spinal cord injury so -- and then 30
23   percent stroke and so it is one of the main areas of my
24   specialty, but I don't know if I have done a -- well, I
25   don't know if I have had a deposition.  I have done life

1   care plans for individuals with a spinal cord injury.
2      Q   But no one like Mr. Aguilar; is that fair?
3      A   I don't know what you mean by that.  I mean, I
4   have done life care plans for individuals with spinal
5   cord injury, and I have treated patients with both
6   ankylosing spondylitis and spinal cord injury.  And
7   obviously nobody is going to be just like Mr. Aguilar
8   so...
9      Q   My initial question:  Are there any people
10   identified on Exhibit No. 8 who suffered injuries
11   similar to Mr. Aguilar?  That's where we started.
12          MR. McALPINE:  To the extent it's not --
13   objection.  To the extent it's not asked and answered,
14   the question is vague.
15      A   So I would say, "yes," there are people that I
16   have done life care plans and that I have been
17   testifying for that have similar injuries, but I don't
18   remember who, because some -- like, for example, some of
19   these people -- I don't know.  I think it was
20   Mr. Cepeda, with a "C," I mean, he had a little bit
21   different injury but severe traumatic brain injury, bed
22   bound, full care, and I think he had spinal fractures as
23   well.  So he had kind of a dual injury, but the same
24   level of disability essentially so...
25      Q   Right, but do you --

1      A   I don't recall.  I can't -- I'm sorry.  I
2   don't recall.
3      Q   So that's a fair answer.  You don't recall
4   anyone on this list having injuries similar to
5   Mr. Aguilar; is that fair?
6      A   No.  I think --
7          MR. McALPINE:  Objection.
8   Mischaracterizes the witness's testimony.
9      A   I think that a lot -- I think that -- I have
10   done life care plans.  I just want to be clear.  I
11   want -- I have done life care plans for individuals with
12   spinal cord injury with ankylosing -- not with
13   ankylosing spondylitis but with spinal cord injury and
14   with similar, you know, ending disability, so if that
15   answers your question.
16      Q   (BY MR. GREENE)  Okay.  So you have never done
17   a life care plan for an individual who had ankylosing
18   spondylitis; is that fair?
19      A   No.  I have treated patients with ankylosing
20   spondylitis, but, no, I don't believe I have done a life
21   care plan for that.  Usually it's more -- people with
22   more traumatic injuries that end up getting life care
23   plans.
24      Q   Let me ask the question again so that we have
25   a clear record.

1          And let me just say this:  Unless I ask you
2   about your clinical practice, I am only talking about
3   your litigation practice, the life care plans that you
4   have written today.  Okay?
5      A   Uh-huh.
6      Q   I will clarify for you if I am talking about
7   your clinical practice.  All right?
8          So have you ever written a life care plan for
9   an individual with ankylosing spondylitis prior to
10   Mr. Aguilar?
11      A   Sorry.  So are we just talking -- you are just
12   going to say Mr. Aguilar only has ankylosing spondylitis
13   or --
14      Q   No.
15      A   Okay.  So, no.  So, no, I have not written a
16   life care plan for an individual with ankylosing
17   spondylitis only.
18      Q   Have you written a life care plan for an
19   individual who had ankylosing -- ankylosing spondylitis
20   and paralysis of the lower extremities?
21      A   No.  Mr. Aguilar is the first one who has had
22   both of those things.
23      Q   Okay.  I think you testified earlier there is
24   no way for you to really go through each one of these
25   individuals identified on Exhibit No. 8 to tell me what



Page 58

1 each case involved, right?
2     A   I mean, I can kind of remember, but I
3 don't recall.
4     Q   So the next thing you produced in response to
5 the subpoena, we will mark it as Exhibit No. 9, and
6 these are three invoices.
7         (EXHIBIT 9 WAS MARKED.)
8     Q   (BY MR. GREENE) Prior to today, are those the
9 only three invoices that you have submitted in this
10 case?
11    A   No.  There are a few more.  They are all on
12 the USB.  Basically for additional record review and
13 then my prep time for today.
14    Q   Tell you what, this is what we are going to
15 do:  We are going to take us a break.
16    A   Yeah.
17        MR. GREENE:  Can you go and print
18 whatever these invoices are that are on the USB, because
19 I don't have them?
20        MR. McALPINE:  Let me see if our printer
21 is functioning properly.
22        MR. GREENE:  In the whole office?
23        MR. McALPINE:  To the extent I am able, I
24 will be happy to do that.
25        THE VIDEOGRAPHER:  We are going off the

Page 59

1 record at 10:29 a.m.
2         (RECESS FROM 10:29 A.M. TO 10:42 A.M.)
3         THE VIDEOGRAPHER:  Going back on the
4 record at 10:42 a.m.
5     Q   (BY MR. GREENE) Dr. Iversen, we took a short
6 break.  We were talking about the invoices that you
7 produced in response to the subpoena, which were marked
8 as Exhibit No. 9.  And then you brought to my attention
9 that there are several more invoices which were on
10 your --
11    A   USB.
12    Q   -- USB drive.  We will mark these as Exhibit
13 No. 10.
14        (EXHIBIT 10 WAS MARKED.)
15    Q   (BY MR. GREENE) And just so that I am clear,
16 because I have no idea what's on your USB drive -- I
17 figured we had all of the invoices, like I am assuming
18 we have all of the other materials, but as we go through
19 the deposition, I need you -- for example, when we get
20 to your report, we will look at things you have reviewed
21 and we will reference the document that you brought
22 today, which is another list of information you have
23 reviewed, which is marked as Exhibit No. 2.  I need you
24 to let me know what's on the USB drive that is not in
25 any of these lists.  Okay?

Page 60

1     A   Okay.
2         MR. McALPINE:  Objection.  Too general.
3     Q   (BY MR. GREENE) To the extent that you can.
4     A   All right.
5     Q   Okay.  So Exhibit No. 9, let me see that,
6 please.
7     A   (Witness tendering.)
8     Q   These are the invoices to date -- excuse me --
9 the invoices that were produced back in January, 2017.
10 How were these invoices created?
11    A   Physician Life Care Planning creates the
12 invoices.
13    Q   I'm sorry.  Say it again.
14    A   Physician Life Care Planning creates the
15 invoices and bills the law firm.
16    Q   Is there one particular person who does that?
17    A   I don't know.
18    Q   Is that a case manager function?
19    A   No.  They have other people to do that.
20    Q   In looking at the first invoice, I think it's
21 dated October 21st, 2016, there is a rate of $9,250 for
22 a catastrophic life care plan.  Is that just a flat rate
23 that you charge?
24    A   That's a flat rate that Physician Life Care
25 Planning charges for a catastrophic plan.

Page 61

1     Q   And then there is another charge, $500, for
2 interview and examination and it says, "Physician Life
3 Care Planner."
4         What does that mean?
5     A   So that means the -- they had the date here
6 that the IME was scheduled, which is the charge of $500.
7 That initial IME that was -- ended up canceled, but this
8 is what Physician Life Care Planning charges for both.
9 I get about half of the catastrophic life care plan
10 amount, 4,050, and then I get the full amount for the
11 IME, 500.
12    Q   So the charge or the rate, the amount, for the
13 catastrophic life care plan is split 50/50 between you
14 and Physician Life Care Planning?
15    A   Approximately, yes.
16    Q   And then you get the full amount for any
17 interview and examination that you perform or conduct?
18    A   Correct.
19    Q   And according to this invoice, which is
20 Invoice No. 8223, on 11/14/16, "canceled IME appointment
21 on 11/16; moving ahead without an IME - see WiMs."
22        Did I read that correctly?
23    A   Yes.
24    Q   What does "WiMs" stand for?
25    A   That's our online database for communication.



Page 62

1    Q   What does it stand for?
2    A   Oh, I don't know exactly the terminology.
3  "Management systems" or something.  I am not sure.
4    Q   So when it says, "see the management system,"
5  do you know what that means?
6    A   Yeah.  It's like log in and see the -- they
7  also make notes, so they let me know.  There is nothing
8  I have to do in WiMs, but that's what they -- they make
9  a note -- like they will put this note in there so that
10 everybody involved in the case can see that.
11   Q   Okay.  So --
12   A   But there is nothing else in WiMs that is not
13 here, so it's like -- they had the IME scheduled, but
14 they canceled it two days prior so...
15   Q   And what does that mean, "moving ahead without
16 an IME"?
17   A   Still doing the life -- they still want the
18 life care plan.
19   Q   Who is "they"?
20   A   The law firm.
21   Q   Is that normal?
22   A   It happens on occasion.
23   Q   Is it preferable?
24   A   No, but sometimes if I can't see the
25 individual or if, like, for the defense one, the defense

Page 63

1  life care plan I prepared, I wasn't able to see him.
2    Q   Right, but --
3    A   Yeah, it's preferable.
4    Q   So it's preferable that you perform your
5  interview and examination?
6    A   Right, but it's not -- I can do a life care
7  plan without an interview and exam.
8    Q   Right.  And in that defense case, I assume you
9  had a plaintiff's life care plan that you were
10 rebutting, correct?
11   A   That one, I actually didn't.
12   Q   Okay.  So you were able to do a life care plan
13 without seeing the plaintiff.  What did you rely on in
14 that one?
15   A   The defendant or...
16   Q   Yeah, in the defendant one, I'm sorry.
17   A   The records.
18   Q   What records?
19   A   In the defense life care plan?
20   Q   Yes, ma'am.
21   A   Whatever records they provided me.
22   Q   Did they bring you with medical records?
23   A   Yes.
24   Q   Did they provide you with deposition
25 testimony?

Page 64

1    A   I don't recall exactly what they provided me
2  with.
3    Q   Did they provide you with witness statements?
4    A   I don't recall specifics of that case right
5  now.
6    Q   Did they provide you with anything that
7  related to the --
8    A   We are talking about this other defense case
9  that I did, right?
10   Q   Yes, ma'am.
11   A   Okay.
12   Q   Did they provide you anything related to --
13 other than information or medical records, did they
14 provide you any information related to how plaintiff
15 thought he was doing in terms of his recovery, his
16 rehab, anything like that?
17   A   I don't recall right now.  Usually they kind
18 of fill out a form.  I don't remember if he did that for
19 that case.  Obviously, I like to get -- I will
20 request -- I will request any time that I don't get to
21 see them, at least -- like, I have done it based on a
22 phone conference.  I will try to get as much information
23 as possible.
24   Q   Yeah.  And that's what's preferred, right?
25   A   Right, yeah.

Page 65

1    Q   Because you want to be able to talk to the
2  plaintiff and at least speak to him about what his
3  concerns are, what -- how he is dealing with the
4  problems that he is faced, as a result of the injury,
5  correct?
6    A   Right.  And if -- in those cases where I
7  haven't got to see the individual before the plan is
8  kind of due, I always request to see them before
9  deposition.  So that's happened, you know, I don't know
10 what percentage of the time, but that does happen.  Not
11 infrequently but...
12   Q   Now, you told me earlier that essentially --
13 and correct me if I mischaracterize this -- but the case
14 manager intakes the case based on contact from a
15 plaintiff's law firm typically, right?
16   A   There is -- from me, yes.
17   Q   If it's a plaintiff's case.
18   A   From me, yes, yes.
19   Q   And why do you say, "for you"?
20   A   There is a lot of -- there is actually
21 physicians at PLCP, at Physician Life Care Planning, who
22 do mostly defense, so it's like a mix.  So for me I,
23 right now, do more plaintiff, but I, you know, have done
24 some --
25   Q   And I tell you what, let's not distinguish



17 (Pages 62 to 65)

1  between plaintiff or defendant.  Case manager intakes
2  the call, and they decide which physician they are going
3  to refer the case to?
4     A  Right.
5     Q  Is that what happened in this case?
6     A  Right.
7     Q  All right.  So how do you find out about the
8  referral?
9     A  They will send me a message through WiMs.
10    Q  So there is an e-mail?
11    A  Right.
12    Q  And does that e-mail reference the attorney?
13    A  Yes.  The attorney, the due date, the nature
14  of the patient's -- or plaintiff information, nature of
15  the injuries.
16    Q  In your response to the subpoena duces tecum,
17  you didn't provide any WiMs e-mail or WiMs notes or
18  anything like that?
19    A  No.  I mean, it's like a proprietary software,
20  so I don't have the ability to provide that.  It's not
21  mine.
22    Q  Well, you understand you were supposed to
23  provide any communications related to Gustavo Aguilar's
24  case, though?  Do you understand that, as part of the
25  subpoena?

1     A  I mean, we can -- I am not able to provide
2  that to you.  You would have to go to Physician Life
3  Care Planning to do that.  I --
4     Q  Right.  My -- well, let's go back to the
5  beginning.  And your testimony, if I believe -- I think
6  what you testified to is when you received a subpoena,
7  you sent it on to Physician Life Care Planning, correct?
8     A  Right.
9     Q  So Physician Life Care Planning had the
10  subpoena, they had Exhibit A, they knew what they were
11  supposed to provide, right?
12    A  Right.
13       MR. McALPINE:  Argumentative objection.
14    Q  (BY MR. GREENE) So when you say I have to go
15  to Physician Life Care Planning, they already had this
16  information from you, true?
17    A  I had to go to them for what?
18    Q  No.  You said I would have to go to Physician
19  Life Care Planning to get the WiMs notes.
20    A  But I am saying I cannot give you what's in
21  WiMs.  WiMs is not mine.  WiMs is Physician Life Care
22  Planning's.  So for me to go and, like, print stuff off
23  of there, I guess?  I don't normally do that.  It's
24  basically just their proprietary software, which I work
25  in, which is not my information.

1     Q  So if I understand what you are saying,
2  anywhere -- anybody who works anywhere, you have an
3  e-mail address that goes to the company, right?
4     A  No.  It's actually just I have a login for
5  WiMs, and I have like an inbox in WiMs.
6     Q  Okay.
7     A  So...
8     Q  And you can't print anything out of that
9  inbox?
10    A  I don't know.  Yeah, I mean, I...
11    Q  You have never tried?
12    A  No.
13    Q  Okay.  So in response to the subpoena, you
14  didn't even try to print any communications regarding
15  Mr. Aguilar?
16       MR. McALPINE:  Objection.  Argumentative,
17  mischaracterizes witness's testimony.
18    A  I did not try to print those, no.
19    Q  (BY MR. GREENE) Okay.
20    A  This is -- it's not my information to give, so
21  you would have to contact Physician Life Care Planning
22  to get that information.
23    Q  Okay.  And, again, I am not trying to argue
24  with you, but it's my understanding that you didn't
25  gather any of this information, did you?  And when I

1  say, "this information," I'm referring to the
2  information responsive to the subpoena.
3     A  I don't have any -- you know, I cannot provide
4  you with any other information other than what I have
5  provided you.
6     Q  That's not my question.
7        In response to the subpoena, you testified
8  earlier that you didn't gather any of this information.
9  You forwarded the subpoena on to Physician Life Care
10  Planning.
11       Do you recall that testimony?
12    A  Yes.
13    Q  All right.  So in response to the subpoena,
14  you didn't gather any of the information, did you?
15    A  I did not gather information from WiMs, no,
16  because it's already in WiMs under Mr. Aguilar's case.
17    Q  Okay.  So you have made a distinction now.
18  Did you gather information that you had in response to
19  the subpoena?
20    A  Yes.  Yesterday I gathered everything, yeah.
21    Q  Okay.  We are kind of confusing things.  Let's
22  be clear.
23       The subpoena was responded to in January,
24  2017.  In January, 2017, prior to producing these
25  documents that are contained in Exhibit No. 5, what did



1   you do to respond to that subpoena?
2       A   I complied with any questions that were asked
3   of me as far as, you know, my file or -- I don't recall
4   specifically if they asked me for my file or for
5   anything that they didn't have, but they will respond
6   and they have access to everything that I have access
7   to, unless it's my handwritten notes, which on occasion
8   they will ask me for my handwritten notes and I will
9   send that to them and then they send it on. So I don't
10  know specifically, you know, how that was responded to.
11      Q   Who is the "they" and the "them" that you are
12  referring to?
13      A   Usually the case manager will respond to the
14  subpoena and --
15      Q   At Physician --
16      A   -- pull the documents. Yes.
17      Q   At Physician Life Care Planning?
18      A   Yes.
19      Q   So my question: The person who responded to
20  this subpoena would have been a case manager at
21  Physician Life Care Planning?
22      A   I believe so, so.
23      Q   Did you respond to this subpoena in January,
24  2017, by doing any work to produce any documents?
25      A   I -- everything is -- you know, I am actually

1   delegating that task to Physician Life Care Planning in
2   that case. So anything that they didn't have, I will
3   make sure they have and then they will go ahead and send
4   it on, so that's kind of like...
5       Q   I tell you what, tell me what you did to
6   respond to the subpoena, because we are kind of not
7   getting to the point here. Tell me everything you did
8   to respond to the subpoena in January, 2017.
9           MR. McALPINE: Objection. Asked and
10  answered.
11      A   I provided anything that was requested of me
12  by Physician Life Care Planning, and they responded on
13  my behalf.
14      Q   (BY MR. GREENE) What did you provide to
15  Physician Life Care Planning?
16      A   I don't recall specifically, at this point in
17  time, if they did request my handwritten notes. I don't
18  think they did at that point, because I hadn't seen him.
19  So I know they have access to my life care plan and they
20  have access to all that stuff, so I don't -- I didn't
21  provide them with anything in addition to that.
22      Q   You have your handwritten notes with you
23  today?
24      A   Yes, I do.
25      Q   Can I see those?

1       A   Yes (tendering).
2       Q   Thank you. What does "DOS" mean?
3       A   "Date of service."
4       Q   Date of service. All right.
5           So if the subpoena was responded to in
6   January -- on or about January 10, 2017, your date of
7   service for these notes was January 26, 2017, you didn't
8   have these notes to include them in the subpoena, did
9   you?
10      A   So I wouldn't have been asked. That's why I
11  said I didn't -- I don't remember if that was included
12  or not.
13      Q   So other than Physician Life Care Planning
14  asking you for your handwritten notes, would there be
15  any other documents that you may have that Physician
16  Life Care Planning wouldn't have in response to the
17  subpoena?
18      A   No.
19      Q   All right. And sitting here today, do you
20  recall assembling any documents to provide to Physician
21  Life Care Planning in response to the subpoena in
22  January, 2017?
23      A   Why would I do that, because they already have
24  everything that they need to respond, so I don't
25  understand.

1       Q   (BY MR. GREENE) The answer to my question is
2   "yes" or "no."
3           MR. McALPINE: Objection. Argumentative.
4       A   I don't know what you are asking. Like,
5   basically so --
6       Q   (BY MR. GREENE) Did you --
7       A   -- they have everything that they need to
8   respond on my behalf, so that's what happened.
9       Q   Well, that's what I am trying to get to, but
10  you -- let's try it again.
11          Physician Life Care Planning, those are the
12  folks who responded to the subpoena, correct?
13      A   On my behalf, yes.
14      Q   What work did you do to assemble documents to
15  give to Physician Life Care Planning to respond to the
16  subpoena?
17      A   I did what was asked of me as far as
18  completing the life care plan so that, you know, they
19  have the final copy of it and then, you know, billing
20  out any time so that they have a copy of those things.
21          They may have asked me for an updated
22  testimony list, which that is another thing I typically
23  provide for them. I don't know specifically if they did
24  in this case. I don't know if there is anything else.
25      Q   Okay. And there is no way to confirm through



Page 74

1  a written communication what they asked you for; is that
2  fair?
3      A   Correct.
4      Q   Would Physician Life Care Planning have access
5  to written communications between their case manager and
6  you regarding Mr. Aguilar's case?
7      A   Possibly.  I don't know if they keep -- keep,
8  you know, track of that.
9      Q   And when you log on to WiMs, is there a drop
10 box or a category or subfolder for the Aguilar case?
11     A   Right.  There is, like, a tab for him.
12     Q   And that tab, what does that tab contain, in
13 addition to medical records?
14     A   Everything about the case, so everything that
15 I need to know about the case.
16     Q   So the communications regarding the case would
17 be under that tab?
18     A   The initial communications in my inbox and
19 then if there -- they will kind of put notes on one of
20 the subtabs.
21     Q   And who would have taken notes about the
22 initial contact, the initial phone call, from the
23 plaintiff's attorney?
24     A   The case manager.
25     Q   Do you know where those notes are stored?

Page 75

1      A   In WiMs.
2      Q   So they are stored somewhere?
3      A   If they made notes, I said it was in the
4  subtab under Mr. Aguilar in WiMs, yeah.
5      Q   Sitting here today, have you ever -- do you
6  recall, rather, reviewing any notes regarding the
7  initial contact related to the Aguilar case?
8      A   No.
9      Q   Well, how did you know what to do?
10     A   I mean, I didn't -- like, I got the initial,
11 you know, message from them in my inbox, but then I --
12 then they -- you know, we do the scheduling.  We -- I
13 mean, I -- this is what happens with every case, so I am
14 not sure...
15     Q   Well, it sounds to me like there are e-mails
16 that go back and forth about Mr. Aguilar's case, right?
17     A   There are messages in WiMs, and then they make
18 case notes and then, you know, phone calls.  And if
19 there is anything that comes up, like I -- I don't have
20 full memory of everything that was discussed.
21     Q   There are communications in WiMs about
22 Mr. Aguilar, right, and his case?
23     A   There would be about any case, yes.
24     Q   Well, specifically the Aguilar case.  That's
25 the only one we are talking about right now.

Page 76

1      A   I would assume so.  I don't know what those
2  are exactly.  There will be routine things that, you
3  know, cancel the appointment, can't make the
4  appointment, talk to, you know, whoever about
5  rescheduling, like, things like that.
6      Q   How many hours does it take you to draft the
7  catastrophic life care plan?
8      A   It's really dependent on how many records
9  there are so -- there are typically more records with a
10 cast, so I would say -- I don't keep track of my hours
11 when I do the initial plan.  I mean, I have to
12 afterwards, but I would say maybe five, six hours.
13     Q   When you receive the communication in WiMs
14 from the case manager, do you recall whether it
15 requested you to do anything other than prepare a cast
16 life care plan?
17     A   I don't recall anything else.
18     Q   Did it provide you with any details about
19 Mr. Aguilar's condition?
20     A   It will -- I don't recall specifically for
21 him.  It usually will just say, you know, "fall,
22 paralyzed from the waist down."  Like, it will give me a
23 couple of lines about him.  It's whatever the attorneys
24 will kind of put in that box so -- or tell the case
25 manager, so I don't recall specifically what was in

Page 77

1  this.
2      Q   All right.  You think it -- you estimated it
3  took about five to six hours to draft the life care plan
4  in this case?
5      A   Right.  And then, you know, maybe additional
6  for reviewing some of the records.  And I can't really
7  give a number, but it's -- it is, you know, a
8  significant amount of hours to do a catastrophic.
9      Q   Based on the records that you reviewed for
10 your December 1st, 2016, report, about how many hours
11 did you expend reviewing the records?  And you can look
12 in the records there.  I don't know if you have them
13 memorized.
14     A   I can't -- I really don't -- I can't say how
15 many hours it was, because I look at the raw records, I
16 looked -- I go back and forth.  It's really hard to say,
17 you know, how many hours total.
18     Q   In Exhibit No. 9, the next invoice that you
19 produced was an Invoice No. 8900.  It says, "Retainer
20 for travel for out-of-town IME - remainder to be billed
21 after IME completed," $1,000.  IME, January 26, 2017.
22     A   Right.
23     Q   And is that reflected in the physician
24 consultation?  Is that the IME?
25     A   Right.



Page 78

1    Q    Which is marked as Exhibit No. 3.
2         Now, why is that out-of-town travel?
3    A    They are in San Antonio, so they think -- you
4    know, Pasadena is actually different than Houston, so
5    that's out of town.
6    Q    The next invoice in Exhibit No. 9, Exhibit
7    [sic] 9019, it's dated 1/16/2017. It says, "medical
8    records" is the activity. Quantity, 103. Rate, $1.
9    A    Can I see that?
10   Q    (Tendering to Witness.)
11        Explain to me what that is.
12   A    I think this might be an error of what the
13   actual activity is. I am not -- I'm not sure. I will
14   have to get back to you, because normally it's not
15   billed separately, but they may have started to, since
16   the plan had already been completed. I will have to get
17   back to you on that. I am not sure.
18   Q    What does the quantify refer to? Number of
19   pages?
20   A    Pages probably, yeah.
21   Q    And we have no idea what medical records --
22   what 103 pages of medical records were reviewed, based
23   on this invoice, do we?
24        MR. McALPINE: Objection.
25   A    I am not sure, because there were like

Page 79

1    about -- there were thousands of records uploaded after
2    this report was done, so I will have to get back to you
3    if that's an error or not.
4    Q    (BY MR. GREENE) So sitting here today, you
5    have -- you really have no explanation because you are
6    confused by the entry?
7    A    It might be -- it might be -- yeah, I don't
8    know. I...
9    Q    It might be what?
10   A    I was thinking mileage, but that doesn't make
11   sense so -- because it was -- the IME had not been done
12   yet, so I apologize for that. I will get back to you on
13   that.
14   Q    No, no worries.
15        Going to Exhibit No. 10, which are the
16   invoices that you produced today -- well, actually,
17   let's go back to Exhibit No. 9.
18        So based on my math, the total for Exhibit
19   No. 9, you billed $10,853 on this case up through
20   January 16, 2017. That's what's reflected in the
21   invoices?
22   A    Right.
23   Q    And that's what you billed, as far as you
24   know?
25   A    Up until that date, yes.

Page 80

1    Q    Now, why did your -- let me ask it a different
2    way.
3         What is the difference between an IME and the
4    interview and examination?
5    A    It's the same thing.
6    Q    Well, why is one billed at $500 and one -- the
7    other billed at a thousand dollars?
8    A    Basically, since it was -- involved traveling,
9    it's including the time. I think there was -- because
10   he had missed it and then it was kind of not really out
11   of town, so I remember having a phone conversation
12   saying, "Are you willing to go down on the price?"
13   Because it's a lot more than a thousand dollars for out
14   of town, normally, and I would normally bill more for
15   travel time and things like that.
16        So I think that was the agreement that we came
17   to, based on, "Okay, we have already" -- "they already
18   paid that initial IME" and then -- I don't recall
19   specifically. I remember maybe a phone conversation
20   about, "Okay, he had to cancel. He had this accident.
21   Can you just see him at the facility?"
22        And I agreed to, and so I gave them the price.
23   It's basically a discounted rate for that follow-up
24   visit, since the initial was canceled so...
25   Q    He is really not that nice to give him a

Page 81

1    discount, trust me. I am just joking.
2    A    Well, it's all back to the individual, so
3    it's...
4    Q    Well, Mr. Aguilar is a nice guy.
5         The next set of invoices you gave me are the
6    ones marked Exhibit 10, and what I am going to do is
7    compare and contrast. So we have exhibit -- or, excuse
8    me -- Invoice No. 8223. That's in both 9 and 10. We
9    have Invoice 8900 that's in 9 and 10, and that's the
10   charge for the IME on 1/26/2017?
11   A    Uh-huh.
12   Q    And the next invoice that I have in Exhibit
13   No. 10 is Invoice No. 9124, and this is for "Travel
14   expenses - IME mileage - 90 miles." Quantity, 1; rate,
15   $50.40.
16        Is this the invoice you were referring to,
17   with respect to travel to see him --
18   A    Right. That's --
19   Q    -- at the facility?
20   A    Yeah, that's...
21   Q    And then Exhibit No. 10 also contains an
22   additional invoice, which is -- the activity is
23   identified as "Sworn testimony - life care planner (in
24   office) 1/2 da7, deposition 4/4/17." The rate is
25   $3,000?

Page 82

1    A   Right.
2    Q   Okay.  So a half-day deposition is how many
3    hours?  Four?
4    A   Four hours.
5    Q   So you charge 750 an hour?
6    A   Basically, I -- the total is 3,000.  That is
7    paid to Physician Life Care Planning.  I get 2,000 of
8    that, so it's basically 500 an hour.
9    Q   So you and Physician Life Care Planning,
10   combined, charge 750 an hour for deposition testimony?
11   A   Yeah.
12   Q   For the services rendered?
13   A   Yes, yes.
14   Q   All right.  As I understand your testimony,
15   you will receive $2,000 of that, based on the assumption
16   that the deposition will last four hours, thus, $500 an
17   hour?
18   A   Right.
19   Q   Are there any other invoices where your time
20   can be, I guess, accounted for in terms of hours and the
21   specific rate per hour?
22   A   Right.  So I just put in some additional hours
23   last night, as far as plugging them in for expenses or
24   prep time.  So I did three hours of prep time and two
25   hours of record review, like, within the past few weeks

Page 83

1    so...
2    Q   Okay.
3    A   So an additional five hours basically.
4    Q   All right.  So there is a flat fee for the
5    catastrophic life care plan of $9,250, right?
6    A   Right.
7    Q   And based on this, for this particular case,
8    there was a $1,500 charge for the interview and
9    examination/IME?
10   A   Right.
11   Q   And then you charge about $500 per hour for
12   appearing at the deposition and preparing for it?
13   A   Yes, that would be right.
14   Q   And with the prep time, does Physician Life
15   Care Planning also receive money for your prep time?
16   A   Right.  They get 100 of the 500, so I will get
17   400 of the 500.
18   Q   Okay.  Let me back up because I am confused
19   and let me -- I may have confused myself actually.
20   A   Yeah.
21        MR. McALPINE:  I think so.
22   Q   (BY MR. GREENE) So with the deposition is
23   $3,000, four hours, that's 750 an hour, right?
24   A   Right.  So that does not --
25   Q   250 --

Page 84

1    A   -- include prep time.
2    Q   Right.
3    A   Okay.
4    Q   Understood.
5        250 of that per hour is for Physician Life
6    Care Planning and 500 of that is for you?
7    A   Right.
8    Q   And that's your deposition rate?
9    A   Right.
10   Q   All right.  Now, your preparation rate is
11   what?
12   A   It's 400 an hour.
13   Q   400 an hour.
14       All right.  And then Physician Life Care
15   Planning charges an extra 100 on top of that?
16   A   You got it, yes.
17   Q   So three hours of prep time, there should be
18   another invoice coming for about $1,500?
19   A   Right.
20   Q   Of course, I have lost my notes with the
21   totals.
22       I think I said earlier 10,853.  That was
23   including the one invoice that we can't recall explain.
24   Another $3,000 today.  That's 13,853.
25   A   Uh-huh.

Page 85

1    Q   And then another 1,500 for your prep time.
2    15,353?  Sound about right?
3    A   Approximately, yeah.
4    Q   And is that all the time you anticipate
5    billing in this matter, prior to going to trial?
6    A   Yes, unless I am asked to do a supplemental
7    report, in which case -- usually it's about -- you know,
8    I have already reviewed a lot of the things, so I would
9    say, like, about two to three hours, if they do ask me
10   for a supplemental.
11   Q   And a supplemental report, is that billed on
12   an hourly basis or a flat fee?
13   A   It's hourly.
14   Q   What is the hourly rate for a supplemental
15   report?
16   A   500 an hour.
17   Q   500 for you or 500 total?
18   A   Total.
19   Q   How did you get this job at Physician Life
20   Care Planning?
21   A   They actually found me on LinkedIn.  They
22   needed a physician in Houston for life care plans, and I
23   was, you know, in Houston since 2012.  I had started my
24   own practice, was looking to kind of do, you know, a few
25   other things as well, so I responded to their -- their



Page 86

1    request and message.
2        Q    And after they found you on LinkedIn, was
3    there an interview process?
4        A    Yes.
5        Q    Do you recall who you interviewed with?
6        A    Several people.  The owners and the -- first
7    of all, it was like the -- I don't know what you would
8    call it, like the headhunter person and then the owners
9    and then the people with the staff.
10       Q    So there was a headhunter involved?
11       A    Not a headhunter, but it's their person at the
12   company who was responsible for finding -- he is not
13   there anymore, but he was hiring new people basically.
14       Q    Okay.  And was there any training involved for
15   you?
16       A    I did have, like, my initial life care plans
17   reviewed by the founder of the company who is a PM&R
18   life care planner, who has been doing it for about 30
19   years, and then I did a certification on my own with --
20   through the ICHCC, which is the International Commission
21   on Health Care Certification, for the certification in
22   life care planning.  I kind of did that training ongoing
23   as I was doing the life care plans.
24       Q    I'm sorry.  What is that training again?
25       A    Certification life care -- it's a CLCP

Page 87

1    credential, so certification in life care planning --
2    certified life care planner.
3        Q    And you said that's an ongoing certification?
4        A    No.  Like in the begin- -- I am certified now,
5    but in the beginning, I -- you know, it takes some time,
6    obviously, to do all the coursework so...
7        Q    And I would imagine, as with most professions,
8    do you have to do continuing education?
9        A    Yes, yes, I do.
10       Q    And are you up to date on your continuing
11   education?
12       A    Yes, sir.
13       Q    What is the last continuing education class
14   you took?
15       A    I don't know actually the last one.  I mean,
16   I'm -- they have various ones, so it's maybe through
17   IARP, the International Association of Rehab
18   Professionals.  I mean, I am a member of their -- the
19   forum, and I get all the literature and everything, so I
20   am constantly reading.  So I can't really say the
21   last -- I have an upcoming conference this week for the
22   CLCP credential, actually.
23       Q    Now, you said initially the founder of the
24   company would review your life care plans.  Is that
25   Dr. Joe Gonzales?

Page 88

1        A    Yes.
2        Q    And you spoke earlier about proprietary
3    information, WiMs being one.  I imagine there is more
4    proprietary information that Physician Life Care --
5    Physician Life Care Planning has?
6        A    I am not sure about all their things.
7        Q    Okay.  And there was no training that you
8    underwent on how to write a life care plan?
9        A    I mean, they did go through, like, what -- the
10   basic things that I also went over in the independent
11   certification as well.  I don't recall specifically all
12   the training.  It wasn't -- it wasn't like a sit-down
13   classroom or anything like that.  It was -- I mean, the
14   thing about life care planning is there is a really big
15   overlap with PM&R.
16           If you look at -- you know, obviously, I read
17   the textbook and I did all the online coursework and all
18   that, but there is a case management handbook for life
19   care planning.  And in that, basically, is the statement
20   of the importance of a PM&R physician, specifically in
21   the life care plan, because you need the medical
22   foundation for the actual life care plan, because you
23   need -- you know, either the life care planner has to
24   get a PM&R physician to do it or the PM&R physician, you
25   know, themselves does it so...

Page 89

1        Q    My question to you was:  At Physician Life
2    Care Planning, was there training that they provided to
3    you --
4        A    Not --
5        Q    -- when you first started?
6        A    Not specific training.  It was more --
7        Q    What was it?
8        A    It was more just the peer review that was back
9    and forth with Dr. Gonzales.
10       Q    And Dr. Gonzales, I imagine, told you what his
11   expectations were for his life care planners?  Yes?
12       A    Actually, it was more that -- it was very much
13   imprinted on me that it's my opinion.  So, you know, a
14   life care plan is going to be very different between
15   different experts, obviously, so he said, "Use your
16   experience to" -- "you know, if" -- "what you think they
17   need."
18           I mean, obviously, like some of the process
19   work, there was some guidance work as far as, okay, you
20   know, doing the vendor survey and the process and the
21   methodology that is expected, because that is expected
22   of any life care planner.  But as far as the content, it
23   was left up to me.  As far as the process, I mean, there
24   was some, you know, kind of, "Here is what we do.  We
25   schedule" -- "we" -- "you have all the records, you



Page 90

1   schedule the person, you start formulating your opinions
2   and then come to conclusions.  And then we will have,
3   you know, a vendor team assist you with doing the
4   research so that we have a plan at the end of it."
5       And that's the basic methodology, by the way,
6   so -- but as far as the content, that was up to me.  As
7   far as the process --
8       Q   No, no, I apologize.  I am not -- if my --
9   perhaps my statement was misworded, my question, rather.
10      I am not saying that anyone told you what to
11  put into your reports.  But, as you said, the process
12  and the methodology, they did --
13      A   Right.
14      Q   -- help you out with that --
15      A   Right.
16      Q   -- to give you a framework --
17      A   Yeah.  I mean, I recall --
18      Q   -- and guidance?
19      A   Right.  I recall -- there is an article in the
20  PM&R Journal that is kind of a nice outline of PM&R and
21  the involvement with the life care planning specialty
22  and how nicely tied it is and the methodology.  And so
23  that's from 2014, I believe.  So that was sent to me, I
24  remember.
25      Q   I'm sorry.  What was sent to you?

Page 91

1       A   A journal article, peer-reviewed journal
2   article, from my -- PM&R.  It's called -- that's the
3   name of the journal.  It's the purple journal from the
4   PM&R specialty.
5       From 2014, there is an article in there that
6   discusses the discipline of life care planning and how
7   it's involved with PM&R.
8       Q   Who wrote that article?
9       A   There were several people.  Mol... I forget
10  the name of the...
11      Q   Is it an article that Physician Life Care
12  Planning had any input into?
13      A   I think -- I believe that they did.  I mean,
14  it was obviously peer-reviewed, but I think that there
15  were -- I don't think it was Physician Life Care
16  Planning.  I think it was some of the individuals at --
17  who were employed by them.
18      Q   Is clerical time, all of that is subsumed in
19  the invoices already, correct?
20      A   Right, yes.  So that's kind of their -- the
21  Physician Life Care Planning, their amount that they
22  take is kind of the clerical.
23      Q   Other than Rebecca Pese, is there anyone else
24  in the office that you worked with on this case?
25      A   Yes.  So I will have kind of an assistant for

Page 92

1   each specific portion.  So I will have a case manager
2   for each case, I will have a vendor specialist to assist
3   me with the search, and then I will have a person
4   assisting me with the record review, to kind of put
5   everything in chronological order and actually, you
6   know, type it out, so to speak, so they are looking at
7   the record and typing it.  I am reviewing it all but --
8   so I have a vendor person, and I have a record person
9   and...
10      Q   And the vendor person is the one who does the
11  research on the vendor costs, charges, fees, that sort
12  of thing?
13      A   Correct.
14      Q   Okay.  And the records person does what
15  exactly?
16      A   They will have the raw records, and they will
17  be responsible for kind of transcribing them over into
18  the format that you see --
19      Q   In the report?
20      A   -- in the report, as far as the records go,
21  and then I review everything and make sure that that's
22  what I want in the report.  They are not changing any of
23  the wording, so it's not content-wise.  It's just they
24  are taking the records and kind of transcribing them
25  into a typed format so that it's easily readable.

Page 93

1       And then the other big thing that they help me
2   with is putting everything in chronological order,
3   because we get these thousand of records, and for time
4   purposes, it's helpful for me to have an assistant to do
5   that.
6       Q   And the invoices in Exhibit No. 10, those are
7   the most current, up-to-date invoices, right?
8       A   Except for the ones that we talked about, yes.
9       Q   I'm sorry.
10      A   Yeah.
11      Q   That's correct.  The preparation time, I'm
12  sorry.
13      And there may be another invoice, for example,
14  if we go beyond half a day today?
15      A   Right.
16      Q   And if he asks you for a supplemental report?
17      A   Right.
18      Q   But right now, everything is current, other
19  than the preparation time?
20      A   Yes, sir.
21      Q   Do you know or do you have any idea when a
22  decision will be made regarding whether you are going to
23  do a supplemental report?
24      A   No.
25      Q   Do you want to do a supplemental report?  That



Page 94

1  was a bad question.
2      A   There will be some questions, so I am -- you
3  know, I can kind of tell you that and then you can --
4  it's up to him, really.  It's not up to me so...
5      Q   Let me ask it a different way.
6          MR. McALPINE:  That's a good question.
7      Q   (BY MR. GREENE) Is it necessary to do a
8  supplemental report?
9          MR. McALPINE:  Objection.  Well, yeah,
10  objection.  Calls for speculation.
11     A   I do have some changes so -- it's not really
12  up to me as far as if he is going to request one.  I
13  mean, I -- they will be in -- there will be some
14  changes, and that will change the final number.  And for
15  that to get all calculated out, then we will need to do
16  a supplemental report, but, again, I am not the one
17  deciding that.
18     Q   (BY MR. GREENE) Right.  It sounds like, if it
19  were up to you, there would be a supplemental report
20  that would reduce the numbers at some point?
21     A   If he needs a specific number, then he will
22  need a supplemental.  It doesn't really matter what I
23  want.  Just he will need -- if he wants specific
24  numbers, based on my change of opinions, then he will
25  need to request that.

Page 95

1      Q   Now, the next thing you produced, in response
2  to the subpoena, was your report, and we will mark this
3  as Exhibit No. 11.
4          (EXHIBIT 11 WAS MARKED.)
5      Q   (BY MR. GREENE) And this is a 76-page report.
6  And we will get into the substance of the report, but
7  based on your previous testimony, is this your final
8  report?
9          MR. McALPINE:  Objection.  Confusing and
10  misleading.
11     A   As of today?
12     Q   (BY MR. GREENE) Uh-huh.
13     A   It is my final report, as of -- you know, we
14  kind of talked about that.
15     Q   Yeah.  Based on what you have told me, though,
16  this report that I have just marked as Exhibit No. 11,
17  it does not contain all of your opinions?
18     A   No, and it doesn't contain my physician
19  consultation.  It doesn't contain the subsequent records
20  that I was provided.  You have those in the other
21  exhibits, but -- and it doesn't contain any new opinions
22  that I have formed since December.
23     Q   When did you first tell Mr. McAlpine about
24  your new opinions?
25          MR. McALPINE:  Objection.  Asked and

Page 96

1  answered.
2      A   About what?
3      Q   (BY MR. GREENE) Your new opinions.
4          MR. McALPINE:  Objection.  Asked and
5  answered.
6      A   Yesterday.
7      Q   (BY MR. GREENE) Yesterday?
8      A   Yeah.
9      Q   But this -- so far, this is the only report
10  you have done in this case?
11     A   Correct.
12     Q   Are there any drafts?
13     A   No.
14     Q   Do you work in drafts?
15     A   I -- yeah.  So in WiMs, I can kind of make
16  changes to -- it's like a live-time thing, so I just hit
17  "save" and it will kind of update to the newest version
18  so...
19     Q   It just saves over whatever version you were
20  working in before?
21     A   Yeah.
22     Q   And you don't save a Version 1, Version 2,
23  Version 3 to go back --
24     A   I don't have anything saved, yeah.
25     Q   Did anybody assist you with drafting this,

Page 97

1  other than the case manager?
2      A   The case manager doesn't assist me.
3      Q   Who assists you with this?  I think you told
4  me the vendor?
5      A   The vendor specialist and then the record
6  specialist, but that's kind of -- they are kind of done
7  with their part, unless I have questions or changes or
8  "go look at this record, make sure this is correct" type
9  of commentary.
10     Q   Okay.  And with respect to -- I mean, this is
11  76 pages.  Did you draft this from scratch?
12     A   I drafted the majority of it, obviously with
13  assistance.  Some of it is introductory, so some of it
14  will be the same in other life care plans that I've
15  done, for example, at the beginning.
16         Obviously, the table of contents is generally
17  the same but specific to Mr. Aguilar, and then
18  "overview" is pretty much the same throughout any life
19  care plan, except for where Mr. Aguilar's information
20  is.
21         And then on to Page 3, it's specific to
22  Mr. Aguilar, and I go through and make sure that that's
23  kind of the wording that I want.  And then if there is
24  any decrease in life expectancy or things like that,
25  that that will be all specific to him.



1      And then with my assistant for the record
2  review, you know, they are helping me, but I am the one
3  who is kind of having the final say of the report. So,
4  in essence, it is my report. Do I sit there and type
5  every word of it? No, I don't, but I subscribe to and
6  I, you know, am adopting it as my own, basically.
7      There is also some -- in the catastrophic
8  plans, there are some explanatory language in Section 3,
9  so -- or, sorry, in Section -- yeah, in Section 3, just
10 to kind of explain to the reader, because that's kind of
11 the whole discipline of life care planning is: What is
12 a life care plan? Who needs it? What does this injury
13 even mean?
14     So it's explanatory because the -- I actually
15 tell the individual that I am doing it for, I said, "I
16 can't give it to you unless you request it, because it's
17 very good information for you," because, as a physician
18 and as a life care planner, my job is to educate.
19     Q   Okay.
20     A   So, yeah.
21     Q   But in terms of drafting this life care plan,
22 there was you, right?
23     A   Right.
24     Q   There is a record review person, right?
25     A   Uh-huh.

1      Q   And there is a vendor person, correct?
2      A   Correct.
3      Q   All right. What's the vendor person's name?
4      A   I don't -- I don't recall for this. I believe
5  it was Kristin, but I don't...
6      Q   Do you know Kristin's last name?
7      A   No. I think it starts with an "A," but I
8  don't think she's actually -- I think she changed jobs.
9      Q   All right. Who is the --
10     A   I don't remember.
11     Q   -- medical records review person who assisted
12 you with this report?
13     A   I think it was Franco, but I don't...
14     Q   You don't know Franco's last name?
15     A   I don't know -- I don't -- no, I don't know if
16 it was him for sure so... I can find that out for you.
17     Q   Do you know Franco's last name?
18     A   Starts with an "S."
19     Q   Okay.
20     A   But, again, I am not 100 percent if it was him
21 or not. There is a -- you know, with different cases
22 going on, I don't keep track of everybody.
23     Q   Well, what we will do is we will leave a space
24 in the deposition. When you read it, please put in the
25 name of the vendor --

1      A   No problem.
2      Q   -- personnel who assisted you and the name of
3  the medical records reviewer who assisted you. Okay?
4      A   Yeah.
5          (REPORTER'S NOTE: The Witness will
6  please include this information on the errata sheet when
7  she reads and signs the deposition.)
8      Q   (BY MR. GREENE) As I understand it, the
9  substantive work -- the only substantive work you have
10 done since you wrote this report was you conducted your
11 IME and you have reviewed other medical records?
12     A   Right.
13     Q   Okay. Anything else?
14     A   No.
15     Q   Now, at the time you authored your report, you
16 did receive certain medical records, though, right?
17     A   Right.
18     Q   And if I recall, your report is based on
19 medical records from October 11, 2013, through March 17,
20 2016?
21     A   Right, right.
22     Q   And at the time you wrote your report, based
23 on those records and everything you had done up to
24 December 1st, 2016, you felt like you had enough
25 information to render the opinions that are contained in

1  the report, which is marked as Exhibit No. 11, correct?
2      A   Right.
3      Q   I mean --
4      A   Right.
5      Q   -- if you didn't think you had enough
6  information, you would not have written the report --
7      A   Correct.
8      Q   -- is that correct?
9      A   Correct.
10     Q   All right. And throughout the report, you
11 provide sources of different factual information, right?
12     A   Yes.
13     Q   And that's part of the methodology, right?
14     A   Right.
15     Q   The facts that are in here, did you identify
16 all of the documents that are the sources or bases for
17 those facts?
18         MR. McALPINE: Objection. Too general.
19     A   Yes. I believe I did, yeah. They are listed
20 in section -- on Page 5, Section 2.11 -- 2.1.1.
21     Q   (BY MR. GREENE) And is it true that all of
22 your opinions regarding Mr. Aguilar's life care plan, as
23 of December 1st, 2016, are contained in this report?
24     A   All my opinions?
25     Q   As of December 1st --

Page 102

1    A   Yes.
2    Q   -- 2016.
3    A   Yes.
4    Q   And those opinions were based on the medical
5    records from the date of the incident until March of
6    2016, right?
7    A   Right.  I also did get a -- like an intake
8    form, because I wasn't able to see Mr. Aguilar, so they
9    had -- they sent me an intake form.
10   Q   Who is "they"?
11   A   Mr. McAlpine sent me an intake form, like,
12   kind of about his current status basically.  It's
13   what -- what they would fill out before -- before a
14   visit with me.  I just didn't get to see him yet.
15   Q   Is it your testimony that that intake form
16   also formed the basis --
17   A   Yes.
18   Q   -- of your opinions --
19   A   Yes.
20   Q   -- here?
21   A   Yes.
22   Q   Have you had the opportunity to review
23   Dr. Garrison and Ms. Stegent's reports in this case?
24   A   Yes, I have.
25   Q   Let me go back a little, hold on, with your

Page 103

1    CV.
2        When you were a chief resident --
3    A   Yes.
4    Q   -- what were your job duties back then?
5    A   I was in charge of scheduling the residents
6    and any research meetings and, like, journal club,
7    things like that.
8    Q   As a chief resident, you didn't write any life
9    care plans, did you?
10   A   No.
11   Q   Would the first life care plan you ever wrote
12   have been sometime after joining Physician Life Care
13   Planning in 2014?
14   A   Yes, sir.
15   Q   Do you recall the first one?
16   A   No.  I don't remember the name, sorry.
17   Q   Oh, you have got to remember the first one.
18       Do you remember the -- approximately when in
19   2014 it was written?
20   A   Like, November, 2014.
21   Q   And did you start there in the beginning of
22   2014?
23   A   No.  I started October, I think.
24   Q   So you started in October, and you wrote your
25   first life care plan.  Let me back up.  I'm sorry.

Page 104

1        So you started in October of 2014, and you
2    wrote your first life care plan in November of 2014,
3    correct?
4    A   Yes.
5    Q   And is that the one that Dr. Gonzales reviewed
6    with you to kind of get you going and make sure
7    everything was, for lack of a better phrase, up to snuff
8    with respect --
9    A   Yes.
10   Q   -- to how --
11   A   Yes.
12   Q   -- Physician Life Care Planning, they write
13   their life care plans?
14   A   Yes.
15   Q   All right.
16   A   And that was ongoing until early 2015.
17   Q   Okay.
18   A   March maybe.  And he was always available if I
19   had questions or anything.
20   Q   All right.  And one of the things that you
21   learned early on in writing life care plans was that
22   life care plans should be individualized, right?
23   A   Right.
24   Q   And that's one of the reasons why you have to
25   look at the medical records, true?

Page 105

1    A   Right.
2    Q   And you have to do your examination so you can
3    find out what the injured person is actually complaining
4    of and what his injuries actually are, true?
5    A   Right.
6    Q   We spoke earlier about, well, the guidelines
7    for a life care plan.  Would you agree with me that the
8    foundation of a life care plan should be credibility and
9    transparency, yes?
10   A   It's important, yes.  I don't know -- I think
11   the foundation is the individual and their impairments
12   so... What the --
13   Q   Well, in terms of --
14   A   -- individual has, yes.
15   Q   In terms of the person actually authoring the
16   life care plan --
17   A   Okay.
18   Q   -- that person's credibility and that person's
19   ability to be transparent, those are the foundations of
20   the life care plan?
21       MR. McALPINE:  Objection.
22   Q   (BY MR. GREENE) The actual document.
23       MR. McALPINE:  Compound and vague.
24       Objection.  Compound and vague.
25   A   I think I just kind of disagree with you on

MAGNA
LEGAL SERVICES

Page 106

1   semantics, but I think it's important, yes.  I mean,
2   it's...
3       Q    (BY MR. GREENE) Well, and it's important
4   because --
5       A    Yeah.  Obviously --
6       Q    Well, let me finish --
7       A    -- I have to have --
8       Q    Well, let me finish my question.
9       A    I have to have the...
10      Q    It's important because, as a life care
11  planner, credibility and transparency show that you are
12  competent, one, right?
13      A    Right.
14      Q    Show that you are professional --
15           MR. McALPINE:  Same objections.
16      Q    (BY MR. GREENE) -- correct?
17      A    That I'm...
18      Q    That you are a professional.
19      A    Yes, sir.
20           MR. McALPINE:  Same objections.
21      Q    (BY MR. GREENE) And it shows you are ethical?
22           MR. McALPINE:  Same objections.
23      A    Yes.
24      Q    (BY MR. GREENE) All right.  And in order to be
25  considered transparent, some of the factors you look at

Page 107

1   would be whether the life care plan contains a complete
2   synopsis of the medical records.  You want to have that,
3   right?
4       A    Correct.
5       Q    You also want to have a complete account of
6   the personal interview and physical examination, right?
7       A    If it's available, yes.
8       Q    Well, that's an important thing, though,
9   right?  You would agree with that?
10      A    It's -- yes, it's important.  Can I do a life
11  care plan without it?  Yes.
12      Q    No, and I am not saying you can't do one
13  without it, but you would agree with me that it is an
14  important aspect of a life care plan?
15      A    Yes.
16      Q    All right.  And you want specific
17  identification of all diagnostic conclusions; is that
18  true?
19           MR. McALPINE:  Wait.
20      A    Specific --
21           MR. McALPINE:  Objection.  Vague.
22      Q    (BY MR. GREENE) Specific identification of all
23  diagnostic conclusions.
24      A    Right.
25      Q    What are "diagnostic conclusions"?

Page 108

1       A    They are basically a list of things that the
2   individual has, so what's wrong with him.
3       Q    Basically his diagnosis?
4       A    Right.
5       Q    You also want specific identification of all
6   consequent circumstances.  Do you know what "consequent
7   circumstances" are?
8       A    You can explain it.
9       Q    You don't know what it is?
10      A    No.  I mean, I --
11      Q    You have never heard that phrase?
12      A    Like how the accident happened or... Is
13  that...
14      Q    Well, the things that flow from the
15  consequences of it.  If you have never heard of the
16  phrase, you have never heard of the phrase?
17      A    I don't have -- I have not heard of it.
18      Q    So when we talked earlier about -- and I think
19  you mentioned this -- but kind of the methodology, you
20  need your facts, you need your opinions, and you need
21  your conclusions, right?
22      A    Uh-huh.
23      Q    Yes?
24      A    Yes.
25      Q    Now, what is the difference between the

Page 109

1   "opinions" and "conclusions"?
2       A    Basically the opinions are my opinions.  It's
3   what I think that the individual has and what he will
4   need.
5            The conclusions are going into the costs, so I
6   have to do my research before I come in to any monetary
7   conclusions.
8       Q    And the facts are the objective findings,
9   true?
10      A    Right.
11      Q    The objective findings are based on, one, the
12  medical review, medical record review?
13      A    Right.
14      Q    And, two, again, the personal interview and
15  the examination?
16      A    Right.
17      Q    Those are the two things that form the bases
18  for your factual findings and your -- your facts and
19  your objective findings, true?
20      A    Right.  Well, part of the interview is also
21  what the person is telling me, so, you know, that's the
22  subjective part of the --
23      Q    Right, but you still need that?
24      A    Right.  It's -- which I did have --
25      Q    It's important?



1    A   -- the -- I did actually have the intake form,
2  so I had his version of what he --
3    Q   And why --
4    A   -- reported.
5    Q   So the intake form that you had when you wrote
6  your report in December, on December 1st, 2016, that was
7  another important piece of information?
8    A   Right, which I mentioned before, yeah.
9    Q   Okay.
10    A   Because I said, "If" -- "Well, if I can't see
11  him, can at least we get this thing filled out," because
12  it was a little unclear because he had had another
13  accident thing, so I wanted to know what was going on.
14    Q   So if I understand it, you couldn't see him?
15    A   Right.
16    Q   And it's important to see him and conduct the
17  interview and the examination, right?
18    A   Right.
19    Q   Since you couldn't see him, the next best
20  thing, the next most important thing in terms of the
21  subjective part of it, was the intake form?
22    A   Right.
23    Q   And the intake form...
24    A   I believe it's on the USB.
25    Q   Is that called the -- I think I have it -- the

1  examinee information form?
2    A   Yes.
3    Q   That's what that's called?
4    A   Yes.
5    Q   All right.  And because you didn't interview
6  him, because you didn't examine him, that was an
7  integral part of your opinions in the December 1st,
8  2016, report?
9    A   It was part of everything.  Everything is
10  important, so it was part of it.  I can't really say how
11  important.  I want as full of a picture as possible.
12  So, you know, I ask for all the records, I ask for --
13  can I talk to him, can I see him, can I -- so that I can
14  get as much information as possible.
15       And then when I do the report, I say if I am
16  offered any other information, I have the, you know,
17  right to amend my report, basically.  So at this point
18  in time, I had everything, and then I made the life care
19  plan based on everything that I had.
20    Q   Okay.
21       MR. GREENE:  Do you want a break?
22       MR. McALPINE:  What, am I squirming?
23       MR. GREENE:  Yeah, a little bit.
24       MR. McALPINE:  Yeah, yeah, yeah, please.
25       MR. GREENE:  Okay.

1       THE VIDEOGRAPHER:  We are going off the
2  record at 11:37 a.m.
3       (RECESS FROM 11:37 A.M. TO 11:46 A.M.)
4       THE VIDEOGRAPHER:  We are back on the
5  record at 11:46 a.m.
6    Q   (BY MR. GREENE) Dr. Iversen, we were talking
7  about the -- some general thoughts about life care plans
8  before we took a break.  I think we left off with the
9  personal interview and the examination.
10       Would you agree with me that a life care plan
11  that does not account for a personal interview, an IME,
12  or your examination intake form is suboptimal?
13    A   It's -- I would say it's not as complete as
14  one that includes it.
15    Q   And why would you say it's not as complete?
16    A   Well, because now I've seen him, so I can make
17  it more complete.
18    Q   Okay.  Well, let's talk about before you see
19  him.  Why wouldn't it be complete before you saw him?
20    A   No, I think it was complete at this time with
21  the information I had.
22    Q   Yeah.  No, no, not talking about yours.  I'm
23  talking about a life care plan that does not include
24  personal interview, physical exam, or the examinee
25  intake form.  You would agree with me that that one is

1  not complete, right?
2    A   It's not ideal but, again, a life care plan,
3  you know, what I always -- I think it's in there, too --
4  is that it's based on available information, so I
5  reserve the right to amend it if I am presented with
6  more information in the future.  So I don't -- I
7  didn't -- you know, I was, again, as you said, I am not
8  going to do a life care plan if I don't have enough
9  information.
10       I have refused to do life care plans in the
11  past because they gave me, like, ten pages of records,
12  and I can't do a life care plan on that.  So I did, in
13  my opinion, felt like I had enough information to
14  complete a life care plan.
15    Q   Right.  And in this particular case, because
16  we had to -- or you -- because someone had to cancel the
17  examination and the interview, at a minimum, you wanted
18  to have that examinee intake form to complete your life
19  care plan?
20    A   Right.
21    Q   All right.  And when we are talking about
22  facts that are essentially the objective findings of a
23  life care plan, objective findings, would you agree with
24  me that those have to include a complete review of the
25  subject's biological systems and symptoms?

MAGNA
LEGAL SERVICES

Page 114

1    A   If it's available.  I mean, again --
2         MR. McALPINE: Objection.  Vague.
3    A   -- if you have that information, if you can
4  get to talk to them and do a review of systems.  I mean,
5  it's part of the interview and exam portion of the life
6  care plan so...
7    Q   (BY MR. GREENE) I hear you saying, "if it's
8  available," so...
9    A   It's again -- I think -- it's part of the --
10 to me, it's part of the -- and it's part of the
11 physician consultation because it's the history portion
12 that the person is giving you.  It's that first part, so
13 I can do a life care plan without that subjective
14 information.
15       If it's -- one thing that I do rely on
16 sometimes is that if they have told other doctors
17 recently what the symptoms are, then I also use that as
18 well.  So if they have told any doctor, that's
19 subjective so...
20   Q   All right.  But more objectively, the life
21 care plan should include an account of the health
22 history, right?
23   A   Right.
24   Q   An account of the social history, right?
25   A   Right.

Page 115

1    Q   And an account of the medication history,
2  true?
3    A   Right.
4    Q   All of those things build into your objective
5  findings that support your facts; is that right?
6    A   Right, any information I can get.  I mean, if
7  I can -- I have also gone to people's houses and got --
8  you know, gotten that as well.  I mean, you can make it
9  as detailed or as, you know, or as less detailed as you
10 want.
11       So there is a large span of things.  What I
12 say is I want the most information that's readily
13 available at the time I create that report.  And if I
14 get more information later, then we can amend it.
15   Q   Okay.  At the time you created this report,
16 you had the necessary components of a life care plan,
17 those being the diagnostic conclusion -- diagnostic
18 conclusions.  You had those when you wrote your --
19   A   No.  I actually formulate those myself.
20   Q   I'm sorry?
21   A   I formulate those myself as well.
22   Q   Okay.
23   A   So I collect any information, and then I
24 formulate those are the things I'm -- my opinions are
25 what he has, so I may see things in the records or after

Page 116

1  I examine the person that were not addressed.  And I may
2  put those in the diagnostic conclusions because I am a
3  physician, and I have that inherent ability to put forth
4  a diagnoses so...
5    Q   Okay.  Well --
6    A   Just to clarify.
7    Q   Okay.  And along with the diagnostic
8  conclusions, which you may arrive at yourself, right?
9    A   Uh-huh, right.
10   Q   You also want to know -- or, excuse me -- you
11 want to identify any physical and mental circumstances
12 that exist as a consequence of the injury or the
13 condition or the disease?
14   A   Right.
15   Q   All right.  And those are usually specified in
16 the diagnostic conclusions, right?
17   A   Right.  So they will be, like, the impairments
18 or the disabilities.
19   Q   Right.  And those, the -- those are the
20 consequent circumstances, true?
21   A   Right.
22   Q   All right.  So the consequent circumstances
23 are impairment, disability, and life expectancy.  Those
24 are the three, true?
25   A   Right.

Page 117

1    Q   All right.  And those are important in every
2  life care plan, correct?
3    A   Right.  The main components -- how my wording
4  is, you know, what the individual has, what they need,
5  and what does it cost.  Those are the three components.
6        So however you arrive at what they need,
7  whether you are just using records or you are using
8  records and their in- -- and an intake form with their
9  information or you are using an interview and exam as
10 well or -- you know, that's all part of coming to the
11 conclusion of what they have, which is the diagnostic
12 conclusions.  And then from there, what impairments and
13 what disabilities will they have.
14   Q   I think your wording was "what they have, what
15 they need, and what it costs"?
16   A   Correct.
17   Q   All right.  And one of the things that affects
18 what it costs is going to be the life expectancy, true?
19   A   Correct.
20   Q   And you would agree with me that you have to
21 make adjustments to life expectancy, when necessary?
22   A   Right.
23   Q   And to do that, you have to consider all the
24 risk factors that may result in a reduced life
25 expectancy, right?

Page 118

1      A   Uh-huh, right.
2      Q   So some of the bases for the adjustments would
3   be -- I think in your report you relied on a third-party
4   benchmark to establish the baseline life expectancy,
5   right?
6      A   Right, yeah.
7      Q   And without looking at your report -- and we
8   will get to it, but from what I recall, Mr. Aguilar was
9   a 65-year-old man and you gave him a life expectancy of
10  19 years, true?
11     A   Correct.
12     Q   And a 19-year life expectancy is the normal
13  life expectancy for a 65-year-old man?
14     A   Right.
15     Q   Healthy 65-year-old man?
16     A   Population, so, I mean...
17     Q   Healthy?
18     A   This is not -- this is healthy and unhealthy.
19  This is the general population.
20     Q   Okay.
21     A   This takes everybody into account:  People
22  with HIV, people with hypertension, people with obesity.
23  It's the general population so...
24     Q   Very good.
25         And when you have a person with HIV, you start

Page 119

1   to reduce it, based on the fact that --
2      A   Actually not so much now but -- that's another
3   conversation but --
4      Q   At one point --
5      A   Yeah.
6      Q   -- right?
7      A   Used to be, yeah.
8      Q   All right.  And obesity?
9      A   Right.
10     Q   You would reduce life care --
11     A   Possibly, yes.
12     Q   You would adjust -- I'm sorry.  Let me start
13  over.
14         You would adjust the life expectancy for an
15  obese person, right?
16     A   Possibly, yes.
17     Q   You consider the primary injury and its likely
18  impact on life expectancy, don't you?
19     A   Right.
20     Q   And you consider the associated conditions and
21  consequences and their likely impact on life expectancy,
22  true?
23     A   Right.
24     Q   And you also consider any preexisting or newly
25  developed conditions and their likely impact on life

Page 120

1   expectancy?
2      A   Correct.
3      Q   And then you would isolate the specific
4   individual and his unique risk factors as established by
5   a doctor?
6      A   Right.
7      Q   And all of those factors are the way that you
8   adjust the life expectancy?
9      A   And then one more thing that you didn't
10  mention that I take into account is I take into account
11  my life care plan.  So the whole purpose of this life
12  care plan is to do four things:  To prevent any
13  complications, it's to get this individual to the
14  highest level of function, highest quality of life, and
15  then decrease any pain and suffering.
16         So part of the thought process in doing a life
17  care plan is almost a -- it's kind of forward-thinking.
18  It's being progressive and being -- trying to prevent
19  those things before they happen, so it's not just doing
20  the bare minimum.
21         So those things are actually -- you know, the
22  things that I have outlined, making sure he has, you
23  know, labs done, seeing the doctor on a regular basis,
24  those are the things that are -- doing the suprapubic
25  cath so he doesn't get wounds, whatever.

Page 121

1         So those are the things that are going to help
2   increase the life expectancy again, so -- just so that
3   we are saying that, yes, there is definitely things that
4   will decrease it, but, yes, there is definitely things
5   that I am accounting for that are increasing it.
6      Q   Well, I understand that, but there is no way
7   to guarantee that you are going to increase somebody's
8   life expectancy simply by writing something in a report,
9   is there?
10     A   No, that's true.
11     Q   All right.
12     A   But he will -- he can decide to follow it.
13  If, you know --
14     Q   Right.
15     A   We don't know, yeah.
16     Q   So, essentially, when you are saying you are
17  accounting for certain things that may increase his life
18  expectancy, you are assuming that that's going to
19  happen, right?
20     A   No.  I am saying this is -- this is my
21  recommendation for a plan of care, and this is the
22  structure it would take.  And if he does these things,
23  more likely than not he will, you know, do better --
24     Q   Exactly.
25     A   -- than if he doesn't.  If he gets minimal

MAGNA ◆
LEGAL SERVICES

Page 122

1  care or no care with a spinal cord injury, you are going
2  to have some pretty bad complications.
3      Q   Right.
4      A   Death, for example, so...
5      Q   But, again, it's if he complies with it.  You
6  are assuming that he is going to comply with it, true?
7      A   This is not kind of going back to that length
8  to say what or what he is not going to do, because I
9  cannot control that.  What -- the life care plan is a
10  model for care, and it is designed to take into account
11  everything that he has and say that if he does these
12  things -- and, by the way, these things are going to
13  help him.  If he does these things, this is what I
14  believe is likely.
15      Q   Okay.  The adjustment for life expectancy,
16  that's something that should be considered in the
17  methodology for --
18      A   That is, yes.
19      Q   -- concluding or for coming to the opinions in
20  the life care plan, right?
21      A   Yes.
22      Q   And when we talk about the methodology,
23  it's -- I have seen it referred to as a "linear
24  methodology."  Would you agree with that or disagree
25  with that?

Page 123

1          MR. McALPINE:  Objection.  Vague.
2      A   Yeah.  Can you be a little more specific?
3      Q   (BY MR. GREENE) Sure.  Okay.
4          Linear, we are going across a line.  Start
5  with diagnostic conclusions, go to impairment, go to
6  disability, you go to life expectancy adjustment, you
7  end up at future medical requirements.
8      A   So that's linear, yes.  I mean --
9      Q   Yes.
10      A   -- I wouldn't say life expectancy in itself
11  is, but it is a linear process.
12      Q   Well, and not just life expectancy, but life
13  expectancy adjustment in a life care plan is part of
14  that methodology, true?
15      A   True.
16      Q   Let's look at your report.
17          Now, the methodology that we just discussed,
18  is that the methodology you used to form the basis of
19  your opinions in this case?
20      A   Yes.
21      Q   All right.  And for each opinion that is
22  expressed in Exhibit No. 11, you used that methodology,
23  right?
24      A   Yes.
25          MR. McALPINE:  Objection.  Vague with

Page 124

1  respect to the methodology you just discussed.
2      Q   (BY MR. GREENE) Do you understand what
3  methodology I am referring to, ma'am?
4      A   I mean, I can repeat it.
5      Q   I don't need you to repeat it.
6      A   Okay.  Yes.
7      Q   But do you understand it when I refer to it?
8      A   Yes.
9      Q   Okay.  Now, if we look at your table of
10  contents, this provides everything that's contained in
11  your life care plan, true?
12      A   Yes.
13      Q   You have your "Overview," Section 1.  "Summary
14  of Records," those are all the records that you have
15  reviewed at the time you wrote the life care plan?
16      A   Yes.
17      Q   The discussion regarding his injury and
18  illness, future requirements, future medical cost, and
19  then the vendor surveys?
20      A   Yes.
21      Q   If you would, turn to Page 2 of your life care
22  plan, the last paragraph.  "The physicians of Physician
23  Life Care Planning also maintain an active role in
24  diagnosing and treating patients with a wide variety of
25  complex medical conditions and disabilities.  They also

Page 125

1  engage in long-term medical and rehabilitative care and
2  disability management."
3          Did I read that correctly?
4      A   Yes.
5      Q   And when they --- when this, in your report,
6  refers to the "physicians of Physician Life Care
7  Planning," that includes you?
8      A   Yes.
9      Q   All right.  Now, no physician at Physician
10  Life Care Planning treated Mr. Aguilar, did they?
11      A   Not that I know of.
12      Q   Okay.  And you did not treat Mr. Aguilar, did
13  you?
14      A   No.
15      Q   All right.  You don't have any plans to treat
16  Mr. Aguilar; is that correct?
17      A   No, not currently.  I mean, I do treat
18  patients who have had life care plans.
19      Q   Right, but specifically with Mr. Aguilar --
20      A   No.
21      Q   -- do you plan on treating him at any time in
22  the future?
23      A   Not unless I am asked to do so.
24      Q   Right.  You were only retained to draft this
25  life care plan?



Page 126

1    A    True.
2    Q    Since no one from Physician Life Care Planning
3 or yourself is treating him, no one is involved in his
4 diagnosis, right?  The active diagnosis.
5    A    Well, no, I guess.  I mean, I can look at all
6 the records and make my own diagnosis --
7    Q    Right.
8    A    -- but I am not treating him so...
9    Q    Right.  And you are not involved in his --
10   A    I am not giving him any diagnoses.
11   Q    Okay.  And you are not involved in his
12 long-term medical care?
13   A    No.
14   Q    Not involved in his rehabilitative care?
15   A    No.
16   Q    Not involved in his disability management?
17   A    No, but this is actually to explain about the
18 company and the background of the physicians, to explain
19 that the physicians that are part of Physician Life Care
20 Planning are kind of actively doing rehab.  Maybe not on
21 people that they are doing life care plans on, although
22 that is true as well, but not, you know, the majority.
23   Q    On Page 3, at the time that you wrote this
24 report, have you had a conversation with Mr. Aguilar?
25   A    No.

Page 127

1    Q    At the time that you wrote this report, have
2 you had a conversation with any of his family members?
3    A    No.
4    Q    At the time that you wrote this report, did
5 you have a conversation with any of his case managers?
6    A    No.
7    Q    Okay.  At the time you wrote this report, did
8 you have any conversations with his healthcare
9 providers?
10   A    No.
11   Q    All right.  But you did review their records?
12   A    Yes.
13   Q    All right.  Or, to put it differently, you
14 reviewed all the records that the attorneys gave you to
15 review --
16   A    Right.
17   Q    -- at the time you were asked?
18   A    I asked for all of the available records.
19   Q    And as far as you know, you got those?
20   A    Right.  But, obviously, I can't control what I
21 get but...
22   Q    Exactly.  Because what was given to you, they
23 stopped in, what, hold on a second.
24   A    March, 2016.
25   Q    March, 2016.

Page 128

1    A    But I obviously knew that there was ongoing
2 things so -- because he didn't make his appointment and
3 I was -- I was told why and all that.
4    Q    What were you told?
5    A    He had had another -- he had a car accident,
6 and he was in rehab or the hospital.  I forget which
7 one.
8    Q    He had a car accident in October of 2016,
9 right?
10   A    Right.
11   Q    Okay.  So the records that you are reviewing,
12 that you had reviewed in March, were the records only
13 related to the injuries that were allegedly sustained as
14 a result of the accident on October 11th, 2013, true?
15   A    Which is -- yes, and which is what I was asked
16 to do the life care plan about.
17   Q    I'm sorry.  What were you asked to do the life
18 care plan about?
19   A    About the injury in 2013.
20   Q    Okay.  Now, the costs in your life care plan,
21 they are all anticipated costs, true?  Future costs?
22   A    Right.
23   Q    All right.  If there is something, for
24 example, that he purchased in the past, if you included
25 that in your future costs, it should be taken out,

Page 129

1 correct?
2    A    Can you be more specific?
3    Q    Sure.
4         If he purchased a device in the past, between
5 October, 2013, and October, 2016, if you, in December,
6 2016, included a device that he already purchased and
7 was using that didn't need replacement, it should be
8 taken out of your life care plan, right?
9    A    Potentially, but can you be more specific
10 about which device you are referring to or just in
11 general?
12   Q    Yeah.  Well, in general, because we will get
13 to the specific devices --
14   A    Okay.  That's true.
15   Q    Let's just -- okay.
16   A    I mean, that's true.  So I always try to find
17 out what they have, because I'm not going to give them a
18 brand-new wheelchair now if they already have just
19 gotten one, for example.  So we don't -- that's other
20 information that we take into account.
21   Q    Right.  And, again, in this particular case,
22 without the benefit of being able to conduct an
23 examination or the benefit of being able to conduct an
24 interview, you were somewhat limited, true?
25   A    I -- yeah.  I have to assume certain things.



Page 130

1    Q   The medical services and goods that are
2  delineated in your life care plan, have you discussed
3  the medical necessity of those with any of Mr. Aguilar's
4  treating physicians?
5    A   No.  I have the capability of determining
6  whether it's medically necessary.  And, again, I am not
7  doing bare minimum medically necessary.  I am actually
8  trying to prevent things and get him to the highest
9  quality of life so...
10    Q   Since you haven't discussed it with any of his
11  treating physicians, is it safe to say that no treating
12  physician has agreed with you and said the goods and
13  services that you are calling for in your life care plan
14  are medically necessary?
15    A   I don't know if they have been asked that
16  question so, no, but I don't know if they have been
17  asked to outline what he is going to need for the rest
18  of his life either, because they are not asked to do a
19  life care plan, which is completely different than
20  treating him on a weekly or monthly basis.
21    Q   Right.  And as I understand your purpose and
22  why you are here, based on your education, background,
23  and training, you are saying that the things in the life
24  care plan are medically necessary, based on your
25  opinions, right?

Page 131

1    A   Right, and based on what a life care plan is
2  designed to do.
3    Q   Okay.  Now, at the bottom of Page 3, these are
4  your four -- are these your four opinions or
5  conclusions?
6    A   Conclusions.
7    Q   Conclusions?
8        And No. 1, we kind of touched on that already
9  with the medical necessity of them.  And in No. 1, you
10  are limiting it to -- you are limiting your conclusions
11  to whatever injuries that allegedly occurred as a result
12  of the incident on October 13th, 2000- -- excuse me --
13  October 11, 2013, true?
14    A   Correct.
15    Q   Then your second conclusion, I will read it
16  aloud and you read it silently, please.  "Based on the
17  known medical conditions, Mr. Gustavo Aguilar will have
18  lifelong, progressive symptoms, physical impairment and
19  subsequent disability which will require lifelong
20  medical care of both conservative and surgical nature."
21        Did I read that correctly?
22    A   Yes.
23    Q   What are the "lifelong, progressive symptoms"
24  that you are referring to?
25    A   So based on his injury, which was a spinal

Page 132

1  cord injury, there is certain things that go along with
2  that.  You -- you have -- the main things with spinal
3  cord injury are spasticity, bowel and blad- -- bowel and
4  bladder management, wounds, overuse of the upper
5  extremity, pain, pneumonia, UTIs, infections, and any
6  kind of complications that go with those things.
7        So that's kind of the symptoms, I guess,
8  that -- because a spinal cord injury doesn't just stay
9  the same forever.  I mean, you will have -- you know,
10  you could end up with kidney issues or urinary issues or
11  skin issues because of that initial injury, so that's
12  the things I am talking about there.
13    Q   And the physical impairment, what are you
14  talking about there?
15    A   Kind of the same things, so the fact that he
16  will be in a wheelchair.  He is, you know, based on the
17  October, 2013, injury, paralyzed from the waist down,
18  unable to walk again.  Impairment with transfers, he is
19  not going to be -- there is age there, too.
20        So just because somebody can transfer
21  themselves at 65, which I am not 100 percent sure that
22  he could do, because he did have his daughter to help
23  him, but even if he could do it at 65, it doesn't mean
24  he is able to do it at 75.  So you do take in age with
25  an injury -- aging with an injury.

Page 133

1    Q   And what about the subsequent disability?
2    A   So the disability is something that is not the
3  person's impairment, but it's what is the outcome in
4  life?  What are they going to have to deal with?
5        He is going to have to deal with the fact he
6  can't walk, can't get in and out of places by
7  himself.  He -- you know, he was driving but -- you
8  know, transportation issues, things like that.  So it's
9  the impact, basically.
10    Q   And the -- and you said, "which will require
11  lifelong medical care"?
12    A   Right.
13    Q   So --
14    A   A spinal cord injury is not going away.
15    Q   Right.  And what this sounds like to me are
16  those consequent circumstances that we talked about
17  earlier --
18    A   Correct.
19    Q   -- true?
20    A   Yes.
21    Q   Impairment, disability, life expectancy
22  adjustment --
23    A   Right.
24    Q   -- right?  Which is in the methodology?
25    A   Correct.



Page 134

1    Q   Okay.  In No. 3 you talk about, "As a result
2  of the injuries listed, there will not be an adverse
3  impact to his life expect-" -- "on his life expectancy."
4  And you cite to the third-party sources that we touched
5  on earlier that you rely on, right?
6    A   Correct.
7    Q   Now, are there three third-party sources that
8  you are relying on?
9    A   No.  It's the same.
10    Q   It's just one?
11    A   Yeah, yeah, it's just one source.
12    Q   Okay.  And does that one source, does it have
13  a section in it that discusses adjusting life
14  expectancy, based on Mr. Aguilar's diagnosis?
15    A   No.
16    Q   So Mr. Aguilar's diagnosis is T12 ASIA B,
17  true?
18    A   Right.
19    Q   And what that means is, as you said earlier,
20  he has essentially lost the use of his legs, his lower
21  extremities?
22    A   Right.
23    Q   All right.  Paralyzed?
24    A   Right.
25    Q   All right.  Are there other sources that you

Page 135

1  are aware of that reduce life expectancy due to
2  paraplegia?
3    A   Yes, there are.
4    Q   Okay.
5    A   There is spinal cord injury sources out there.
6    Q   Why did you not use those, since Mr. Aguilar
7  is suffering from a spinal cord injury?
8    A   The reason I don't use those is -- first of
9  all, I'm taking the life care plan into account.  Second
10  of all, those sources, specific journal articles or
11  specific databases for spinal cord injury, those are a
12  very specific group of patients.
13      And in my opinion, you know, Mr. Aguilar -- I
14  don't know that he -- you know, there is no specific
15  journal article or table for Mr. Aguilar, so I am
16  looking individually at Mr. Aguilar.  So I don't want to
17  be -- I don't want the limitations of those studies or
18  those conclusions kind of on him, so I try to make it as
19  individual as possible.
20    Q   Okay.  And in making it as individual as
21  possible, you should have considered the adjustment
22  factors, right, the life expectancy adjustment factors,
23  true?
24    A   Based on what I reviewed and his injuries, I
25  didn't feel like, at that point, that I needed to reduce

Page 136

1  the life expectancy.
2    Q   But my question, though -- well, let me ask it
3  a different way.
4      Since you didn't feel like you needed to
5  reduce the life expectancy or adjust the life
6  expectancy, you didn't consider any of the adjustment
7  factors that we agreed upon earlier that you should look
8  at?
9    A   Adjustment factors like?
10    Q   Establish a baseline from a third-party
11  source, consider the primary injury and its most likely
12  impact, those factors that we talked about.
13    A   So kind of going back to my thought process in
14  that, based on what I reviewed at this -- at that time,
15  I mean, I did say that I actually want to decrease it
16  for other reasons now.  But based on the fact that he,
17  with the life care plan, will get optimal care and
18  prevent any complications, I was comfortable using, you
19  know, these life tables and not adjusting life
20  expectancy at that time.
21    Q   Right.  But now, if I understand your earlier
22  testimony, you are going to adjust it because he is
23  quadriplegic?
24    A   Right.
25    Q   Okay.

Page 137

1    A   But not only that, because he is -- he is
2  severely disabled currently.  And the fact that he has
3  ankylosing spondylitis and the fact that, you know,
4  being on bed rest and being at risk for certain things,
5  I believe that the life expectancy needs to be decreased
6  now.
7    Q   So the fact that he has ankylosing
8  spondylitis, is that one of the factors that weighs on
9  your decision to -- that now it's appropriate to reduce
10  the life expectancy?
11    A   Not only the fact that he has ankylosing
12  spondylitis, because you can be pretty functional --
13    Q   Yeah, not only.  Not only.
14    A   Not only but -- and I knew he had it before,
15  but seeing him and realizing that he has pretty bad
16  ankylosing spondylitis, kind of -- to kind of put it
17  plainly.  So seeing him was kind of one of the biggest
18  reasons why I could see it decreasing.
19    Q   So have you -- had you seen him before
20  December 1st, 2016, and after that October, 2016,
21  accident, you would have decided to reduce it then,
22  true?
23    A   Possibly, yeah.  Possibly.
24    Q   It would have been a lower number in your life
25  care -- the number would have been lower had you been



Page 138

1  able to look at him or examine him and interview him
2  before you wrote your report on December 1st, 2016?
3      A   Possibly.  I can't really say for sure,
4  because it really just depends.  I mean, I -- I --
5      Q   Well, the condition that he is in or the
6  condition that he was in on January 26, 2017, would have
7  been the same condition he would have been in on
8  December 1st, 2016, right?  I may have messed up the
9  dates.  Let me ask that again.
10         The condition that he was in on January 26,
11  2017, when you conducted your interview and examination,
12  that was the same condition he was in in December of
13  2016, true?
14      A   Yeah.  I am not going -- I'm just not going to
15  speculate on what I would have done if I would have --
16  there is a lot of "ifs" there.  So I did what I did
17  based on the information I had, and now that I have more
18  information, I am doing this.  So that's it.
19      Q   Now, going back to Conclusion No. 2, what
20  subsequent disability are you assuming that he is going
21  to have?
22      A   Contractures, spasticity.
23      Q   Right, but --
24      A   Bladder issues, wounds.
25      Q   And that's based on what?

Page 139

1      A   The fact that he has a spinal cord injury.
2      Q   Does he have any of those things now?
3      A   I believe he -- I don't know if he has them
4  today, but when I saw him, he had wounds.
5      Q   Okay.
6      A   And then he was due to have -- he was having
7  renal stones or ureter tract stones and then due to have
8  a suprapubic, because he had had UTIs and -- so he
9  had -- he was having complications.
10      Q   Right.  Do you know if he was having those
11  complications before October, 2016?
12      A   I don't know.
13      Q   You have reviewed the medical records, right?
14  In the medical records --
15      A   You know, he was having ongoing urinary
16  issues.  The wounds, I don't know if I saw anything
17  about the wounds.
18      Q   Right.  In the medical --
19      A   There were wounds initially.
20      Q   Initially --
21      A   Yeah.
22      Q   -- but they healed, right?
23      A   Right.
24      Q   All right.  And that's what the medical
25  records showed you, the ones that you reviewed, that

Page 140

1  ended in March, 2016, true?
2      A   Right, but you understand that just -- once a
3  wound heals, it doesn't mean that he is not going to get
4  another wound.  If you have a spinal cord injury,
5  whether it's -- you know, actually the paraplegics end
6  up getting -- can get up -- end up getting worse wounds
7  because they are sitting so much, so they will be
8  noncompliant with weight shifting and all that.
9      Q   Excuse me, I'm sorry.
10         I understand that.
11      A   Yeah.
12      Q   But based on the records that you saw, you
13  didn't see -- or that you reviewed, you didn't see any
14  indication of that, did you?
15      A   That he had on, like, wounds at this moment?
16      Q   Yes, ma'am.
17      A   Well, the last record I had was March so, I
18  mean, let me just take a look here.
19         I mean, he had ongoing issues, as of, you
20  know, 2016, of the neurogenic bladder, which is not
21  going to be getting better.
22      Q   Well, right now, we are talking about the
23  wounds.
24      A   Right.  The wounds, the last thing that I saw
25  in the records would have been January, 2014, wounds

Page 141

1  from the Foley, and then prior to that...
2      Q   So based on the medical records that you
3  reviewed at the time you had -- that support your
4  December 1st, 2016, life care plan, there was no mention
5  of wounds after January, 2014, true?
6      A   I believe so, yeah.
7      Q   All right.  So, again, you are making this
8  assumption regarding subsequent disability, right --
9      A   Yes.
10      Q   -- based on the records?
11      A   Absolutely.
12      Q   Okay.
13      A   With a spinal cord injury, the likelihood they
14  are going to get wounds, pretty high.
15      Q   Well, I understand that.
16         From January, 2014, though, until, we will
17  say, October, 2016, when he had the subsequent incident,
18  or accident, there is nothing in the records about
19  wounds, is there?
20      A   No.
21         MR. McALPINE:  Objection.  Assumes facts
22  not in evidence.
23      A   Not that I -- not that were in the records.
24      Q   (BY MR. GREENE) Okay.  And you have reviewed
25  additional records since then, true?



Page 142

1    A   Right.
2    Q   All right.  And there is no -- so there is no
3   treatment records to support the assumption of
4   subsequent disability --
5         MR. GREENE:  Object --
6    Q   (BY MR. GREENE) -- prior to that October,
7   2016, incident?
8    A   He had wounds on admission when he first had a
9   spinal cord injury obviously and then --
10    Q   I apologize.  That was a bad question.
11    A   Yeah, yeah.
12    Q   Between January, 2014, and October, 2016, when
13   the subsequent incident occurred, there are no medical
14   records to support subsequent disability --
15         MR. McALPINE:  Objection.  Argumentative.
16    Q   (BY MR. GREENE) -- correct?
17    A   As far as the wounds, there are no record that
18   I saw of him having any wounds.  I don't know if he had
19   any still.  There are -- I don't see any evidence in
20   what I reviewed that he did have.  That doesn't mean
21   that I am not going to -- just because he had a short
22   period of time where he didn't have any, the individual
23   is not -- it's great he didn't have wounds.  It's great,
24   but it doesn't mean that he is never going to have
25   wounds in the future if he is a paraplegic, you know,

Page 143

1   so...
2    Q   So, in your opinion, two years and ten months
3   is a short period of time with respect to whether wounds
4   are going to show up?
5    A   If he has got the rest of his life left?  I
6   mean, it's -- it's good.  He didn't have ongoing
7   problems, but I think with aging, you can't assume that
8   he -- I think it would be irresponsible to assume that
9   he was not going to have any wounds.  I think...
10    Q   Earlier when we were talking about adjusting
11   the life expectancy and you explained why you did it --
12    A   Right.
13    Q   -- the way you did it, but with respect to
14   methodology, it is commonly accepted for folks in your
15   field to adjust life care expectancy based on the
16   primary injury and its most likely impact on life
17   expectancy, right?
18    A   A lot of people use tables.  A lot of people
19   use those spinal cord tables.  There are -- those tables
20   are not perfect, though.  That's all I'm saying.  Those
21   are a specific patient population.  It doesn't take into
22   account, you know, great care and, you know, all that
23   stuff so...
24         People use it.  I wouldn't say that -- I mean,
25   every life care planner/physiatrist is going to do

Page 144

1   things differently.  Maybe you will find some that, you
2   know, take -- they will take percentages off the life
3   expectancy every time.  I just like to be individual,
4   and that's why I am, you know, paying attention to it
5   now and wanting to decrease it a little bit.
6    Q   I understand.  That wasn't quite my question,
7   though.
8    A   Okay.
9    Q   My question is:  In life care planning and
10   physiatry, as you mentioned, it is acceptable to adjust
11   life expectancy based on the primary injury and its most
12   likely impact on life expectancy, true?
13    A   Yes, I would say that's true.
14    Q   And it's also an acceptable methodology to
15   consider the associated conditions and consequences and
16   their impact on life expectancy, true?
17    A   Yes.
18    Q   And it is also an accepted methodology to
19   consider preexisting injuries or newly developed
20   conditions and their impact on life expectancy --
21    A   True.
22    Q   -- right?
23    A   Right.
24    Q   And it's also a commonly accepted
25   methodology -- methodology in life care planning and

Page 145

1   physiatry to isolate the specific individual and his
2   unique risk factors that have been established by a
3   physician, true?
4    A   True.
5    Q   All right.  So simply because you did it a
6   different way, that doesn't mean that's the only way to
7   do it, is it?
8    A   No, and I -- I don't know why you are trying
9   to isolate, you know, me as -- I am giving my opinion in
10   full, based on what I had at that time so --
11    Q   Well --
12    A   -- you can -- I mean, that's what everybody
13   does.  And I don't think it's fair to say that you --
14   that everyone does it, when we don't have everyone here.
15    Q   Oh, no, no.  I apologize if you interpreted --
16   I didn't say, "everyone does it."
17         My question was:  The things that I just
18   mentioned, they are commonly accepted methodologies for
19   doing it, true?
20    A   True.
21    Q   Okay.  Where are we at?  Page 5.  From Page 5
22   to 24, these are all of your reviews of the records,
23   true?
24    A   As of December 1st, yes.
25    Q   I'm sorry.  Exactly.  As of December 1st.



Page 146

1        And if we go to Exhibit No. 2, which you
2   provided at the beginning of the deposition this
3   morning, as a supplement, this is a listing of all of
4   the records you have reviewed since December 1st?
5      A   True.
6      Q   Actually, these are also records that predate
7   the October 11th, 2013, incident?
8      A   Yes, which is what I got after.
9      Q   And what is the impact of the records that
10  predate, if any?
11          MR. McALPINE:  Objection.  Too general.
12     Q   (BY MR. GREENE) On your opinions.
13     A   Nothing more than what I have said so far, so
14  I did take that into account.
15     Q   The ankylosing spondylitis?
16     A   Yeah, yeah.  And that was in the records
17  that -- initial records, too.  And I know that he had,
18  you know, abnormalities on spine imaging and everything.
19     Q   If we turn to Page 28 in your report, this
20  lists other documents that you reviewed?
21     A   Right.
22     Q   And, again, these are the documents that the
23  attorneys gave to you --
24     A   Right.
25     Q   -- at the time, true?

Page 147

1      A   True.
2      Q   On -- or in, rather, Exhibit No. 2, I don't
3   see any other documents that you were provided.  Were
4   you --
5      A   Because that means that -- let me just show
6   you here.
7          So in the life care plan, "other documents" is
8   things that were not necessarily in the record review,
9   like billing and things like that.  They are not going
10  to summarize that.  In "other documents" here, it
11  doesn't kind of delineate other documents, but there
12  are -- they don't break it up that way, but as far as,
13  like, from, let's see, anything that is not medical,
14  that will be considered kind of "other documents," like
15  CVs from the other experts, reports from other experts,
16  W9, those things.  Those are in addition.
17          So even though those aren't reviewed, I also
18  reviewed those because they are listed here.
19     Q   Is it common for you to review a deposition?
20     A   Yeah.  I definitely do that.
21     Q   Because if you can't interview him --
22     A   Let's say half the time, about.
23     Q   We are talking over each other.
24     A   Sorry.
25     Q   That's okay.

Page 148

1      Q   If you can't interview him, you can't examine
2   him, and you don't have an intake form, if a deposition
3   is available, it should be sent to you, correct?
4      A   I would say it's about -- half the time, it's
5   there.  I don't specifically ask for depositions, but if
6   it's there, I will -- I obviously review it.
7      Q   Yeah, no.  And I am not saying you ask for it,
8   because you don't know if it's there or not, true?
9      A   Right.
10     Q   But if you don't have any other source of
11  subjective data -- the intake form, the interview, the
12  physical examination -- at least you can review a
13  deposition and you know what the man is testifying
14  about, with respect to whether he has improved, whether
15  his condition is deteriorating, what devices he is
16  using, how is he progressing?
17     A   Right.
18     Q   You should be able to gather that from the
19  deposition, right?
20     A   I can do that, yeah.  I mean, I will be happy
21  to review it if he has one.  I don't know if he has one.
22     Q   Yeah.  And that would be useful information?
23     A   Yeah.
24     Q   Right.  Actually, he does have one.
25     A   Okay.

Page 149

1      Q   He was deposed before this October 11, 2013,
2   incident -- or '16.  Let me back up.
3      A   Okay.
4      Q   So many dates.
5          The October 4th, 2016, incident, Mr. Aguilar
6   was deposed on September 9th -- September 19th, 2016.
7   You didn't know that?
8      A   No.  I mean, I -- it's not abnormal that he is
9   deposed.  I just didn't know when he was.
10     Q   Well, we would hope he would be deposed in a
11  lawsuit, true?
12     A   Right.
13     Q   All right.  So -- but that deposition would
14  have provided you with information regarding his
15  condition prior to the subsequent accident, correct?
16          MR. McALPINE:  Objection.  Calls for
17  speculation.
18     A   It -- yeah, it could have.
19     Q   (BY MR. GREENE) It could have.
20     A   I mean, I don't know what was in there.
21     Q   But you have never seen it?
22     A   No, I have not.
23     Q   All right.
24     A   Happy to review it before I do a subsequent
25  report.



1    Q   I wish you would have reviewed it before you
2  did the first one, but that's neither here nor there.
3        Going back to the methodologies for adjusting
4  life expectancy, if you would have used the
5  methodologies that we discussed earlier, regarding --
6    A   Can you be more specific --
7    Q   Sure.
8    A   -- sorry, on "methodology of life expectancy,"
9  because I --
10   Q   No.  I said, "methodologies regarding
11 adjustments to life expectancy."
12   A   Right, so...
13   Q   Had you looked at the tables that you said are
14 available --
15   A   Yes.
16   Q   -- regarding spinal cord injuries?
17   A   I am aware of the tables, yes.
18   Q   Had you considered his associated conditions
19 and consequences, had you considered preexisting
20 conditions and consequences or newly developed
21 conditions, had you used that methodology, how would
22 that have affected your opinion?
23        MR. McALPINE:  Objection.  Calls for
24 speculation, incomplete hypothetical.
25   A   So as far as -- decreasing any life expectancy

1  is included in my methodology.  How I do that, there is
2  no -- that's individual to whoever is decreasing it.
3  You know, you can have Life Care Planner A over here.
4  They may do it one way, because that -- as long as you
5  are kind of doing it the same way every time, there is
6  no specific outline for saying, "you must decrease life
7  expectancy if A, B, C, D."  That is individual to the
8  expert.
9        So as long as I am doing it the -- it's almost
10 like the way I do costs.  It's like as long as I'm --
11 the IARP and the organizations that exist oversighting
12 life care planners, they are actually very general, as
13 far as the methodologies, but they do say, as long as
14 you have a way that is repeatable and you do it that way
15 every time.
16        So I just kind of disagree with the fact that
17 you are saying, oh, there is these methodologies for
18 life expectancy adjustment out there that you
19 are -- well, I am actually following the methodology
20 that I always follow in doing a life care plan, which
21 includes am I adjusting or am I not?  And at --
22   Q   Right.
23   A   -- that point -- and at the point of -- in
24 January -- or, sorry, in December, 2016, I did not want
25 to adjust life expectancy.  I am not going to just, you

1  know, prematurely decrease it without knowing, like --
2    Q   Okay.
3    A   Based on more information I may have, yes.
4    Q   So in December, 2016, you knew he was
5  paralyzed, right?
6    A   Right.
7    Q   You knew he was diagnosed as T12 ASIA B,
8  right?
9    A   Right.
10   Q   Using a chart, you could have reduced the life
11 expectancy, true?
12   A   A chart based on what, though?  That's the --
13 that's where --
14   Q   Based on the spinal cord studies that you
15 talked about earlier.
16   A   Right, and -- but I don't have a study for
17 Mr. Aguilar that has followed my life care plan, so
18 that's kind of where I am disagreeing with you.
19   Q   You knew that he suffered from ankylosing
20 spondylitis, right?
21   A   Yes.
22   Q   You could have reduced it for that, right?
23   A   Potentially, but not --
24   Q   Well, you're --
25   A   You have to account for everything, so I

1  didn't and -- you know, at that time, I didn't.
2    Q   Why didn't you?
3    A   Because I didn't feel like I had the
4  information to do it, and I am -- I don't typically just
5  reduce it to reduce it.  I really take it seriously to
6  reduce the life expectancy or to mess with the life
7  expectancy at all, and it's not -- it's just I want to
8  be sure.
9    Q   Do you know if Mr. Aguilar has gained any
10 weight since the October 11, 2013, accident?
11   A   I don't know specifically right now.
12   Q   Do you know what his weight was when he showed
13 up to the hospital on October 11, 2013?
14   A   No.  I don't have that information right now.
15   Q   Do you know what his weight is now, or as of
16 January 26, 2017?
17   A   Can I see my physician consultation, please?
18   Q   (Counsel tendering to Witness.)
19   A   It was around 216 pounds.  But that was by
20 history, so I didn't actually weigh him myself.
21   Q   Okay.  So you don't know if he has gained
22 weight or lost weight?
23   A   No.
24   Q   What happened to your flash drive?
25        MR. McALPINE:  Can we go off the record



1  for a second?
2      THE VIDEOGRAPHER:  Yes, sir.  We are
3  going off the record at 12:32 p.m.
4      (RECESS FROM 12:32 P.M. TO 12:43 P.M.)
5      THE VIDEOGRAPHER:  We are back on the
6  record at 12:43 p.m.
7      Q   (BY MR. GREENE) Ma'am, with respect to the
8  four conclusions that you have come up with in this case
9  on pages -- reflected on pages 3 and 4 of your
10 December 1st, 2016, report, have you told me everything
11 that you have relied on for those --
12     A   Yes.
13     Q   -- to support those conclusions?
14     A   Yes.
15     Q   And other than the medical records, every
16 document that you relied on in formulating the
17 conclusions in the December report are identified in the
18 report itself, true?
19     A   Except for maybe the intake but, yes.  The
20 intake form was not -- I don't know if it was identified
21 in the plan, but everything else would have been.  I
22 mean, I guess, technically it's part of his medical
23 records so...
24     Q   We talked about your continuing legal
25 educate- -- I'm sorry -- your continuing education

1  earlier?
2      A   Yes.
3      Q   Did you take a class entitled "Certified Life
4  Care" -- "Certified Life Care Course" online?  Have you
5  ever heard of that?
6      A   It's through UF.  It's through University of
7  Florida.
8      Q   Uh-huh.
9      A   There is six modules.  Five of them is online.
10 The sixth one is in person.  That's the course I took
11 for my pre-life care planning.
12     Q   And was there a section on spinal cord
13 injuries?
14     A   Yes.
15     Q   Is that something that you relied on in this
16 case?
17     A   I didn't rely on anything specifically.  I
18 mean, I rely on my education, training, experience, and
19 that does include -- but I didn't go back to any
20 documents that I, you know, specifically a course I went
21 to or anything.  This was my opinion.
22     Q   With respect to your assignment in this
23 matter, what were you told to render opinions on?
24     A   His future medical needs and the cost of those
25 items, as well as the diagnostic conclusions that would

1  bring out those future needs.  And that's -- so I was
2  asked to do a life care plan.  That's basically what a
3  life care plan is.
4      Q   And is it fair to say that your opinions are
5  based on his medical diagnosis?
6      A   Yes.
7      Q   And that's the T12 ASIA B that we have talked
8  about before?
9      A   Right.
10     Q   Can you break that down?  Tell me what that
11 means, "T12 ASIA B."
12     A   T12 is basically the thoracic spine, the
13 level, which vertebrae neurologic level that he is --
14 that he was kind of determined to be after his injury.
15 So that's just kind of where, along the spine --
16 cervical, thoracic, or lumbar -- that he is.  So he is a
17 lower thorac- -- at that time, he was lower thoracic.
18     He is an incomplete injury.  And it goes
19 through A through E, and A is a complete injury.
20 Anything other than A is an incomplete injury.  What
21 that means is, do they have anal sphincter and tone.  So
22 if they are a complete injury, there is no sensation
23 there.  There is no motor control in those segments, in
24 those sacral -- lower sacral segments, and that makes
25 him an incomplete -- or, sorry, a complete.

1      An incomplete is basically -- a B is basically
2  close to a complete, but he has some sensation in lower
3  extremities or sacral segments.  So it's just a way that
4  we determine -- because based on what level he is,
5  that's that ASIA scale, that helps us determine what his
6  functional status is going to be later on.
7      It's not, you know, for sure, but, you know,
8  we know certain things about certain levels, certain
9  things that happen to them.  Complication-wise, certain
10 functions that they will be able to attain.
11     Like, for example, I am not going to, you
12 know, start rehabbing somebody who is a C5 to start, you
13 know, walking independently, not at this point anyway.
14 With the medical technology, maybe in the future, but --
15 so it just helps us classify them so we can
16 appropriately care for them.
17     Q   And that diagnosis was also considered in your
18 opinions?
19     A   Yes.
20     Q   All right.  And ultimately in this case, as a
21 life care planner, the ultimate opinions are the future
22 costs; is that fair?
23     A   Right.
24     Q   Before we talk about that, if you would, turn
25 to Page 46 of your report.



Page 158

1   A   Uh-huh.
2   Q   Are you already --
3   A   Yeah, I am here.
4   Q   You have mentioned this term a couple of
5   times.  What is "comorbidities"?
6   A   It means medical problems that he has as well,
7   kind of other things that he has going on kind of
8   unrelated to this accident.
9   Q   Do those other medical problems -- or, excuse
10  me.  Can those other medical problems affect his life
11  expectancy?
12  A   Those things alone, I wouldn't say, "Oh, yeah,
13  for sure decrease the life expectancy."  Those are not
14  impressive enough to me to say for sure.  Can they?
15  Could he have high blood pressure untreated, get a
16  stroke, and, you know, have a bad outcome?  Yeah, he
17  could die.  I mean, there is things that obviously --
18  but I didn't decrease it based on these.
19  Q   Well, and let's talk about those.  The
20  comorbidities that you have identified are ankylosing
21  spondylitis, true?
22  A   Yes.
23  Q   Impaired mobility?
24  A   Yes.
25  Q   Hypertension?

Page 159

1   A   Yes.
2   Q   And hyperlipidemia?
3   A   Right.
4   Q   And you didn't consider any of those in
5   adjusting his life expectancy when you authored your
6   report in December -- on December 1st, 2016?
7   A   I did consider them.  I just did not make the
8   conclusion that I was going to decrease it.
9   Q   You concluded that none of those warranted an
10  adjustment to his life expectancy?
11  A   Right.  At that time, no.  And, again, I do
12  take decreasing life expectancy pretty seriously,
13  because I feel like I really would need to know why I am
14  doing that.  I can't just arbitrarily, you know, do
15  that.
16  Q   Even when he -- when a patient, such as
17  Mr. Aguilar, has four different factors that could
18  affect his life expectancy, you still don't consider
19  that worthy of adjusting life expectancy in this case?
20  A   No, because I didn't really see a lot of
21  evidence to say, "Okay, for sure he is having a lot of
22  problems with this."  I mean, he was having -- he was
23  taking his blood pressure medication.  He was taking his
24  other medications.  He was under, you know, doctor's
25  treatment for ankylosing spondylitis.  So did I want

Page 160

1   more information about that subsequent injury, which I
2   had no records on?  Yes, but at that time I didn't have
3   those.
4   Q   Now, in 5.2, "Diagnosis Requiring Ongoing
5   Medical Attention," No. 5, "severe traumatic brain
6   injury"?
7   A   Right.
8   Q   He sustained a severe traumatic brain injury?
9   A   So, basically, based on history and based on
10  his GCS, his Glasgow Coma Scale, at the time of
11  admission -- I just want to see exactly what that was --
12  that's all -- all you need to say somebody has severe
13  TBI is:  What was their GCS?
14        He hit his head, according to history, and
15  then GCS was 3.  That's -- that's the lowest you can go
16  on that scale, so something happened to him.  The GCS
17  was severely affected, so without saying -- and I
18  didn't, you know, go and go crazy on that.  I just said,
19  "We need to look at that."
20        I know that when I saw him, he was walking,
21  talking, all that stuff, but according to what I had at
22  that time, when I see GCS of 3, even if he is fully
23  recovered, he is severe.  He will always be a severe.
24  Q   A 3 is he is unconscious, right?
25  A   Right.

Page 161

1   Q   Okay.
2   A   With no movement, no eye opening, anything.
3   Q   Okay.  This says, "ongoing medical attention."
4   What medical attention has he received since October 11,
5   2013, regarding a severe traumatic brain injury?
6   A   Well, he had rehab, so that inherently
7   includes -- he had a neuropsych evaluation inpatient
8   when he was evaluated --
9   Q   When was that?
10  A   -- initially.  Back after the initial injury,
11  so it was November, 2013.
12  Q   Okay.  Since November, 2013, what medical
13  attention --
14  A   I don't believe he has had any, yeah.
15  Q   -- what medical attention has he required
16  related to his severe traumatic brain injury?
17  A   He has not had any specific, you know, TBI
18  treatment.  He wasn't, you know, on any ongoing speech
19  or anything like that.  What I am interested, when I did
20  this report, was I want to make sure we assess it
21  correctly.  And then beyond that, I did not have
22  anything major for him.
23  Q   So there is no ongoing medical treatment for
24  severe traumatic brain injury --
25  A   Well, if you want to go through --

Page 162

1    Q   -- is that fair?
2    A   No, it's not, because he had -- after I saw
3  him, he does have memory issues.  It's a little unclear
4  about when those started happening.  He couldn't really
5  tell me.  I don't think that -- I want to go through,
6  you know, line by line to make sure that I am not
7  forgetting anything so...
8        So the only thing that I would include would
9  be -- which can be related to the TBI, would be the
10  individual counseling, which can be tied to the TBI, and
11  then as far as treatment for the severe TBI, and then
12  the neuropsych evaluation.
13    Q   What treating physician has said he needs
14  treatment for the TBI?
15    A   I don't know if anyone has.
16    Q   What treating physician has said he needs to
17  undergo neuropsych evaluations on a regular basis
18  related to a severe traumatic brain injury?
19    A   I don't know that anyone has.  I only -- I
20  didn't say, "on a regular basis."  I only want him to do
21  an evaluation one time as an outpatient, because they
22  are always -- they do evaluations initially and they are
23  not as lengthy, so I would like him to get one now.  And
24  that's -- there is really not a lot of ongoing
25  treatment, other than the supportive care, you know, for

Page 163

1  the spinal cord injury, which is kind of unrelated to
2  the TBI.
3        But, again, I am outlining all the medical
4  diagnoses that I see.  Whether or not they need a little
5  or a lot, that's kind of -- you have to look at the rest
6  of the plan.
7    Q   Right.  But with respect to the TBI, I am
8  trying to figure out what medical evidence you have to
9  support that, other than the initial treatment where he
10  had a Glasgow Coma Scale score of 3.
11    A   That's all I need to say he has a severe TBI,
12  and I --
13    Q   Right.
14    A   And the only ongoing treatment I am saying is:
15  "Can we take a look at that one more time?"  That's
16  pretty severe to have a GCS of 3 and to say you have no
17  deficits.  I am very skeptical of anyone who says -- I
18  don't think anyone has.  But to say he has no deficits,
19  I just disagree with that, because I don't think they
20  have looked hard enough.  So I'm saying, "Let's get him
21  a neuropsych eval and just see."  I haven't outlined any
22  future, you know, cognitive, anything.  I am just
23  saying, "Let's look."
24    Q   So if I understand, he is three and a half
25  years removed from this incident where he hit his head,

Page 164

1  and there is no treating physician who has identified
2  any objective factors to support that he has a severe
3  traumatic brain injury that requires ongoing treatment.
4  Despite that, you just want him to have a neuropsych
5  eval, just because?
6            MR. McALPINE:  Objection.  Assumes facts
7  not in evidence.
8    A   I -- I mean, the fact -- I cannot comment on
9  if they have picked up on anything or not.  I know that
10  after I saw him -- first of all, I think it's prudent
11  for him to have that done outpatient, whether or not
12  anyone has said it or not, because I think that they are
13  going to find things that he is not saying or that they
14  just haven't asked.
15        Just -- because if you go see a PM&R doctor
16  for half an hour, they are not going to delve into all
17  your cognitive issues.  And he may not -- when I -- so,
18  then, when I saw him, everything was pretty good, speech
19  was good.  He reported to me that after the accident, he
20  had difficulty with expressive parts, not necessarily
21  speech, but more dexterity, which was fine at that time,
22  but writing and using his hands expressively.  So that's
23  a cognitive issue.
24    Q   (BY MR. GREENE) After what accident?
25    A   The first accident.

Page 165

1    Q   Because after the first accident, he was
2  sending text messages.  You know that?
3    A   Yes, yes.  And he --
4    Q   After the first accident --
5    A   -- he said that it wasn't as good.
6    Q   -- he was driving?
7    A   Yeah, I got it.
8    Q   Okay.
9    A   He just said it wasn't as good so --
10    Q   Right.
11    A   -- it just kind of backs up the fact that I
12  think he should have a one-time evaluation, which I
13  think is prudent for him to have.
14    Q   And you are basing this on an interview that
15  you conducted with him after the second accident?
16    A   No.  I am basing it on GCS of 3.
17    Q   Well --
18    A   It hasn't been looked into.
19    Q   Right.  Earlier you said you test- -- you
20  interviewed him and he expressed to you some cognitive
21  issues, some memory loss issues.
22        Do you remember saying that?
23    A   Yes, sir.
24    Q   Okay.  And that's based on an examination that
25  you conducted on January 26, 2017, correct?

MAGNA
LEGAL SERVICES

Page 166

1    A   Right.  And it also backs up what I suspected
2  before, that I am sure there is something, right?  So I
3  am not saying that I based this on my interview.  I am
4  saying that --
5    Q   Well --
6    A   I am saying that he likely has something.  I
7  just don't think anybody has found it yet.  The fact
8  that he had a GCS of 3 deserves a neuropsych eval.
9  That's all I said.  I am not saying he needs, like --
10  I'm not saying -- assuming that he has anything or that
11  he is going to need future treatment at the time of this
12  life care plan, so it's reasonable to -- for him to have
13  a neuropsych eval.  Then --
14    Q   Okay.
15    A   -- after the life care plan, I saw him.  I
16  said, "Oh, he actually does have cognitive deficits" --
17    Q   So --
18    A   -- "by history."  So for sure he deserves the
19  neuropsych eval.  So I'm just saying that my visit kind
20  of backed up what I thought and --
21    Q   Right.
22    A   -- what I recommended.
23    Q   But that visit was after an incident -- an
24  accident, a car accident, which left the man a
25  quadriplegic, right?

Page 167

1    A   Right, that's true.
2    Q   What was his Glasgow Coma Scale after that
3  accident?
4    A   I would have to look.  I am not sure.
5    Q   Have you seen it?
6    A   I would have to look.
7    Q   Okay.
8    A   If I can see the...
9    Q   Do you know, sitting here today, whether he
10  was unconscious, as a result of that accident?
11    A   Can I take a look at the...
12    Q   I don't know which record you are talking
13  about.
14    A   It's the record review that was subsequent to
15  the...
16       But it doesn't change the fact that he
17  deserves a neuropsych eval from the first accident, you
18  know what I am saying?  So -- and, plus, he gave me the
19  history that he had memory issues and expressive issues
20  after.  It doesn't mean he wasn't texting.  It just
21  means that he wasn't what he used to be so...
22    Q   And when we are talking about the neuropsych
23  eval, we are talking about the cost -- the future care?
24    A   Right.
25    Q   Okay.  And we will get to all of those.  All

Page 168

1  right.
2    A   Yeah.  Glasgow Coma Scale of 15 on the 2016
3  so...
4    Q   Okay.  Let's go through your costs.  Well,
5  actually, before we do that, Section 6.
6    A   Yes.
7    Q   Those are the vendor surveys, right?
8    A   Yes.
9       THE REPORTER:  I'm sorry.  The vendor
10  what?
11       MR. GREENE:  "Surveys."
12    Q   (BY MR. GREENE)  And this is, you testified
13  earlier, something that you did not perform, right?
14    A   No, not the initial research.
15    Q   Okay.
16    A   I rely on an assistant, and then I go over
17  everything.
18    Q   How do you know -- excuse me.
19       How are the vendors surveys conducted?
20    A   So basically we -- we maintain a database at
21  PLCP that is updated, you know, every six months, or
22  more often, to include prices in specific areas.  So for
23  his case, prices in Houston.  And then if we don't have
24  a price for a specific item, we will -- I will have the
25  vendor specialist call or research that specific price,

Page 169

1  because they can either do that online in certain
2  databases that are available to the public or by calling
3  a specific office and asking for a price or a specific
4  rehab facility and asking for a price.  So it's a
5  combination.
6    Q   And you are relying on someone -- what's his
7  name again?
8    A   This would have been Kristin or somebody -- I
9  believe it was Kristin, the vendor person.
10    Q   Do you know why Kristin is no longer there?
11    A   No, I don't.
12    Q   All right.  And what's the purpose --
13    A   She was excellent.  She was excellent, by the
14  way.
15    Q   What's the purpose of the vendor survey and
16  the prices?
17    A   So basically in the methodology outlined by
18  rehab professionals in specific journals -- the Journal
19  of Life Care Planning is one of them -- the correct
20  methodology for obtaining prices, they are not -- they
21  are pretty general about it, but -- and I think that
22  PLCP actually does a better job than just their general
23  recommendation in the general life care planning, but
24  they say that it has to be specific to the person's
25  geographical location and more than one price should be

Page 170

1  obtained, if possible, so basically you average it.  And
2  then, you know, obviously it would have to be current
3  prices.
4       So they ask that you follow those specific
5  rules when you are obtaining prices.  It's a guideline
6  basically, and then that's exactly how Physician Life
7  Care Planning does it.  They just make sure, you know, a
8  little bit more stringently making sure the prices are
9  up to date.
10      If -- you know, specifically, if I have a
11  question on things, they will double-check.  They will
12  call, they will outline exactly what's going on, so I am
13  very confident in the vendor survey.
14      Q   How have you individualized your life care
15  plan to Mr. Aguilar's needs?
16      A   As far as what?
17      Q   In general, the entire life care plan.  How is
18  it individualized to the injury that he received and the
19  future needs that you are saying he requires?
20      A   So when I start a life care plan, I think
21  about what he has and how he has to approach his daily
22  life.  All right?  So I have to know what doctors he is
23  going to need to see based on his injuries.  I have
24  to -- so I go through each category of care to optimize
25  everything, right?

Page 171

1       What medications is he going to need?  Do we
2  need to monitor the effect of those medications?  What
3  devices is he going to need to maximize his function?
4  What type of evaluations have not been done that need to
5  be done that can help us further, you know, outline what
6  his injuries are and how we can help him?  What are the
7  specific interventions that he will need in the future,
8  if any?
9       In his case, specifically suprapubic catheter
10  placement to prevent any future wounds and, you know,
11  neurogenic bladder issues.  So I go through and I look
12  at him going through his daily life and say, "What does
13  he need to do that?"
14      Q   And in looking at the -- what you are
15  projecting, the physical medicine and rehab plan [sic],
16  why is that --
17      A   Pain.  Pain.  Or pain.
18      Q   I'm sorry.  "Physical medicine and
19  rehabilitation/pain management."
20      A   Uh-huh.
21      Q   What is that?
22      A   It's basically an office visit with a PM&R
23  physician who knows about pain as well or who could be,
24  you know, certified in pain management as well, because
25  he has pain issues.

Page 172

1       Q   Well, he is provided medication for pain,
2  right?
3       A   Right, but you need somebody to manage.  It's
4  an office visit with a physician.
5       Q   And what's the basis for the recommendation
6  that he do this four times per year?
7       A   So basically that is -- in actuality now, he
8  is actually going to need more visits than that, but
9  based on the injuries that he sustained in 2013, my
10  opinion is that to manage and maintain ongoing rehab
11  needs, medications, you know, specifically, like,
12  refills, equipment, managing symptoms, like spasticity,
13  pain, contracture, wounds, et cetera, this is kind of
14  like the primary care doctor for the spinal-cord-injured
15  individual.
16      Q   My question, though, is:  What is the basis
17  for that?  What is the basis for this recommendation
18  that he is going to --
19      A   Education, training, yeah.
20      Q   -- need this four --
21          You've got to -- you have got to let me
22  finish.
23          What's the basis for your opinion that he is
24  going to need to do this PM&R and pain management four
25  times per year?

Page 173

1       A   That's based on my education, training, and
2  experience as a PM&R doctor.  That's the -- that's the
3  minimum of the follow-up, if somebody is having ongoing
4  issues and -- you know, quarterly basically.
5       Q   So is any of this based on any input from
6  Mr. Aguilar?
7       A   No, no.  This is --
8       Q   His subjective statements to you?
9       A   No.
10      Q   Okay.  There is nothing -- is there anything
11  that he could have said in an interview that would
12  affect whether he will need this service?
13      A   I mean, first of all, I did this before I saw
14  him, but in the future, I mean, just because somebody
15  says, "I want to go every month to the PM&R," I am not
16  going to do that.  It's reasonable that they can go
17  every quarter.  They can make phone calls, if they need
18  to, for other problems.
19      Q   Right.  And that's -- can you point me to
20  anything that I can read that says four times a year is
21  reasonable?
22      A   I think you can look at common practice.  I
23  don't have a journal that says a spinal-cord-injured
24  patient -- they should, at a minimum, be seen once a
25  year.  That is definitely -- there may be literature on



Page 174

1    that, but as far as what I have seen in practice and the
2    actual what happens to people and how often they end up
3    coming to see a PM&R, it's basically their -- their
4    primary doctor for everything, I mean, because they will
5    end up managing, you know, other things as well and any
6    complications from the spinal cord injuries.  So it is
7    kind of a commonplace...
8        Q    Well, you say it's "commonplace" and what you
9    have seen in practice.  How long have you been
10   practicing?
11       A    Well, including residency, since 2009.
12       Q    Yeah.  Just practicing, not including your
13   residency.
14       A    I don't think that's fair, because we saw a
15   lot of spinal-cord-injured parents.
16       Q    Okay.
17       A    Yeah.
18       Q    Since residency in 2009, since you have been a
19   licensed physician, how long?
20       A    How many patients?
21       Q    No.  How long?  How long have you been a
22   licensed physician?
23       A    Oh, well, I had my New York license since
24   2011.
25       Q    And your Texas license?

Page 175

1        A    2012.  I don't have my New York license
2    anymore, since I moved.
3        Q    All right.  So when you say what you have seen
4    in practice as, we will say as a licensed physician, you
5    are talking about four and a half years of practice?
6    Not even four and a half years.  Four years and a
7    quarter in practice, right?
8        A    Right.
9        Q    The orthopedic spine surgeon -- oh, I'm sorry.
10   Before we leave the PM&R/pain management, we know now
11   that the duration is wrong in this --
12       A    Yes.
13       Q    -- estimate, right?
14       A    I would like to change the duration, yes.
15       Q    To what?
16       A    So I have not come to a final decision on what
17   percentage I will decrease it, but I am thinking at
18   least 10 percent decrease of life expectancy, so that
19   would be about two years off of the total.
20       Q    What are you going to base your decreased life
21   expectancy on?  How do you arrive at 2 percent?
22            MR. McALPINE:  Objection.
23       A    Two years.  Two years.
24       Q    (BY MR. GREENE) Oh, 10 percent, I'm sorry.
25       A    Yeah, 10 percent.

Page 176

1        Q    How do you arrive at a 10 percent reduction in
2    life expectancy?
3        A    Again, that's kind of -- we talked about that
4    already, as far as individualizing it to Mr. Aguilar,
5    based on his injuries, based on, you know, now he has
6    the cervical -- the tetraplegia as well.
7            So I -- since last night, I haven't had enough
8    time to really kind of come to a full conclusion on
9    that.  I am just saying at least 10 percent.  And how am
10   I -- you know, I would actually like to see how he is
11   doing functionally, because I think when I saw him, he
12   wasn't doing as well as he could be doing.
13       Q    Well, my question is:  When you are talking
14   about a 10 percent reduction, what is the -- like, what
15   are you relying on?  What document?  What periodical?
16   What -- what written something that we can look at that
17   says you reduce life expectancy by 10 percent if you
18   have a person in Mr. Aguilar's condition?
19       A    I am not aware of any article, you know,
20   specific to his specific -- all of his specific things.
21   Unfortunately, he doesn't -- there is no article written
22   about Mr. Aguilar, but based -- it's based on my
23   education, training, and experience, as well as the
24   literature that's out there, so that's -- you know, I do
25   want to also look at, you know, if there is any good

Page 177

1    data on, you know, spinal cord injury, subsequent
2    injuries, ankylosing spondylitis.  I just haven't come
3    to a full conclusion on the percentage, but obviously
4    it's based on education, training, experience, research.
5        Q    No, I understand that.  So what is the
6    methodology that you are using to arrive at a 10 percent
7    reduction in life -- life expectancy?
8            MR. McALPINE:  Objection.  Assumes facts
9    not in evidence.
10           MR. GREENE:  She said she is going to
11   reduce it.
12           MR. McALPINE:  No, no, no.  Just the 10
13   percent.  She is sort of...
14           MR. GREENE:  Okay.
15           MR. McALPINE:  She said it wasn't final,
16   right?  Did you get that part?  Okay.
17       A    Yeah.
18           MR. GREENE:  Not really.
19       A    No.  I said at least 10 percent, based on his
20   injuries, based on my education, training, experience.
21   That's it.  I mean, and I'm aware of the tables.
22       Q    (BY MR. GREENE) So it could be more?
23       A    It could be more.  I am aware of the tables.
24   I am aware of, you know, the spinal cord injury tables
25   decrease a cervical way more, so I want to just look at

MAGNA
LEGAL SERVICES

Page 178

1  it very carefully.
2      Q   Okay.  And do you know the basis as to why the
3  spinal cord inj- -- the spinal cord injury table reduces
4  it way more than 10 percent?
5      A   Yes.
6      Q   Why?
7      A   Complications.
8      Q   Okay.  Well, why aren't you reducing it
9  consistent -- well, let me back up.
10     A   Well, I am.  I am taking my life care plan
11 into account.
12     Q   Let me back up.
13         The spinal cord studies, the spinal cord chart
14 that reduces life expectancy or adjusts life expectancy
15 based on the injuries, that chart is based on studies
16 that have been conducted, right?
17     A   It's based on people with spinal cord injury
18 that are participating in the studies.
19     Q   Right.
20     A   My problem with the studies is that it cannot
21 include everybody so...
22     Q   Are the studies peer-reviewed?
23     A   Yes.  I mean, this is actually a table, so,
24 yeah, they are peer-reviewed.
25     Q   Okay.  So they are accepted by the medical

Page 179

1  community?
2      A   Yes, but I think that you are missing my point
3  as far as why I -- why it's dangerous to just rely on a
4  chart that Mr. Aguilar may or may not be included in, so
5  I am tailoring it to him specifically.
6      Q   Okay.  Well, so a chart that is supported by
7  empirical data and that's been peer-reviewed, the
8  methodology to reach those numbers for adjusting a life
9  care plan, they have been accepted by the medical
10 community, right?
11     A   Yes.  And what's also --
12     Q   Well, let me finish my question.  Let me
13 finish.
14         But you are going to reduce the life care
15 plan -- or, excuse me -- reduce the life expectancy by a
16 minimum of 10 percent.  Can you tell me what statistical
17 information or empirical data that you are relying on
18 for a reduction or an adjustment in life expectancy of
19 10 percent?
20     A   I am -- there is no study, again, about his
21 specific things, but I can tell you -- no, no, let me
22 finish, too.
23         So what I can tell you is that I rely on that
24 specifically.  I look at that when I am thinking about,
25 okay, how much should I -- how much does a cervical, you

Page 180

1  know, tetraplegic normally live?  But what about
2  Mr. Aguilar?  He is going to have optimal care.  There
3  is no study that talks about that.  I mean, I wish there
4  was, but there isn't.
5          And if you ask if he -- I want to talk -- one
6  more thing.  If you ask a PM&R in practice, okay, are
7  there tables out there?  Are there statistics out there?
8  Yes.  Does that mean that Mr. Aguilar is going to follow
9  them exactly?  What if you give him optimal care?  He is
10 going to do much better than what the tables show.
11         So that's what I am going on.  And,
12 unfortunately, there is no table that I am aware of that
13 is, you know, pertinent to Mr. Aguilar.  That's why I
14 have been asked to look at everything for him and say,
15 "What is your opinion?"  Since I do have the capacity to
16 make that opinion, it is my opinion, what I believe the
17 decreasing life expectancy would be.
18             MR. GREENE:  Okay.  Objection,
19 nonresponsive.
20     Q   (BY MR. GREENE)  My question, ma'am:  What is
21 your -- okay.  Let's back up.
22         The tables, the National Spinal Cord Injury
23 Statistical Center, are you familiar with the table?
24     A   Yes.
25     Q   Do you disagree with the table?

Page 181

1      A   No.
2      Q   But you disagree with using the table?
3      A   I think it's problematic to use a table only
4  for Mr. Aguilar.
5      Q   Okay.  But in arriving at your life expectancy
6  of 19 years, you did rely on a table, correct?  You
7  relied on the --
8      A   A table --
9      Q   -- life expectancy table --
10     A   A table.
11     Q   -- yes?
12     A   Another table for general population, yes.
13     Q   Right.  And you relying on that table was
14 sufficient to arrive at your opinions, correct?
15     A   That is kind of generally-accepted methodology
16 for life care --
17     Q   Okay.
18     A   -- planning and with -- you know, obviously we
19 can't give an exact number of years.  I mean, he could
20 die tomorrow from something else but -- but we have to
21 rely on something, so that's what we relied on.
22     Q   Okay.
23     A   I am just not comfortable relying on one
24 specific table for him when I have been asked to look at
25 everything and make that opinion.  So I think it's more



Page 182

1    reliable for me to look at everything that I can
2    specific to Mr. Aguilar, including any studies and
3    tables that are out there, but --
4         Q   Well, I guess --
5         A   -- then you don't need a life care plan if you
6    can look at a table.
7         Q   All right.  We talked about this earlier.  The
8    confusion that I am having is you just said you are not
9    comfortable relying on one specific table, right?
10        A   For life expectancy, no.
11        Q   Okay.  So your conclusion in No. 3, that as a
12   result of injuries listed here, there would not be an
13   adverse impact on life expectancy, you relied on one
14   table for that conclusion.
15        A   Right, but not for decreasing his life
16   expectancy.  I am not going to rely on one table with
17   regards to one injury.  I think that the tables are not
18   equal, if you want to talk about --
19        Q   No, no.
20        A   -- comparing one table to the other because --
21        Q   I don't want to talk about them right now.
22        A   Okay.
23        Q   If I want to talk about it, we will definitely
24   get into it, but in your -- what I do want to talk about
25   is your conclusion where you said, "adverse impact."

Page 183

1    The adverse impact will be a decrease, right?
2         A   Now that -- in the deposition you are saying
3    that I said that or...
4         Q   No.  In your opinion, your Opinion No. 3 on
5    Page 4.
6         A   No decrease, I said, in my opinion.
7         Q   Right.  "As a result of the injuries listed,
8    there will not be an adverse impact" --
9         A   Right.
10        Q   -- right?
11            So in arriving at no adverse impact, you
12   relied on this one table?
13        A   Right.
14        Q   Okay.
15        A   Because I am assuming he is general
16   population, and in order to do a life care plan, I have
17   to have some number of how much he has left to live.
18        Q   Right.  But we know he is not general
19   population, don't we?
20        A   Right, but I don't know what the number is
21   going to be.  So at the time I did this report, I didn't
22   know what that would be, because I didn't feel like I
23   had enough information to make that conclusion, because
24   we would be sitting here talking about something totally
25   different --

Page 184

1         Q   I'm sorry.  Which conclusion?
2         A   The decrease.
3         Q   Oh.
4         A   So I want to wait until I get more information
5    to make a decrease.  That's --
6         Q   What other information do you need?
7         A   Well, I saw him, right?
8         Q   Uh-huh.
9         A   I had -- now I have subsequent records.  I
10   don't think I have had adequate time to, you know, tell
11   you the exact decrease that I am coming to.  I would be
12   happy to include that in my supplemental report.
13        Q   Okay.  And you saw him on January 26, 2017?
14        A   Right.
15        Q   Right.
16            The table, the National Spinal Cord Injury
17   Statistical Center's table, again, that's one that
18   everybody -- not "everybody," but people use to support
19   their adjustments to life expectancy, true?
20        A   They do.  Yes, that's true.
21        Q   Are you aware of any study or data that says
22   that the National Spinal Cord Injury Statistical Center
23   table is not acceptable to use when adjusting life
24   expectancy?
25        A   I don't think there is a study that's

Page 185

1    disproving it, no.
2         Q   All right.  You -- if I understand your
3    testimony, you don't want to use it or you haven't used
4    it because it is not individualized to Mr. Aguilar; is
5    that correct?
6         A   That's one of the reasons, right.
7         Q   But the fact is, as you said, the table takes
8    into account folks with spinal cord injuries who are
9    participating -- participating in a study to arrive at
10   data, empirical information, that can be peer-reviewed,
11   right?
12        A   That's true, yeah.
13        Q   All right.  And so the numbers in this table
14   have been peer-reviewed, yes?
15        A   That's right.  I am just saying that I
16   don't -- you -- with a study -- medical school,
17   residency, you go -- you read -- you do journals every
18   week, right?  So you talk about the inconsistencies or
19   the problems with the study or the limitations of the
20   study.  And that's what I am trying to get at here with
21   saying, well, relying on just one table, this is not,
22   you know, the end-all be-all of Mr. Aguilar.
23            I think that if you, in my opinion, follow a
24   life care plan where he has adequate care, I think that
25   he can, you know, kind of go against, a little bit, what

**MAGNA** ▶
**LEGAL SERVICES**

Page 186

1   the table is saying.
2       And optimal care is not what's taken into
3   account in all of those patients in that study, because
4   you have patients who have horrible things happening and
5   not so horrible. It is a mix. I just -- I am just
6   saying that he doesn't necessarily -- I don't want to be
7   tied to that one table.
8       Q   Right. But what you are essentially doing
9   then, because you -- if I understand your testimony, you
10  are relying on the life care plan to essentially say,
11  "His life expectancy may be greater, may be less, but I
12  am going to give him this life care plan and if he
13  follows it, I am going to maximize his time here on
14  earth"?
15      A   Correct.
16      Q   All right.
17      A   That's -- you got it.
18      Q   But in order to arrive at the numbers for the
19  future medical, in order to arrive at the future medical
20  treatment, the life expectancy adjustment is a factor
21  that you consider when reaching that number. You don't
22  do it backwards, do you?
23      A   No.
24      Q   Okay. So that's what I am trying to get at
25  here. You are saying that you are going to rely on the

Page 187

1   life care plan to increase his life expectancy, but in
2   order to know what the life care plan is, you have to
3   adjust the life expectancy based on him, true?
4       A   True.
5       Q   You are just not willing to adjust it based on
6   a table --
7           MR. McALPINE: Objection.
8       Q   (BY MR. GREENE) -- that decreases life --
9           MR. McALPINE: Misstates prior testimony.
10      Q   (BY MR. GREENE) -- that decreases life
11  expectancy?
12          MR. McALPINE: Objection.
13      A   I am not only going to rely on the table.
14          MR. McALPINE: Misstates prior testimony.
15      A   The table is referenced in my life care plan.
16  I am aware of the table. I am just saying that I am not
17  only going to use that table. I think that there is
18  other things that we have to consider. It is my
19  opinion. It is my opinion. There is no study for
20  Mr. Aguilar, so that's it. I mean, it's -- I am
21  entitled to my opinion about it.
22      Q   (BY MR. GREENE) But there are no --
23      A   Medical doctors and, you know, people doing
24  life care plans, it's -- being a physician, there are
25  kind of -- we are one of the only people who can say,

Page 188

1   "Okay. Well, I think the life expectancy is going to be
2   lower because of this, this, this."
3       So we don't just take into account a table.
4   You don't have to be a doctor to just read a table, so
5   that's -- it is my opinion.
6       Q   Why did you not reduce the life expectancy
7   before?
8           MR. McALPINE: Objection. Asked and
9   answered.
10      A   Like I said before, I don't feel like I had
11  adequate evidence to, for sure, say that we were
12  going -- he is going to need a decrease. I knew that
13  there was something going on, but I was expecting to see
14  him. And I know I can amend it, but I'm not -- like I
15  said, I do take it very seriously to decrease the life
16  expectancy.
17      Q   (BY MR. GREENE) Orthopedic spine surgeon, is
18  there something in the medical records to indicate that
19  he needs to see an orthopedic spine surgeon as often you
20  are saying he needs to see one?
21      A   Once every three years, so that's three visits
22  in the rest of his life. He has had a -- the reason for
23  his spinal cord injury was, at that level, a worsening
24  or a fracture at that area, so I think it's prudent for
25  him to have a visit to follow up and monitor that.

Page 189

1       Q   Is there any -- are there any medical records
2   to support the fact that some doctor who he is treating
3   with has said he should see an outpatient [sic] spine
4   surgeon as often as you are requesting he see him?
5           MR. McALPINE: Objection. Argumentative.
6       A   I don't believe --
7           MR. McALPINE: Asked and answered.
8       A   I don't believe that he has been asked, or I
9   don't believe that his treating doctors have been asked,
10  how many times in the rest of Mr. Aguilar's life do you
11  think he is going to need to see me, because they are
12  not doing a life care plan.
13      Q   (BY MR. GREENE) Ma'am, have you reviewed the
14  medical records?
15      A   Yes.
16      Q   Okay. Has any treating doctor, in the medical
17  records that you have seen, recommended that Mr. Aguilar
18  see an orthopedic spine surgeon once a year?
19          MR. McALPINE: Objection. Asked and
20  answered, argumentative.
21      A   He saw a spine surgery initially, right?
22      Q   (BY MR. GREENE) Uh-huh.
23      A   He has issues with that area. That's the area
24  that he is -- that he had the paralysis from initially.
25  It's prudent in my mind and in my opinion for him to



Page 190

1  have follow-up and monitoring of that specific area.
2      Whether or not the fact that some treating
3  doctor, who is looking at this patient for 15 minutes,
4  says, you know, "Oh, by the way, I think you should go
5  see the surgeon," he is only going to send him to the
6  surgeon if there is, you know, an ongoing issue at that
7  very moment.  He is not going to comment, "Yes, in five
8  years, you are going to need to see the surgeon."
9  That's where a life care planner comes in.
10     MR. GREENE:  Objection, nonresponsive.
11  Q   (BY MR. GREENE) My question:  Based on the
12  records that you have reviewed, has any treating
13  physician said that Mr. Aguilar needs to see an
14  orthopedic spine surgeon more often than the one time
15  that he has already seen one?
16  A   I don't know.
17  Q   Well, based on the medical records that you
18  have reviewed, do you know?
19  A   I am not aware of anyone recommending that
20  recently.
21  Q   So -- okay.  Thank you.
22      What is the basis, then, of your opinion that
23  he needs to see an orthopedic spine surgeon every three
24  years?
25     MR. McALPINE:  Objection.  Asked and

Page 191

1  answered.
2  A   Monitoring.
3  Q   (BY MR. GREENE) No, no, not why.  I said what
4  is the basis for that opinion?
5  A   My education --
6  Q   What are you basing it on?
7  A   Yeah, yeah.  My education, training, and
8  experience.
9  Q   And wound management, we have touched on that
10  earlier?
11  A   Right.
12  Q   Now, why is it medically necessary for him to
13  have an ultrasound of his kidney once a year?
14  A   To monitor any effects of his kidneys from the
15  neurogenic bladder, and that is something that is very
16  commonplace.
17  Q   As a result of the October 11, 2013, incident,
18  what medical records have you seen that require him to
19  have an ultrasound on his kidney once a year?
20  A   He had ultrasounds of his kidney.
21  Q   Right.
22  A   Yeah.
23  Q   Have you seen a recommendation for him to do
24  that every year?
25  A   Like, nobody has said, "Yes, from here on out,

Page 192

1  he is going to need it," but he has been having it so...
2  Q   Right.  He has had them on, what, routine
3  visits?
4  A   Yeah.
5  Q   How frequently --
6  A   For neurogenic bladder, not routine.  I mean,
7  routine for a spinal cord but...
8  Q   Okay.  The X rays on his spine, you are again
9  saying he needs to see -- he needs to have that done
10  every three years.  Why is it not acceptable just for
11  him to have one X ray, I mean, on his spine?
12  A   Well, because if you understand the nature of
13  his disease, it's --
14  Q   I'm sorry.  Just to be clear, his lumbosacral
15  spine.  I'm sorry.
16  A   Right.  So now I am assuming he has a lower --
17  lower extremity paralysis and he is going to be in the
18  wheelchair now, right?  So let's just forget about the
19  subsequent accident that happened.
20      He has a spinal cord injury.  He is going to
21  be in the wheelchair.  He will develop issues in the
22  low -- low back because he is in a seated position for,
23  you know, extended periods of time.  That's not true now
24  because he is actually having a -- he is going to be
25  more in a lying position.

Page 193

1      But the -- in the formation of this life care
2  plan, it's basically monitoring for ongoing and
3  worsening of any disk abnormalities based on his spinal
4  cord injury and based on the fact that he has the
5  ankylosing spondylitis and that it will -- he will have
6  an overall worsening of the spine over time.
7  Q   Okay.  So I heard a couple of things.
8  A   Uh-huh.
9  Q   No. 1, because of the ankylosing spondylitis,
10  which is a preexisting condition, right?
11  A   Right, but that's not what I said initially,
12  yeah.
13  Q   I didn't say that's what you said.  I said I
14  heard a couple of things.
15      I also heard that he is not going to be
16  sitting in the wheelchair anymore, because of his
17  current condition, right?
18     MR. McALPINE:  Objection.
19      Are you -- you are asking her if she can
20  testify about what you heard?  That's a vague question.
21  What are you asking?
22     MR. GREENE:  What's your objection?
23  Vague?
24     MR. McALPINE:  My objection is vagueness,
25  yes.



Page 194

1    Q   (BY MR. GREENE) Ma'am, from your recent
2  testimony, I think you said that Mr. Aguilar will not be
3  sitting in the wheelchair because of his current
4  condition, true?
5    A   Correct.  He will be sitting in a wheelchair
6  because I have outlined that for him as well, so any
7  time that you are in an extended seated position for any
8  period of time, especially if you are a tetra- or
9  quadriplegic, you are putting extra stress on the spine
10  and the -- you know, scoliosis is an -- it can be an
11  issue, disk issues, as well as, for him, worsening of
12  the ankylosing spondylitis, because of his -- the
13  posture that he will have to be in.
14    Q   So the X rays of his lumbosacral spine relate
15  to the fact that he is a tetra- or quadriplegic?
16    A   Right.
17    Q   Okay.  This incident resulted in paraplegia,
18  though?
19    A   Right, either.
20    Q   So --
21    A   Yeah, yeah.  So I would do X rays if he was
22  paraplegic.  I would do X rays if he is tetraplegic.
23  It's the same.  And it's a monitoring thing to detect
24  scoliosis, to detect if he is having any worsening of
25  that area.

Page 195

1    Q   Okay.  But if he is a paraplegic, it's not
2  necessary?
3    A   Incorrect.
4    Q   Okay.  X rays of the thoracic spine, he needed
5  those X rays anyway because of the ankylosing
6  spondylitis, right?
7    A   This is in addition to what he would have
8  needed anyway, because he is going to be having way more
9  films in addi- -- one time every three years, I am
10  saying.  So a portion of the X rays he is going to get
11  to monitor are due to the injury.  Obviously, he is
12  going to have more X rays than one X ray every three
13  years, if he has ankylosing spondylitis.
14    Q   Okay.  I am confused, because if he is going
15  to have it anyway, why are you putting into your life
16  care plan as something new that he needs for the future,
17  as a result of this incident?
18    A   I'm saying a portion of the future is going to
19  be monitoring the area in the thoracic spine that was
20  injured as a result of this accident.  So we need to
21  monitor that area that was injured by doing one X ray
22  every three years for the duration so...
23    Q   Okay.
24    A   Monitoring the injury.  Yes, he has ankylosing
25  spondylitis.  Yes, he will have X rays.  I am saying, in

Page 196

1  addition to his ankylosing spondylitis X rays, he is
2  going to need additional X rays.
3    Q   The ankylosing spondylitis X rays are of that
4  area -- are of the thoracic spine, right?
5    A   I am just saying over and above those.
6    Q   The X rays for the ankylosing spondylitis are
7  of the thoracic spine, correct?
8    A   They are of the whole --
9        MR. McALPINE:  Objection.  Asked and
10  answered.
11    A   -- the whole spine, yes.  They include the
12  thoracic spine.  I'm just saying that because of his
13  injury, he will need X rays over and above what would
14  normally be required for the ankylosing spondylitis.
15    Q   (BY MR. GREENE) So based on this section of
16  your life care plan, you are requiring him to have
17  treatment that he is already going to have?
18    A   No, no, I am not.
19    Q   Well, he is already having the X rays of the
20  thoracic spine due to the ankylosing spondylitis,
21  correct?
22    A   No.  I am saying he is going to need these, in
23  addition to what he is having.  He is going to have way
24  more X rays.  This is just in addition.
25    Q   And this, the -- okay.  But why does he need

Page 197

1  it more than one time, or as needed?  Why are you --
2    A   He has a spinal cord injury at that level.
3  For monitoring of worsening, for looking at other levels
4  above and below that area, for monitoring of the bone
5  density, for monitoring for scoliosis because of his
6  injuries.  So there is plenty of reasons to back up --
7  in addition to the ankylosing spondylitis, which I am
8  saying is not related to these -- monitoring of the
9  injury.
10    Q   Okay.  This assumes that he is going to do it
11  every three years, though, right?  Ultimately it's up to
12  him, true?
13    A   He is going to do it way more than every three
14  years.  He -- somebody will order an X ray.  He will be
15  at the emergency room.  Somebody will order it for him.
16  Guaranteed he will have more than three X rays -- or
17  once every three years.
18    Q   But --
19    A   And, again, a life care plan is not based
20  on -- going back, he may not do any of this, but I am
21  not being asked to comment on whether I think
22  Mr. Aguilar is going to follow through with my life care
23  plan.  I am -- I am commenting on what I believe, in my
24  opinion, he will need in the future to get him to the
25  highest level of function, lower, you know, his pain and



Page 198

1    suffering, and decrease duplications.
2        Q    Right, but my question is:  Why is it not
3    sufficient for him to have a thoracic spine X ray once,
4    or as needed, as opposed to you assuming that he is
5    going to be required to have one every three years?
6            MR. McALPINE:  Objection.  Calls for
7    speculation, argumentative, asked and answered.
8            THE WITNESS:  Answer?
9        Q    (BY MR. GREENE)  Yeah.
10           MR. McALPINE:  Yeah, of course.
11       A    In my opinion, this is the as needed.  This is
12   the as needed.  In order to put a price on something, I
13   have to put a number on something.  I can't just say --
14   throw a number.  It's -- this is as needed.
15       Q    (BY MR. GREENE)  Okay.  What's the basis of
16   your number?
17       A    Education, training, experience.
18       Q    The neuropsychological evaluation?
19       A    We talked about that.
20       Q    That's what we talked about earlier, correct?
21       A    Right.
22       Q    The venous Doppler studies?
23       A    Monitor for DVTs because of his condition.
24   Let's just say, lower extremity paraplegia, he would be
25   warranted to have that once every two years for the

Page 199

1    duration, as a complication of spinal cord injury due to
2    sedentary status.
3        Q    What is a venous Doppler study?
4        A    It's an ultrasound of the leg to look at the
5    veins to look for clots.
6            THE VIDEOGRAPHER:  We have five minutes.
7            MR. GREENE:  We can go off the record.
8    We can take a break now.
9            THE VIDEOGRAPHER:  We are going off the
10   record at 1:32 p.m.
11           (RECESS FROM 1:32 P.M. TO 1:34 P.M.)
12           THE VIDEOGRAPHER:  We are going back on
13   the record at 1:34 p.m.
14       Q    (BY MR. GREENE)  So it's your opinion that the
15   venous Doppler studies are done with every paraplegic?
16       A    It is in my experience that a complication of
17   spinal cord injury is blood clot in the legs because of
18   immobility and not walking, so they are at risk for
19   that.  In my opinion, he will need that -- need those
20   studies in the future.
21       Q    And you are recommending every two years?
22       A    Yes.
23       Q    Okay.  So in the almost three and a half years
24   since he has sustained this injury, how many venous
25   Doppler studies have been done?

Page 200

1        A    I don't believe he has had any recently.
2        Q    Well, not just recently.  Period.
3        A    I'll check here.
4            In my report records, I hadn't seen that he
5    had had any, but it doesn't mean that it wouldn't be
6    prudent to include that.
7        Q    Based on the medical records, has he had any
8    problems with clotting in his legs?
9        A    No, not that I have seen, but I am basing it
10   on the fact that he has a spinal cord injury.
11       Q    The bone density study, why are you
12   recommending the bone density study?
13       A    Because spinal-cord-injured patients develop
14   osteopenia just as a result of their injury.
15       Q    Based on the medical records, has any doctor
16   recommended a bone density study since October 11, 2016,
17   and prior to -- excuse me -- October 11, 2013, and prior
18   to October 11, 2013 --
19       A    No.
20       Q    -- '16?
21       A    Not that I have seen, no.
22       Q    So why is the bone density medically
23   necessary, in your opinion?
24       A    Because of his spinal cord injury, because
25   he -- it's likely that he will develop osteoporosis from

Page 201

1    the injury itself and that needs to be monitored.
2        Q    In the roughly three and a half years that he
3    has had this injury, the T12 ASIA B, has any doctor made
4    any reference to issues with osteoporosis or bone
5    density?
6        A    No.  He probably hasn't developed anything
7    yet.  I do think that if you look at any of the PM&R
8    textbooks even, they are going to mention that, you
9    know, this is a common complication of spinal cord
10   injuries so that's why -- my reason for including --
11   excuse me -- including it.
12       Q    Okay.  According to you, the medical
13   literature will say it's a common complication, true?
14       A    Right.
15       Q    It doesn't mean it is going to happen, though,
16   does it?
17       A    It doesn't mean it's not going to happen just
18   because he hasn't had it in the past two years.  I mean,
19   he has a long way to go.
20       Q    Right.  But there is no indication right now
21   that he is suffering from osteoporosis?
22       A    No, but we need a baseline, first of all,
23   right, of his bone density and then we follow him.  And
24   the nature of osteoporosis is it's very gradual and
25   it -- you don't end up having issues until later, so

MAGNA
LEGAL SERVICES

Page 202

1  that's my reasoning for including it.
2      MR. McALPINE: I couldn't get my
3  objection in. I'm going to object to that as
4  argumentative and assuming facts not in evidence.
5      Q  (BY MR. GREENE) What is "KUB"?
6      A  It's an X ray of the kidney, ureter, bladder.
7  Evaluate for stones.
8      Q  Okay. Wouldn't the ultrasound evaluate for
9  stones?
10     A  Right, both. Ultrasound doesn't always pick
11 up everything. It's also a way to evaluate the abdomen,
12 so you -- it's an abdominal X ray, but you just want it
13 to be so that it will evaluate the whole thing. So it's
14 in addition to the ultrasound.
15     Q  Right. But why -- why is the KUB medically
16 necessary if he is having the kidney ultrasound done?
17     A  Because I don't think that the KUB necessarily
18 would pick up other abdominal issues that he is having,
19 and it's also kind of used as a screening tool. If he
20 is just having, like, vague abdominal pain and we don't
21 know if it's the bladder, they may do one or the other.
22 So I'm saying that it's reasonable to assume that these
23 are screening tools that he will need in the future.
24     Q  In the medical records that you have reviewed,
25 have you seen any indication that a KUB was necessary?

Page 203

1      A  Not so far, other than the fact that he has a
2  GI bleed from medications so...
3      Q  The medications, you have a muscle relaxant.
4  Which muscle relaxant is this?
5      A  All the medications are outlined in Section 6,
6  so it is... baclofen.
7      Q  Is oxybutynin, is that appropriate?
8      A  That's for the bladder. Oxybutynin is for the
9  bladder. Baclofen is for the muscles. It's a common
10 antispasticity medication.
11     Q  And why have you concluded that he is going to
12 need this muscle relaxant for the rest of his life?
13     A  Because he has a spinal cord injury and he
14 will develop spasticity because of his injury, and that
15 is something that gets worse over time and that's
16 something that's commonly managed with a muscle
17 relaxant.
18     Q  You anticipate that he is going to develop
19 that, right?
20     A  He has already --
21     Q  He has already?
22     A  -- spasticity, yeah.
23     Q  So he is already taking muscle relaxants?
24     A  He is taking -- I don't know if I had the
25 complete list when I -- when I did this, but it is

Page 204

1  something that almost all spinal-cord-injured patients
2  need. And then if you will hand me the physician
3  consultation, I can look at all of his medications
4  again.
5      I don't know if he was taking it when I saw
6  him, but it is something that is used for spasticity and
7  pain in spinal cord injuries.
8      Q  Okay. So based on the medical records, the
9  medication that you are recommending, he isn't taking it
10 now?
11     A  Based on the interview and exam, I don't know
12 if he was taking it at the time that I saw him, as far
13 as the medical records. I don't see that we have a good
14 list of the medical records in -- of the medications in
15 the medical records.
16     I am basing it on my education, training, and
17 experience that individuals with spinal cord injury use
18 baclofen and usually at much higher doses than what I am
19 recommending. They sometimes even necessitate a
20 baclofen pump, which I haven't actually said that he
21 will need, which he may need, but which I haven't
22 included.
23     Q  Well, we have agreed a couple of times that a
24 life care plan is supposed to be individualized, right?
25     A  Right. And that it has to be more likely than

Page 205

1  not that he will need it, so that -- you know, if I
2  haven't included something, it's because -- or if I
3  haven't discounted something, that's why.
4      Q  With respect to Mr. Aguilar, you don't see any
5  indication that he is using that medication?
6      A  I don't know if he is. I don't know if he is
7  or isn't. I really would like to, you know, get the
8  current medical records and see medications, because I
9  have a hard time believing that he isn't on some sort of
10 muscle relaxant.
11     Q  Well, looking at your medical records review,
12 which is Exhibit 2, and the medical records you relied
13 on in formulating your opinions, back on December 1st,
14 2016, was there any indication in any of those medical
15 records that you have already reviewed that he is taking
16 that medication?
17     A  Not as of this report, no.
18     Q  What about as of this medical records review?
19     A  If I can see that, please.
20     The only mention was 2014 of any medications.
21 And they do not have a complete list, but they do have
22 blood pressure and pain medication. I don't see that
23 they have the baclofen.
24     Q  Do you see that they have any other medication
25 for the muscle --

MAGNA
LEGAL SERVICES

Page 206

1    A   I don't have a complete list in any of the
2  records so I don't -- I would like to get a complete
3  list of what he is taking, obviously.
4    Q   Well, based on the records that you have, do
5  you see any other reference to a muscle relaxant?
6    A   No, not -- not after that accident.
7    Q   And the analgesic, why 12 times per year?
8    A   So basically that's how we price out
9  medication.  So as far as specific analgesic for him, it
10 was throughout the records that he was needing an
11 analgesic for his pain, even before the October, 2016,
12 accident.
13       The specific one that I outline is kind of a
14 little bit not as strong analgesic as what he is taking
15 because, you know, there is complications associated
16 with taking narcotics like Norco.  So I have put him on,
17 in this plan, a -- recommended a lesser opiate,
18 tramadol, which is going to help deal with the pain
19 associated with his deformities and his spinal cord
20 injury.
21   Q   With all the medications that you are
22 recommending, with respect to your opinions, the
23 duration is going to change on all of them, right?
24   A   Anything that's 19 will likely go down.
25   Q   What about anything that's ten?

Page 207

1    A   Which one are you --
2    Q   Does that also go down?
3    A   There is nothing that's ten.
4    Q   Flu vac- -- wait a minute.  Hold on.  I'm
5  sorry.
6        What about five, erectile dysfunction, is that
7  going to go down?
8    A   No, I don't think so.
9    Q   The orthopedic spine surgeon, that's a
10 duration of ten.  Is that going to go down?
11   A   I am only anticipating currently.  Obviously,
12 I don't know what my final report is going to say, but
13 right now, currently, I am only going to decrease
14 anything that's 19.
15   Q   But that, too, could change, potentially?
16   A   It may be -- it may be -- you know, I might
17 decrease it more than 10 percent.  I don't know yet
18 but --
19   Q   Well, I'm sorry.  No, no.
20   A   Yeah.
21   Q   When you said -- bad question.
22       You said you are only anticipating decreasing
23 everything that's 19.
24   A   Right now, yes, yes.
25   Q   So none of the other numbers are going to

Page 208

1  decrease by 10 percent --
2    A   I mean, again, I haven't really had time to --
3    Q   -- for duration?
4    A   -- kind of go through everything.  It's just
5  been since yesterday.  Potentially I may decrease a few
6  of the things.  I just don't know yet so...
7    Q   Okay.  All right.  So we'll continue to go
8  through this, but the fact of the matter is, without
9  knowing the duration, you really don't -- your opinions
10 aren't complete right now?
11   A   That's correct, because I did express to you
12 that I was going to change the duration of his -- of the
13 life expectancy.
14   Q   And so the opinions that you are expressing in
15 this report that's dated December 1, 2016, as we are
16 sitting here today in your deposition, based on new
17 information that you have learned, these opinions in
18 Exhibit 11 are incorrect with respect to --
19       MR. McALPINE:  Objection.  Argumentative,
20 too general.
21   Q   (BY MR. GREENE) -- with respect to the
22 duration and how the duration affects future cost?
23   A   All I am going to say was in the original
24 report in December, I did reserve the right to amend my
25 report, which I have not been asked to do so.  I am

Page 209

1  expressing to you that I do have changes that I would
2  like to make.
3        I am not outlining specifically each one,
4  because I don't feel like I have had adequate time and,
5  you know, I am not going to do it on the fly, because I
6  take this very seriously.
7        So I would like to opportunity to make those
8  changes and put adequate thought into it and go about my
9  normal methodology in doing so.  I expect that all the
10 19 durations will decrease.  I am not sure about the
11 other ones.
12   Q   Okay.  The -- is that the flu vaccine --
13   A   Yes.
14   Q   -- Pneumovax?
15       What are the CBC recommendations with respect
16 to Pneumovax?
17   A   Every five years over 65, especially those
18 with other, you know, lung -- lung diseases.  I know
19 that spinal cord injury, they -- they need it.  This
20 isn't just like a soft recommendation, like, "You should
21 get it if you are over 65 and healthy."  It's, like,
22 "You need to have it because pneumonia is a significant
23 complication that can kill you."
24   Q   It's every five years, and you are
25 recommending it every two years?



Page 210

1    A   No.  That's actually a typo.  That should be
2   every five years.
3    Q   So this flu vaccine --
4    A   It should be 0.2, instead of 0.5.
5    Q   Okay.  And he has already had the flu vaccine
6   this year, right?
7    A   I don't -- I would assume so.  I don't know.
8   Yeah, so you could take one of the flu off if he's had
9   it this year, if he has also had the Pneumovax.  I
10  didn't have that information at the time I did that
11  report -- did this report.
12       So if he had the Pneumovax, you know, in the
13  last five years, great.  We can take -- we can start --
14  start it at age, you know, 70, or whenever he had the
15  last one.  So those can potentially be decreased, you
16  know, somewhat, if he has had them and he is up to speed
17  on those.
18    Q   And I'm sorry.  I said the "flu vaccine" and
19  "Pneumovax" and I kind of -- kind of combined those, but
20  you had them listed separately in your report.
21    A   The flu vaccine is for influenza and that's
22  recommended for the general population every year,
23  especially the old and the young, or chronically ill.
24       The Pneumovax is a pneumonia vaccine, so
25  that's different.  So that's recommended for over 65 and

Page 211

1   chronically ill as well.
2    Q   Okay.  So if he had never had this accident on
3   October 11, 2013, he was going to be required to take
4   the flu vaccine anyway.
5    A   Maybe.  I mean, I don't know if he -- I am
6   saying that I don't know for sure if he would have
7   gotten it.  I am recommending that he absolutely needs
8   to get it, because of the spinal cord injury.  That's
9   all I'm saying, because --
10    Q   Right.
11    A   -- of the pneumonia complication that can
12  occur with spinal cord injury.
13    Q   Okay.  Let me back up.  You said it's
14  recommended for everybody anyway, correct, the flu
15  vaccine?
16    A   Yes.
17    Q   All right.  So whether he would have had this
18  accident on October 11, 2013, or not, he was still going
19  to be required or recommended -- it was still going to
20  be recommended that he have the flu vaccine, true?
21    A   Correct.
22    Q   So that's something that's already within his
23  general healthcare, right --
24    A   It should be.
25    Q   -- as a recommendation?

Page 212

1    A   It should be.  I am just saying that specific
2   to his -- I mean, I understand what you are saying, but
3   specific to his spinal cord injury, he absolutely needs
4   it now.  There is no question.  It's not a soft
5   recommendation.
6        It is because he has a spinal cord injury, you
7   are absolutely getting it on your yearly checkup.  There
8   is no questions asked.  You are at increased risk.
9    Q   But that's the case anyway, though.  He's --
10  he should be getting it anyway is my point.
11       MR. McALPINE:  Objection.  Argumentative,
12  mischaracterizes prior testimony.
13    A   I am -- by including it, I am placing utmost
14  importance on the fact that he get it.
15    Q   (BY MR. GREENE) By including it, you are also
16  charging for something that he should be getting anyway,
17  regardless of if he had this accident or not?
18       MR. McALPINE:  Objection.  Argumentative,
19  misstate --
20    A   I don't know that -- no.
21       MR. McALPINE:  Objection.  Argumentative.
22    A   I don't know that that's true, because you can
23  have a 70-year-old person.  What if they -- you know,
24  they have to pay out-of-pocket for things.  Hopefully
25  they don't have to pay for that.  We didn't get into any

Page 213

1   of the cost aspects.  You know, I don't know that he
2   will get it.  I don't know that, but I am recommending
3   that he get it.
4    Q   No, no.  I understand what you are
5   recommending.
6    A   I don't know that he would get it otherwise.
7    Q   Right.  And I understand that you are
8   recommending it.
9    A   Yeah.
10    Q   And I guess that's where we are.  My point is:
11  It was already going to be recommended that he get the
12  flu vaccine, whether he had this accident or not, true?
13       MR. McALPINE:  Objection.  Argumentative,
14  asked and answered --
15    A   Yes, because everyone --
16       MR. McALPINE:  -- assumes facts not in
17  evidence.
18    A   -- is recommended to have it.
19       THE REPORTER:  I'm sorry.  Can you repeat
20  your objection?
21       MR. McALPINE:  Yeah.  Objection.
22  Argumentative, assumes facts not in evidence, asked and
23  answered.
24    A   I am recommending it because I am placing more
25  importance on just -- he is just a general person.  I am



Page 214

1    saying he absolutely needs it.  I don't know that he
2    would get it if he didn't have this.
3        Q    (BY MR. GREENE)  All right.  But you don't know
4    if he is going to get it simply because you recommend
5    it, though, true?
6        A    No, that's true, but I am saying in this view
7    of him, looking at his spinal cord injury, he needs a
8    flu vaccine and he needs a pneumonia vaccine.  So, I
9    mean, I think you can kind of take a guess if he would
10   have gotten it or if somebody would have recommended.  I
11   don't know that anyone would have recommended it.  I
12   don't know that.
13       Q    Well --
14       A    I don't know if he would have gone to a
15   primary care gave him the flu vaccine.
16       Q    Ma'am.
17       A    I am saying I am being asked -- it would be --
18   it would not be prudent of me to not include it as a
19   PM&R doctor with a spinal-cord-injured patient.
20       Q    I understand that.  But as a man 65 years of
21   age, his doctor would recom- -- every doctor recommends
22   that a person 65 years old takes the flu vaccine, true?
23       A    I don't -- I don't know what every doctor
24   does.
25       Q    Okay.  The CDC recommends that you take the

Page 215

1    flu vaccine, and Mr. Aguilar would be included in that
2    recommendation, true?
3        A    That's true, yeah.
4        Q    All right.  I'm skipping to page -- what are
5    we talking -- "Physical Therapy, Periodic."  Why are you
6    recommending therapy once a month?
7        A    I am actually recommending 12 times per year.
8    Where do you see once a month?
9        Q    You are right.  I am just assuming it was once
10   a month.
11       A    No, sorry.  So --
12       Q    But you are right.
13       A    So basically this is actually 12 times per
14   year, assuming he will get it in short bursts.  It might
15   be six and six.
16       Q    Okay.
17       A    It's probably not going to be once a week,
18   although for kind of -- for patients like him, there is
19   kind of a preventative PT that they will go through, but
20   that's not what I have outlined.  But it's just -- I am
21   assuming he will get it in bursts, because he will have
22   ups and downs related to his injury.
23       Q    Well, shouldn't it be recommended annually,
24   the PT?  Annual PT --
25       A    Once a year?

Page 216

1        Q    Let me -- you have got to let me finish.
2             Annual PT and three sessions per year to help
3    update his home exercise program, wouldn't that be the
4    more prudent approach?
5             MR. McALPINE:  Objection.  No foundation.
6        A    Again, I had done this report back in
7    December.  I may change it to home exercise -- or to a
8    home PT program, but I am not sure yet.  At the point
9    that I had -- because I think it's going to be very
10   cumbersome for him to go out of the house.  I don't
11   think it was as cumbersome at the time of his initial
12   injury.
13            So that may be something that actually changes
14   so that it will be home health PT, but I don't -- I
15   don't -- again, without a supplemental report -- but my
16   thinking in doing it at the time that I did it was that
17   with his spinal cord injury, he will need kind of
18   preventative or PT that -- after kind of a worsening of
19   his spinal cord injury.
20       Q    Right.  But we are only talking about the care
21   before October 4th, 2016, before that subsequent injury.
22       A    Right.  And I --
23       Q    Before that subsequent injury, he would have
24   required annual PT with three sessions per year --
25       A    No.

Page 217

1        Q    -- to update the home exercise program?
2        A    No.  I think I would recommend outpatient.  If
3    it was just talking about the paraplegia, outpatient for
4    him.
5        Q    Okay.  Well, let's make sure --
6        A    Which is what I recommended again.
7        Q    -- that's all we are talking about in this
8    life care plan, right, paraplegia?
9        A    Right.
10       Q    Okay.
11       A    But I have to be realistic, too, so I would
12   probably -- because he is not -- let's be realistic.  He
13   is not going to get to go to outpatient.  He is not
14   going to get that.  He is going to get home health now.
15            So based on his comorbidities, which is the
16   tetraplegia, which is now he can't really do much at
17   all, I think we would have to go to a PT home health.
18            Does that make sense?
19       Q    Is that --
20       A    Which is --
21       Q    How would that affect this opinion?
22       A    I don't have that price, so it's going to
23   change it to be a different entity.  We are going to
24   price out a home health visit.
25       Q    Is it going to be more or less?

MAGNA
LEGAL SERVICES

Page 218

1    A   I don't know.  It will likely be less.
2    Q   Right, but what I am hearing you say now is
3  that's going to happen not because of the paraplegia
4  from the October 11, 2013, incident but because of the
5  subsequent incident in October, 2016.  That's why you
6  are doing that, true?
7    A   I mean, I can generally say that it's probably
8  going to be less because of his tetraplegia, because
9  outpatient therapy is way more involved than a home
10  health person coming in three or four times a year.
11  Normally, I do four times per year.
12        So I think, because of his comorbidities, it
13  will go down, but I just -- you know, since I haven't
14  done the subsequent report, I actually hadn't thought
15  about that specific incident.  I've only thought about the
16  life expectancy so...
17    Q   At the time you wrote this report in December
18  of 2016, as a T12 AISA B, was he having physical therapy
19  at that time?
20    A   He had had it.  I don't know if he was having
21  it at that very moment.  The last record that I had
22  was -- you know, at the time I did this report was
23  March --
24    Q   Okay.
25    A   -- of 2016, so I don't see that he had had it

Page 219

1  very recently before that.
2    Q   Between March, 2016, and October, 2016, had he
3  had it?
4    A   No, not from the records that I have.
5    Q   All right.  So he hadn't gone to physical
6  therapy at all?
7    A   No, that's fine.  I mean, it doesn't mean that
8  I am not going to recommend it, because, again, going
9  back to the objectives of the life care plan.
10    Q   And the basis of the 12 visits over the course
11  of a year is what?
12    A   So the normal kind of stint of physical
13  therapy is two or three times per week for four to six
14  weeks.  So if you say two times -- two times per week
15  for six weeks, that gets you to 12.  If you do two times
16  per week -- or three times per week for four weeks, 12.
17  So that's the normal subscript- -- prescription of
18  physical therapy, so that's the reason for including it
19  there.
20    Q   Well, let's -- let's individualize this to
21  Mr. Aguilar.  What would the physical therapy be for
22  him, not for --
23    A   This --
24    Q   -- the normal person who -- what you normally
25  prescribe?

Page 220

1    A   This is what I think is going to be adequate
2  for Mr. Aguilar.
3    Q   And so if anyone else opines that it should be
4  one -- it should be annually, with three sessions per
5  year, you disagree with that?
6    A   I have my own opinion, and they can have their
7  own opinion so --
8    Q   Well, no.
9    A   And, again --
10    Q   I am asking --
11    A   Again, you know, I don't know that this is my
12  final recommendation of therapy, now that I have seen
13  more records and seen him in person, so -- but at this
14  time, that was my opinion and if somebody else wants to
15  have another opinion, that's fine.
16    Q   Right.  But if they have that opinion, do you
17  have any problems with it?
18    A   I would disagree with it because I am having,
19  you know, to meet the objectives of my life care plan.
20  I am not doing bare minimum.
21    Q   Well, so you are only disagreeing with it --
22  let me back up.
23        From a clinical perspective, why would you
24  disagree with it?
25    A   I think that it's very -- I think that's the

Page 221

1  bare minimum amount.  I don't think three times a year
2  is enough.  I think, minimum, four times a year.  I
3  think that is the bare minimum for somebody -- and then
4  if you are going to say, "Oh, I want them to get to
5  their highest level of function," highest level of
6  function, you need them to have active, ongoing therapy.
7  You need them to have preventative kind of maintenance
8  therapy, not just, "Oh, let's wait for him to get bad
9  and then we will perk" -- "we will boost him up a little
10  and wait for him to get bad and boost him up and do the
11  bare minimum and, okay, now he gets a little therapy
12  because he has a wound," or whatever.
13        I'm trying to impress upon the reader that
14  this is something that would help him to get to the
15  highest level of function and highest quality of life.
16    Q   From October 11th through -- October 11, 2013,
17  until October 4th, 2016, was he involved in any ongoing
18  physical therapy?
19    A   I don't have evidence of that in the records,
20  however, it doesn't -- just the fact -- just because of
21  the fact he didn't get it, it doesn't mean he didn't
22  need it or he wouldn't have been better off for it.  So,
23  I mean, I have people I do life care plans for and there
24  is -- they don't even -- they haven't gotten any
25  treatment at all in the past two years.  It doesn't mean



Page 222

1   that they didn't need something.
2        So I am just looking at him and I do look at
3   the past records and I do take that into account.  But
4   just because they haven't had them, because you have
5   been asking me the same question about that, just
6   because they haven't had it at all doesn't mean that
7   they didn't need it or doesn't mean they can't benefit
8   from it.
9             MR. GREENE:  Objection, nonresponsive.
10       Q   (BY MR. GREENE) Based on the records that you
11  have reviewed from October 11, 2013, until October 4th,
12  2016, was he participating in an ongoing physical
13  therapy program?
14       A   No, not that I saw from the records I
15  reviewed.
16       Q   Occupational therapy.  We talked about this
17  earlier and what you told me was physical therapy is for
18  the lower extremities, occupational therapy is for the
19  upper extremities, right?
20       A   Basically, yes.
21       Q   Yes, very basically.  But if he is a T12 ASIA
22  B, he doesn't have any problem with his arms, right?
23       A   No, but he is using his arms, right?  Overuse
24  of the arms.  He is at risk for overuse.  He is -- so he
25  could develop biceps tendonitis, which is very common,

Page 223

1   as well as OT helps you with ADLs.  So any equipment,
2   any reachers, any sock -- helping to put your socks on,
3   equipment for those types of things with dressing, they
4   help you with that.  So that's my thinking there.
5        Q   From October 11, 2013, until October 4th,
6   2016, did you see any indication that he was having
7   problems with his upper extremities?
8        A   No.
9        Q   Did you see any indication that he had
10  developed biceps tendonitis?
11       A   No, not at that time.
12       Q   And the folks who -- whose records you are
13  reviewing, you made a comment earlier that it's the
14  treating physician who sees him for 15 minutes, but, in
15  fact, the treating physician is seeing him 15 minutes a
16  few times a year, over a few years, right?
17       A   Correct.
18       Q   Yes?
19       A   Right.  I don't -- I am not going to comment
20  on how often everyone sees him, but, yeah, they don't
21  see -- my point is they don't look at the whole picture
22  of Mr. Aguilar every time they see him.  They see him
23  for short, you know, snippets.
24       Q   Right.  How long did your exam with
25  Mr. Aguilar last?

Page 224

1        A   About one and a half to two hours.
2        Q   Okay.  So we'll give you the high end, two
3   hours.
4        A   Okay.  In addition to, you know, however long
5   I told you before, about six hours of reviewing all the
6   records and --
7        Q   Well, no, no.  All right.  Sorry.  Sorry to
8   cut you off.  I apologize.  No, no, I am talking about
9   your actual visit with him.
10       A   Two hours.
11       Q   Two hours.
12           That was the first time you ever saw him?
13       A   Right.
14       Q   Last time you ever saw him?
15       A   Right.
16       Q   You are not treating him on a regular basis,
17  are you?
18       A   No, no.
19       Q   As a physician, would you rely on the person
20  who is treating him regularly or someone who saw him
21  once for two hours?
22           MR. McALPINE:  Objection.  Calls for
23  speculation, complete hypothetical, no foundation.
24       A   As far as the treating physicians?  I think it
25  would be helpful to ask them what they think about the

Page 225

1   future.  I don't think they are trained life care
2   planners in the -- for the most part, so I don't think
3   that they -- usually, when I do have the conversations
4   with the treating, they are, like, "Oh, well, you are
5   the life care planner."  You know, you can -- that's
6   your department kind of a thing.  So they will tell me
7   what they usually do, and then I will kind of project it
8   out.  So I don't know how to answer the question.
9        Q   Well, the treating physician took the same
10  oath that you took, right?
11       A   I am not treating Mr. Aguilar in this case
12  but --
13       Q   Right.
14       A   -- yes, we have all taken the oath.
15       Q   Okay.  So they have the same interest in --
16  that you have in helping him to get better, true?
17       A   Right.  And they are doing their job, and I
18  have no comment on that at all.  I am just saying that
19  the life care plan is a bit of a different perspective.
20       Q   Are there any records that you have reviewed
21  that support the need for occupational therapy, prior to
22  October 4th, 2016?
23       A   Yes.  I mean, he stayed at TIRR.  He had
24  ongoing therapy when he was at TIRR.  He --
25       Q   Occupational therapy, I'm sorry?

MAGNA
LEGAL SERVICES

Page 226

1    A   Yeah.  He had PT, OT, and speech when he was
2  admitted.  That's what -- anyone who is admitted to
3  acute rehab at TIRR, or any other acute rehab, they are
4  on PT, OT, and speech, at least for an eval, and then PT
5  and OT.  And then as needed, they will kind of taper off
6  whatever they don't need.  But that's kind of the
7  requirements of being in acute rehab.
8    Q   When did he stop with the OT?
9    A   I don't know the exact date of that.
10   Q   Well, you have the records here, right?
11   A   He would have stopped on discharge.  If he had
12  any subsequent visits -- he did have the vehicle
13  modification done, so that involves OT.  June, 2015, OT
14  re-eval.  According to this plan, that's the last that I
15  had.
16   Q   I'm sorry.  When was it?
17   A   October 20 -- I'm sorry.  June, 2015.  June,
18  2015.
19   Q   And he hasn't attended any other occupational
20  therapy sessions?
21   A   Not at this time.  I didn't have evidence of
22  that.
23   Q   And based on the records you reviewed, there
24  have been no complaints or diagnoses of problems with
25  his upper extremities, prior to October 11 --

Page 227

1  October 4th, 2016?
2    A   No, but I am assuming that he will have some
3  of the common things that spinal-cord-injured patients
4  have and need to be evaluated for.
5    Q   You also have a nutritional counselor.  You
6  have recommended a nutritional counselor.  Earlier you
7  told me you don't know if he has gained weight, lost
8  weight.  You don't know one way or the other, right?
9  Correct?
10   A   I don't know.  Yeah, I don't know.
11   Q   So why are you recommending a nutritional
12  counselor?
13   A   Just for general nutrition, because the
14  spinal -- because of his spinal cord injury.  So it is a
15  state that it is -- it can be more of a catabolic state.
16  He was definitely in a breakdown state, and you are
17  using kind of more energy.  And just to maximize his
18  potential, I believe that he could benefit from some
19  nutritional input.  It's not for weight loss or anything
20  like that.
21   Q   What do the records show with respect to his
22  need for a nutritional counselor?  The medical records.
23   A   He -- he likely had it in the hospital, and I
24  didn't see anything after that.
25   Q   When was he released from the hospital?

Page 228

1    A   He had it done in February, 2014.  There was
2  an assessment done, nutritional assessment done, and I
3  don't see that he had one after that.
4    Q   And when you interviewed him, is there
5  anything in your physician consultation that lets you
6  know that he needs nutritional -- excuse me -- that he
7  needed a nutritional counselor before October 11,
8  2000- -- excuse me -- October 4th, 2016?
9    A   Yes.  I mean, just the fact that he has a
10  spinal cord injury.  That's all I'm basing it on.  It's
11  not --
12   Q   Okay.
13   A   It's, like, let's get him on the right track
14  so that he can maximum the rest of his life, so he knows
15  what to eat, so he knows to eat enough protein and you,
16  know, it's just basically related to the injury.
17   Q   So from October --
18   A   Whether or not there is weight-loss needs or
19  something else, I mean, I'm not addressing that.
20   Q   From October 11, 2013, until October 4th,
21  2016, he did not have a nutritional counselor, right?
22   A   Just --
23   Q   Correct?
24   A   -- after the injury.
25   Q   Other than --

Page 229

1    A   Yeah.
2    Q   -- being in the hospital?
3    A   No, not outpatient, I don't believe he had.
4    Q   And he is --
5        THE REPORTER:  I'm sorry.
6        (OFF-THE-RECORD DISCUSSION.)
7    Q   (BY MR. GREENE) And since his release from the
8  hospital, there has been no indication that he wants a
9  nutritional counselor?
10   A   I don't --
11       MR. McALPINE:  Objection.  Compound.
12   A   I don't see that he has had one.  I don't know
13  what his wants are, as far as wanting one.  I believe
14  that it is -- that it could improve his quality of life
15  if he gets a nutritional evaluation.
16   Q   (BY MR. GREENE) Based on Mr. Aguilar, other
17  than -- well, based on Mr. Aguilar and his condition
18  after October 11, 2013, prior to October 4, 2016, what
19  is it about his condition that leads you to conclude
20  that he needs a nutritional counselor?
21   A   The fact that he has a spinal cord injury,
22  period.
23   Q   That's it?
24   A   Yeah.
25   Q   So every person with a spinal cord injury



Page 230

1  needs a nutritional counselor?
2      A   At least in the beginning, yeah.
3      Q   Okay.
4      A   To get -- to get them on the right track, I
5  think that that is helpful for quality of life the rest
6  of his life.
7      Q   Okay.  He had a nutritional counselor in the
8  beginning until --
9      A   Yeah.  Everybody has one in the hospital.
10 Sorry.
11     Q   Okay.  He had one in the beginning, in the
12 hospital, true?
13     A   Yes.
14     Q   So is it your opinion that every person who
15 has a spinal cord injury, once they are released from
16 the hospital, they require a nutritional counselor?
17     A   I believe that they can benefit from a
18 nutritional evaluation and counseling.
19     Q   My question was:  Do they need one?  Is it
20 your opinion that they need a nutrition -- that they
21 need a nutritional --
22     A   Yes.
23     Q   -- counselor?
24     A   Yes.  To meet the objectives of the life care
25 plan, yes.

Page 231

1      Q   Well, so now you went back to the life care
2  plan with Mr. Aguilar.
3      A   And that's what I --
4      Q   I'm talking --
5      A   And that is what I have been asked to do.  You
6  are not -- I am not here to answer questions about what
7  people normally do, you know, at the bare minimum.  It's
8  like -- I am asked -- I am here today to answer
9  questions on, "You are the life care planner.  What do
10 you think that he is going to need" -- "to get him
11 to the highest level of foundation?"  That -- I am
12 answering it within that paradigm.
13     Q   No.  Actually, you are here to answer the
14 questions that I ask that are related to this case.
15         You just stated that every person who is a --
16 has a spinal cord injury needs a nutritional counselor.
17 That was your earlier testimony.
18         My question to you, because you went back to
19 Mr. Aguilar and the life care plan, outside of this life
20 care plan, is it your opinion that every person who
21 suffers a spinal cord injury needs a nutritional
22 counselor after they are released from the hospital?
23         MR. McALPINE:  Objection.  Argumentative,
24 outside scope of direct, assumes facts not in evidence,
25 object to sidebar.

Page 232

1          Go ahead.
2      A   I believe he can benefit from nutritional
3  counseling because of his spinal cord injury.
4      Q   (BY MR. GREENE) Okay.  Again, my question was
5  not limited to Mr. Aguilar.  My question was based on
6  your earlier testimony that every person who has a
7  spinal cord injury needs a nutritional counselor once
8  they are released from the hospital.  Is that your
9  opinion?
10     A   I don't think everyone needs it.  I think that
11 Mr. Aguilar can benefit from it.
12     Q   Okay.  The next cost, as far as service items,
13 is the electrical hospital bed.  Now, a person who is a
14 T12, they -- it's not recommended that they have an
15 electrical hospital bed, is it?
16     A   Again, we are back to decreasing
17 complications.  I think that he needs a hospital bed so
18 that he can prevent wounds.
19     Q   Okay.  He has not had a hospital bed for the
20 last three years, other than when he was in the
21 hospital, true?
22     A   I don't know that.
23     Q   Well, you interviewed him, right?  You didn't
24 ask that question?
25     A   Yes.  I don't -- let me check.

Page 233

1      Q   Isn't there a section in there about what
2  devices he has?
3      A   I don't have that information.
4      Q   So sitting here today, you don't know if he
5  has a hospital bed or not, true?
6      A   True.
7      Q   Can I see that?
8      A   (Witness tendering to Counsel.)
9      Q   Well, a person who is a T12, you want them to
10 use their upper extremities, though, true?
11     A   They have -- yeah, they have to use their
12 upper extremities.
13     Q   And an electrical hospital bed would limit his
14 use of his upper extremities somewhat; isn't that fair?
15     A   No.  Why would it limit it?
16     Q   Well, he is not using his arms to get up out
17 of bed.  He is using the electrical bed.
18     A   It's not to help him with getting up.  It's
19 just the fact that he has a movable -- to kind of help
20 with adjusting with offloading and things like that and
21 that he has an adequate mattress and an adequate, you
22 know, setup to prevent complications.  This is not about
23 him, like, helping him to get up and...
24     Q   So is it fair that it's your opinion that a
25 hospital bed is required for a person who is a T12?



Page 234

1    A   I think that it, again, will prevent
2  complications and get him to the highest level of
3  function.
4    Q   Is it required?
5    A   I'm -- I don't think that that's a relevant
6  question, sorry.  I think that -- I believe that he will
7  need it and that it will get him to the highest level of
8  function.
9    Q   Is it required, ma'am?
10   A   He doesn't have to even have a house over his
11  head.  I mean, what -- I don't know where you are going
12  with the question.  It's like -- he doesn't need any of
13  it, and he will do poorly.  Like -- but if he gets a lot
14  of this stuff, he will do well, but, you know, in spite
15  of his condition.  So it's...
16          MR. GREENE:  Objection, nonresponsive.
17   A   He doesn't need medications either.  He can
18  just have all these complications happen to him.  I
19  mean, it's -- I am being asked to comment on what his --
20  what is the -- you know, what are the things that he
21  needs to get into the highest level of function to
22  prevent complications.  It is not unreasonable that a
23  person with a paraplegia would need a hospital bed.
24          MR. GREENE:  Well, objection,
25  nonresponsive.

Page 235

1    Q   (BY MR. GREENE) I'm not asking you if it's
2  unreasonable.  My question was:  Is it required for
3  Mr. Aguilar to have an electrical hospital bed?
4    A   Yes.
5    Q   Why?
6    A   To prevent complications.
7    Q   What complications?
8    A   Wounds, contractures --
9    Q   Okay.  Well, as far as --
10   A   -- falls.  I mean --
11   Q   As far as we know, he does not have a hospital
12  bed now, right?
13   A   I don't know that.
14   Q   You don't know that?
15   A   I don't know if he does or doesn't.
16   Q   Let's just -- assume with me --
17   A   He was in a hospital bed when I saw him, but I
18  don't know if he has one at home.
19   Q   Where did you see him at?
20   A   In a rehab facility.
21   Q   Okay.  And the rehab facilities typically have
22  hospital beds, right?
23   A   Correct.
24   Q   Okay.  When he was living at home with his
25  daughter, have you inquired about whether he had a

Page 236

1  hospital bed?
2    A   I don't recall if I asked him that question.
3    Q   A power wheelchair.  With respect to
4  Mr. Aguilar and his paraplegia, he is not required to
5  have a power wheelchair, is he?
6    A   I think for long distances and I think that
7  it's -- it is reasonable that he will have a power
8  wheelchair, yes.
9    Q   Okay.  Well, you do --
10   A   And I made that conclusion before I even saw
11  him and saw how debilitated he was but...
12   Q   Well, he is debilitated now, ma'am, because of
13  a subsequent accident, right?
14   A   I am aware of that.
15   Q   Okay.
16          MR. McALPINE:  Objection.
17   A   I'm saying I made the conclusion before I had
18  any details about that.
19   Q   (BY MR. GREENE) Right.  You just made that
20  conclusion without interviewing him, without examining
21  him.  It's just a conclusion that you made?
22          MR. McALPINE:  Objection.  Argumentative,
23  asked and answered.
24   Q   (BY MR. GREENE) Right?
25          MR. McALPINE:  Objection.  Argumentative,

Page 237

1  asked and answered.
2    A   I believe that based on his paraplegia, he
3  will need an electric wheelchair.
4    Q   (BY MR. GREENE) Well, you are aware, though,
5  that prior to that October, 2016, accident, he did not
6  have an electric wheelchair?
7    A   I don't know that.
8    Q   You don't know that?
9    A   No.
10   Q   If he did not have an electric --
11   A   He had a -- he had a vehicle that was
12  hand-controlled so...
13   Q   If he did not have an electric wheelchair,
14  would that be a surprise to you since --
15   A   No, I am not surprised.  People don't get the
16  things they need, so I am not surprised.
17   Q   Well, do you know if he needed one back then?
18   A   I think that there are definitely cases of
19  paraplegia where they could benefit from having --
20  especially for long distances, benefit from having an
21  electric chair.
22   Q   Let me tell you what:  Since they were not
23  nice enough to give you his deposition, let me refer you
24  to his deposition testimony.
25          MR. McALPINE:  Objection.  Sidebar.

Page 238

1    Q   (BY MR. GREENE) Reading from Page 75, answer,
2    Line 14: "Because originally from my waist down, I
3    didn't have any mobility at all.  After that, I went
4    home and I had -- oops.  Always -- I could always feel
5    if they touched my legs or my feet.  I have never lost
6    that.  Mobility, yes.  And then when I was sent --
7    Dr. Prasarn sent or told us, my daughter Tiffany and me,
8    that we needed to find a nursing home so that I could go
9    back -- go lie on my back for 30 days to help promote
10   the healing" [sic].
11       "So gradually over the last two and a half, or
12   however long it's been, years, I have gained some
13   mobility in my legs.  My feet are still paralyzed.  I
14   can still feel touch, but I can't move my -- wiggle my
15   toes and I can't move my foot at all, both of them.  I
16   was progressing, you know.  I was progressed, but about
17   as far as I could go on with them" [sic].
18       Did you know that Mr. Aguilar felt that he had
19   progressed prior to that October 11th -- October 4th --
20       A   Can I --
21       Q   -- 2016, incident?
22       A   Can I see my physician consult, please?  Or I
23   can actually look at this.
24       He said he was at the wheelchair level after
25   the accident.

Page 239

1    Q   What does that mean, "at the wheelchair
2    level"?
3    A   Meaning he -- he is not ambulating anymore.
4    He needs a wheelchair.  I'm sorry.  Can I see that one,
5    too?
6        And then as far as if he thought he
7    progressed, I was actually surprised at how positive the
8    guy was, but he... I think he thought he was doing
9    pretty well, I mean, as far as, like, he -- he used the
10   wheelchair, he could get around in the car with the hand
11   controls.  I think he probably thought he had
12   progressed, if that's what you are asking.
13   Q   Reading from Page 84, Line 20, "If it's not
14   raining, are you able to get around and go where you
15   need to go?"
16       "Pretty much.  Now, I still have back pain
17   so -- because of the fact that I have to load the chair
18   into my car by myself and it's heavy -- I have to
19   manually pick it up.  If my back is not feeling -- if
20   it's sensitive that day, I can't -- I can't drive and I
21   can't -- because I can't put the chair in the car"
22   [sic].
23       "You had back pain before this accident
24   happened?"
25       "Yes, sir."

Page 240

1        So does that tell you whether he had an
2    electric or a manual wheelchair, based on his testimony?
3    A   Not specifically.  I would probably guess
4    manual, because he can't -- he didn't have a -- like one
5    where he just drove in and transferred himself from the
6    back to the front or could drive the wheelchair in.
7    Q   And as a paraplegic, would you want him using
8    a manual wheelchair or an electric wheelchair, if he
9    could use the manual wheelchair?
10   A   I think that I would, for him specifically, I
11   would opt for the electric.  If he was just, you know,
12   paraplegic, age 40, like, go manual because they are
13   going to want to make sure that they are exercising and
14   they can exercise.  I don't think that the manual is
15   ideal for him.
16   Q   Now, you are not complaining about the doctor
17   who prescribed a manual wheelchair, are you?
18   A   No.
19   Q   And as far as you know, based on Mr. Aguilar's
20   testimony, he used the manual wheelchair, he was able to
21   get around, and he was actually pretty proud of the fact
22   that he was able to drive and do things on his own,
23   right?
24   A   Right.
25   Q   And the manual wheelchair allowed him to do

Page 241

1    that, true?
2    A   Right, and I don't believe he will -- you
3    know, if he wouldn't have had this other accident, let's
4    just talk about if nothing else would have happened, I
5    don't believe he would have been at that level for that
6    long, let me just say that, because he does have the
7    comorbidities that he has.  He is older.  I think the
8    fact that he was at that level is probably the highest
9    level that he would have been at.
10   Q   Right, but you don't -- based on Mr. Aguilar
11   alone and the records that you have seen, you don't have
12   any basis for that in those medical records, do you?
13   For that opinion that you don't think he would have been
14   at that level for long, what are you basing --
15       MR. McALPINE:  Objection.
16   Q   (BY MR. GREENE) -- that on?
17   A   That's not based on --
18       MR. McALPINE:  Objection.  Vagueness and
19   argumentative.
20   A   That's not based on the medical records.
21   That's based on experience with older individuals with
22   spinal cord injury and significant comorbidities.  It's
23   not likely that it's going to be really long-term that
24   he can just keep hauling the wheelchair in and out.  I
25   mean, it's not likely.



Page 242

1  Q   (BY MR. GREENE) Right.  But individualizing it
2  to Mr. Aguilar, there are no records that support
3  that -- that statement, are there?
4      A   No.  It's my opinion.  It's my opinion that I
5  don't believe that he could have gone on like that for,
6  you know, more than five years.  Five maximum, you know.
7      Q   And because you have recommended the power
8  wheelchair, you are also recommending the power
9  wheelchair battery, right?
10     A   Correct.
11     Q   If another life care planner comes along and
12 says the power wheelchair is not necessarily, not
13 medically necessary, are you going to argue with that?
14     A   If I am recommending the wheelchair, I am
15 going to include the battery and the maintenance.
16     Q   Yeah.  No, no, I'm sorry.  I apologize.
17         The power wheelchair, period, if someone says
18 or opines or concludes that the power wheelchair is not
19 necessary, medically, for a person in Mr. Aguilar's
20 condition as a T12 AISA B, would you disagree with that?
21     A   They can have that opinion, and I can have my
22 opinion.  So I don't agree with that, no.
23     Q   A urine bag.  You are recommending a urine bag
24 twice a year.  Now, why are you recommending the urine
25 bag?

Page 243

1      A   It's for catheter, like, so -- to collect the
2  urine.
3      Q   Well, if Mr. Aguilar testified that he always
4  used his catheter, always catheterized himself, does he
5  still need a urine bag?
6      A   Okay.  I had to be realistic when I'm doing
7  the plan.  I know he can't self-cath anymore so...
8      Q   Well, you didn't know --
9      A   Yeah, yeah, I did.
10     Q   Hold on, hold on.
11     A   No, no.  I knew the accident.  I knew the
12 accident had occurred.
13     Q   What accident?
14     A   The second one.
15     Q   Right.  But -- okay.  Thank you for that.
16         This urine bag is related to the second
17 accident then, right?
18     A   No.
19         MR. McALPINE:  Object to --
20     Q   (BY MR. GREENE) Oh, he can't do it anymore
21 because of the second accident?
22     A   Right, but --
23     Q   All right.
24     A   Right, right, right.  Let me say one thing:  I
25 recommended a suprapubic catheter for him.  He cannot

Page 244

1  self-cath anymore if he has a suprapubic catheter.  I am
2  recommending a suprapubic catheter because he has
3  neurogenic bladder and because of the complications
4  associated with self-cathing and with neurogenic
5  bladder.  With the suprapubic cath, he needs this bag,
6  not to mention the fact that he can't self-cath anymore
7  anyway so...
8      Q   Prior to the October 4, 2016, accident, was he
9  using a urine bag?
10     A   No.  He was self-cathing --
11     Q   All right.
12     A   -- and he was having complications.
13         MR. GREENE:  Objection, nonresponsive.
14     Q   (BY MR. GREENE) Prior to the October 4, 2016,
15 accident, was he using a urine bag?
16     A   No.
17     Q   Okay.  Prior to October 4th, 2016, he was also
18 not using a suprapubic catheter, was he?
19     A   No.
20     Q   Prior to October 4th, 2016, was the suprapubic
21 catheter nec-- medically necessary?
22     A   I believe that he would have ended up getting
23 a suprapubic catheter, and I believe that it would have
24 benefited him, the fact -- I don't know -- you know, if
25 you want to say, "medically necessary or not," you can

Page 245

1  get any doctor to say something is medically necessary.
2  It's very common that patients with spinal cord injuries
3  end up with a suprapubic cath.  It's way less
4  complication.  They don't have to self-cath, less
5  infection, all that, all that.
6      Q   Prior to October 4, 2016, was there any
7  indication in any medical record that Mr. Aguilar was
8  going to need a suprapubic catheter?
9      A   No.
10         MR. McALPINE:  Object to the --
11     Q   (BY MR. GREENE) And why are you recommending
12 the recliner?
13         MR. McALPINE:  -- form of the last
14 question.  Object to vagueness.
15     A   What?
16     Q   (BY MR. GREENE) Why are you recommending the
17 recliner?
18     A   He can't -- with the paraplegia, he can't sit
19 in a normal chair, because of the decreased balance and
20 the muscles that it would take him.  So it's just as a
21 quality-of-life issue for him so that he can sit
22 somewhere other than bed or the chair.
23     Q   Did he have a recliner before December 1st,
24 2016?
25     A   I don't know that.

Page 246

1     Q    Had he requested a recliner before
2  December 1st, 2016?
3     A    I don't know.
4     Q    So the basis of your recommendation that he
5  use a recliner is a quality-of-life issue; is that fair?
6     A    It's highest quality of life, prevent
7  complication, improve function, yes.
8     Q    What -- what's his current bladder status?
9     A    He was awaiting a suprapubic cath, I believe,
10  when I saw him.  He is incontinent, and he still has
11  neurogenic bladder.  He doesn't have any control.  He --
12  he is actually -- he probably has a
13  suprapubic cath now, but he was actually scheduled for
14  pre-op, he said to me, a week after I saw him so...
15     Q    And what was his bladder status before
16  October 4, 2016?
17     A    Self-cathing, but still had neurogenic bladder
18  and ongoing skin issues.
19     Q    Now, why are you recommending that he use a
20  shower wheelchair as a -- well, let me back up a little
21  bit.
22        Are you recommending that he use a shower
23  wheelchair due to the diagnosis of T12 ASIA B?
24     A    Yes.
25     Q    Why?

Page 247

1     A    I think it's unstable for him to use a shower
2  chair, and I think it's -- and he is unable to stand,
3  and I think that he needs the ability to not have to
4  transfer from a wheelchair onto a shower chair, because
5  of the safety issue.  I think this is the safest --
6  safest option for him is to have a chair he can get
7  into, wheel in, shower, wheel out.
8     Q    Were you aware that he was using a shower
9  chair at the time of his deposition in September, 2016?
10     A    That's fine.  I am glad he was using a shower
11  chair.  I am saying that I think it would be more
12  optimal if he could use a shower wheelchair.  And I have
13  only recommended that one time, over the course of his
14  life, for $34.91.
15     Q    I'm sorry.  Maybe I am looking at the wrong
16  thing.
17     A    We might have different numbers, because of
18  the economic report.
19     Q    Because I have a shower wheelchair, $708.77.
20     A    Shower wheelchair -- oh, I'm sorry.  I was
21  looking at shower chair.  Shower wheelchair, 708.77.
22     Q    Right.  So even though he has a shower chair,
23  you have also recommended another shower chair, too,
24  right?
25     A    Right.

Page 248

1     Q    So you just said -- you just testified that
2  you don't -- you wouldn't recommend a shower chair.  You
3  would recommend a shower wheelchair, correct?
4     A    Right.
5     Q    So why are you charging for a shower chair, as
6  well as a wheelchair?
7     A    Well, obviously depending on his function, I
8  think it's safest for him to use the wheelchair.  If
9  he -- I don't remember if I knew he had a shower chair
10  at that time but -- at the time of doing this report, I
11  don't know if I knew that or not.  I think, as of right
12  now, I would get rid of the shower chair --
13     Q    Right.
14     A    -- all together so...
15     Q    I understand that.
16     A    Yeah.
17     Q    But as of December 1, 2016 --
18     A    I think I --
19     Q    -- your life care plan charged for both of
20  them.  Why is that?
21     A    Because I think at the time -- I am not 100
22  percent sure, because I don't remember, but whenever I
23  do that, I will give them the option of using one or the
24  other, because he was pretty functional after that first
25  accident, so kind of giving him the option.  On a bad

Page 249

1  day, he could use one.  But for his condition now, I
2  stand by what I said as far as he should not be in a
3  shower chair so...
4     Q    Yeah.  His condition now --
5     A    I have to take that into account.
6     Q    Well, your -- you told me at the beginning you
7  were retained to come up with a life care plan based on
8  the injuries he had sustained as a result of the
9  October 11, 2013, accident, right?
10     A    Right.
11     Q    So his condition now should only be taken into
12  account with respect to his life expectancy, right?
13     A    Life expectancy?
14     Q    Yes.  You told me earlier it affects his life
15  expectancy, his current condition.
16     A    Right.  The subsequent injury, yes.
17     Q    Yeah.  Okay.  So the costs in this life care
18  plan that you are saying are based on his condition now,
19  those costs should not be in here.
20     A    And I let you know before, I am going -- would
21  like to do a supplemental report.  I am saying the
22  thought process that I had when I included it was the
23  fact that he had a paraplegia.  He was going to have
24  good days, bad days.  He should have access to both, one
25  time each.  Right?  I am not saying he needs five of



Page 250

1  them over the rest of his life.
2      I am saying that he was -- you know, I don't
3  know if I knew he was using a shower chair, but shower
4  chair, shower wheelchair.  And then subsequently,
5  because of his current, you know, condition when I saw
6  him, he is not going to need some of the things that I
7  outlined before, because he is not able to use a shower
8  chair now.  He will need a shower wheelchair one time.
9  So, I mean, actually it will decrease the price but
10 it's...
11     Q   Okay.  Let me make sure --
12     A   I think we are getting a little bit unclear
13 because I haven't done a supplemental report and you are
14 asking me to comment on all these things, what-ifs, and
15 I don't really feel comfortable kind of doing my opinion
16 on the fly like this, because I don't think that that --
17 I take it very seriously what I do, so I don't want to
18 just...
19     Q   Well, you know what, I actually agree with you
20 because I would have preferred had you done a
21 supplemental report and we can depose you on that as
22 opposed to deposing you on a report that has no basis
23 now because some of the numbers are going to change, but
24 this is the only chance I get to depose you, so I have
25 to depose you today and ask you the questions, including

Page 251

1  what-ifs.
2      MR. McALPINE:  Hold on.  Let's go off the
3  record for a second.
4      THE VIDEOGRAPHER:  Yes, sir.
5      MR. McALPINE:  This is sidebar
6  conversation anyway.
7      THE VIDEOGRAPHER:  We are going off --
8      MR. GREENE:  I am not ready to go off the
9  record.
10     THE VIDEOGRAPHER:  Oh, I apologize.
11     MR. GREENE:  I am asking questions.
12     THE VIDEOGRAPHER:  Yes, sir.
13     MR. McALPINE:  All right.  Let's read
14 that back and see if that was a question.
15     MR. GREENE:  Well, you interrupted me.
16 You didn't let me finish but --
17     MR. McALPINE:  All right.  What's your
18 question?
19     MR. GREENE:  Please read it back.
20     (THE REPORTER READ BACK THE REQUESTED
21 PORTION OF TESTIMONY.)
22     Q  (BY MR. GREENE) As in --
23     MR. McALPINE:  Objection.  Sidebar.
24     Q  (BY MR. GREENE) As in, what if when you do
25 your supplemental report, what about these numbers are

Page 252

1  changed?  What are you taking out?
2      MR. McALPINE:  Objection.  Too general.
3      Q   (BY MR. GREENE) What services and items are
4  you omitting?
5      THE REPORTER:  I'm sorry.  What was your
6  objection?
7      MR. McALPINE:  Too general.
8      A   You want me to go through --
9      Q   (BY MR. GREENE) If you can tell me.  I mean,
10 you may not be able to.
11     A   As of right now -- and I will say that if
12 there is a subsequent report, that this may change, but
13 as of right now, I believe he won't need the transfer
14 board, he won't need the reacher, he won't need the
15 shower chair or the... Yeah, that's it.
16     Q   In the whole report?
17     A   No, in this section.  I don't have an answer
18 for the rest of the report.  I really want --
19     Q   Right.  And why doesn't he need those things?
20     A   Because of his comorbidities now.
21     A   I'm sorry.  Because of what?
22     A   Comorbidities now.
23     Q   He had the same -- okay.  What are the
24 comorbidities?
25     A   How is he going to use a reacher if he can't

Page 253

1  use his hands?  I'm just being common sense about it.
2      Q   Okay.
3      A   Yeah.
4      Q   So are you replacing that with something?
5      A   No.
6      Q   For example, you took the shower chair -- you
7  are going to take it out and replace it with just the
8  shower wheelchair?
9      A   I am not putting anything else.  He has the
10 shower wheelchair already, so I don't need to replace it
11 with anything.
12     Q   But this report, the December 1st, 2016,
13 report, it is based on him being a T12 ASIA B, right?
14     A   Yes.  And I did have some knowledge of this
15 other accident, but not enough to say -- yeah, I put in
16 what I thought he needed, based on the information that
17 I had.
18     Q   So some of the things that you put in are
19 based on the subsequent accident?
20     A   No.
21     Q   Okay.  So, again --
22     A   Not -- not as a -- not as he needs these
23 because now he is a tetraplegic.  I am saying I did take
24 it into account that he has it as a comorbidity, for
25 example, you know?



Page 254

1    Q    You took it into account at the time you wrote
2  the report?
3    A    I was aware of it.  I did my very best to make
4  sure that this report reflected that first accident,
5  which is what I was asked to do.
6    Q    But you did take it into account when you
7  wrote this first report?
8    A    Yes, because I knew about it, so I'm not -- I
9  am obviously not going to, you know, include something
10 that I think is ridiculous because of his current
11 situation, you know what I am saying?
12   Q    What's the basis for the transportation
13 allowance?
14         MR. McALPINE:  I think we now know what
15 it is.  Go ahead.
16         MR. GREENE:  Apparently, you are the only
17 one.
18   A    What page is this?  Sorry.  What page?
19   Q    (BY MR. GREENE) I have no idea.
20   A    Oh, transportation --
21   Q    "Environmental modifications and essential
22 services."
23   A    Okay.  I am assuming -- at the time I did this
24 report, I am assuming that he will not be completely
25 independent with driving.  I wasn't assuming he is not

Page 255

1  going to do anything, but I think that he is -- he would
2  need some assistance with being transported to and from
3  doctors' appointments, for example.
4    Q    All right.  But at the time you wrote this
5  report, you did not know that he was driving with hand
6  controls, did you?
7    A    Yeah -- I don't know.
8    Q    No, you did not know that.  How would you have
9  known that?
10   A    He told me.
11         MR. McALPINE:  Objection.  Misstates
12 prior testimony.
13   A    He told me, but I don't know if he mentioned
14 it in the exam form.  I will take a look at that if you
15 have it.
16   Q    (BY MR. GREENE) If he was driving -- and he
17 was driving, right?  You understand that?
18   A    I'm sorry.  Can I take a break?
19   Q    Do you want to take a break?
20   A    Yeah.  I'm sorry.
21         THE VIDEOGRAPHER:  We are going off the
22 record at 2:36.
23         (RECESS FROM 2:36 P.M. TO 2:44 P.M.)
24         THE VIDEOGRAPHER:  Back on the record at
25 2:44 p.m.

Page 256

1         MR. GREENE:  So I understand that,
2  Dr. Iversen, you have to leave and we are going to
3  suspend the deposition because of a personal issue with
4  your husband, I think, coming out of surgery.  So,
5  obviously, we will suspend the deposition and we will
6  reschedule it.
7         Mr. McAlpine, with respect to
8  supplementing the report, I have to talk to my client
9  about whether they are willing to allow her to do that
10 or whether we need a hearing on it, but let me talk to
11 them first before --
12         MR. McALPINE:  Since you brought up that
13 issue, I mean, I don't know that it's a consent -- I
14 don't know that you would have -- I mean, you could file
15 an objection, however, we are within the discovery
16 period.
17         I mean, I know Tim had said something in
18 English's depo about that, but subsequent to that, I had
19 done research and there may be a question if we could
20 supplement a report or supplement expert opinions
21 outside of discovery, but --
22         MR. GREENE:  No.  I'm not --
23         MR. McALPINE:  I am not asking you to
24 agree to anything.  I'm just saying that we are going
25 to.

Page 257

1         MR. GREENE:  Right.  And I am not arguing
2  with you, but I don't want you to think that, "Oh, they
3  didn't object to it.  They didn't" -- "they waived it."
4  I'm just saying --
5         MR. McALPINE:  No, no, no, you haven't
6  waived anything.
7         MR. GREENE:  -- we aren't waiving
8  anything so...
9         MR. McALPINE:  And I'll even --
10         MR. GREENE:  We can talk about this off
11 the record.  Let's let Dr. Iversen go.
12         MR. McALPINE:  I will even go so far as
13 to -- okay.  Yes, that's fine actually.
14         MR. GREENE:  We are off the record now.
15         THE VIDEOGRAPHER:  We are going off the
16 record at 2:45 p.m.
17         (DEPOSITION RECESSED AT 2:45 P.M.)
18         (EXHIBIT 12 WAS MARKED.)
19
20
21
22
23
24
25

MAGNA
LEGAL SERVICES

Page 258

```
1            CHANGES AND SIGNATURE
2   WITNESS NAME: _____
3   DATE OF DEPOSITION: _____
4   PAGE LINE    CHANGE       REASON
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____
```

Page 259

```
1         I, SASHA R. IVERSEN, D.O., have read the
2   foregoing deposition and hereby affix my signature that
3   same is true and correct, except as noted above.
4
5
6
7       _____
            SASHA R. IVERSEN, D.O.
8
9
    THE STATE OF _____)
10  COUNTY OF _____)
11       Before me, _____, on
12  this day personally appeared SASHA R. IVERSEN, D.O.,
13  known to me (or proved to me under oath or through
14  _____) (description of identity
15  card or other document)) to be the person whose name is
16  subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
18  consideration therein expressed.
19       Given under my hand and seal of office this
20  _____ day of _____, _____.
21
22
23
        _____
24          NOTARY PUBLIC IN AND FOR
            THE STATE OF _____
25          COMMISSION EXPIRES: _____
```

Page 260

```
1   THE STATE OF TEXAS:
2   COUNTY OF HARRIS:
3        I, Mona S. Whitmarsh, a Certified Shorthand
4   Reporter, hereby certify that the foregoing testimony
5   was given before me after the Witness had been first
6   duly sworn.
7        I further certify that this deposition was
8   transcribed under my direction and is a complete and
9   correct transcript of the proceedings; and that it is
10  being filed with the Court in accordance with the
11  Stipulation of Counsel contained in this deposition.
12       I further certify that I am neither attorney for,
13  related to, nor employed by any of the parties to the
14  lawsuit in which this deposition was taken.  Further, I
15  am neither related to nor employed by any attorney of
16  record in this cause; nor do I have a financial interest
17  in the matter.
18       GIVEN UNDER MY HAND AND SEAL OF OFFICE this ____
19  day of _____, 2017.
20
21       Mona S. Whitmarsh
            Mona S. Whitmarsh
22          Texas CSR No. 3986
            Expiration Date:  12/31/17
23
            MAGNA LEGAL SERVICES
24          Firm Registration No. 633
            (866)624-6221
25          www.MagnaLS.com
```



**A**

**abdomen** 202:11
**abdominal** 202:12
  202:18,20
**ability** 66:20
  105:19 116:3
  247:3
**able** 15:23 25:21
  58:23 63:1,12
  65:1 67:1 102:8
  129:22,23 132:24
  138:1 148:18
  157:10 239:14
  240:20,22 250:7
  252:10
**abnormal** 149:8
**abnormalities**
  146:18 193:3
**above-styled** 1:16
**absolutely** 10:22
  141:11 211:7
  212:3,7 214:1
**acceptable** 144:10
  144:14 184:23
  192:10
**accepted** 143:14
  144:18,24 145:18
  178:25 179:9
**access** 70:6,6 71:19
  71:20 74:4 249:24
**accident** 26:16 27:3
  27:6,7,9,13,16
  28:14,18 80:20
  108:12 110:13
  128:5,8,14 137:21
  141:18 149:15
  153:10 158:8
  164:19,24,25
  165:1,4,15 166:24
  166:24 167:3,10
  167:17 192:19
  195:20 206:6,12
  211:2,18 212:17
  213:12 236:13
  237:5 238:25

239:23 241:3
243:11,12,13,17
243:21 244:8,15
248:25 249:9
253:15,19 254:4
**account** 107:5
  112:11 114:21,24
  115:1 118:21
  120:10,10 122:10
  129:20 135:9
  143:22 146:14
  152:25 178:11
  185:8 186:3 188:3
  222:3 249:5,12
  253:24 254:1,6
**accounted** 82:20
**accounting** 121:5
  121:17
**accurately** 30:8
**acknowledged**
  259:16
**active** 124:23 126:4
  221:6
**actively** 126:20
**activities** 40:9
**activity** 25:25 78:8
  78:13 81:22
**actual** 25:9 78:13
  88:22 105:22
  174:2 224:9
**actuality** 172:7
**acute** 226:3,3,7
**add** 32:5
**added** 32:17,25
  33:3 42:25
**addi** 195:9
**adding** 32:20
**addition** 14:15
  15:14 71:21 74:13
  147:16 195:7
  196:1,23,24 197:7
  202:14 224:4
**additional** 19:25
  20:18 31:9 58:12
  77:5 81:22 82:22
  83:3 141:25 196:2

**address** 8:1,2,2,3,7
  8:9 54:4 68:3
**addressed** 116:1
**addresses** 18:21
**addressing** 228:19
**adequate** 184:10
  185:24 188:11
  209:4,8 220:1
  233:21,21
**adjust** 119:12,14
  120:8 136:5,22
  143:15 144:10
  151:25 187:3,5
**adjusting** 134:13
  136:19 143:10
  150:3 151:21
  159:5,19 179:8
  184:23 233:20
**adjustment** 122:15
  123:6,13 133:22
  135:21,22 136:6,9
  151:18 159:10
  179:18 186:20
**adjustments**
  117:21 118:2
  150:11 184:19
**adjusts** 178:14
**ADL** 40:9
**ADLs** 40:10 223:1
**admission** 142:8
  160:11
**admitted** 15:16
  226:2,2
**adopting** 98:6
**Adraon** 2:9 5:13
  6:16
**adverse** 134:2
  182:13,25 183:1,8
  183:11
**advise** 20:17
**affect** 25:6 158:10
  159:18 173:12
  217:21
**affix** 259:2
**age** 29:3 132:19,24
  210:14 214:21

240:12
**aging** 132:25 143:7
**agree** 105:7 107:9
  107:13 112:10,25
  113:23 117:20
  122:24 242:22
  250:19 256:24
**agreed** 80:22
  130:12 136:7
  204:23
**agreement** 80:16
**agreene@gallow...**
  2:12
**Aguilar** 1:3 4:7,14
  5:4,16 6:22 15:16
  15:20 16:13 17:22
  20:6 22:2 23:12
  25:16 36:1 41:15
  54:12 55:2,7,11
  56:5 57:10,12,21
  68:15 74:10 75:4
  75:7,22,24 81:4
  97:17,22 102:8
  118:8 125:10,12
  125:16,19 126:24
  131:17 135:6,13
  135:15,16 149:5
  152:17 153:9
  159:17 173:6
  176:4,22 179:4
  180:2,8,13 181:4
  182:2 185:4,22
  187:20 189:17
  190:13 194:2
  197:22 205:4
  215:1 219:21
  220:2 223:22,25
  225:11 229:16,17
  231:2,19 232:5,11
  235:3 236:4
  238:18 241:10
  242:2 243:3 245:7
**Aguilar's** 15:23
  16:17 18:1 20:25
  52:17 66:23 69:16
  74:6 75:16 76:19

97:19 101:22
130:3 134:14,16
170:15 176:18
189:10 240:19
242:19
**ahead** 11:6 41:25
  61:21 62:15 71:3
  232:1 254:15
**AISA** 218:18
  242:20
**alert** 25:19
**allegedly** 128:13
  131:11
**Alliance** 1:5 5:4,13
**allow** 256:9
**allowance** 254:13
**allowed** 240:25
**aloud** 131:16
**ambulating** 239:3
**ambulation** 40:3
**amend** 111:17
  113:5 115:14
  188:14 208:24
**American** 31:16
**amount** 61:10,10
  61:12,16 77:8
  91:21 221:1
**anal** 156:21
**analgesic** 206:7,9
  206:11,14
**ankylosing** 23:15
  24:2,5 54:18 55:6
  56:12,13,17,19
  57:9,12,16,19,19
  137:3,7,11,16
  146:15 152:19
  158:20 159:25
  177:2 193:5,9
  194:12 195:5,13
  195:24 196:1,3,6
  196:14,20 197:7
**annual** 215:24
  216:2,24
**annually** 215:23
  220:4
**answer** 7:13,14,24



16:4 38:20 56:3
73:1 198:8 225:8
231:6,8,13 238:1
252:17
**answered** 10:1
38:19 55:13 71:10
96:1,5 188:9
189:7,20 191:1
196:10 198:7
213:14,23 236:23
237:1
**answering** 231:12
**answers** 7:8,10
56:15
**anticipate** 22:15
23:3,8 85:4
203:18
**anticipated** 128:21
**anticipating** 207:11
207:22
**antispasticity**
203:10
**Antonio** 78:3
**anybody** 35:20
68:2 96:25 166:7
**anymore** 86:13
175:2 193:16
239:3 243:7,20
244:1,6
**anyway** 157:13
195:5,8,15 211:4
211:14 212:9,10
212:16 244:7
251:6
**apologize** 12:13
13:2 79:12 90:8
142:10 145:15
224:8 242:16
251:10
**Apparently** 254:16
**appearance** 44:15
**appearances** 3:2
4:9,10 5:12 42:14
43:4
**appeared** 259:12
**appearing** 83:12

**appointment** 11:8
11:9 15:24 26:14
61:20 76:3,4
128:2
**appointments**
33:11 255:3
**approach** 216:4
**appropriate** 137:9
203:7
**appropriately**
157:16
**approximately**
61:15 85:3 103:18
**April** 1:12,17 5:7
**arbitrarily** 159:14
**area** 11:2 188:24
189:23,23 190:1
194:25 195:19,21
196:4 197:4
**areas** 54:20,23
168:22
**argue** 68:23 242:13
**arguing** 257:1
**argumentative**
21:3 67:13 68:16
73:3 142:15 189:5
189:20 198:7
202:4 208:19
212:11,18,21
213:13,22 231:23
236:22,25 241:19
**arms** 222:22,23,24
233:16
**arrive** 116:8 117:6
175:21 176:1
177:6 181:14
185:9 186:18,19
**arriving** 181:5
183:11
**article** 90:19 91:1,2
91:5,8,11 135:15
176:19,21
**articles** 135:10
**ASIA** 134:16 152:7
156:7,11 157:5
201:3 222:21

246:23 253:13
**asked** 9:25 15:13
16:20,21 22:13
25:1 44:7 55:13
70:2,4 71:9 72:10
73:17,21 74:1
85:6 95:25 96:4
125:23 127:17,18
128:15,17 130:15
130:17,18 156:2
164:14 180:14
181:24 188:8
189:7,8,9,19
190:25 196:9
197:21 198:7
208:25 212:8
213:14,22 214:17
231:5,8 234:19
236:2,23 237:1
254:5
**asking** 72:14 73:4
169:3,4 193:19,21
220:10 222:5
235:1 239:12
250:14 251:11
256:23
**asks** 93:16
**aspect** 40:19
107:14
**aspects** 213:1
**assemble** 73:14
**assembling** 72:20
**assess** 161:20
**assessment** 228:2,2
**assign** 11:1
**assignment** 155:22
**assist** 14:25 39:8
40:8 90:3 92:2
96:25 97:2
**assistance** 26:3,23
97:13 255:2
**assistant** 91:25
93:4 98:1 168:16
**assisted** 99:11
100:2,3
**assisting** 92:4

**assists** 97:3
**associate** 9:5,7 12:5
33:15,19
**associated** 9:2,3,9
9:20 119:20
144:15 150:18
206:15,19 244:4
**Association** 87:17
**assume** 6:14 63:8
76:1 129:25 143:7
143:8 202:22
210:7 235:16
**assumed** 16:21
**assumes** 141:21
164:6 177:8
197:10 213:16,22
231:24
**assuming** 59:17
121:18 122:6
138:20 166:10
183:15 192:16
198:4 202:4 215:9
215:14,21 227:2
254:23,24,25
**assumption** 82:15
141:8 142:3
**attached** 1:23
**attain** 157:10
**attended** 226:19
**attention** 59:8
144:4 160:5 161:3
161:4,13,15
**attorney** 66:12,13
74:23 260:12,15
**attorneys** 19:13
20:14,17,25,25
34:1 50:22 76:23
127:14 146:23
**August** 47:14
**author** 33:6,6 35:7
**authored** 15:8,10
100:15 159:5
**authoring** 15:20
105:15
**Autofill** 54:7
**available** 11:15

33:21 50:13
104:18 107:7
113:4 114:1,8
115:13 127:18
148:3 150:14
169:2
**average** 170:1
**awaiting** 246:9
**awake** 25:19
**aware** 14:5 26:12
135:1 150:17
176:19 177:21,23
177:24 180:12
184:21 187:16
190:19 236:14
237:4 247:8 254:3
**a.m** 1:18 5:8 59:1,2
59:2,4 112:2,3,3,5

---

**B**

**B** 134:16 151:7
152:7 156:7,11
157:1 201:3
218:18 222:22
242:20 246:23
253:13
**back** 13:8 14:23,24
19:1 26:2 29:5
30:10 31:6 32:4
33:5 34:8 49:21
49:22 50:1 59:3
60:9 67:4 75:16
77:16 78:14,17
79:2,12,17 81:2
83:18 89:8 96:23
102:25 103:4,25
112:4 122:7
136:13 138:19
149:2 150:3 154:5
155:19 161:10
178:9,12 180:21
192:22 197:6,20
199:12 205:13
211:13 216:6
219:9 220:22
231:1,18 232:16



237:17 238:9,9
239:16,19,23
240:6 246:20
251:14,19,20
255:24
**backed** 166:20
**background** 126:18
130:22
**backs** 165:11 166:1
**backwards** 186:22
**baclofen** 203:6,9
204:18,20 205:23
**bad** 94:1 122:2
137:15 142:10
158:16 207:21
221:8,10 248:25
249:24
**bag** 242:23,23,25
243:5,16 244:5,9
244:15
**balance** 245:19
**bare** 120:20 130:7
220:20 221:1,3,11
231:7
**base** 175:20
**based** 6:20,24
19:20 22:4 23:14
27:15 28:14 49:3
64:21 65:14 77:9
78:22 79:18 80:17
82:15 83:7 94:24
95:7,15 100:18,22
102:4 109:11
111:19 113:4
119:1 130:22,24
131:1,16,25
132:16 134:14
135:24 136:14,16
138:17,25 140:12
141:2,10 143:15
144:11 145:10
152:3,12,14 156:5
157:4 158:18
160:9,9 165:24
166:3 170:23
172:9 173:1,5

176:5,5,22,22
177:4,19,20
178:15,15,17
187:3,5 190:11,17
193:3,4 196:15
197:19 200:7,15
204:8,11 206:4
208:16 217:15
222:10 226:23
229:16,17 232:5
237:2 240:2,19
241:10,17,20,21
249:7,18 253:13
253:16,19
**baseline** 118:4
136:10 201:22
**bases** 101:16
109:17 118:2
**basic** 88:10 90:5
**basically** 9:5 10:18
10:21,23 16:12,20
17:24 23:4 24:8
25:3,7,19 26:11
27:3,22 28:1,7
30:19 33:21 35:19
39:5 48:25 50:20
51:24 58:12 67:24
73:5 80:8,23 82:6
82:8 83:3 86:13
88:19 98:6 102:12
108:1,3 109:2
111:17 133:9
156:2,12 157:1,1
160:9 168:20
169:17 170:1,6
171:22 172:7
173:4 174:3 193:2
206:8 215:13
222:20,21 228:16
**basing** 165:14,16
191:6 200:9
204:16 228:10
241:14
**basis** 46:7,7,15
85:12 102:16
120:23 123:18

130:20 162:17,20
172:5,16,17,23
178:2 190:22
191:4 198:15
219:10 224:16
241:12 246:4
250:22 254:12
**bathing** 26:4
**battery** 242:9,15
**Bayou** 18:17
**bed** 26:2 55:21
137:4 232:13,15
232:17,19 233:5
233:13,17,17,25
234:23 235:3,12
235:17 236:1
245:22
**beds** 235:22
**bed-bound** 24:9
**beginning** 46:11
67:5 87:5 97:15
103:21 146:2
230:2,8,11 249:6
**begins** 5:2
**behalf** 44:4,9,15
71:13 73:8,13
**believe** 9:19 10:4
11:23 12:20 13:6
17:14 22:9 23:24
28:20,21 43:2,24
45:6,7 47:19
51:24 56:20 67:5
70:22 90:23 91:13
99:4 101:19
110:24 122:14
137:5 139:3 141:6
161:14 169:9
180:16 189:6,8,9
197:23 200:1
227:18 229:3,13
230:17 232:2
234:6 237:2 241:2
241:5 242:5
244:22,23 246:9
252:13
**believing** 205:9

**belong** 31:13
**benchmark** 118:4
**benefit** 129:22,23
222:7 227:18
230:17 232:2,11
237:19,20
**benefited** 244:24
**best** 28:11 38:18
110:19 254:3
**better** 43:11 104:7
121:23 140:21
169:22 180:10
221:22 225:16
**beyond** 28:22 93:14
161:21
**be-all** 185:22
**biceps** 222:25
223:10
**big** 37:19 88:14
93:1
**biggest** 23:24 37:16
137:17
**bill** 80:14
**billed** 77:20 78:15
79:19,23 80:6,7
85:11
**billing** 73:19 85:5
147:9
**bills** 60:15
**bio** 30:17,17,18
**biological** 113:25
**bit** 13:8 46:10
55:20 111:23
144:5 170:8
185:25 206:14
225:19 246:21
250:12
**blad** 132:3
**bladder** 132:4
138:24 140:20
171:11 191:15
192:6 202:6,21
203:8,9 244:3,5
246:8,11,15,17
**blank** 34:21
**bleed** 203:2

**blood** 158:15
159:23 199:17
205:22
**board** 30:19 31:10
31:16,18 32:19,20
33:2 41:1,2,4
54:21 252:14
**boards** 30:12,22
41:10,25
**bone** 197:4 200:11
200:12,16,22
201:4,23
**books** 33:7
**boost** 221:9,10
**bottom** 131:3
**bound** 55:22
**bowel** 132:3,3
**box** 74:10 76:24
**bracing** 40:5
**brain** 55:21 160:5,8
161:5,16,24
162:18 164:3
**brand-new** 129:18
**break** 7:21,22,22
14:19 17:3 37:21
58:15 59:6 111:21
112:8 147:12
156:10 199:8
255:18,19
**breakdown** 227:16
**briefly** 7:4
**bring** 16:22 20:21
63:22 156:1
**bringing** 21:12
**broad** 15:6 39:21
**broadly** 23:11
**brought** 17:17
42:16,18 59:8,21
256:12
**Bruera** 45:10,13
**build** 115:4
**bunch** 18:7
**BURR** 2:9
**bursts** 215:14,21

———————————
**C**
———————————



**C** 2:1 55:20 151:7
**calculated** 94:15
**call** 24:16 37:25
  39:15 52:16 54:2
  66:2 74:22 86:8
  168:25 170:12
**called** 42:6 43:18
  91:2 110:25 111:3
**calling** 130:13
  169:2
**calls** 52:18 75:18
  94:10 149:16
  150:23 173:17
  198:6 224:22
**cancel** 76:3 80:20
  113:16
**canceled** 61:7,20
  62:14 80:24
**capability** 130:5
**capacity** 180:15
**car** 128:5,8 166:24
  239:10,18,21
**card** 259:15
**care** 4:14 6:20,21
  8:20,21 9:2,4,11
  9:14,15,18,21,24
  10:12,24,25,25
  11:1,10 12:6,21
  13:18,19 14:1
  15:15,18,24 16:5
  18:14,24 19:2
  22:8,10 24:15
  25:8,23 26:5,8,10
  26:23,24 27:1
  28:6,12,15,17,21
  28:23 29:1,4
  30:21 33:15,20,21
  33:22,24 34:1,3,4
  34:6,9 35:5 36:6
  38:17 43:8 44:6
  44:12,15 46:18,22
  47:11,17,19,22,24
  50:16 51:2,17,19
  52:2,24 54:17
  55:1,4,16,22
  56:10,11,17,21,22

57:3,8,16,18
60:11,14,22,24
61:3,8,9,13,14
62:18 63:1,6,9,12
63:19 65:21 67:3
67:7,9,15,19,21
68:21 69:9 70:17
70:21 71:1,12,15
71:19 72:13,16,21
73:11,15,18 74:4
76:7,16 77:3
81:23 82:7,9 83:5
83:15 84:6,14
85:20,22 86:16,18
86:21,22,23,25
87:1,2,24 88:4,5,8
88:14,19,21,22,23
89:2,11,14,22
90:21 91:6,11,15
91:21 97:14,19
98:11,12,18,21
101:22 103:9,11
103:12,25 104:2
104:12,13,21,22
105:7,8,16,20
106:10 107:1,11
107:14 111:18
112:7,10,23 113:2
113:8,10,12,14,19
113:23 114:6,13
114:21 115:16
117:2 119:10
120:11,12,17
121:21 122:1,1,9
122:10,20 123:13
124:11,15,21,23
125:1,6,10,18,25
126:2,12,14,19,21
128:16,18,20
129:8 130:2,13,19
130:24 131:1,20
133:11 135:9
136:17,17 137:25
141:4 143:15,22
143:25 144:9,25
147:7 151:3,12,20

152:17 155:4,4,11
156:2,3 157:16,21
162:25 166:12,15
167:23 169:19,23
170:7,14,17,20,24
172:14 178:10
179:9,14 180:2,9
181:16 182:5
183:16 185:24,24
186:2,10,12 187:1
187:2,15,24
189:12 190:9
193:1 195:16
196:16 197:19,22
204:24 216:20
217:8 219:9
220:19 221:23
225:1,5,19 230:24
231:1,9,19,20
242:11 248:19
249:7,17
**carefully** 178:1
**case** 1:4 5:3 6:21
10:7,10,11,13,21
11:1,7,12,14,17
11:19,20,23 12:18
14:5 20:24 31:3,4
34:14,19 35:4
40:18 41:15 42:6
42:7,18 43:10
44:20 51:12,25
52:1,6,8,8,14,17
52:25 53:20 54:12
58:1,10 60:18
62:10 63:8 64:4,8
64:19 65:13,14,17
66:1,3,5,24 69:16
70:13,20 71:2
73:24 74:5,6,10
74:14,15,16,24
75:7,13,16,18,22
75:23,24 76:14,24
77:4 79:19 83:7
85:7 88:18 91:24
92:1,2 96:10 97:1
97:2 102:23

113:15 123:19
127:5 129:21
154:8 155:16
157:20 159:19
168:23 171:9
212:9 225:11
231:14
**caseload** 37:20
**cases** 42:25 48:14
48:25 49:2,23
51:23 52:7 65:6
99:21 237:18
**cast** 76:10,15
**catabolic** 227:15
**catastrophic** 4:14
60:22,25 61:9,13
76:7 77:8 83:5
98:7
**category** 74:10
170:24
**cath** 120:25 244:5
245:3 246:9,13
**catheter** 171:9
243:1,4,25 244:1
244:2,18,21,23
245:8
**catheterized** 243:4
**cause** 1:17 24:11
260:16
**caused** 24:4
**caveat** 7:23
**CBC** 209:15
**CDC** 214:25
**cell** 26:6
**Center** 180:23
184:22
**Center's** 184:17
**Central** 5:8
**Centre** 2:4
**Cepeda** 55:20
**certain** 17:10
100:16 121:17
129:25 132:1
137:4 157:8,8,8,9
169:1
**Certificate** 3:7

**certification** 32:19
41:2,11 86:19,21
86:21,25 87:1,3
88:11
**certifications** 41:1
41:7
**certified** 30:19,21
41:4 87:2,4 155:3
155:4 171:24
260:3
**certify** 260:4,7,12
**cervical** 26:17
156:16 176:6
177:25 179:25
**cetera** 36:7 172:13
**chair** 26:1 237:21
239:17,21 245:19
245:22 247:2,4,6
247:9,11,21,22,23
248:2,5,9,12
249:3 250:3,4,8
252:15 253:6
**chance** 15:15
250:24
**change** 15:3 23:21
23:24 30:9,23
32:19 94:14,24
167:16 175:14
206:23 207:15
208:12 216:7
217:23 250:23
252:12 258:4
**changed** 99:8 252:1
**changes** 3:6 22:5,10
22:14,15 23:8
25:2 32:10 38:24
39:17 50:24 53:16
94:11,14 96:16
97:7 209:1,8
216:13 258:1
**changing** 92:22
**characterization**
45:21
**charge** 60:23 61:1,6
61:12 81:10 82:5
82:10 83:8,11



103:5
**charged** 248:19
**charges** 60:25 61:8
84:15 92:11
**charging** 212:16
248:5
**chart** 152:10,12
178:13,15 179:4,6
**check** 200:3 232:25
**checkup** 212:7
**chief** 103:2,8
**chose** 41:8
**chronically** 210:23
211:1
**chronological** 92:5
93:2
**circumstances**
108:6,7 116:11,20
116:22 133:16
**cite** 134:4
**clarify** 20:5 27:5
57:6 116:6
**clarifying** 10:5
**class** 87:13 155:3
**classify** 157:15
**classroom** 88:13
**CLCP** 86:25 87:22
**cleaning** 26:4
**clear** 26:22 32:21
41:19 56:10,25
59:15 69:22
192:14
**clerical** 91:18,22
**client** 256:8
**clients** 46:22
**clinical** 45:18 46:4
47:4 57:2,7
220:23
**close** 46:13 157:2
**clot** 199:17
**clots** 199:5
**clotting** 200:8
**cloud-based** 50:10
**club** 103:6
**cognitive** 40:19
163:22 164:17,23

165:20 166:16
**collect** 115:23
243:1
**Coma** 160:10
163:10 167:2
168:2
**combination** 169:5
**combined** 82:10
210:19
**come** 47:11 90:2
109:6 154:8
175:16 176:8
177:2 249:7
**comes** 75:19 190:9
242:11
**comfortable** 136:18
181:23 182:9
250:15
**coming** 13:8 84:18
117:10 122:19
174:3 184:11
218:10 256:4
**commanded** 19:11
**comment** 164:8
190:7 197:21
223:13,19 225:18
234:19 250:14
**commentary** 97:9
**commenting**
197:23
**Commission** 86:20
259:25
**commit** 54:8
**committed** 53:6
**common** 147:19
173:22 201:9,13
203:9 222:25
227:3 245:2 253:1
**commonly** 33:11
143:14 144:24
145:18 203:16
**commonplace**
174:7,8 191:16
**communication**
50:21 61:25 74:1
76:13

**communications**
66:23 68:14 74:5
74:16,18 75:21
**community** 179:1
179:10
**comorbidities**
23:15 24:3 39:20
158:5,20 217:15
218:12 241:7,22
252:20,22,24
**comorbidity**
253:24
**company** 50:20
68:3 86:12,17
87:24 126:18
**compare** 42:24
81:7
**comparing** 182:20
**competent** 106:12
**complaining** 105:3
240:16
**complaints** 226:24
**complete** 14:12,16
41:8 107:1,5
112:13,15,17,19
112:20 113:1,14
113:18,24 156:19
156:22,25 157:2
203:25 205:21
206:1,2 208:10
224:23 260:8
**completed** 13:20
15:18 77:21 78:16
**completely** 130:19
254:24
**completing** 73:18
**complex** 124:25
**complication** 199:1
199:16 201:9,13
209:23 211:11
245:4 246:7
**complications**
24:10 120:13
122:2 132:6
136:18 139:9,11
174:6 178:7

206:15 232:17
233:22 234:2,18
234:22 235:6,7
244:3,12
**Complication-wise**
157:9
**complied** 70:2
**complies** 122:5
**comply** 18:11 122:6
**complying** 21:4
**components** 115:16
117:3,5
**Compound** 105:23
105:24 229:11
**comp-type** 38:10
**concerns** 65:3
**conclude** 229:19
**concluded** 159:9
203:11
**concludes** 242:18
**concluding** 122:19
**conclusion** 115:17
117:11 131:15
138:19 159:8
176:8 177:3
182:11,14,25
183:23 184:1
236:10,17,20,21
**conclusions** 90:2
107:17,23,25
108:21 109:1,5,7
115:18 116:2,8,16
117:12 123:5
131:5,6,7,10
135:18 154:8,13
154:17 155:25
**condition** 15:23
25:17 76:19
116:13 138:5,6,7
138:10,12 148:15
149:15 176:18
193:10,17 194:4
198:23 229:17,19
234:15 242:20
249:1,4,11,15,18
250:5

**conditions** 119:20
119:25 124:25
131:17 144:15,20
150:18,20,21
**conduct** 15:20
61:17 110:16
129:22,23
**conducted** 100:10
138:11 165:15,25
168:19 178:16
**conference** 64:22
87:21
**confident** 170:13
**confirm** 73:25
**confirmed** 25:3
**conflicts** 11:6
**confused** 79:6
83:18,19 195:14
**confusing** 13:2
69:21 95:9
**confusion** 182:8
**consent** 256:13
**consequence**
116:12
**consequences**
108:15 119:21
144:15 150:19,20
**consequent** 108:6,6
116:20,22 133:16
**conservative**
131:20
**consider** 117:23
119:17,20,24
136:6,11 144:15
144:19 159:4,7,18
186:21 187:18
**consideration**
259:18
**considered** 106:25
122:16 135:21
147:14 150:18,19
157:17
**consistent** 178:9
**constantly** 32:5
87:20
**consult** 238:22



**consultant** 39:12
**consultation** 4:5
  21:10,16,23 22:1
  22:5 25:21 36:4
  77:24 95:19
  114:11 153:17
  204:3 228:5
**consulting** 35:12
  39:3
**consults** 36:5,24
  39:2
**contact** 10:23 11:3
  65:14 68:21 74:22
  75:7
**contacted** 10:11
  11:19 46:22
**contain** 74:12
  95:17,18,19,21
**contained** 30:1
  69:25 100:25
  101:23 124:10
  260:11
**contains** 4:7 17:9
  17:23 32:14 81:21
  107:1
**contemplated**
  15:14 23:9,10
**content** 89:22 90:6
**contents** 97:16
  124:10
**content-wise** 92:23
**continue** 208:7
**continuing** 19:24
  87:8,10,13 154:24
  154:25
**contracture** 172:13
**contractures**
  138:22 235:8
**contrast** 81:7
**contributing** 33:6,6
**Contributions**
  31:15
**control** 122:9
  127:20 156:23
  246:11
**controls** 239:11

255:6
**conversation** 80:11
  80:19 119:3
  126:24 127:2,5
  251:6
**conversations**
  127:8 225:3
**copies** 49:18,22,23
  50:13
**copy** 14:19 17:2
  21:17 32:8 73:19
  73:20
**copying** 15:1
**cord** 28:11 29:3
  41:12,16,21,24
  54:19,22 55:1,5,6
  56:12,13 122:1
  132:1,3,8 133:14
  135:5,7,11 139:1
  140:4 141:13
  142:9 143:19
  150:16 152:14
  155:12 163:1
  174:6 177:1,24
  178:3,3,13,13,17
  180:22 184:16,22
  185:8 188:23
  192:7,20 193:4
  197:2 199:1,17
  200:10,24 201:9
  203:13 204:7,17
  206:19 209:19
  211:8,12 212:3,6
  214:7 216:17,19
  227:14 228:10
  229:21,25 230:15
  231:16,21 232:3,7
  241:22 245:2
**correct** 6:12 10:8
  15:8 16:8 19:23
  23:1 27:7,11,13
  27:14 32:15 40:20
  41:16,17 42:8,9,9
  43:16,21,23 44:11
  44:13,16,17 45:13
  49:5,13 61:18

63:10 65:5,13
  67:7 73:12 74:3
  91:19 92:13 93:11
  96:11 97:8 99:1,2
  101:1,7,8,9 104:3
  106:16 107:4
  117:2,16,19
  118:11 120:2
  125:16 129:1
  131:14 133:18,25
  134:6 142:16
  148:3 149:15
  165:25 169:19
  181:6,14 185:5
  186:15 194:5
  196:7,21 198:20
  208:11 211:14,21
  223:17 227:9
  228:23 235:23
  242:10 248:3
  259:3 260:9
**correctly** 61:22
  125:3 131:21
  161:21
**cost** 20:14 117:5
  124:18 155:24
  167:23 208:22
  213:1 232:12
**costs** 25:11 92:11
  109:5 117:15,18
  128:20,21,21,25
  151:10 157:22
  168:4 249:17,19
**counsel** 5:11
  153:18 233:8
  260:11
**counseling** 162:10
  230:18 232:3
**counselor** 227:5,6
  227:12,22 228:7
  228:21 229:9,20
  230:1,7,16,23
  231:16,22 232:7
**count** 48:6,11,15,22
**counted** 48:8
**counting** 48:17

**COUNTY** 259:10
  260:2
**couple** 30:22 37:22
  37:24 76:23 158:4
  193:7,14 204:23
**course** 84:20 155:4
  155:10,20 198:10
  219:10 247:13
**coursework** 87:6
  88:17
**court** 1:1 4:9,10 5:5
  5:9,17 7:9,15
  14:25 42:14 43:4
  44:14,22 45:5
  260:10
**courthouse** 45:7
**covered** 25:13
**crazy** 160:18
**create** 115:13
**created** 21:2 60:10
  115:15
**creates** 60:11,14
**credential** 87:1,22
**credentialed** 39:1
**credibility** 105:8,18
  106:11
**CSR** 1:18 260:22
**cumbersome**
  216:10,11
**current** 4:10 8:1
  31:8 32:23 42:15
  42:16 43:13 93:7
  93:18 102:12
  170:2 193:17
  194:3 205:8 246:8
  249:15 250:5
  254:10
**currently** 23:13
  28:18 30:12,21
  33:14 36:11,19,22
  125:17 137:2
  207:11,13
**cut** 224:8
**CV** 4:8 6:24 30:5,8
  31:6,7,21 32:12
  32:17,23,23,25

33:9,10 103:1
**CVs** 147:15
**C5** 157:12

_____

**D**
**D** 2:9 151:7
**daily** 40:9 170:21
  171:12
**Dallas** 34:17 43:14
  43:15
**dangerous** 179:3
**Daspit** 1:20 2:4 5:8
  11:25 52:16
**data** 148:11 177:1
  179:7,17 184:21
  185:10
**database** 50:9,18
  51:20 61:25
  168:20
**databases** 135:11
  169:2
**date** 15:24 19:6,7,9
  19:10 31:20 32:7
  44:20 60:8 61:5
  66:13 72:3,4,6
  79:25 87:10 102:5
  170:9 226:9 258:3
  260:22
**dated** 14:2 47:13
  60:21 78:7 208:15
**dates** 11:15 138:9
  149:4
**daughter** 132:22
  235:25 238:7
**day** 26:2 29:2 48:15
  49:1 93:14 239:20
  249:1 259:12,20
  260:19
**days** 62:14 238:9
  249:24,24
**da7** 81:24
**deadline** 15:24
  19:14
**deal** 52:5,6 53:16
  53:20 133:4,5
  206:18



**dealing** 65:3
**Death** 122:4
**debilitated** 38:13
236:11,12
**December** 14:2
15:8 16:5 19:4,5
22:6 26:7 28:25
77:10 95:22
100:24 101:23,25
110:6,6 111:7
129:5 137:20
138:2,8,12 141:4
145:24,25 146:4
151:24 152:4
154:10,17 159:6,6
205:13 208:15,24
216:7 218:17
245:23 246:2
248:17 253:12
**decide** 66:2 121:12
**decided** 137:21
**deciding** 94:17
**decision** 93:22
137:9 175:16
**decrease** 23:17
24:15 97:24
120:15 121:4
136:15 144:5
151:6 152:1
158:13,18 159:8
175:17,18 177:25
183:1,6 184:2,5
184:11 188:12,15
198:1 207:13,17
208:1,5 209:10
250:9
**decreased** 24:12
137:5 175:20
210:15 245:19
**decreases** 187:8,10
**decreasing** 24:1
25:5,10 137:18
150:25 151:2
159:12 180:17
182:15 207:22
232:16

**defendant** 1:6,16
2:8 44:4,10,15
63:15,16 66:1
**defendants** 19:12
**defendant's** 19:12
**defense** 34:1,5,10
34:16 35:4,4,10
62:25,25 63:8,19
64:8 65:22
**deficits** 163:17,18
166:16
**definitely** 121:3,4
147:20 173:25
182:23 227:16
237:18
**deformities** 206:19
**delegating** 71:1
**delineate** 147:11
**delineated** 130:2
**delve** 164:16
**density** 197:5
200:11,12,16,22
201:5,23
**department** 225:6
**dependent** 76:8
**depending** 37:5
248:7
**depends** 36:23 39:2
138:4
**depo** 256:18
**depose** 250:21,24
250:25
**deposed** 7:1 49:4,6
51:11,12 149:1,6
149:9,10
**deposing** 250:22
**deposition** 1:10,14
4:3,9,10 5:2 6:3
6:20 7:5 12:9,10
12:11,23,25 13:5
13:10,13 14:14
16:22 18:4 24:19
34:22 35:1,9
43:18 44:3,9
47:20 49:1 50:1
51:13,15 54:25

59:19 63:24 65:9
81:24 82:2,10,16
83:12,22 84:8
99:24 100:7 146:2
147:19 148:2,13
148:19 149:13
183:2 208:16
237:23,24 247:9
256:3,5 257:17
258:3 259:2 260:7
260:11,14
**depositions** 20:22
42:12,14 43:3
46:12 48:3,14
49:10,19 50:6
51:1,9,20 148:5
**describe** 25:17
**description** 4:1,17
259:14
**deserves** 166:8,18
167:17
**designed** 122:10
131:2
**desire** 24:14
**Despite** 164:4
**detail** 23:11 26:18
**detailed** 115:9,9
**details** 76:18
236:18
**detect** 194:23,24
**deteriorating**
148:15
**determine** 157:4,5
**determined** 156:14
**determining** 130:5
**develop** 192:21
200:13,25 203:14
203:18 222:25
**developed** 50:20
119:25 144:19
150:20 201:6
223:10
**device** 40:9 129:4,6
129:10
**devices** 37:25 38:2
38:8 129:13

148:15 171:3
233:2
**dexterity** 164:21
**diagnosed** 152:7
**diagnoses** 28:5
116:4 126:10
163:4 226:24
**diagnosing** 124:24
**diagnosis** 108:3
126:4,4,6 134:14
134:16 156:5
157:17 160:4
246:23
**diagnostic** 107:17
107:23,25 115:17
115:17 116:2,7,16
117:11 123:5
155:25
**dictation** 21:18
**die** 158:17 181:20
**difference** 40:1
80:3 108:25
**different** 15:7
26:20 36:18,23
39:1 49:1 52:6,7
53:13 55:21 78:4
80:1 89:14,15
94:5 99:21 101:11
130:19 136:3
145:6 159:17
183:25 210:25
217:23 225:19
247:17
**differently** 127:13
144:1
**difficulty** 164:20
**direct** 231:24
**direction** 260:8
**directly** 8:25 9:1
46:20,23
**disabilities** 116:18
117:13 124:25
**disability** 23:12
55:24 56:14
116:23 123:6
125:2 126:16

131:19 133:1,2,21
138:20 141:8
142:4,14
**disabled** 137:2
**disagree** 105:25
122:24 151:16
163:19 180:25
181:2 220:5,18,24
242:20
**disagreeing** 152:18
220:21
**discharge** 36:7
226:11
**discharging** 39:13
**discipline** 91:6
98:11
**discount** 81:1
**discounted** 80:23
205:3
**discovery** 256:15
256:21
**discussed** 75:20
123:17 124:1
130:2,10 150:5
**discusses** 91:6
134:13
**discussion** 124:17
229:6
**disease** 116:13
192:13
**diseases** 209:18
**disk** 193:3 194:11
**disproving** 185:1
**distances** 236:6
237:20
**distinction** 69:17
**distinguish** 65:25
**District** 1:1,1 5:5,6
**diverse** 38:6
**Division** 1:2 5:6
**doctor** 6:12 11:2
39:5,6 46:24 47:3
47:4 114:18 120:5
120:23 164:15
172:14 173:2
174:4 188:4 189:2



189:16 190:3
200:15 201:3
214:19,21,21,23
240:16 245:1
**doctors** 41:23
114:16 170:22
187:23 189:9
255:3
**doctor's** 159:24
**document** 14:17
16:9,11 59:21
105:22 154:16
176:15 259:15
**documents** 13:12
13:17,19 14:13
15:3 16:23 17:11
17:24 18:7 19:3
19:12,15,17,25
20:8,18 29:12
34:2 50:23,23
51:17 69:25 70:16
70:24 72:15,20
73:14 101:16
146:20,22 147:3,7
147:10,11,14
155:20
**DOCUMENTS/I...**
4:17
**doing** 15:14 31:16
34:2 46:1 62:17
64:15 70:24 86:18
86:23 89:20 90:3
98:15 120:16,19
120:24 126:20,21
130:7 138:18
145:19 151:5,9,20
159:14 176:11,12
176:12 186:8
187:23 189:12
195:21 209:9
216:16 218:6
220:20 225:17
239:8 243:6
248:10 250:15
**dollars** 80:7,13
**Doppler** 198:22

199:3,15,25
**DOS** 72:2
**doses** 204:18
**double-check** 43:2
170:11
**download** 50:23
**downs** 215:22
**Dr** 4:7,8,15 5:3
6:14,16 12:15
18:16 59:5 87:25
89:9,10 102:23
104:5 112:6 238:7
256:2 257:11
**draft** 76:6 77:3
97:11 125:24
**drafted** 97:12
**drafting** 96:25
98:21
**drafts** 96:12,14
**dressing** 223:3
**drive** 8:5,10 17:23
17:25 18:17,19
29:13,14 32:9,11
59:12,16,24
153:24 239:20
240:6,22
**driving** 133:7 165:6
254:25 255:5,16
255:17
**drop** 74:9
**drove** 240:5
**dual** 55:23
**duces** 7:1 12:17
66:16
**due** 23:14 24:10
65:8 66:13 135:1
139:6,7 195:11
196:20 199:1
246:23
**duly** 1:16 5:20
260:6
**duplications** 198:1
**duration** 175:11,14
195:22 199:1
206:23 207:10
208:3,9,12,22,22

**durations** 209:10
**duties** 33:19,23
103:4
**duty** 19:24 21:4
**DVTs** 198:23
**dysfunction** 207:6
**D.O** 1:11,15 3:4
5:19 18:17 259:1
259:7,12

— **E** —

**E** 2:1,1 156:19
**earlier** 17:7 32:15
40:25 42:7 52:15
57:23 65:12 69:8
84:22 88:2 105:6
108:18 133:17
134:5,19 136:7,21
143:10 150:5
152:15 155:1
165:19 168:13
182:7 191:10
198:20 222:17
223:13 227:6
231:17 232:6
249:14
**early** 104:16,21
**earth** 186:14
**easily** 92:25
**eat** 228:15,15
**economic** 247:18
**educate** 98:18
154:25
**education** 87:8,11
87:13 130:22
154:25 155:18
172:19 173:1
176:23 177:4,20
191:5,7 198:17
204:16
**effect** 171:2
**effects** 191:14
**eight** 29:2
**either** 18:20 21:1
35:25 38:11 51:15
88:23 130:18

169:1 194:19
234:17
**elective** 38:12
**electric** 237:3,6,10
237:13,21 240:2,8
240:11
**electrical** 232:13,15
233:13,17 235:3
**electronic** 11:14
**electronically** 11:5
**Ella** 44:20 51:12
**emergency** 197:15
**empirical** 179:7,17
185:10
**employed** 91:17
260:13,15
**employee** 9:6,8
**ended** 61:7 140:1
244:22
**end-all** 185:22
**energy** 227:17
**engage** 125:1
**English's** 256:18
**entire** 17:17 29:20
170:17
**entitled** 155:3
187:21
**entity** 9:1 10:23
217:23
**entry** 79:6
**Environmental**
254:21
**equal** 182:18
**equipment** 172:12
223:1,3
**erectile** 207:6
**errata** 34:25 100:6
**error** 30:10 78:12
79:3
**especially** 194:8
209:17 210:23
237:20
**essence** 98:4
**essential** 254:21
**essentially** 55:24
65:12 113:22

121:16 134:20
186:8,10
**establish** 118:4
136:10
**established** 120:4
145:2
**estimate** 36:21 46:8
46:9 175:13
**estimated** 77:2
**estimation** 45:21
**et** 36:7 172:13
**ethical** 106:21
**eval** 163:21 164:5
166:8,13,19
167:17,23 226:4
**evaluate** 202:7,8,11
202:13
**evaluated** 161:8
227:4
**evaluation** 40:20
161:7 162:12,21
165:12 198:18
229:15 230:18
**evaluations** 162:17
162:22 171:4
**everybody** 62:10
99:22 118:21
145:12 178:21
184:18,18 211:14
230:9
**evidence** 141:22
142:19 159:21
163:8 164:7 177:9
188:11 202:4
213:17,22 221:19
226:21 231:24
**exact** 32:7 181:19
184:11 226:9
**exactly** 62:2 64:1
76:2 92:15 121:24
127:22 145:25
160:11 170:6,12
180:9
**exam** 16:1,2,6
54:21 63:7 112:24
114:5 117:9



204:11 223:24
255:14
**examination** 3:5
6:5 15:20 61:2,17
63:5 80:4 105:2
107:6 109:15
110:17 112:9,12
113:17 129:23
138:11 148:12
165:24
**examination/IME**
83:9
**examine** 22:8 111:6
116:1 138:1 148:1
**examined** 22:2
**examinee** 111:1
112:24 113:18
**examiner** 31:10,18
32:20 33:2
**examining** 236:20
**example** 27:1 28:13
35:25 39:14 54:21
55:18 59:19 93:13
97:15 122:4
128:24 129:19
157:11 253:6,25
255:3
**examples** 27:23
**excellent** 169:13,13
**excuse** 42:9 49:7
60:8 81:7 116:10
131:12 140:9
158:9 168:18
179:15 200:17
201:11 228:6,8
**executed** 259:17
**exercise** 216:3,7
217:1 240:14
**exercising** 240:13
**exhibit** 12:11,12
14:9,11,25 15:3
16:25 17:1,6,8,10
17:12,12 18:5,8
19:18 20:19 21:20
29:5,7,7,8,19,20
29:23 30:5,6,7

31:1,2 32:25 42:6
42:19,20,21,24,25
43:12,19,23 49:3
49:8 54:10 55:10
57:25 58:5,7 59:8
59:12,14,23 60:5
67:10 69:25 77:18
78:1,6,6 79:15,17
79:18 81:6,7,12
81:21 93:6 95:3,4
95:16 101:1
123:22 146:1
147:2 205:12
208:18 257:18
**exhibits** 4:1,7 12:8
29:25 30:1 95:21
**exist** 116:12 151:11
**expect** 134:3 209:9
**expectancy** 23:17
24:1,12,15 25:5
25:10 97:24
116:23 117:18,21
117:25 118:4,9,12
118:13 119:14,18
119:21 120:1,8
121:2,8,18 122:15
123:6,10,12,13
133:21 134:3,14
135:1,22 136:1,5
136:6,20 137:5,10
143:11,15,17
144:3,11,12,16,20
150:4,8,11,25
151:7,18,25
152:11 153:6,7
158:11,13 159:5
159:10,12,18,19
175:18,21 176:2
176:17 177:7
178:14,14 179:15
179:18 180:17
181:5,9 182:10,13
182:16 184:19,24
186:11,20 187:1,3
187:11 188:1,6,16
208:13 218:16

249:12,13,15
**expectations** 89:11
**expected** 89:21,21
**expecting** 188:13
**expend** 77:11
**expenses** 81:14
82:23
**experience** 89:16
155:18 173:2
176:23 177:4,20
191:8 198:17
199:16 204:17
241:21
**expert** 11:3 33:23
34:3 43:10 151:8
256:20
**expertise** 39:19
54:20
**experts** 89:15
147:15,15
**Expiration** 260:22
**EXPIRES** 259:25
**explain** 10:15 28:12
33:18 78:11 84:23
98:10 108:8
126:17,18
**explained** 143:11
**explanation** 79:5
**explanatory** 98:8
98:14
**express** 208:11
**expressed** 24:16
123:22 165:20
259:18
**expressing** 208:14
209:1
**expressive** 164:20
167:19
**expressively** 164:22
**extended** 192:23
194:7
**extent** 55:12,13
58:23 60:3
**extra** 16:23 20:14
84:15 194:9
**extremities** 24:5

40:5,10 57:20
134:21 157:3
222:18,19 223:7
226:25 233:10,12
233:14
**extremity** 40:7
132:5 192:17
198:24
**eye** 161:2
**e-mail** 54:2,3,4
66:10,12,17 68:3
**e-mails** 75:15

**F**
**faced** 65:4
**facilities** 35:17,23
36:3,5,15,16
38:11,22 235:21
**facility** 15:17 25:18
36:1 38:16,17,23
39:14 80:21 81:19
169:4 235:20
**fact** 119:1 132:15
133:5 136:16
137:2,3,7,11
139:1 151:16
164:8 165:11
166:7 167:16
185:7 189:2 190:2
193:4 194:15
200:10 203:1
208:8 212:14
221:20,21 223:15
228:9 229:21
233:19 239:17
240:21 241:8
244:6,24 249:23
**factor** 186:20
**factors** 106:25
117:24 120:4,7
135:22,22 136:7,9
136:12 137:8
145:2 159:17
164:2
**facts** 101:15,17
108:20 109:8,18

113:22 115:5
141:21 164:6
177:8 202:4
213:16,22 231:24
**factual** 101:11
109:18
**fair** 45:21,21 55:2
56:3,5,18 74:2
145:13 156:4
157:22 162:1
174:14 233:14,24
246:5
**fairly** 30:7
**fall** 76:21
**falls** 235:10
**familiar** 180:23
**family** 39:6 127:2
**far** 14:5 26:15 70:3
73:17 79:23 82:23
89:19,22,23 90:6
90:7 92:20 94:12
96:9 127:19
142:17 146:13
147:12 150:25
151:13 162:11
170:16 174:1
176:4 179:3 203:1
204:12 206:9
224:24 229:13
232:12 235:9,11
238:17 239:6,9
240:19 249:2
257:12
**fax** 2:6,11
**February** 20:8
228:1
**federal** 1:22 44:22
45:3
**fee** 83:4 85:12
**feed** 25:21 27:22
**feel** 135:25 136:4
153:3 159:13
183:22 188:10
209:4 238:4,14
250:15
**feeling** 239:19



**fees** 92:11
**feet** 238:5,13
**fellowship** 41:8,25
**fellowships** 41:23
**felt** 100:24 113:13
  238:18
**fewer** 25:12
**field** 143:15
**figure** 163:8
**figured** 59:17
**file** 4:7 17:16,17
  29:8,11,19,20,25
  30:1 70:3,4
  256:14
**filed** 18:10 260:10
**fill** 34:22 64:18
  102:13
**filled** 110:11
**films** 195:9
**final** 21:10,11,16
  73:19 94:14 95:7
  95:13 98:3 175:16
  177:15 207:12
  220:12
**financial** 260:16
**find** 10:10 66:7
  99:16 105:3
  129:16 144:1
  164:13 238:8
**finding** 86:12
**findings** 109:8,11
  109:18,19 113:22
  113:23 115:5
**fine** 40:6 164:21
  219:7 220:15
  247:10 257:13
**finish** 7:12,14 23:5
  106:6,8 172:22
  179:12,13,22
  216:1 251:16
**finished** 21:9
**firm** 1:20 2:4 5:8
  9:1 10:23 11:16
  11:25 34:5,16
  35:4,10 43:14,15
  46:20 47:15 52:16

60:15 62:20 65:15
  260:24
**firms** 8:22 43:19,20
  49:11,16
**first** 5:20 12:9
  24:13 30:4,14,15
  33:9 47:13,17,19
  47:20,21 53:10
  57:21 60:20 86:6
  89:5 95:23 103:11
  103:15,17,25
  104:2 114:12
  135:8 142:8 150:2
  164:10,25 165:1,4
  167:17 173:13
  201:22 224:12
  248:24 254:4,7
  256:11 260:5
**five** 39:1 76:12 77:3
  83:3 155:9 190:7
  199:6 207:6
  209:17,24 210:2
  210:13 242:6,6
  249:25
**flash** 153:24
**flat** 60:22,24 83:4
  85:12
**Florida** 155:7
**flow** 108:14
**flu** 207:4 209:12
  210:3,5,8,18,21
  211:4,14,20
  213:12 214:8,15
  214:22 215:1
**fluctuates** 46:16
**fly** 209:5 250:16
**focused** 40:10
**focuses** 40:2
**Foley** 141:1
**folks** 52:24 54:10
  73:12 143:14
  185:8 223:12
**follow** 121:12
  151:20 170:4
  180:8 185:23
  188:25 197:22

201:23
**followed** 152:17
**following** 37:22
  151:19
**follows** 5:20 186:13
**follow-up** 36:24
  80:23 173:3 190:1
**follow-ups** 37:5
**foot** 238:15
**foregoing** 259:2,16
  260:4
**forever** 132:9
**forget** 91:9 128:6
  192:18
**forgetting** 162:7
**form** 45:14 64:18
  102:8,9,11,15
  109:17 110:1,5,21
  110:23 111:1
  112:12,25 113:18
  117:8 123:18
  148:2,11 154:20
  245:13 255:14
**format** 92:18,25
**formation** 193:1
**formed** 95:22
  102:16
**formulate** 16:6
  115:19,21,24
**formulating** 90:1
  154:16 205:13
**forth** 75:16 77:16
  89:9 116:3
**forum** 87:19
**forwarded** 19:2
  69:9
**forward-thinking**
  120:17
**found** 30:10 85:21
  86:2 166:7
**foundation** 88:22
  105:8,11 216:5
  224:23 231:11
**foundations** 105:19
**founder** 86:17
  87:23

**four** 41:9 42:25
  82:3,4,16 83:23
  120:12 131:4,4
  154:8 159:17
  172:6,20,24
  173:20 175:5,6,6
  218:10,11 219:13
  219:16 221:2
**fracture** 188:24
**fractures** 55:22
**framework** 90:16
**Franco** 99:13
**Franco's** 99:14,17
**frequently** 192:5
**front** 7:19 14:23,24
  16:10 30:18 32:18
  240:6
**full** 6:7 26:3 55:22
  61:10,16 75:20
  111:11 145:10
  176:8 177:3
**fully** 160:22
**function** 9:10 26:18
  60:18 120:14
  171:3 197:25
  221:5,6,15 234:3
  234:8,21 246:7
  248:7
**functional** 137:12
  157:6 248:24
**functionally** 176:11
**functioning** 58:21
**functions** 157:10
**further** 24:4 171:5
  260:7,12,14
**future** 25:11 31:17
  113:6 123:7
  124:18,18 125:22
  128:21,25 142:25
  155:24 156:1
  157:14,21 163:22
  166:11 167:23
  170:19 171:7,10
  173:14 186:19,19
  195:16,18 197:24
  199:20 202:23

208:22 225:1

---

**G**

**gained** 153:9,21
  227:7 238:12
**GALLOWAY** 2:9
**Garrison** 102:23
**gather** 68:25 69:8
  69:14,15,18
  148:18
**gathered** 69:20
**GCS** 160:10,13,15
  160:16,22 163:16
  165:16 166:8
**general** 24:6 35:13
  35:14 41:20 60:2
  101:18 112:7
  118:19,23 129:11
  129:12 146:11
  151:12 169:21,22
  169:23 170:17
  181:12 183:15,18
  208:20 210:22
  211:23 213:25
  227:13 252:2,7
**generally** 23:24
  97:16 218:7
**generally-accepted**
  181:15
**geographical**
  169:25
**getting** 50:5 56:22
  71:7 140:6,6,21
  212:7,10,16
  233:18 244:22
  250:12
**GI** 203:2
**give** 6:19 8:4 19:22
  19:25 36:21,25
  53:10 67:20 68:20
  73:15 76:22 77:7
  80:25 90:16 98:16
  129:17 180:9
  181:19 186:12
  224:2 237:23
  248:23



**given** 16:16 18:1
   44:3,9 48:3 51:2
   127:22 259:19
   260:5,18
**giving** 114:12
   126:10 145:9
   248:25
**glad** 247:10
**Glasgow** 160:10
   163:10 167:2
   168:2
**go** 7:4 11:6 14:7
   18:3 22:12,16
   23:23 25:11,14
   28:4 29:24 31:6
   35:22,25 36:3,4
   38:11,14,15,15,24
   38:25 40:22 41:24
   57:24 58:17 59:18
   67:2,4,14,17,18
   67:22 71:3 75:16
   77:16 79:17 80:12
   88:9 92:20 93:14
   96:23 97:8,22
   102:25 123:5,5,6
   132:1,6 146:1
   153:25 155:19
   160:15,18,18
   161:25 162:5
   164:15 168:4,16
   170:21,24 171:11
   173:15,16 185:17
   185:25 190:4
   199:7 201:19
   206:24 207:2,7,10
   208:4,7 209:8
   215:19 216:10
   217:13,17 218:13
   232:1 238:8,9,17
   239:14,15 240:12
   251:2,8 252:8
   254:15 257:11,12
**goes** 68:3 156:18
**going** 7:7,8,9 12:8,9
   12:16 17:6 23:11
   23:16,21 24:9,9

25:3,9,11,12
   26:22 28:8,13,22
   29:4,24,25 30:12
   38:15,17 39:13
   40:8 55:7 57:12
   58:14,15,25 59:3
   66:2 79:15 81:6
   85:5 89:14 93:22
   94:12 99:22 104:6
   109:5 110:13
   112:1 113:8
   117:18 121:1,7,18
   122:1,6,7,8,12
   123:4 129:17
   130:17 132:19
   133:4,5,14 136:13
   136:22 138:14,14
   138:19,20 140:3
   140:21 141:14
   142:21,24 143:4,9
   143:25 147:9
   150:3 151:25
   154:3 157:6,11
   158:7 159:8
   164:13,16 166:11
   170:12,23 171:1,3
   171:12 172:8,18
   172:24 173:16
   175:20 177:10
   179:14 180:2,8,10
   180:11 182:16
   183:21 186:12,13
   186:25 187:13,17
   188:1,12,12,13
   189:11 190:5,7,8
   192:1,17,20,24
   193:15 195:8,10
   195:12,14,18
   196:2,17,22,23
   197:10,13,20,22
   198:5 199:9,12
   201:8,15,17 202:3
   203:11,18 206:18
   206:23 207:7,10
   207:12,13,25
   208:12,23 209:5

211:3,18,19
   213:11 214:4
   215:17 216:9
   217:13,14,14,22
   217:23,25 218:3,8
   219:8,8 220:1
   221:4 223:19
   231:10 234:11
   240:13 241:23
   242:13,15 245:8
   249:20,23 250:6
   250:23 251:7
   252:25 253:7
   254:9 255:1,21
   256:2,24 257:15
**Gonzales** 87:25
   89:9,10 104:5
**good** 53:18 94:6
   98:17 118:24
   143:6 164:18,19
   165:5,9 176:25
   204:13 249:24
**goods** 130:1,12
**gotten** 115:8
   129:19 211:7
   214:10 221:24
**gradual** 201:24
**gradually** 238:11
**great** 142:23,23
   143:22 210:13
**greater** 186:11
**Greene** 2:9 3:5 5:13
   5:13,24 6:6,16
   10:3,19 12:13
   13:25 14:1,12,19
   14:23 15:2 17:2,6
   17:9 18:8 21:7,14
   27:24 29:24 30:7
   31:3 35:3 42:21
   45:17 49:3 52:23
   56:16 58:8,17,22
   59:5,15 60:3
   67:14 68:19 71:14
   73:1,6 79:4 83:22
   94:7,18 95:5,12
   96:3,7 100:8

101:21 105:22
   106:3,16,21,24
   107:22 111:21,23
   111:25 112:6
   114:7 123:3 124:2
   141:24 142:5,6,16
   146:12 149:19
   154:7 164:24
   168:11,12 175:24
   177:10,14,18,22
   180:18,20 187:8
   187:10,22 188:17
   189:13,22 190:10
   190:11 191:3
   193:22 194:1
   196:15 198:9,15
   199:7,14 202:5
   208:21 212:15
   214:3 222:9,10
   229:7,16 232:4
   234:16,24 235:1
   236:19,24 237:4
   238:1 241:16
   242:1 243:20
   244:13,14 245:11
   245:16 251:8,11
   251:15,19,22,24
   252:3,9 254:16,19
   255:16 256:1,22
   257:1,7,10,14
**gross** 40:3
**group** 135:12
**guarantee** 121:7
**Guaranteed** 197:16
**guess** 16:21 67:23
   82:20 126:5 132:7
   154:22 182:4
   213:10 214:9
   240:3
**guidance** 89:19
   90:18
**guideline** 170:5
**guidelines** 105:6
**Gustavo** 1:3 5:4,16
   6:22 66:23 131:17
**guy** 81:4 239:8

**guys** 24:21,25

---

**H**

**half** 24:24 61:9
   93:14 147:22
   148:4 163:24
   164:16 175:5,6
   199:23 201:2
   224:1 238:11
**half-day** 82:2
**hand** 29:5 204:2
   239:10 255:5
   259:19 260:18
**handbook** 88:18
**handed** 14:2,8
   18:10
**handles** 11:12
**hands** 164:22 253:1
**handwritten** 4:15
   17:21 70:7,8
   71:17,22 72:14
**hand-controlled**
   237:12
**happen** 65:10
   120:19 121:19
   157:9 201:15,17
   218:3 234:18
**happened** 11:17
   65:9 66:5 73:8
   108:12 153:24
   160:16 192:19
   239:24 241:4
**happening** 162:4
   186:4
**happens** 62:22
   75:13 174:2
**happy** 58:24
   148:20 149:24
   184:12
**hard** 37:20 46:15
   77:16 163:20
   205:9
**HARRIS** 260:2
**hauling** 241:24
**head** 160:14 163:25
   234:11



**headhunter** 86:8
86:10,11
**healed** 139:22
**healing** 238:10
**heals** 140:3
**health** 37:9,19
86:21 114:21
216:14 217:14,17
217:24 218:10
**healthcare** 127:8
211:23
**healthy** 118:15,17
118:18 209:21
**hear** 114:7
**heard** 37:16 108:11
108:15,16,17
155:5 193:7,14,15
193:20
**hearing** 218:2
256:10
**heavy** 239:18
**help** 19:3 38:16
40:5 90:14 93:1
121:1 122:13
132:22 171:5,6
206:18 216:2
221:14 223:4
233:18,19 238:9
**helpful** 93:4 224:25
230:5
**helping** 98:2 223:2
225:16 233:23
**helps** 36:16 157:5
157:15 223:1
**hereto** 1:23
**high** 48:5 141:14
158:15 224:2
**higher** 204:18
**highest** 120:14,14
130:8 197:25
221:5,5,15,15
231:11 234:2,7,21
241:8 246:6
**hiring** 86:13
**history** 114:11,22
114:24 115:1

153:20 160:9,14
166:18 167:19
**hit** 96:16 160:14
163:25
**HIV** 118:22,25
**hold** 102:25 127:23
207:4 243:10,10
251:2
**holding** 29:19
**holistic** 30:14,20
**home** 8:2,9 37:9,19
38:14,15,17 216:3
216:7,8,14 217:1
217:14,17,24
218:9 235:18,24
238:4,8
**hope** 149:10
**Hopefully** 212:24
**horrible** 186:4,5
**hospital** 35:24
38:13 128:6
153:13 227:23,25
229:2,8 230:9,12
230:16 231:22
232:8,13,15,17,19
232:21 233:5,13
233:25 234:23
235:3,11,17,22
236:1
**hour** 24:24 26:2
82:5,8,10,17,21
83:11,23 84:5,12
84:13 85:16
164:16
**hourly** 85:12,13,14
**hours** 29:2 76:6,10
76:12 77:3,8,10
77:15,17 82:3,4
82:16,20,22,24,25
83:3,23 84:17
85:9 224:1,3,5,10
224:11,21
**house** 18:25 19:1
216:10 234:10
**houses** 115:7
**Houston** 1:2,21 2:5

2:10 5:6,9 8:6,10
8:12 11:3,4 18:17
18:19 36:5 78:4
85:22,23 168:23
**husband** 256:4
**hyperlipidemia**
159:2
**hypertension** 39:7
118:22 158:25
**hypothetical**
150:24 224:23

**I**

**IARP** 87:17 151:11
**Ibarra** 47:14
**ICHCC** 86:20
**idea** 59:16 78:21
93:21 254:19
**ideal** 113:2 240:15
**identification**
107:17,22 108:5
**identified** 43:22
54:10 55:10 57:25
81:23 154:17,20
158:20 164:1
**identifies** 12:14
**identify** 101:15
116:11
**identity** 259:14
**ifs** 138:16
**ill** 210:23 211:1
**illness** 124:18
**imagine** 87:7 88:3
89:10
**imaging** 146:18
**IME** 61:6,7,11,20
61:21 62:13,16
77:20,21,21,24
79:11 80:3,18
81:10,14 100:11
112:11
**immobility** 24:11
199:18
**impact** 119:18,21
119:25 133:9
134:3 136:12

143:16 144:12,16
144:20 146:9
182:13,25 183:1,8
183:11
**Impaired** 158:23
**impairment** 116:23
123:5 131:18
132:13,18 133:3
133:21
**impairments**
105:11 116:17
117:12
**importance** 88:20
212:14 213:25
**important** 105:10
106:1,3,10 107:8
107:10,14 109:25
110:7,16,20
111:10,11 117:1
**impress** 221:13
**impressed** 23:13
**impressive** 158:14
**imprinted** 89:13
**improve** 229:14
246:7
**improved** 148:14
**inbox** 68:5,9 74:18
75:11
**incident** 28:25
102:5 131:12
141:17 142:7,13
146:7 149:2,5
163:25 166:23
191:17 194:17
195:17 218:4,5
238:21
**include** 16:1 34:25
38:5 72:8 84:1
100:6 112:23
113:24 114:21
155:19 162:8
168:22 178:21
184:12 196:11
200:6 214:18
242:15 254:9
**included** 17:14

43:6,9 54:4 72:11
128:24 129:6
151:1 179:4
204:22 205:2
215:1 249:22
**includes** 112:14
125:7 151:21
161:7
**including** 23:15
80:9 84:23 174:11
174:12 182:2
201:10,11 202:1
212:13,15 219:18
250:25
**incomplete** 150:24
156:18,20,25
157:1
**inconsistencies**
185:11
**incontinent** 246:10
**incorrect** 195:3
208:18
**increase** 121:2,7,17
187:1
**increased** 212:8
**increasing** 121:5
**independent** 88:10
254:25
**independently**
157:13
**INDEX** 3:1
**indicate** 188:18
**indicating** 19:6
42:2
**indication** 140:14
201:20 202:25
205:5,14 223:6,9
229:8 245:7
**individual** 20:22
40:8 46:24 51:25
56:17 57:9,16,19
62:25 65:7 81:2
98:15 105:11,14
108:2 109:3 117:4
120:4,13 135:19
135:20 142:22



144:3 145:1 151:2
151:7 162:10
172:15
**individualize**
219:20
**individualized**
104:22 170:14,18
185:4 204:24
**individualizing**
176:4 242:1
**individually** 135:16
**individuals** 39:10
43:22 55:1,4
56:11 57:25 91:16
204:17 241:21
**infection** 245:5
**infections** 132:5
**influenza** 210:21
**information** 6:24
17:25 20:12 21:1
22:4 26:15 32:14
34:25 59:22 64:13
64:14,22 66:14
67:16,25 68:20,22
68:25 69:1,2,4,8
69:14,15,18 88:3
88:4 97:19 98:17
100:6,25 101:6,11
110:7 111:1,14,16
112:21 113:4,6,9
113:13 114:3,14
115:6,12,14,23
117:9 129:20
138:17,18 148:22
149:14 152:3
153:4,14 160:1
179:17 183:23
184:4,6 185:10
208:17 210:10
233:3 253:16
**infrequently** 65:11
**inherent** 116:3
**inherently** 161:6
**initial** 23:14 26:12
26:25 28:6,8,14
28:18 55:9 61:7

74:18,22,22 75:7
75:10 76:11 80:18
80:24 86:16
132:11 146:17
161:10 163:9
168:14 216:11
**initially** 21:2 29:16
87:23 139:19,20
161:10 162:22
189:21,24 193:11
**inj** 178:3
**injections** 39:24
**injured** 105:3
195:20,21
**injuries** 26:17
35:21,21 38:9
54:11,16 55:10,17
56:4,22 66:15
105:4 128:13
131:11 134:2
135:24 144:19
150:16 155:13
170:23 171:6
172:9 174:6 176:5
177:2,20 178:15
182:12 183:7
185:8 197:6
201:10 204:7
245:2 249:8
**injury** 23:16 24:3
26:12,13,25,25
28:8,11 29:3
41:12,16,21,24
54:19,22 55:1,5,6
55:21,21,23 56:12
56:13 65:4 98:12
116:12 119:17
122:1 124:17
128:19 131:25
132:1,3,8,11,17
132:25,25 133:14
135:5,7,11 136:11
139:1 140:4
141:13 142:9
143:16 144:11
156:14,18,19,20

156:22 160:1,6,8
161:5,10,16,24
162:18 163:1
164:3 170:18
177:1,24 178:3,17
180:22 182:17
184:16,22 188:23
192:20 193:4
195:11,24 196:13
197:2,9 199:1,17
199:24 200:10,14
200:24 201:1,3
203:13,14 204:17
206:20 209:19
211:8,12 212:3,6
214:7 215:22
216:12,17,19,21
216:23 227:14
228:10,16,24
229:21,25 230:15
231:16,21 232:3,7
241:22 249:16
**inpatient** 36:9,10
161:7
**input** 91:12 173:5
227:19
**inquired** 235:25
**instance** 1:15
**instrument** 259:16
**intake** 102:7,9,11
102:15 110:1,5,21
110:23 112:12,25
113:18 117:8
148:2,11 154:19
154:20
**intakes** 65:14 66:1
**intaking** 52:16
**integral** 111:7
**integrative** 30:13
30:13,20
**interest** 225:15
260:16
**interested** 161:19
**International** 86:20
87:17
**internist** 39:6

**interpreted** 145:15
**interrupt** 23:19
**interrupted** 251:15
**interventions** 39:24
171:7
**interview** 61:2,17
63:5,7 80:4 83:8
86:3 107:6 109:14
109:20 110:17
111:5 112:9,11,24
113:17 114:5
117:9 129:24
138:1,11 147:21
148:1,11 165:14
166:3 173:11
204:11
**interviewed** 22:2
86:5 165:20 228:4
232:23
**interviewing**
236:20
**introductory** 97:13
**invoice** 60:20 61:19
61:20 77:18,19
78:6,23 81:8,9,12
81:13,16,22 84:18
84:23 93:13
**invoices** 4:12,13
17:23 58:6,9,18
59:6,9,17 60:8,9
60:10,12,15 79:16
79:21 81:5 82:19
91:19 93:6,7
**involved** 9:11 36:6
51:25 58:1 62:10
80:8 86:10,14
91:7 126:3,9,11
126:14,16 218:9
221:17
**involvement** 90:21
**involves** 226:13
**irresponsible** 143:8
**isolate** 120:3 145:1
145:9
**issue** 20:20 164:23
190:6 194:11

245:21 246:5
247:5 256:3,13
**issues** 132:10,10,11
133:8 138:24
139:16 140:19
162:3 164:17
165:21,21 167:19
167:19 171:11,25
173:4 189:23
192:21 194:11
201:4,25 202:18
246:18
**item** 168:24
**items** 25:9 155:25
232:12 252:3
**Iversen** 1:11,14 3:4
4:8 5:3,19 6:9,14
6:16 12:14,15
18:16 59:5 112:6
256:2 257:11
259:1,7,12
**Iversen's** 4:7,15
**Ivy** 8:10 18:19,22

**J**

**January** 19:13 22:3
25:16 45:1 60:9
69:23,24 70:23
71:8 72:6,6,7,22
77:21 79:20 138:6
138:10 140:25
141:5,16 142:12
151:24 153:16
165:25 184:13
**Jenny** 53:22 54:2
**Jenny's** 53:23
**job** 9:10 85:19
98:18 103:4
169:22 225:17
**jobs** 33:12 99:8
**Joe** 87:25
**JOHNSON** 2:9
**joining** 103:12
**joking** 81:1
**journal** 90:20 91:1
91:1,3,3 103:6



135:10,15 169:18
173:23
**journals** 169:18
185:17
**June** 226:13,17,17
**jury** 7:19

**K**

**keep** 36:12 49:20
49:22 50:3,4,12
50:13 74:7,7
76:10 99:22
241:24
**kept** 51:2
**kidney** 132:10
191:13,19,20
202:6,16
**kidneys** 191:14
**Kiernan** 2:3 5:15
**kier@daspitlaw....**
2:7
**kill** 209:23
**kind** 15:5 19:3
25:25 26:15 34:2
38:20 39:10 40:22
46:15 47:1 50:11
55:23 58:2 64:17
65:8 69:21 71:4,6
74:19 76:24 80:10
85:24 86:22 89:24
90:20 91:20,22,25
92:4,17,24 94:3
95:14 96:15,17
97:6,6,23 98:3,10
98:10 102:12
104:6 105:25
108:19 120:17
122:7 126:20
131:8 132:6,7,15
135:18 136:13
137:16,16,17
147:11,14 151:5
151:16 152:18
156:14,15 158:7,7
163:1,5 165:11
166:19 172:13

174:7 176:3,8
181:15 185:25
187:25 202:19
206:13 208:4
210:19,19 214:9
215:18,19 216:17
216:18 219:12
221:7 225:6,7
226:5,6 227:17
233:19 248:25
250:15
**knew** 67:10 128:1
137:14 152:4,7,19
188:12 243:11,11
248:9,11 250:3
254:8
**know** 7:22 9:19
11:7,15,19,24
12:19 15:5,25
17:16 20:22 21:9
21:12,18 22:12
24:8,10 25:3,24
25:24 26:1,4,19
27:1,3,21 28:5,11
29:3,14,15 31:25
32:4 33:25 35:25
36:2,13,23,25
37:7,8 38:8,10,25
39:6,18,22,23
40:4 41:21,23
46:13 48:5,10,15
50:24 51:8,15,16
51:16,19 52:3
53:17,23,24,25
54:5,16,19,24,25
55:3,19 56:14
59:24 60:1 62:2
62:5,7 65:9,9,23
68:10 69:3 70:3
70:10,10,25 71:19
73:4,18,19,23,24
74:7,8,15,25 75:9
75:11,12,18 76:1
76:3,4,21 77:5,7
77:12,17 78:4
79:8,24 85:7,23

85:24 86:7 87:5
87:15 88:16,23,25
89:13,16,20,24
90:3 92:6 93:21
94:3 95:13 98:2,6
99:6,14,15,15,17
99:21 105:10
108:6,9 109:21
110:13 111:12,16
113:3,7 115:8,9
116:10 117:4,10
120:21,23 121:13
121:15,23 125:11
126:22 127:19
130:15,16 132:9
132:16 133:7,8
135:13,14,14
136:19 137:3
139:3,10,12,15,16
140:5,20 142:18
142:25 143:22,22
144:2,4 145:8,9
146:17,18 148:8
148:13,21 149:7,9
149:20 151:3
152:1 153:1,9,11
153:12,15,21
154:20 155:20
157:7,7,8,12,13
158:16 159:13,14
159:24 160:18,20
161:17,18 162:6
162:15,19,25
163:22 164:9
165:2 167:9,12,18
168:18,21 169:10
170:2,7,10,22
171:5,10,24
172:11 173:4
174:5 175:10
176:5,10,19,24,25
177:1,24 178:2
180:1,13 181:18
183:18,20,22
184:10 185:22,25
187:2,23 188:14

190:4,6,16,18
192:23 194:10
197:25 201:9
202:21 203:24
204:5,11 205:1,6
205:6,7 206:15
207:12,16,17
208:6 209:5,18,18
210:7,12,14,16
211:5,6 212:20,22
212:23 213:1,1,2
213:6 214:1,3,11
214:12,14,23
218:1,13,20,22
220:11,11,19
223:23 224:4
225:5,8 226:9
227:7,8,10,10
228:6,16 229:12
231:7 232:22
233:4,22 234:11
234:14,20 235:11
235:13,14,15,18
237:7,8,17 238:16
238:18 240:11,19
241:3 242:6,6
243:7,8 244:24,24
245:25 246:3
248:11 249:20
250:2,3,5,19
253:25 254:9,11
254:14 255:5,7,8
255:13 256:13,14
256:17
**knowing** 152:1
208:9
**knowledge** 253:14
**known** 131:17
255:9 259:13
**knows** 171:23
228:14,15
**Kristin** 99:5 169:8
169:9,10
**Kristin's** 99:6
**KUB** 202:5,15,17
202:25

**L**

**labs** 120:23
**lack** 104:7
**Land** 45:2 51:14
**language** 98:8
**large** 115:11
**Lauren** 53:11 54:1
**Lauren's** 53:25
**law** 1:20 2:4 5:8
8:22 9:1 10:23
11:16,25 43:19,20
46:20 47:15 52:16
60:15 62:20 65:15
**lawsuit** 18:10 47:10
149:11 260:14
**lawsuits** 45:25
**lawyer** 18:1
**lawyers** 16:17 18:1
**leads** 229:19
**learned** 104:21
208:17
**leave** 34:21 35:9
99:23 175:10
256:2
**left** 89:23 112:8
143:5 166:24
183:17
**leg** 199:4
**legal** 1:24 2:14
154:24 260:23
**legs** 134:20 199:17
200:8 238:5,13
**length** 122:7
**lengthy** 162:23
**lesser** 206:17
**let's** 31:6 65:25
67:4 69:21 73:10
79:17 112:18
123:16 129:15
147:13,22 158:19
163:20,23 168:4
180:21 192:18
198:24 217:5,12
219:20,20 221:8
228:13 235:16



241:3 251:2,13
257:11
**level** 23:12 26:8
38:17 55:24
120:14 156:13,13
157:4 188:23
197:2,25 221:5,5
221:15 231:11
234:2,7,21 238:24
239:2 241:5,8,9
241:14
**levels** 157:8 197:3
**license** 174:23,25
175:1
**licensed** 174:19,22
175:4
**lie** 238:9
**life** 4:14 6:20,21
8:20,21 9:2,3,11
9:14,15,18,21,24
10:12,24,25,25
11:1,10 12:6,21
13:18,19 14:1
15:14,18,24 16:5
18:14,23 19:2
22:8,10 23:17
24:1,12,15,15
25:5,8,10 26:10
26:23,24 27:2
28:6,23 30:21
33:15,20,21,22,23
34:1,3,4,6,9 35:5
43:8 44:6,12,15
46:18,21 47:11,17
47:19,21,23 50:16
51:2,17,19 52:2
52:24 54:17,25
55:4,16 56:10,11
56:17,20,22 57:3
57:8,16,18 60:11
60:14,22,24 61:2
61:8,9,13,14
62:17,18 63:1,6,9
63:12,19 65:21
67:2,7,9,15,19,21
68:21 69:9 70:17

70:21 71:1,12,15
71:19 72:13,16,21
73:11,15,18 74:4
76:7,16 77:3
81:23 82:7,9 83:5
83:14 84:5,14
85:19,22 86:16,18
86:22,23,25 87:1
87:2,24 88:4,5,8
88:14,18,21,22,23
89:1,11,14,22
90:21 91:6,11,15
91:21 97:14,18,24
98:11,12,18,21
101:22 103:8,11
103:12,25 104:2
104:12,13,21,22
105:7,8,16,20
106:10 107:1,10
107:14 111:18
112:7,10,23 113:2
113:8,10,12,14,18
113:23 114:5,13
114:20 115:16
116:23 117:2,18
117:21,24 118:4,9
118:12,13 119:10
119:14,18,21,25
120:8,11,11,14,16
121:2,8,17 122:9
122:15,20 123:6
123:10,12,12,13
124:11,15,21,23
125:6,10,18,25
126:2,19,21
128:16,17,20
129:8 130:2,9,13
130:18,19,23
131:1 133:4,21
134:3,3,13 135:1
135:9,22 136:1,5
136:5,17,19,19
137:5,10,24 141:4
143:5,11,15,16,25
144:2,9,11,12,16
144:20,25 147:7

150:4,8,11,25
151:3,6,12,18,20
151:25 152:10,17
153:6,6 155:3,4
156:2,3 157:21
158:10,13 159:5
159:10,12,18,19
166:12,15 169:19
169:23 170:6,14
170:17,20,22
171:12 175:18,20
176:2,17 177:7,7
178:10,14,14
179:8,14,15,18
180:17 181:5,9,16
182:5,10,13,15
183:16 184:19,23
185:24 186:10,11
186:12,20 187:1,1
187:2,3,8,10,15
187:24 188:1,6,15
188:22 189:10,12
190:9 193:1
195:15 196:16
197:19,22 203:12
204:24 208:13
217:8 218:16
219:9 220:19
221:15,23 225:1,5
225:19 228:14
229:14 230:5,6,24
231:1,9,19,19
242:11 246:6
247:14 248:19
249:7,12,13,14,17
250:1
**lifelong** 131:18,19
131:23 133:11
**likelihood** 141:13
**limit** 233:13,15
**limitations** 135:17
185:19
**limited** 129:24
232:5
**limiting** 37:11
131:10,10

**line** 4:19 123:4
162:6,6 238:2
239:13 258:4
**linear** 122:23 123:4
123:8,11
**lines** 4:18,19 76:23
**LinkedIn** 85:21
86:2
**list** 4:9,11 13:16,20
14:12,16 31:3,4
34:13,14 42:6,7
42:11,15,18 43:3
43:6,16 46:12
47:13 48:17,20
49:5,7 53:3 56:4
59:22 73:22 108:1
203:25 204:14
205:21 206:1,3
**listed** 13:17 101:19
134:2 147:18
182:12 183:7
210:20
**listing** 146:3
**lists** 59:25 146:20
**literature** 87:19
173:25 176:24
201:13
**litigation** 9:12,16
9:19,24 10:8 43:7
45:25 46:2,3,10
46:17 47:7,10
57:3
**little** 13:8 26:16
27:16,25 46:10
48:5 55:20 102:25
110:12 111:23
123:2 144:5 162:3
163:4 170:8
185:25 206:14
221:9,11 246:20
250:12
**live** 8:10 180:1
183:17
**lived** 8:12 18:20
**live-time** 96:16
**living** 8:14 40:9

235:24
**LLC** 1:6 5:4,14
**load** 239:17
**location** 169:25
**log** 62:6 74:9
**login** 68:4
**long** 8:12 11:6 12:5
24:23 151:4,9,10
151:13 174:9,19
174:21,21 201:19
223:24 224:4
236:6 237:20
238:12 241:6,14
**longer** 169:10
**long-term** 125:1
126:12 241:23
**look** 33:9 59:20
77:11,15 88:16
97:8 104:25
106:25 123:16
124:9 126:5 136:7
138:1 140:18
160:19 163:5,15
163:23 167:4,6,11
171:11 173:22
176:16,25 177:25
179:24 180:14
181:24 182:1,6
199:4,5 201:7
204:3 222:2
223:21 238:23
255:14
**looked** 77:16
150:13 163:20
165:18
**looking** 60:20
85:24 92:6 118:7
135:16 171:14
190:3 197:3
205:11 214:7
222:2 247:15,21
**looks** 42:25
**loss** 165:21 227:19
**lost** 38:20 84:20
134:20 153:22
227:7 238:5



**lot** 45:12 56:9 65:20
80:13 85:8 138:16
143:18,18 159:20
159:21 162:24
163:5 174:15
234:13
**Louisiana** 1:21 2:5
**low** 48:12,12
192:22,22
**lower** 40:5 57:20
134:20 137:24,25
156:17,17,24
157:2 188:2
192:16,17 197:25
198:24 222:18
**lowest** 160:15
**lumbar** 156:16
**lumbosacral**
192:14 194:14
**lung** 209:18,18
**lying** 192:25
**Lyric** 2:4

**M**

**machine** 1:19
**Magna** 1:24 2:14
5:10 260:23
**main** 54:20,23
117:3 132:2
**maintain** 42:7,10
42:11 49:18,23
124:23 168:20
172:10
**maintenance** 221:7
242:15
**major** 161:22
**majority** 97:12
126:22
**making** 22:15 23:8
23:25 39:15
120:22 135:20
141:7 170:8
**man** 118:9,13,15
148:13 166:24
214:20
**manage** 172:3,10

**managed** 203:16
**management** 62:3
62:4 88:18 125:2
126:16 132:4
171:19,24 172:24
175:10 191:9
**manager** 11:12,14
11:19 52:8,14
60:18 65:14 66:1
70:13,20 74:5,24
76:14,25 92:1
97:1,2
**managers** 10:11
52:6,25 53:20
127:5
**manager's** 10:13
**managing** 172:12
174:5
**manual** 240:2,4,8,9
240:12,14,17,20
240:25
**manually** 239:19
**March** 100:19
102:5 104:18
127:24,25 128:12
140:1,17 218:23
219:2
**Mario** 47:14
**mark** 12:8,9,11,16
14:9,24 16:24
17:7 29:20,25
30:5,25 42:19
58:5 59:12 95:2
**marked** 12:12 14:9
14:11 17:1,8
29:23 30:6 31:2
32:25 42:5,20
58:7 59:7,14,23
78:1 81:6 95:4,16
101:1 257:18
**materials** 59:18
**math** 79:18
**matter** 10:8 85:5
94:22 155:23
208:8 260:17
**matters** 9:12 45:25

47:10
**mattress** 233:21
**maximize** 171:3
186:13 227:17
**maximum** 228:14
242:6
**ma'am** 6:7 19:6
23:5 42:22 63:20
64:10 124:3
140:16 154:7
180:20 189:13
194:1 214:16
234:9 236:12
**McAlpine** 2:3 5:15
5:15,23 9:25
10:17 11:22 12:3
13:9,23 14:21
17:4 18:6 21:3,12
24:14,18 27:20
45:14,16 48:24
51:4,7 52:18,21
55:12 56:7 58:20
58:23 60:2 67:13
68:16 71:9 73:3
78:24 83:21 94:6
94:9 95:9,23,25
96:4 101:18
102:11 105:21,23
106:15,20,22
107:19,21 111:22
111:24 114:2
123:1,25 141:21
142:15 146:11
149:16 150:23
153:25 164:6
175:22 177:8,12
177:15 187:7,9,12
187:14 188:8
189:5,7,19 190:25
193:18,24 196:9
198:6,10 202:2
208:19 212:11,18
212:21 213:13,16
213:21 216:5
224:22 229:11
231:23 236:16,22

236:25 237:25
241:15,18 243:19
245:10,13 251:2,5
251:13,17,23
252:2,7 254:14
255:11 256:7,12
256:23 257:5,9,12
**McKinney** 2:10
**mean** 8:24 9:13
10:4 18:6 25:20
32:4 37:20 39:3
42:24 43:8 46:9
50:8 53:1,11 55:3
55:3,20 58:2 61:4
62:15 66:19 67:1
68:10 72:2 75:10
75:13 76:11 87:15
87:18 88:9,13
89:18,23 90:17
91:13 94:13 97:10
98:13 101:3 106:1
108:10 114:1,4
115:6,8 118:16
123:8 124:4
125:17 126:5
129:16 132:9,23
136:15 138:4
140:3,18,19
142:20,24 143:6
143:24 145:6,12
148:20 149:8,20
154:22 155:18
158:17 159:22
164:8 167:20
173:13,14 174:4
177:21 178:23
180:3,8 181:19
187:20 192:6,11
200:5 201:15,17
201:18 208:2
211:5 212:2 214:9
218:7 219:7,7
221:21,23,25
222:6,7 225:23
228:9,19 234:11
234:19 235:10

239:1,9 241:25
250:9 252:9
256:13,14,17
**Meaning** 239:3
**means** 35:23 61:5
62:5 134:19 147:5
156:11,21 158:6
167:21
**medical** 4:4 21:19
24:6 25:11 39:5
63:22 64:13 74:13
78:7,21,22 88:21
99:11 100:3,11,16
100:19 102:4
104:25 107:2
109:12,12 123:7
124:18,25 125:1
126:12 130:1,3
131:9,17,20
133:11 139:13,14
139:18,24 141:2
142:13 147:13
154:15,22 155:24
156:5 157:14
158:6,9,10 160:5
161:3,4,12,15,23
163:3,8 178:25
179:9 185:16
186:19,19 187:23
188:18 189:1,14
189:16 190:17
191:18 200:7,15
201:12 202:24
204:8,13,14,15
205:8,11,12,14,18
227:22 241:12,20
245:7
**medically** 130:6,7
130:14,24 191:12
200:22 202:15
242:13,19 244:21
244:25 245:1
**medication** 38:8
39:8,17 115:1
159:23 172:1
203:10 204:9



205:5,16,22,24 206:9
**medications** 38:3 159:24 171:1,2 172:11 203:2,3,5 204:3,14 205:8,20 206:21 234:17
**medicine** 8:17 30:12,13,14,20,20 30:22 31:17 35:12 38:6 39:4 41:4,9 41:12,20 171:15 171:18
**meet** 13:9 24:18 220:19 230:24
**meeting** 25:4
**meetings** 103:6
**member** 87:18
**members** 127:2
**Memorial** 8:5
**memorized** 77:13
**memory** 53:6 54:9 75:20 162:3 165:21 167:19
**mental** 116:11
**mention** 37:16 120:10 141:4 201:8 205:20 244:6
**mentioned** 40:24 43:14 108:19 110:8 144:10 145:18 158:4 255:13
**mentioning** 40:25
**mess** 153:6
**message** 66:9 75:11 86:1
**messages** 75:17 165:2
**messed** 138:8
**met** 6:17 19:14
**methodologies** 145:18 150:3,5,10 151:13,17
**methodology** 89:21

90:5,12,22 101:13 108:19 122:17,22 122:24 123:14,17 123:18,22 124:1,3 133:24 143:14 144:14,18,25,25 150:8,21 151:1,19 169:17,20 177:6 179:8 181:15 209:9
**mileage** 79:10 81:14
**miles** 81:14
**mind** 189:25
**mine** 66:21 67:21
**minimal** 121:25
**minimum** 113:17 120:20 130:7 173:3,24 179:16 220:20 221:1,2,3 221:11 231:7
**minute** 207:4
**minutes** 190:3 199:6 223:14,15
**mischaracterize** 65:13
**mischaracterizes** 51:5 52:21 56:8 68:17 212:12
**misleading** 21:4 95:10
**missed** 26:14 80:10
**missing** 179:2
**misstate** 212:19
**Misstates** 27:20 187:9,14 255:11
**misworded** 90:9
**mix** 65:22 186:5
**mobility** 158:23 238:3,6,13
**model** 122:10
**modification** 226:13
**modifications** 254:21
**modules** 155:9

**Mol** 91:9
**moment** 140:15 190:7 218:21
**Mona** 1:18 260:3 260:21
**monetary** 109:6
**money** 83:15
**monitor** 171:2 188:25 191:14 195:11,21 198:23
**monitored** 201:1
**monitoring** 190:1 191:2 193:2 194:23 195:19,24 197:3,4,5,8
**month** 173:15 215:6,8,10
**monthly** 46:7,15 130:20
**months** 30:23 37:24 143:2 168:21
**morning** 6:17 146:3
**motor** 40:3,7 156:23
**movable** 233:19
**move** 7:14 238:14 238:15
**moved** 175:2
**movement** 161:2
**movements** 40:3,7
**moving** 61:21 62:15
**muscle** 203:3,4,12 203:16,23 205:10 205:25 206:5
**muscles** 203:9 245:20
**musculoskeletal** 35:14

--------
### N

**N** 2:1
**name** 6:7,16 10:13 34:18,19 35:10

53:8,9,10,10,23 53:25 54:3 91:3 91:10 99:3,6,14 99:17,25 100:2 103:16 169:7 258:2 259:15
**names** 53:5
**narcotics** 206:16
**National** 180:22 184:16,22
**nature** 66:13,14 131:20 192:12 201:24
**nec** 244:21
**necessarily** 147:8 164:20 186:6 202:17 242:12
**necessary** 94:7 115:16 117:21 130:6,7,14,24 191:12 195:2 200:23 202:16,25 242:13,19 244:21 244:25 245:1
**necessitate** 204:19
**necessity** 130:3 131:9
**need** 7:21,22,23 10:24 14:21 17:2 25:7,12 26:22 28:13,15,20,21,22 29:4 36:24 37:23 37:23,24 38:7,14 39:17 50:10 54:8 59:19,23 72:24 73:7 74:15 88:21 88:23 89:17 94:15 94:22,23,25 108:20,20,20 109:4,23 117:4,6 117:15 124:5 129:7 130:17 159:13 160:12,19 163:4,11 166:11 170:23 171:1,2,3 171:4,7,13 172:3

172:8,20,24 173:12,17 182:5 184:6 188:12 189:11 190:8 192:1 195:20 196:2,13,22,25 197:24 199:19,19 201:22 202:23 203:12 204:2,21 204:21 205:1 209:19,22 216:17 221:6,7,22 222:1 222:7 225:21 226:6 227:4,22 230:19,20,21 231:10 234:7,12 234:17,23 237:3 237:16 239:15 243:5 245:8 250:6 250:8 252:13,14 252:14,19 253:10 255:2 256:10
**needed** 29:1 85:22 135:25 136:4 195:4,8 197:1 198:4,11,12,14 226:5 228:7 237:17 238:8 253:16
**needing** 206:10
**needs** 25:23 26:3 28:18 35:20 39:8 94:21 98:12 137:5 155:24 156:1 162:13,16 166:9 170:15,19 172:11 188:19,20 190:13 190:23 192:9,9 195:16 201:1 211:7 212:3 214:1 214:7,8 228:6,18 229:20 230:1 231:16,21 232:7 232:10,17 234:21 239:4 244:5 247:3 249:25 253:22



**neither** 51:11 150:2
260:12,15
**neurogenic** 140:20
171:11 191:15
192:6 244:3,4
246:11,17
**neurologic** 156:13
**neuropsych** 161:7
162:12,17 163:21
164:4 166:8,13,19
167:17,22
**neuropsychologi...**
198:18
**neuro-rehab** 39:22
**neuro-rehabilitat...**
35:15
**never** 12:23 44:3,5
44:7,9,14 56:16
68:11 108:11,15
108:16 142:24
149:21 211:2
238:5
**new** 86:13 95:21,24
96:3 174:23 175:1
195:16 208:16
**newest** 96:17
**newly** 119:24
144:19 150:20
**nice** 80:25 81:4
90:25 237:23
**nicely** 90:22
**night** 82:23 176:7
**noncompliant**
140:8
**nonresponsive**
180:19 190:10
222:9 234:16,25
244:13
**nonsurgical** 39:24
**Norco** 206:16
**normal** 62:21
118:12 209:9
219:12,17,24
245:19
**normally** 16:22
34:8 67:23 78:14

80:14,14 180:1
196:14 218:11
219:24 231:7
**NOTARY** 259:24
**note** 34:24 62:9,9
100:5
**noted** 259:3
**notes** 4:15 17:21
21:17,17 62:7
66:17 67:19 70:7
70:8 71:17,22
72:7,8,14 74:19
74:21,25 75:3,6
75:18 84:20
**Noteworthy** 31:15
**notice** 12:10,23,25
13:5
**notified** 11:5
**November** 103:20
104:2 161:11,12
**number** 25:14
36:13,25 37:16
52:4 77:7 78:18
94:14,21 137:24
137:25 181:19
183:17,20 186:21
198:13,14,16
**numbered** 1:17
**numbers** 94:20,24
179:8 185:13
186:18 207:25
247:17 250:23
251:25
**nurse** 36:16 37:6,18
**nursing** 238:8
**nutrition** 227:13
230:20
**nutritional** 227:5,6
227:11,19,22
228:2,6,7,21
229:9,15,20 230:1
230:7,16,18,21
231:16,21 232:2,7

---

**O**

**oath** 7:18 225:10,14

259:13
**obese** 119:15
**obesity** 118:22
119:8
**object** 10:17 21:8
45:14 142:5 202:3
231:25 243:19
245:10,14 257:3
**objected** 10:5
**objection** 9:25 21:3
27:20 51:4 52:18
55:13 56:7 60:2
67:13 68:16 71:9
73:3 78:24 94:9
94:10 95:9,25
96:4 101:18
105:21,24 107:21
114:2 123:1,25
141:21 142:15
146:11 149:16
150:23 164:6
175:22 177:8
180:18 187:7,12
188:8 189:5,19
190:10,25 193:18
193:22,24 196:9
198:6 202:3
208:19 212:11,18
212:21 213:13,20
213:21 216:5
222:9 224:22
229:11 231:23
234:16,24 236:16
236:22,25 237:25
241:15,18 244:13
251:23 252:2,6
255:11 256:15
**objections** 106:15
106:20,22
**objective** 109:8,11
109:19 113:22,23
115:4 164:2
**objectively** 114:20
**objectives** 219:9
220:19 230:24
**observer** 31:17

**obtain** 22:4
**obtained** 170:1
**obtaining** 169:20
170:5
**obviously** 13:17
16:2 21:17 25:11
26:19 28:10,22
41:21 51:17 54:18
55:7 64:19 87:6
88:16 89:15,18
91:14 97:12,16
106:5 127:20
128:1 142:9 148:6
158:17 170:2
177:3 181:18
195:11 206:3
207:11 248:7
254:9 256:5
**occasion** 62:22 70:7
**occupational** 39:9
40:6 222:16,18
225:21,25 226:19
**occur** 211:12
**occurred** 131:11
142:13 243:12
**October** 27:7,9,17
28:19,25 31:18
44:21 60:21
100:19 103:23,24
104:1 128:8,14
129:5,5 131:12,13
132:17 137:20
139:11 141:17
142:6,12 146:7
149:1,5 153:10,13
161:4 191:17
200:16,17,18
206:11 211:3,18
216:21 218:4,5
219:2 221:16,16
221:17 222:11,11
223:5,5 225:22
226:17,25 227:1
228:7,8,17,20,20
229:18,18 237:5
238:19,19 244:8

244:14,17,20
245:6 246:16
249:9
**offered** 111:16
**offering** 15:12
**office** 8:2 26:14
35:19 36:14,14
58:22 81:24 91:24
169:3 171:22
172:4 259:19
260:18
**offices** 1:20
**offloading** 233:20
**OFF-THE-REC...**
229:6
**oh** 13:2 22:21 29:16
48:23 53:22 62:2
103:17 145:15
151:17 158:12
166:16 174:23
175:9,24 184:3
190:4 221:4,8
225:4 243:20
247:20 251:10
254:20 257:2
**okay** 7:4,16,17,24
8:5 12:5 15:7
17:11,25 19:11
20:3 22:19,21,23
23:22 24:18 26:15
27:5 28:3,9 29:21
29:22 30:2 31:6
32:6 33:4 35:2,10
35:11 37:12 40:15
40:21 42:18 43:14
44:3 46:25 47:7,9
47:21 48:9 50:2
53:5,11 56:16
57:4,15,23 59:25
60:1,5 62:11
63:12 64:11 68:6
68:13,19,23 69:17
69:21 73:25 80:17
80:20 82:2 83:2
83:18 84:3 86:14
88:7 89:19 92:14



MAGNA ▶
LEGAL SERVICES

97:10 98:19 99:19
100:3,13 104:17
105:17 110:9
111:20,25 112:18
115:15,22 116:5,7
118:20 122:15
123:3 124:6,9
125:12 126:11
127:7 128:11,20
129:14,15 131:3
134:1,12 135:4,20
136:25 139:5
141:12,24 144:8
145:21 147:25
148:25 149:3
152:2 153:21
159:21 161:1,3,12
165:8,24 166:14
167:7,25 168:4,15
173:10 174:16
177:14,16 178:2,8
178:25 179:6,25
180:6,18,21 181:5
181:17,22 182:11
182:22 183:14
184:13 186:24
188:1 189:16
190:21 192:8
193:7 194:17
195:1,4,14,23
196:25 197:10
198:15 199:23
201:12 202:8
204:8 208:7
209:12 210:5
211:2,13 214:25
215:16 217:5,10
218:24 221:11
224:2,4 225:15
228:12 230:3,7,11
232:4,12,19 235:9
235:21,24 236:9
236:15 243:6,15
244:17 249:17
250:11 252:23
253:2,21 254:23

257:13
**old** 210:23 214:22
**older** 241:7,21
**omitting** 252:4
**once** 140:2 173:24
  188:21 189:18
  191:13,19 197:17
  198:3,25 215:6,8
  215:9,17,25
  224:21 230:15
  232:7
**ones** 39:2 53:2,7
  54:12 81:6 87:16
  93:8 139:25
  209:11
**one-time** 165:12
**ongoing** 53:21
  86:22 87:3 104:16
  128:1 139:15
  140:19 143:6
  160:4 161:3,18,23
  162:24 163:14
  164:3 172:10
  173:3 190:6 193:2
  221:6,17 222:12
  225:24 246:18
**online** 50:9,19,21
  50:25 51:2 61:25
  88:17 155:4,9
  169:1
**oops** 238:4
**opening** 161:2
**opiate** 206:17
**opine** 29:1
**opines** 220:3
  242:18
**opinion** 24:12 25:7
  28:7 89:13 113:13
  123:21 135:13
  143:2 145:9
  150:22 155:21
  172:10,23 180:15
  180:16,16 181:25
  183:4,4,6 185:23
  187:19,19,21
  188:5 189:25

190:22 191:4
197:24 198:11
199:14,19 200:23
217:21 220:6,7,14
220:15,16 230:14
230:20 231:20
232:9 233:24
241:13 242:4,4,21
242:22 250:15
**opinions** 6:21 15:4
  16:6 22:6 25:6
  90:1 94:24 95:17
  95:21,24 96:3
  100:25 101:22,24
  102:4,18 108:20
  109:1,2,2 111:7
  115:24 122:19
  123:19 130:25
  131:4 146:12
  155:23 156:4
  157:18,21 181:14
  205:13 206:22
  208:9,14,17
  256:20
**opportunity** 15:17
  22:7 102:22 209:7
**opposed** 12:15
  198:4 250:22
**opt** 240:11
**optimal** 136:17
  180:2,9 186:2
  247:12
**optimize** 170:24
**option** 247:6
  248:23,25
**oral** 1:10,14 31:17
**order** 92:5 93:2
  106:24 183:16
  186:18,19 187:2
  197:14,15 198:12
**organizations**
  151:11
**oriented** 25:20
**original** 208:23
**originally** 26:23
  238:2

**orthopedic** 38:12
  39:24 175:9
  188:17,19 189:18
**Osteopathic** 31:16
**osteopenia** 200:14
**osteoporosis**
  200:25 201:4,21
  201:24
**OT** 39:16 40:1,7
  223:1 226:1,4,5,8
  226:13,13
**outcome** 133:3
  158:16
**outline** 27:1 28:7
  90:20 130:17
  151:6 170:12
  171:5 206:13
**outlined** 25:8 28:6
  28:21 120:22
  163:21 169:17
  194:6 203:5
  215:20 250:7
**outlining** 163:3
  209:3
**outpatient** 35:22
  36:10 162:21
  164:11 189:3
  217:2,3,13 218:9
  229:3
**outside** 231:19,24
  256:21
**out-of-pocket**
  212:24
**out-of-town** 77:20
  78:2
**overall** 25:10 193:6
**overlap** 28:10
  88:15
**oversee** 39:9
**oversight** 40:14
**oversighting** 37:6
  39:10 151:11
**overuse** 132:4
  222:23,24
**overview** 97:18

124:13
**owners** 86:6,8
**oxybutynin** 203:7,8
**O'Rourke** 47:14

---

**P**

**P** 2:1,1
**page** 3:1 4:1,18,19
  4:19 7:6 30:14,15
  31:9,14 33:9,10
  97:21 101:20
  124:21 126:23
  131:3 145:21,21
  146:19 157:25
  183:5 215:4 238:1
  239:13 254:18,18
  258:4
**pages** 78:19,20,22
  97:11 113:11
  154:9,9
**paid** 8:22,25 9:1,1
  46:20 80:18 82:7
**pain** 30:12,22 35:21
  38:8 120:15 132:5
  171:17,17,17,23
  171:24,25 172:1
  172:13,24 197:25
  202:20 204:7
  205:22 206:11,18
  239:16,23
**paradigm** 231:12
**paragraph** 124:22
**paralysis** 24:4
  57:20 189:24
  192:17
**paralyzed** 27:4,10
  76:22 132:17
  134:23 152:5
  238:13
**paraplegia** 135:2
  194:17 198:24
  217:3,8 218:3
  234:23 236:4
  237:2,19 245:18
  249:23
**paraplegic** 27:4



28:2 142:25
194:22 195:1
199:15 240:7,12
**paraplegics** 140:5
**parents** 174:15
**Park** 18:17
**part** 8:23,24 9:10
29:7 33:7 37:10
66:24 97:7 101:13
109:20,22 110:21
111:7,9,10 114:5
114:9,10,10,12
117:10 120:16
123:13 126:19
154:22 177:16
225:2
**partial** 4:7
**participating** 31:10
178:18 185:9,9
222:12
**particular** 10:7
11:20 41:15 60:16
83:7 113:15
129:21
**parties** 260:13
**parts** 164:20
**part-time** 36:14
**Pasadena** 25:19
78:4
**patient** 11:8,9
143:21 159:16
173:24 190:3
214:19
**patients** 36:4,11,19
36:21 37:5,6,7,21
38:2,4,7,10 46:19
46:20 54:19 55:5
56:19 124:24
125:18 135:12
174:20 186:3,4
200:13 204:1
215:18 227:3
245:2
**patient's** 66:14
**Patty** 2:14
**pay** 212:24,25

**paying** 144:4
**peer** 89:8
**peer-reviewed** 91:1
91:14 178:22,24
179:7 185:10,14
**pending** 5:5 49:24
**people** 33:11 35:20
37:9 38:11 52:1,4
54:11 55:9,15,19
56:21 60:19 86:6
86:9,13 91:9
118:21,22,22
126:21 143:18,18
143:24 174:2
178:17 184:18
187:23,25 221:23
231:7 237:15
**people's** 115:7
**percent** 9:23 10:3
46:1,3,4 49:15
54:22,23 99:20
132:21 175:18,21
175:24,25 176:1,9
176:14,17 177:6
177:13,19 178:4
179:16,19 207:17
208:1 248:22
**percentage** 9:17
45:24 65:10
175:17 177:3
**percentages** 144:2
**perfect** 143:20
**perform** 8:18,22
21:25 61:17 63:4
168:13
**period** 142:22
143:3 194:8 200:2
229:22 242:17
256:16
**Periodic** 215:5
**periodical** 176:15
**periods** 192:23
**perk** 221:9
**person** 15:16 26:20
52:2,5 60:16
70:19 86:8,11

90:1 92:3,8,8,10
92:14 98:24 99:1
99:11 105:3,15
109:21 114:12
116:1 118:25
119:15 155:10
169:9 176:18
212:23 213:25
214:22 218:10
219:24 220:13
224:19 229:25
230:14 231:15,20
232:6,13 233:9,25
234:23 242:19
259:15
**personal** 107:6
109:14 112:9,11
112:24 256:3
**personally** 259:12
**personnel** 100:2
**person's** 99:3
105:18,18 133:3
169:24
**perspective** 220:23
225:19
**pertinent** 180:13
**Pese** 52:11,23 91:23
**phone** 24:17 26:6
64:22 74:22 75:18
80:11,19 173:17
**phrase** 104:7
108:11,16,16
**physiatry** 144:10
145:1
**physical** 8:17,19
30:19 31:17 35:12
38:6 39:4,8 40:2
41:4,9,19 107:6
112:24 116:11
131:18 132:13
148:12 171:15,18
215:5 218:18
219:5,12,18,21
221:18 222:12,17
**physician** 4:5 8:15
8:16,17,19 9:2,3,5

9:7,9,11,15,23
10:12,24,25,25
11:10 12:6,6,21
18:14,23 19:2
21:10,14,16,23,25
22:5 25:20 33:15
33:15,20,20 35:13
39:4 41:20 46:18
46:21 47:11,23
50:16 51:2,19
52:2,24 60:11,14
60:24 61:2,8,14
65:21 66:2 67:2,7
67:9,15,18,21
68:21 69:9 70:15
70:17,21 71:1,12
71:15 72:13,15,20
73:11,15 74:4
77:23 82:7,9
83:14 84:5,14
85:19,22 88:4,5
88:20,24,24 89:1
91:11,15,21 95:18
98:17 103:12
104:12 114:11
116:3 124:22
125:6,9,9 126:2
126:19 130:12
145:3 153:17
162:13,16 164:1
170:6 171:23
172:4 174:19,22
175:4 187:24
190:13 204:2
223:14,15 224:19
225:9 228:5
238:22
**physicians** 9:20
65:21 124:22
125:6 126:18,19
130:4,11 224:24
**pick** 202:10,18
239:19
**picked** 26:1 164:9
**picture** 111:11
223:21

**piece** 110:7 218:15
**Pierce** 45:9,12
**placement** 171:10
**places** 133:6
**placing** 212:13
213:24
**plainly** 137:17
**plaintiff** 1:3 2:3
5:16 44:2 63:13
64:14 65:2,23
66:1,14
**plaintiffs** 43:20,23
49:11,16
**plaintiff's** 63:9
65:15,17 74:23
**plan** 4:14 6:20,21
10:25,25 13:18,19
14:1 15:12,15,18
15:24 16:5 22:8
22:10 24:15 25:8
26:10,24,24 28:6
28:23 34:6,9
43:10 44:6,12,15
47:17,20 51:17
54:17 56:17,21
57:8,16,18 60:22
60:25 61:9,13
62:18 63:1,7,9,12
63:19 65:7 71:19
73:18 76:7,11,16
77:3 78:16 83:5
88:8,21,22 89:14
90:4 97:19 98:12
98:21 101:22
103:11,25 104:2
105:7,8,16,20
107:1,11,14
111:19 112:10,23
113:2,8,12,14,19
113:23 114:6,13
114:21 115:16
117:2 120:11,12
120:17 121:21
122:9,20 123:13
124:11,15,22
125:21,25 128:16



MAGNA
LEGAL SERVICES

128:18,20 129:8
130:2,13,19,24
131:1 135:9
136:17 141:4
147:7 151:20
152:17 154:21
156:2,3 163:6
166:12,15 170:15
170:17,20 171:15
178:10 179:9,15
182:5 183:16
185:24 186:10,12
187:1,2,15 189:12
193:2 195:16
196:16 197:19,23
204:24 206:17
217:8 219:9
220:19 225:19
226:14 230:25
231:2,19,20 243:7
248:19 249:7,18
**planner** 35:5 61:3
81:23 86:18 87:2
88:23 89:22 98:18
106:11 151:3
157:21 190:9
225:5 231:9
242:11
**planners** 89:11
151:12 225:2
**planner/physiatr...**
143:25
**planning** 8:20,21
9:2,4,11,15,24
10:12,24 11:1,11
12:6,21 18:14,24
19:2 30:21 33:16
33:20 34:4 36:7
46:18,22 47:11,24
50:16 51:3,20
52:3,24 60:11,14
60:25 61:8,14
65:21 67:3,7,9,15
67:19 68:21 69:10
70:17,21 71:1,12
71:15 72:13,16,21

73:11,15 74:4
82:7,9 83:15 84:6
84:15 85:20 86:22
87:1 88:5,14,19
89:2 90:21 91:6
91:12,16,21 98:11
103:13 104:12
124:23 125:7,10
126:2,20 144:9,25
155:11 169:19,23
170:7 181:18
**Planning's** 67:22
**plans** 9:14,18,21
33:21,22,24 34:2
34:3,14 43:8
47:22 55:1,4,16
56:10,11,23 57:3
85:22 86:16,23
87:24 97:14 98:8
103:9 104:13,21
104:22 112:7
113:10 125:15,18
126:21 187:24
221:23
**PLCP** 65:21 168:21
169:22
**please** 5:11,18 23:5
34:24 42:1,22
54:13 60:6 99:24
100:6 111:24
131:16 153:17
205:19 238:22
251:19
**plenty** 197:6
**plugging** 82:23
**plus** 167:18
**PM** 41:14
**PM&R** 36:5 37:12
37:13,15 39:20
41:14,20 54:21
86:17 88:15,20,24
88:24 90:20,20
91:2,4,7 164:15
171:22 172:24
173:2,15 174:3
180:6 201:7

214:19
**PM&R/pain**
175:10
**pneumonia** 132:5
209:22 210:24
211:11 214:8
**Pneumavax** 209:14
209:16 210:9,12
210:19,24
**point** 53:18 71:7,16
71:18 94:20
111:17 119:4
135:25 151:23,23
157:13 173:19
179:2 212:10
213:10 216:8
223:21
**pointing** 16:10
**poorly** 234:13
**pops** 54:6
**population** 118:16
118:19,23 143:21
181:12 183:16,19
210:22
**portion** 13:1 92:1
114:5,11 195:10
195:18 251:21
**position** 51:16
192:22,25 194:7
**positioning** 25:23
**positive** 239:7
**possession** 19:21
20:9
**possibility** 22:11
**possible** 64:23
111:11,14 135:19
135:21 170:1
**Possibly** 51:6 74:7
119:11,16 137:23
137:23 138:3
**poststroke** 39:18
**posture** 194:13
**post-acute** 35:17,23
35:23 36:9 38:22
**post-orthopedic**
35:21 39:23

**potential** 24:7
227:18
**potentially** 129:9
152:23 207:15
208:5 210:15
**pounds** 153:19
**power** 236:3,5,7
242:7,8,12,17,18
**practice** 8:5 35:19
36:14 46:3 47:5,8
57:2,3,7 85:24
173:22 174:1,9
175:4,5,7 180:6
**practicing** 174:10
174:12
**practitioner** 36:16
37:7,18
**Prasarn** 238:7
**predate** 146:6,10
**preexisting** 119:24
144:19 150:19
193:10
**prefer** 6:14
**preferable** 62:23
63:3,4
**preferred** 64:24
250:20
**prematurely** 152:1
**prep** 58:13 82:24
82:24 83:14,15
84:1,17 85:1
**preparation** 14:13
33:22 84:10 93:11
93:19
**prepare** 9:14 13:9
13:12 18:3 50:7
76:15
**prepared** 31:21,22
31:25 32:2,4 63:1
**preparing** 83:12
**prescribe** 219:25
**prescribed** 240:17
**prescription**
219:17
**prescriptions** 37:24
38:1,8

**presented** 113:5
**pressure** 158:15
159:23 205:22
**pretty** 37:19 97:18
122:2 137:12,15
141:14 159:12
163:16 164:18
169:21 239:9,16
240:21 248:24
**prevent** 120:12,18
130:8 136:18
171:10 232:18
233:22 234:1,22
235:6 246:6
**preventative**
215:19 216:18
221:7
**previous** 51:21
95:7
**pre-life** 155:11
**pre-op** 246:14
**price** 80:12,22
168:24,25 169:3,4
169:25 198:12
206:8 217:22,24
250:9
**prices** 168:22,23
169:16,20 170:3,5
170:8
**primary** 119:17
136:11 143:16
144:11 172:14
174:4 214:15
**print** 58:17 67:22
68:8,14,18
**printer** 58:20
**prior** 13:4 15:18,20
52:21 57:9 58:8
62:14 69:24 85:5
141:1 142:6
149:15 187:9,14
200:17,17 212:12
225:21 226:25
229:18 237:5
238:19 244:8,14
244:17,20 245:6



255:12
**probably** 31:24
  32:2 33:5 34:15
  37:4 39:1 46:10
  52:4 78:20 201:6
  215:17 217:12
  218:7 239:11
  240:3 241:8
  246:12
**problem** 100:1
  178:20 222:22
**problematic** 181:3
**problems** 65:4
  143:7 158:6,9,10
  159:22 173:18
  185:19 200:8
  220:17 223:7
  226:24
**procedures** 38:12
**proceedings** 260:9
**process** 86:3 89:18
  89:20,23 90:7,11
  120:16 123:11
  136:13 249:22
**produce** 17:10
  70:24
**produced** 1:15 6:25
  14:4,8 29:8,19
  30:4,24 31:4
  32:23 58:4 59:7
  60:9 77:19 79:16
  95:1
**producing** 69:24
**professional** 31:15
  33:10 106:14,18
**professionals** 87:18
  169:18
**professions** 87:7
**program** 216:3,8
  217:1 222:13
**progress** 39:16
**progressed** 238:16
  238:19 239:7,12
**progressing** 148:16
  238:16
**progressive** 120:18

131:18,23
**project** 225:7
**projecting** 171:15
**promote** 238:9
**promptly** 21:5
**properly** 58:21
**proprietary** 66:19
  67:24 88:2,4
**protein** 228:15
**proud** 240:21
**proved** 259:13
**provide** 7:8,13
  19:11 20:24 24:14
  53:8 63:24 64:3,6
  64:12,14 66:17,20
  66:23 67:1,11
  69:3 71:14,21
  72:20 73:23 76:18
  101:11
**provided** 13:18
  51:18 63:21 64:1
  69:5 71:11 89:2
  95:20 146:2 147:3
  149:14 172:1
**providers** 127:9
**provides** 124:10
**provisions** 1:22
**prudent** 164:10
  165:13 188:24
  189:25 200:6
  214:18 216:4
**PT** 39:16 40:1,2
  215:19,24,24
  216:2,8,14,18,24
  217:17 226:1,4,4
**public** 169:2
  259:24
**publication** 33:4
**pull** 70:16
**pump** 204:20
**purchased** 128:24
  129:4,6
**purple** 91:3
**purpose** 120:11
  130:21 169:12,15
**purposes** 7:15

43:11 93:4 259:17
**pursuant** 1:21
  18:10
**put** 11:15 26:1,2,23
  26:24 28:12 62:9
  74:19 76:24 82:22
  90:11 92:4 99:24
  116:2,3 127:13
  137:16 198:12,13
  206:16 209:8
  223:2 239:21
  253:15,18
**putting** 93:2 194:9
  195:15 253:9
**P-e-s-e** 52:11,12
**p.m** 1:18 19:13
  24:22 154:3,4,4,6
  199:10,11,11,13
  255:23,23,25
  257:16,17

---

## Q

**quadriplegic** 28:1
  136:23 166:25
  194:9,15
**quality** 120:14
  130:9 221:15
  229:14 230:5
  246:6
**quality-of-life**
  245:21 246:5
**quantify** 78:18
**Quantity** 78:8
  81:14
**quarter** 173:17
  175:7
**quarterly** 173:4
**question** 7:13,15,23
  7:24 10:20 15:6
  16:4 20:24 28:24
  32:21 55:9,14
  56:15,24 69:6
  70:19 73:1 89:1
  90:9 94:1,6 106:8
  130:16 136:2
  142:10 144:6,9

145:17 170:11
  172:16 176:13
  179:12 180:20
  190:11 193:20
  198:2 207:21
  212:4 222:5 225:8
  230:19 231:18
  232:4,5,24 234:6
  234:12 235:2
  236:2 245:14
  251:14,18 256:19
**questions** 7:8,9,10
  70:2 94:2 97:7
  104:19 212:8
  231:6,9,14 250:25
  251:11
**quick** 23:20
**quickly** 31:7
**quite** 7:2 144:6

---

## R

**R** 1:11,14 2:1 3:4
  5:19 6:9,10 259:1
  259:7,12
**raining** 239:14
**rate** 60:21,22,24
  61:12 78:8 80:23
  81:14,24 82:21
  84:8,10 85:14
**raw** 77:15 92:16
**ray** 192:11 195:12
  195:21 197:14
  198:3 202:6,12
**rays** 192:8 194:14
  194:21,22 195:4,5
  195:10,12,25
  196:1,2,3,6,13,19
  196:24 197:16
**reach** 26:6 179:8
**reacher** 252:14,25
**reachers** 223:2
**reaching** 186:21
**read** 6:2 17:5 25:20
  34:22 49:21 61:22
  88:16 99:24 125:3
  131:15,16,21

173:20 185:17
  188:4 251:13,19
  251:20 259:1
**readable** 92:25
**reader** 98:10
  221:13
**readily** 115:12
**reading** 87:20
  238:1 239:13
**reads** 35:1 100:7
**ready** 50:6 251:8
**real** 23:20
**realistic** 217:11,12
  243:6
**realizing** 137:15
**really** 31:6 36:25
  57:24 76:8 77:6
  77:14,16 79:5
  80:10,25 87:20
  88:14 94:4,11,22
  111:10 138:3,4
  153:5 159:13,20
  162:4,24 176:8
  177:18 205:7
  208:2,9 217:16
  241:23 250:15
  252:18
**reason** 49:7 135:8
  188:22 201:10
  219:18 258:4
**reasonable** 166:12
  173:16,21 202:22
  236:7
**reasonably** 21:5
**reasoning** 202:1
**reasons** 9:21
  104:24 136:16
  137:18 185:6
  197:6
**Rebecca** 52:9,10,23
  53:11,13,14,15
  91:23
**rebutting** 63:10
**recall** 10:13 11:24
  11:25 12:4,17
  13:1,5 27:18



51:14 54:15 56:1
56:2,3 58:3 64:1,4
64:17 69:11 70:3
71:16 72:20 75:6
76:14,17,20,25
80:18 84:23 86:5
88:11 90:17,19
99:4 100:18
103:15 118:8
236:2
**receive** 20:7 49:25
76:13 82:15 83:15
100:16
**received** 12:20 19:7
21:1,11 67:6
161:4 170:18
**receiving** 12:17
**RECESS** 59:2
112:3 154:4
199:11 255:23
**RECESSED**
257:17
**recliner** 245:12,17
245:23 246:1,5
**recom** 214:21
**recommend** 40:19
214:4 217:2 219:8
248:2,3
**recommendation**
121:21 169:23
172:5,17 191:23
209:20 211:25
212:5 215:2
220:12 246:4
**recommendations**
209:15
**recommended**
166:22 189:17
200:16 206:17
210:22,25 211:14
211:19,20 213:11
213:18 214:10,11
215:23 217:6
227:6 232:14
242:7 243:25
247:13,23

**recommending**
190:19 199:21
200:12 204:9,19
206:22 209:25
211:7 213:2,5,8
213:24 215:6,7
227:11 242:8,14
242:23,24 244:2
245:11,16 246:19
246:22
**recommends**
214:21,25
**record** 1:22 5:2 6:8
21:11 34:3 56:25
58:12 59:1,4
82:25 92:4,7,8
97:5,8 98:1,24
109:12 112:2,5
140:17 142:17
147:8 153:25
154:3,6 167:12,14
199:7,10,13
218:21 245:7
251:3,9 255:22,24
257:11,14,16
260:16
**records** 4:4 21:19
22:9 23:14 25:1,1
26:12,21 37:8
63:17,18,21,22
64:13 74:13 76:8
76:9 77:6,9,11,12
77:15 78:8,21,22
79:1 89:25 92:14
92:16,20,24 93:3
95:19 99:11 100:3
100:11,16,19,23
102:5 104:25
107:2 111:12
113:11 115:25
117:7,8 124:14,14
126:6 127:11,14
127:18 128:11,12
139:13,14,25
140:12,25 141:2
141:10,18,23,25

142:3,14 145:22
146:4,6,9,16,17
154:15,23 160:2
184:9 188:18
189:1,14,17
190:12,17 191:18
200:4,7,15 202:24
204:8,13,14,15
205:8,11,12,15,18
206:2,4,10 219:4
220:13 221:19
222:3,10,14
223:12 224:6
225:20 226:10,23
227:21,22 241:11
241:12,20 242:2
**recovered** 160:23
**recovery** 64:15
**reduce** 94:20 119:1
119:10 135:1,25
136:5 137:9,21
153:5,5,6 176:17
177:11 179:14,15
188:6
**reduced** 117:24
152:10,22
**reduces** 178:3,14
**reducing** 178:8
**reduction** 176:1,14
177:7 179:18
**refer** 33:11 66:3
78:18 124:7
237:23
**reference** 59:21
66:12 201:4 206:5
**referenced** 17:7
187:15
**referral** 66:8
**referred** 122:23
**referring** 47:4
52:15 69:1 70:12
81:16 124:3
129:10 131:24
**refers** 125:6
**refills** 172:12
**reflect** 26:8 30:8

**reflected** 49:7,8
77:23 79:20 154:9
254:4
**refused** 113:10
**regarding** 6:21
52:17 68:14 74:6
74:16 75:6 93:22
101:22 124:17
141:8 149:14
150:5,10,16 161:5
**regardless** 212:17
**regards** 182:17
**Registration**
260:24
**regular** 120:23
162:17,20 224:16
**regularly** 224:20
**rehab** 8:17,19 24:6
25:18 30:20 31:17
35:13 38:6 41:9
41:20 64:16 87:17
126:20 128:6
161:6 169:4,18
171:15 172:10
226:3,3,7 235:20
235:21
**rehabbing** 157:12
**rehabilitation**
35:17,20 36:6
38:14,22 39:4,11
39:16 41:5
**rehabilitation/pain**
171:19
**rehabilitative**
125:1 126:14
**relate** 194:14
**related** 26:24 28:18
44:6,12 46:21
64:7,12,14 66:23
75:7 128:13
161:16 162:9,18
197:8 215:22
228:16 231:14
243:16 260:13,15
**relaxant** 203:3,4,12
203:17 205:10

206:5
**relaxants** 203:23
**release** 229:7
**released** 227:25
230:15 231:22
232:8
**relevant** 234:5
**reliable** 182:1
**relied** 118:3 154:11
154:16 155:15
181:7,21 182:13
183:12 205:12
**rely** 16:6 63:13
114:15 134:5
155:17,18 168:16
179:3,23 181:6,21
182:16 186:25
187:13 224:19
**relying** 134:8 169:6
176:15 179:17
181:13,23 182:9
185:21 186:10
**remainder** 77:20
**remember** 19:1
29:10 34:18 53:2
53:8,8,9 55:18
58:2 64:18 72:11
80:11,19 90:24
99:10 103:16,17
103:18 165:22
248:9,22
**removed** 163:25
**renal** 139:7
**render** 100:25
155:23
**rendered** 82:12
**renotice** 4:3 12:10
**repeat** 124:4,5
213:19
**repeatable** 151:14
**replace** 253:7,10
**replacement** 129:7
**replacing** 253:4
**report** 15:8,10,12
15:21 20:14 22:6
22:11,22,24 23:17



23:23 25:2,6 26:7
35:7 59:20 77:10
79:2 85:7,11,15
92:19,20,22 93:16
93:23,25 94:8,16
94:19 95:2,5,6,8
95:13,16 96:9
98:3,4 99:12
100:10,15,18,22
101:1,6,10,23
110:6 111:8,15,17
115:13,15 118:3,7
121:8 123:16
125:5 126:24
127:1,4,7 138:2
146:19 149:25
154:10,17,18
157:25 159:6
161:20 183:21
184:12 200:4
205:17 207:12
208:15,24,25
210:11,11,20
216:6,15 218:14
218:17,22 247:18
248:10 249:21
250:13,21,22
251:25 252:12,16
252:18 253:12,13
254:2,4,7,24
255:5 256:8,20
reported 1:19
25:25 110:4
164:19
reporter 5:9,18,21
5:25 7:9,15 14:25
168:9 213:19
229:5 251:20
252:5 260:4
Reporter's 3:7
34:24 100:5
reports 90:11
102:23 147:15
represent 5:12
request 64:20,20
65:8 71:17 86:1

94:12,25 98:16
requested 4:17
20:15 24:16 71:11
76:15 246:1
251:20
requesting 9:15
189:4
require 131:19
133:10 191:18
230:16
required 17:10
18:11 161:15
196:14 198:5
211:3,19 216:24
233:25 234:4,9
235:2 236:4
requirements
123:7 124:18
226:7
requires 164:3
170:19
requiring 160:4
196:16
reschedule 256:6
rescheduling 76:5
research 90:4
92:11 103:6 109:6
168:14,25 177:4
256:19
reserve 113:5
208:24
residency 33:7
41:10 174:11,13
174:18 185:17
resident 103:2,8
Residential 1:5 5:4
5:14
residents 103:5
respect 46:6 52:15
81:17 97:10 104:8
124:1 143:3,13
148:14 154:7
155:22 163:7
205:4 206:22
208:18,21 209:15
227:21 236:3

249:12 256:7
respond 70:1,5,13
70:23 71:6,8
72:24 73:8,15
responded 21:2
69:23 70:10,19
71:12 72:5 73:12
85:25
response 6:25 18:7
19:18 29:8,18,18
30:25 31:4 32:24
58:4 59:7 66:16
68:13 69:7,13,18
72:16,21 95:1
responsibilities
33:19
responsible 86:12
92:17
responsive 20:18
69:2
rest 27:2 130:17
137:4 143:5 163:5
188:22 189:10
203:12 228:14
230:5 250:1
252:18
result 28:24 65:4
117:24 128:14
131:11 134:1
167:10 182:12
183:7 191:17
195:17,20 200:14
249:8
resulted 194:17
retained 10:7 33:25
34:5 35:5 43:9,15
45:9 125:24 249:7
Retainer 77:19
review 4:4 13:12,15
21:11,15,19 22:8
34:3 50:6,11
51:13,17 58:12
82:25 87:24 89:8
92:4,21 98:12
99:11 102:22
109:12,12 113:24

114:4 127:11,15
147:8,19 148:6,12
148:21 149:24
167:14 205:11,18
reviewed 13:17,18
14:13 17:15 25:2
59:20,23 77:9
78:22 85:8 86:17
100:11 104:5
124:15 127:14
128:12 135:24
136:14 139:13,25
140:13 141:3,24
142:20 146:4,20
147:17,18 150:1
189:13 190:12,18
202:24 205:15
222:11,15 225:20
226:23
reviewer 100:3
reviewing 26:21
34:1,2,9 37:8 75:6
77:6,11 92:7
128:11 223:13
224:5
reviews 145:22
re-eval 226:14
rid 248:12
ridiculous 254:10
right 9:24 14:17
15:2,9 16:9 19:15
19:16,19,22 20:1
20:12 21:23 22:20
25:15,25 26:5
27:24,25 28:16
29:20 30:3,24
33:12,14,16,18
36:8 37:11,18
38:24 40:24 41:18
42:1,13 43:1,20
44:14 45:10,24
46:5,14,25 47:5,6
48:4,9 49:2,6,11
49:18 51:1 52:20
53:2 55:25 57:7
58:1 60:4 63:2,6,8

64:4,9,17,24,25
65:6,15,23 66:4,6
66:7,11 67:4,8,11
67:12 68:3 69:13
72:4,19 74:11
75:16,22,25 77:2
77:5,22,25 79:22
81:18 82:1,14,18
82:22 83:4,5,6,10
83:13,16,23,24
84:2,7,9,10,14,19
85:2 90:13,15,19
91:20 93:7,15,17
93:18 94:18 98:22
98:23,24 99:3,9
100:12,16,17,21
100:21 101:2,4,10
101:11,13,14
102:6,7 104:15,20
104:22,23 105:1,5
106:12,13,24
107:3,6,9,16,24
108:4,21 109:10
109:13,16,20,23
109:24 110:8,15
110:17,18,22
111:5,17 113:1,5
113:15,20,21
114:20,22,23,24
114:25 115:3,5,6
116:8,9,14,15,16
116:17,19,21,22
116:25 117:1,3,17
117:22,25 118:1,5
118:6,14 119:6,8
119:9,15,19,23
120:6 121:11,14
121:19 122:3,20
123:21,23 125:9
125:15,19,24
126:4,7,9 127:11
127:13,16,20
128:9,10,22,23
129:8,21 130:21
130:25 131:1
133:12,15,23,24



134:5,18,22,23,24
134:25 135:22
136:21,24 138:8
138:23 139:10,13
139:18,22,23,24
140:2,22,24 141:7
141:8 142:1,2
143:12,17 144:22
144:23 145:5
146:21,24 148:9
148:17,19,24
149:12,13,23
150:12 151:22
152:5,6,8,9,16,20
152:22 153:11,14
156:9 157:20,23
159:3,11 160:7,24
160:25 163:7,13
165:10,19 166:1,2
166:21,25 167:1
167:24 168:1,7,13
169:12 170:22,25
172:2,3 173:19
175:3,7,8,13
177:16 178:16,19
179:10 181:13
182:7,9,15,21
183:1,7,9,10,13
183:18,20 184:7
184:14,15 185:2,6
185:11,13,15,18
186:8,16 189:21
191:11,21 192:2
192:16,18 193:10
193:11,17 194:16
194:19 195:6
196:4 197:11
198:2,21 201:14
201:20,20,23
202:10,15 203:19
204:24,25 206:23
207:13,24 208:7
208:10,24 210:6
211:10,17,23
213:7 214:3 215:4
215:9,12 216:20

216:22 217:8,9
218:2 219:5
220:16 222:19,22
222:23 223:16,19
223:24 224:7,13
224:15 225:10,13
225:17 226:10
227:8 228:13,21
230:4 232:23
235:12,22 236:13
236:19,24 240:23
240:24 241:2,10
242:1,9 243:15,17
243:22,23,24,24
243:24 244:11
247:22,24,25
248:4,11,13 249:9
249:10,12,16,25
251:13,17 252:11
252:13,19 253:13
255:4,17 257:1
**Ringdahl** 6:11
**risk** 117:24 120:4
137:4 145:2
199:18 212:8
222:24
**role** 9:9 31:10,18
32:20 33:2 124:23
**room** 197:15
**roughly** 201:2
**routine** 76:2 192:2
192:6,7
**row** 46:14
**rules** 1:22 5:23 7:5
170:5
**running** 36:12
**R-i-n-g-d-a-h-l**
6:11

_____
**S**
_____

**S** 1:18 2:1 99:18
260:3,21
**sacral** 156:24,24
157:3
**safe** 45:18 130:11
**safest** 38:18 247:5,6

248:8
**safety** 247:5
**sake** 48:22
**San** 78:3
**Sarah** 12:14
**Sasha** 1:11,14 3:4
5:3,19 6:9 12:15
18:16 259:1,7,12
**save** 96:17,22
**saved** 96:24
**saves** 96:19
**saw** 17:22 23:12
24:8 25:16,18,22
36:1,2 112:19
139:4,16 140:12
140:24 142:18
160:20 162:2
164:10,18 166:15
173:13 174:14
176:11 184:7,13
189:21 204:5,12
222:14 224:12,14
224:20 235:17
236:10,11 246:10
246:14 250:5
**saying** 27:18 28:14
28:17 29:16 48:23
67:20 68:1 80:12
90:10 107:12
114:7 121:3,16,20
130:23 143:20
148:7 151:6,17
160:17 163:14,20
163:23 164:13
165:22 166:3,4,6
166:9,10,19
167:18 170:19
176:9 183:2
185:15,21 186:1,6
186:25 187:16
188:20 192:9
195:10,18,25
196:5,12,22 197:8
202:22 211:6,9
212:1,2 214:1,6
214:17 225:18

236:17 247:11
249:18,21,25
250:2 253:23
254:11 256:24
257:4
**says** 61:2 62:4
77:19 78:7 161:3
163:17 173:15,20
173:23 176:17
184:21 190:4
242:12,17
**scale** 157:5 160:10
160:16 163:10
167:2 168:2
**schedule** 11:9
89:25 90:1
**scheduled** 15:22
61:6 62:13 246:13
**scheduling** 11:7
75:12 103:5
**school** 185:16
**scoliosis** 194:10,24
197:5
**scope** 231:24
**score** 163:10
**scratch** 97:11
**screening** 202:19
202:23
**seal** 259:19 260:18
**search** 92:3
**seated** 192:22
194:7
**second** 33:10
127:23 131:15
135:9 154:1
165:15 243:14,16
243:21 251:3
**section** 98:8,9,9
101:20,20 124:13
134:13 155:12
168:5 196:15
203:5 233:1
252:17
**sedentary** 199:2
**see** 4:18,19 12:25
13:21,23 15:15

16:14 17:12 18:5
20:6,20 26:14,19
35:20 36:3 38:2
42:1,21 44:18
46:12,19,19 54:13
58:20 60:5 61:21
62:4,6,10,24 63:1
64:21 65:7,8
71:25 78:9 80:21
81:17 92:18 102:8
102:14 110:10,14
110:16,19 111:13
112:18 115:25
137:18 140:13,13
142:19 147:3,13
153:17 159:20
160:11,22 163:4
163:21 164:15
167:8 170:23
174:3 176:10
188:13,19,20
189:3,4,11,18
190:5,8,13,23
192:9 204:13
205:4,8,19,22,24
206:5 215:8
218:25 223:6,9,21
223:22,22 227:24
228:3 229:12
233:7 235:19
238:22 239:4
251:14
**seeing** 13:1 26:21
63:13 120:23
137:15,17 223:15
**seen** 12:19,21,23
13:6,7 17:12
20:22 71:18
112:16 122:23
137:19 149:21
167:5 173:24
174:1,9 175:3
189:17 190:15
191:18,23 200:4,9
200:21 202:25
220:12,13 241:11



**sees** 223:14,20
**segments** 156:23,24
   157:3
**select** 11:16
**self-cath** 243:7
   244:1,6 245:4
**self-cathing** 244:4
   244:10 246:17
**semantics** 106:1
**send** 19:3 49:20,22
   50:1 66:9 70:9,9
   71:3 190:5
**sending** 165:2
**sensation** 156:22
   157:2
**sense** 50:12 79:11
   217:18 253:1
**sensitive** 239:20
**sent** 18:13,14,16,23
   67:7 90:23,25
   102:9,11 148:3
   238:6,7
**separate** 30:1
**separately** 78:15
   210:20
**September** 149:6,6
   247:9
**seriously** 153:5
   159:12 188:15
   209:6 250:17
**served** 13:4 19:4,9
   20:7
**service** 72:3,4,7
   173:12 232:12
**services** 1:24 2:14
   82:12 130:1,13
   252:3 254:22
   260:23
**Session** 5:2
**sessions** 216:2,24
   220:4 226:20
**set** 27:23 81:5
**setting** 35:22
**setup** 233:22
**severe** 55:21 160:5
   160:8,12,23,23

161:5,16,24
   162:11,18 163:11
   163:16 164:2
**severely** 38:13
   137:2 160:17
**sheet** 34:25 100:6
**shifting** 140:8
**short** 59:5 142:21
   143:3 215:14
   223:23
**shorthand** 1:20
   260:3
**show** 42:5 106:11
   106:14 143:4
   147:5 180:10
   227:21
**showed** 139:25
   153:12
**shower** 246:20,22
   247:1,4,7,8,10,12
   247:19,20,21,21
   247:22,23 248:2,3
   248:5,9,12 249:3
   250:3,3,4,7,8
   252:15 253:6,8,10
**shows** 106:21
**sic** 19:13 78:7
   171:15 189:3
   238:10,17 239:22
**sidebar** 231:25
   237:25 251:5,23
**sign** 6:2 34:23
   49:21
**signature** 3:6 5:25
   258:1 259:2
**significant** 77:8
   209:22 241:22
**signs** 35:1 100:7
**silently** 131:16
**similar** 54:11 55:11
   55:17 56:4,14
**Simon** 47:14
**simply** 121:8 145:5
   214:4
**sir** 8:8 10:14 14:3
   27:8 31:5 32:13

32:16 33:17 35:6
   36:20 38:3 44:25
   49:9 87:12 93:20
   103:14 106:19
   154:2 165:23
   239:25 251:4,12
**sit** 30:12 98:4
   245:18,21
**sitting** 16:10 22:20
   23:2 30:22 72:19
   75:5 79:4 140:7
   167:9 183:24
   193:16 194:3,5
   208:16 233:4
**situation** 254:11
**sit-down** 88:12
**six** 76:12 77:3
   155:9 168:21
   215:15,15 219:13
   219:15 224:5
**sixth** 155:10
**skeptical** 163:17
**skin** 132:11 246:18
**skipping** 215:4
**Skrabanek** 45:10
   45:12
**SMITH** 2:9
**snippets** 223:23
**snuff** 104:7
**social** 114:24
**sock** 223:2
**socks** 223:2
**soft** 209:20 212:4
**software** 50:9,10,19
   66:19 67:24
**somebody** 26:20
   34:17 39:15 54:17
   54:17 132:20
   157:12 160:12
   169:8 172:3 173:3
   173:14 197:14,15
   214:10 220:14
   221:3
**somebody's** 121:7
**somewhat** 129:24
   210:16 233:14

**sorry** 23:6,19 29:16
   31:13 32:21,22
   33:10 34:17 56:1
   57:11 60:13 63:16
   86:24 90:25 93:9
   93:12 98:9 103:16
   103:25 115:20
   119:12 128:17
   140:9 145:25
   147:24 150:8
   151:24 154:25
   156:25 168:9
   171:18 175:9,24
   184:1 192:14,15
   207:5,19 210:18
   213:19 215:11
   224:7,7 225:25
   226:16,17 229:5
   230:10 234:6
   239:4 242:16
   247:15,20 252:5
   252:21 254:18
   255:18,20
**sort** 9:19 92:11
   177:13 205:9
**sound** 48:3 85:2
**sounds** 48:5 49:2
   75:15 94:18
   133:15
**source** 134:11,12
   136:11 148:10
**sources** 101:11,16
   134:4,7,25 135:5
   135:10
**Southern** 1:1 5:5
**space** 35:9 50:4
   99:23
**span** 115:11
**spasticity** 39:19
   132:3 138:22
   172:12 203:14,22
   204:6
**speak** 65:2 92:6
**specialist** 92:2 97:5
   97:6 168:25
**specialties** 30:11

40:25,25
**specialty** 38:7
   39:21 54:24 90:21
   91:4
**specific** 11:1,2
   24:10 26:17 28:5
   82:21 89:6 92:1
   94:21,23 97:17,21
   97:25 107:16,20
   107:22 108:5
   120:3 123:2 129:2
   129:9,13 135:10
   135:11,12,14
   143:21 145:1
   150:6 151:6
   161:17 168:22,24
   168:25 169:3,3,18
   169:24 170:4
   171:7 176:20,20
   176:20 179:21
   181:24 182:2,9
   190:1 206:9,13
   212:1,3 218:15
**specifically** 12:4
   15:5 50:20 54:15
   70:4,10 71:16
   73:23 75:24 76:20
   76:25 80:19 88:11
   88:20 125:19
   148:5 153:11
   155:17,20 170:10
   171:9 172:11
   179:5,24 209:3
   240:3,10
**specifics** 23:20 64:4
**specified** 116:15
**speculate** 138:15
**speculation** 52:19
   94:10 149:17
   150:24 198:7
   224:23
**speech** 40:11,12,17
   161:18 164:18,21
   226:1,4
**speed** 210:16
**spent** 45:25



**sphincter** 156:21
**spinal** 28:10 29:3
  41:12,16,21,24
  54:19,22 55:1,4,6
  55:22 56:12,13
  122:1 131:25
  132:2,8 133:14
  135:5,7,11 139:1
  140:4 141:13
  142:9 143:19
  150:16 152:14
  155:12 163:1
  174:6 177:1,24
  178:3,3,13,13,17
  180:22 184:16,22
  185:8 188:23
  192:7,20 193:3
  197:2 199:1,17
  200:10,24 201:9
  203:13 204:7,17
  206:19 209:19
  211:8,12 212:3,6
  214:7 216:17,19
  227:14,14 228:10
  229:21,25 230:15
  231:16,21 232:3,7
  241:22 245:2
**spinal-cord-injur...**
  172:14 173:23
  174:15 200:13
  204:1 214:19
  227:3
**spine** 146:18
  156:12,15 175:9
  188:17,19 189:3
  189:18,21 190:14
  190:23 192:8,11
  192:15 193:6
  194:9,14 195:4,19
  196:4,7,11,12,20
  198:3 207:9
**spite** 234:14
**split** 36:14 61:13
**spoke** 88:2 105:6
**spondylitis** 23:15
  24:2,6 54:18 55:6

56:13,18,20 57:9
57:12,17,19 137:3
137:8,12,16
146:15 152:20
158:21 159:25
177:2 193:5,9
194:12 195:6,13
195:25 196:1,3,6
196:14,20 197:7
**squirming** 111:22
**staff** 86:9
**stand** 6:10 61:24
  62:1 247:2 249:2
**start** 47:21 90:1
  103:21 118:25
  119:12 123:4
  157:12,12 170:20
  210:13,14
**started** 47:23 55:11
  78:15 85:23 89:5
  103:23,24 104:1
  162:4
**starts** 99:7,18
**state** 1:19 5:11 6:7
  44:21,23 45:2,4,5
  45:8 227:15,15,16
  259:9,24 260:1
**stated** 1:22 231:15
**statement** 88:19
  90:9 242:3
**statements** 64:3
  173:8
**STATES** 1:1
**statistical** 179:16
  180:23 184:17,22
**statistics** 180:7
**status** 102:12 157:6
  199:2 246:8,15
**stay** 132:8
**stayed** 225:23
**Stegent's** 102:23
**Stephen** 45:2 51:14
**stint** 219:12
**Stipulation** 260:11
**stipulations** 3:3
  5:22

**stones** 139:7,7
  202:7,9
**stop** 226:8
**stopped** 127:23
  226:11
**stored** 74:25 75:2
**stores** 51:20
**Street** 2:5,10
**stress** 194:9
**stringently** 170:8
**stroke** 39:20,23
  54:23 158:16
**strong** 206:14
**structure** 121:22
**studies** 135:17
  152:14 178:13,15
  178:18,20,22
  182:2 198:22
  199:15,20,25
**study** 152:16
  179:20 180:3
  184:21,25 185:9
  185:16,19,20
  186:3 187:19
  199:3 200:11,12
  200:16
**stuff** 67:22 71:20
  143:23 160:21
  234:14
**styled** 5:3
**subacute** 25:18
**subfolder** 74:10
**subjective** 109:22
  110:21 114:13,19
  148:11 173:8
**subject's** 113:25
**submitted** 58:9
**suboptimal** 112:12
**subpoena** 4:6 6:25
  12:17,18,19 13:4
  17:7,9 18:5,7,9,9
  19:20 20:7,19
  21:2 29:8,18
  30:25 31:4 32:24
  58:5 59:7 66:16
  66:25 67:6,10

68:13 69:2,7,9,13
69:19,23 70:1,14
70:20,23 71:6,8
72:5,8,17,21
73:12,16 95:2
**subscribe** 98:5
**subscribed** 259:16
**subscript** 219:17
**subsequent** 13:19
  20:8 22:9 23:16
  24:3,14 26:13
  27:12,15 95:19
  131:19 133:1
  138:20 141:8,17
  142:4,13,14
  149:15,24 160:1
  167:14 177:1
  184:9 192:19
  216:21,23 218:5
  218:14 226:12
  236:13 249:16
  252:12 253:19
  256:18
**subsequently** 250:4
**subspecialties** 41:3
  41:13
**subspecialty** 41:7
  41:11
**substance** 95:6
**substantive** 100:9,9
**subsumed** 91:18
**subtab** 75:4
**subtabs** 74:20
**suffer** 54:11
**suffered** 41:16
  54:12 55:10
  152:19
**suffering** 120:15
  135:7 198:1
  201:21
**suffers** 231:21
**sufficient** 181:14
  198:3
**suggestions** 39:17
**Suite** 1:21 2:5,10
**summarize** 147:10

**summary** 16:12,16
  124:13
**supervising** 36:15
**supplement** 19:25
  20:11 21:5 146:3
  256:20,20
**supplemental**
  15:10,12 20:13
  21:1 22:11 85:6
  85:10,11,14 93:16
  93:23,25 94:8,16
  94:19,22 184:12
  216:15 249:21
  250:13,21 251:25
**supplementing**
  256:8
**supplied** 19:17 20:9
**supply** 19:15
**support** 115:5
  141:3 142:3,14
  154:13 163:9
  164:2 184:18
  189:2 225:21
  242:2
**supported** 179:6
**supportive** 162:25
**supposed** 19:22
  66:22 67:11
  204:24
**suprapubic** 120:24
  139:8 171:9
  243:25 244:1,2,5
  244:18,20,23
  245:3,8 246:9,13
**sure** 13:25 14:21
  17:4 31:25 32:7
  34:20 54:14 62:3
  71:3 75:14 78:13
  78:17,25 88:6
  92:21 97:8,22
  99:16 104:6
  120:22 123:3
  129:3 132:21
  138:3 150:7 153:8
  157:7 158:13,14
  159:21 161:20



162:6 166:2,18
167:4 170:7,8
188:11 209:10
211:6 216:8 217:5
240:13 248:22
250:11 254:4
**surgeon** 175:9
188:17,19 189:4
189:18 190:5,6,8
190:14,23 207:9
**surgery** 189:21
256:4
**surgical** 131:20
**surprise** 237:14
**surprised** 237:15
237:16 239:7
**survey** 89:20
169:15 170:13
**surveys** 124:19
168:7,11,19
**suspected** 166:1
**suspend** 256:3,5
**sustained** 23:16
128:13 160:8
172:9 199:24
249:8
**swear** 5:18
**sworn** 1:16 5:20
7:18 81:23 260:6
**symptoms** 113:25
114:17 131:18,23
132:7 172:12
**synopsis** 107:2
**system** 50:22 62:4
**systems** 62:3
113:25 114:4

— T —
**tab** 74:11,12,12,17
**table** 7:23 97:16
124:9 135:15
178:3,23 180:12
180:23,25 181:2,3
181:6,8,9,10,12
181:13,24 182:6,9
182:14,16,20

183:12 184:16,17
184:23 185:7,13
185:21 186:1,7
187:6,13,15,16,17
188:3,4
**tables** 136:19
143:18,19,19
150:13,17 177:21
177:23,24 180:7
180:10,22 182:3
182:17
**tailoring** 179:5
**take** 7:9,22 34:7
58:15 76:6 91:22
120:10,10 121:22
122:10 129:20
132:24 140:18
143:21 144:2,2
146:14 153:5
155:3 159:12
163:15 167:11
188:3,15 199:8
209:6 210:8,13
211:3 214:9,25
222:3 245:20
249:5 250:17
253:7,23 254:6
255:14,18,19
**taken** 1:16 25:9
48:2 74:21 128:25
129:8 186:2
225:14 249:11
260:14
**takes** 87:5 118:21
185:7 214:22
**talk** 22:10 23:19,20
24:19,21,25 65:1
76:4 111:13
112:18 114:4
122:22 134:1
157:24 158:19
180:5 182:18,21
182:23,24 185:18
241:4 256:8,10
257:10
**talked** 32:10 93:8

95:14 108:18
133:16 136:12
152:15 154:24
156:7 176:3 182:7
198:19,20 222:16
**talking** 9:22 21:20
27:7 46:25 47:7
57:2,6,11 59:6
64:8 75:25 112:6
112:22,23 113:21
132:12,14 140:22
143:10 147:23
160:21 167:12,22
167:23 175:5
176:13 183:24
215:5 216:20
217:3,7 224:8
231:4
**talks** 180:3
**taper** 226:5
**task** 71:1
**TBI** 39:23 160:13
161:17 162:9,10
162:11,14 163:2,7
163:11
**team** 90:3
**technically** 154:22
**TECHNICIAN**
2:13
**technology** 157:14
**tecum** 7:1 12:17
66:16
**tell** 23:9 30:11
33:18 43:25 52:23
53:2,7,7 57:25
58:14 65:25 71:5
71:5,7 76:24 94:3
95:23 98:15
156:10 162:5
179:16,21,23
184:10 225:6
237:22 240:1
252:9
**telling** 109:21
**ten** 37:1 113:11
143:2 206:25

207:3,10
**tendering** 13:22
16:15 42:3,23
54:14 60:7 72:1
78:10 153:18
233:8
**tendonitis** 222:25
223:10
**term** 158:4
**terminology** 62:2
**terms** 43:6 64:15
82:20 98:21
105:13,15 110:20
**test** 165:19
**testified** 5:20 57:23
67:6 69:7 168:12
243:3 248:1
**testify** 44:24 193:20
**testifying** 55:17
148:13
**testimony** 15:19
17:11 28:16 34:13
51:7 52:15,22
56:8 63:25 67:5
68:17 69:11 73:22
81:23 82:10,14
95:7 102:15
136:22 185:3
186:9 187:9,14
194:2 212:12
231:17 232:6
237:24 240:2,20
251:21 255:12
260:4
**tetra** 194:8,15
**tetraplegia** 176:6
217:16 218:8
**tetraplegic** 28:1
180:1 194:22
253:23
**Texas** 1:1,19,21 2:5
2:10 5:6 8:6,10
18:17,19 174:25
260:1,22
**text** 165:2
**textbook** 88:17

**textbooks** 201:8
**texting** 167:20
**thank** 21:8 23:7
35:16 42:4 72:2
190:21 243:15
**theirs** 9:8
**therapy** 38:9 39:9,9
40:2,6,11,17
215:5,6 218:9,18
219:6,13,18,21
220:12 221:6,8,11
221:18 222:13,16
222:17,18 225:21
225:24,25 226:20
**thing** 12:16 22:17
30:4,24 31:9
32:17,24 33:3
58:4 73:22 80:5
88:14 92:12 93:1
95:1 96:16 107:8
110:11,13,20,20
114:15 120:9
140:24 162:8
180:6 194:23
202:13 225:6
243:24 247:16
**things** 17:15 20:21
21:13 25:8 27:19
28:4,6,7 32:5
39:25 40:14 50:24
57:22 59:20 69:21
73:20 76:2,5
80:15 85:8,25
88:6,10 97:24
103:7 104:20
108:1,14 109:17
115:4,11,24,25
117:17 120:12,19
120:21,22,24
121:1,3,4,17,22
122:12,12,13
128:2 129:25
130:8,23 132:1,2
132:6,12,15 133:8
137:4 139:2 144:1
145:17 147:8,9,16



157:8,9 158:7,12
158:17 164:13
170:11 174:5
176:20 179:21
186:4 187:18
193:7,14 208:6
212:24 223:3
227:3 233:20
234:20 237:16
240:22 250:6,14
252:19 253:18
**think** 12:2 22:13
32:2 38:19 42:6
43:24 44:2 45:7
46:9 48:9 54:5,16
55:19,22 56:6,9,9
57:23 60:20 67:5
71:18 77:2 78:3
78:12 80:9,16
83:21 84:22 89:16
91:13,14,15,16
97:3 99:7,8,8,13
101:5 103:23
105:10,25 106:1
108:18 109:3
110:25 112:8,20
113:3 114:9
117:14 118:3
143:7,8,9 145:13
162:5 163:18,19
164:10,12 165:12
165:13 166:7
169:21 170:20
173:22 174:14
176:11 179:2
181:3,25 182:17
184:10,25 185:23
185:24 187:17
188:1,24 189:11
190:4 194:2
197:21 201:7
202:17 207:8
214:9 216:9,11
217:2,17 218:12
220:1,25,25 221:1
221:2,3 224:24,25

225:1,2 230:5
231:10 232:10,10
232:17 234:1,5,6
236:6,6 237:18
239:8,11 240:10
240:14 241:7,13
247:1,2,3,5,11
248:8,11,18,21
250:12,16 254:10
254:14 255:1
256:4 257:2
**thinking** 79:10
175:17 179:24
216:16 223:4
**third-party** 118:3
134:4,7 136:10
**thorac** 156:17
**thoracic** 156:12,16
156:17 195:4,19
196:4,7,12,20
198:3
**thought** 64:15
120:16 136:13
166:20 209:8
218:14,15 239:6,8
239:11 249:22
253:16
**thoughts** 112:7
**thousand** 80:7,13
93:3
**thousands** 79:1
**three** 31:19 33:2
36:4 38:25 46:14
53:16,20,22 58:6
58:9 82:24 84:17
85:9 116:24 117:5
134:7 163:24
188:21,21 190:23
192:10 195:9,12
195:22 197:11,13
197:16,17 198:5
199:23 201:2
216:2,24 218:10
219:13,16 220:4
221:1 232:20
**throw** 198:14

**tie** 33:23
**tied** 90:22 162:10
186:7
**Tiffany** 238:7
**Tim** 256:17
**time** 5:7,8 7:21
19:21 24:13 31:11
31:12,23 32:6,8
34:8 38:24 43:9
53:21 58:13 64:20
65:10 71:17 73:20
80:9,15 82:19,24
82:24 83:14,15
84:1,17 85:1,4
87:5 91:18 93:3
93:11,19 100:15
100:22 111:18
112:20 115:13,15
124:15 125:21
126:23 127:1,4,7
127:17 136:14,20
141:3 142:22
143:3 144:3
145:10 146:25
147:22 148:4
151:5,15 153:1
156:17 159:11
160:2,10,22
162:21 163:15
164:21 166:11
176:8 183:21
184:10 186:13
190:14 192:23
193:6 194:7,8
195:9 197:1
203:15 204:12
205:9 208:2 209:4
210:10 216:11,16
218:17,19,22
220:14 223:11,22
224:12,14 226:21
247:9,13 248:10
248:10,21 249:25
250:8 254:1,23
255:4
**times** 7:2 45:9,15

49:4 158:5 172:6
172:25 173:20
189:10 204:23
206:7 215:7,13
218:10,11 219:13
219:14,14,15,16
221:1,2 223:16
**TIRR** 225:23,24
226:3
**title** 39:3
**today** 5:7 6:19 9:22
12:24 13:9 14:14
16:17 17:13,16,18
20:3,11 21:13
25:4 30:1 32:15
42:17,18 43:11
48:24 49:4 57:4
58:8,13 59:22
71:23 72:19 75:5
79:4,16 84:24
93:14 95:11 139:4
167:9 208:16
231:8 233:4
250:25
**toes** 238:15
**told** 23:2 24:13
32:14,15 45:17
65:12 89:10 90:10
95:15 97:3 114:16
114:18 128:3,4
154:10 155:23
222:17 224:5
227:7 238:7 249:6
249:14 255:10,13
**tomorrow** 181:20
**TOMPKINS** 2:9
**tone** 156:21
**tool** 202:19
**tools** 202:23
**top** 84:15
**total** 77:17 79:18
82:6 85:17,18
175:19
**totally** 183:24
**totals** 84:21
**touch** 238:14

**touched** 131:8
134:4 191:9 238:5
**town** 78:5 80:11,14
**track** 74:8 76:10
99:22 228:13
230:4
**tract** 139:7
**trained** 225:1
**training** 86:14,22
86:24 88:7,12
89:2,6 130:23
155:18 172:19
173:1 176:23
177:4,20 191:7
198:17 204:16
**tramadol** 206:18
**transcribed** 260:8
**transcribing** 92:17
92:24
**transcript** 260:9
**transfer** 132:20
247:4 252:13
**transferred** 240:5
**transfers** 40:4
132:18
**transition** 38:16
**transparency** 105:9
106:11
**transparent** 105:19
106:25
**transportation**
133:8 254:12,20
**transported** 255:2
**traumatic** 55:21
56:22 160:5,8
161:5,16,24
162:18 164:3
**travel** 77:20 78:2
80:15 81:13,17
**traveling** 80:8
**treat** 36:11,18,22
39:19,19 41:20
46:23 125:12,15
125:17
**treated** 54:19 55:5
56:19 125:10



**treating** 28:8 36:2
39:7 46:19,24
47:3,4 124:24
125:21 126:3,8
130:4,11,11,20
162:13,16 164:1
189:2,9,16 190:2
190:12 223:14,15
224:16,20,24
225:4,9,11
**treatment** 38:4
39:18 142:3
159:25 161:18,23
162:11,14,25
163:9,14 164:3
166:11 186:20
196:17 221:25
**trial** 43:18 44:18,22
44:22 45:2,3,3
49:13 51:10,10
85:5
**trials** 48:6 49:15
50:5,6,7
**tried** 68:11
**true** 6:17 16:7
19:18 43:4,5
47:12 67:16
101:21 104:25
105:4 107:18
109:9,19 115:2
116:20,24 117:18
118:10 119:22
121:10 122:6
123:14,15 124:11
126:1,22 128:14
128:21 129:14,16
129:24 131:13
133:19 134:17
135:23 137:22
138:13 140:1
141:5,25 144:12
144:13,16,21
145:3,4,19,20,23
146:5,25 147:1
148:8 149:11
152:11 154:18

158:21 167:1
184:19,20 185:12
187:3,4 192:23
194:4 197:12
201:13 211:20
212:22 213:12
214:5,6,22 215:2
215:3 218:6
225:16 230:12
232:21 233:5,6,10
241:1 259:3
**trust** 81:1
**try** 64:22 68:14,18
73:10 129:16
135:18
**trying** 68:23 73:9
120:18 130:8
145:8 163:8
185:20 186:24
221:13
**turn** 7:13 24:11
124:21 146:19
157:24
**twice** 44:18 48:16
49:13 242:24
**two** 21:22 36:4
46:14 48:14 49:1
62:14 82:24 85:9
109:14,17 143:2
175:19,23,23
198:25 199:21
201:18 209:25
219:13,14,14,15
221:25 224:1,2,10
224:11,21 238:11
**type** 8:16 26:3 40:4
40:8 92:6 97:8
98:4 171:4
**typed** 92:25
**types** 36:3 223:3
**typically** 20:13
49:25 65:15 73:22
76:9 153:4 235:21
**typing** 92:7
**typo** 210:1
**T12** 134:16 152:7

156:7,11,12 201:3
218:18 222:21
232:14 233:9,25
242:20 246:23
253:13

———————
**U**
———————
**UF** 155:6
**Uh-huh** 29:6 57:5
81:11 84:25 95:12
98:25 108:22
116:9 118:1 155:8
158:1 171:20
184:8 189:22
193:8
**ultimate** 25:6
157:21
**ultimately** 157:20
197:11
**ultrasound** 191:13
191:19 199:4
202:8,10,14,16
**ultrasounds** 191:20
**unable** 26:5 132:18
247:2
**unclear** 110:12
162:3 250:12
**unconscious** 160:24
167:10
**undergo** 162:17
**understand** 6:19
7:1,7,18 10:19
15:19 17:11 18:9
18:24 19:20,24
20:23 28:16 35:3
41:6 66:22,24
68:1 72:25 82:14
100:8 110:14
121:6 124:2,7
130:21 136:21
140:2,10 141:15
144:6 163:24
177:5 185:2 186:9
192:12 212:2
213:4,7 214:20
248:15 255:17

256:1
**understanding**
10:16 33:1 68:24
**Understood** 84:4
**underwent** 88:8
**unfortunately**
176:21 180:12
**unhealthy** 118:18
**unique** 120:4 145:2
**UNITED** 1:1
**University** 155:6
**unreasonable**
234:22 235:2
**unrelated** 158:8
163:1
**unstable** 247:1
**untreated** 158:15
**upcoming** 87:21
**update** 31:23 96:17
216:3 217:1
**updated** 31:11 32:6
32:8,9,11 73:21
168:21
**upload** 50:22
**uploaded** 51:9 52:1
79:1
**upper** 24:5 40:7,10
132:4 222:19
223:7 226:25
233:10,12,14
**ups** 215:22
**up-to-date** 93:7
**ureter** 139:7 202:6
**urinary** 132:10
139:15
**urine** 242:23,23,24
243:2,5,16 244:9
244:15
**USB** 17:23,25
29:13,13,14 32:9
32:11 58:12,18
59:11,12,16,24
110:24
**use** 43:12 50:9
89:15 114:17
134:20 135:6,8

143:18,19,24
181:3 184:18,23
185:3 187:17
204:17 233:10,11
233:14 240:9
246:5,19,22 247:1
247:12 248:8
249:1 250:7
252:25 253:1
**useful** 148:22
**usually** 11:2,3
18:15 20:20,21,23
33:23 49:20 53:21
56:21 64:17 70:13
76:21 85:7 116:15
204:18 225:3,7
**UTIs** 132:5 139:8
**utmost** 212:13
**U.S** 5:5

———————
**V**
———————
**vac** 207:4
**vaccine** 209:12
210:3,5,18,21,24
211:4,15,20
213:12 214:8,8,15
214:22 215:1
**vague** 55:14 105:23
105:24 107:21
114:2 123:1,25
193:20,23 202:20
**vagueness** 10:17
45:16 193:24
241:18 245:14
**Valencia** 2:14
**variety** 124:24
**various** 87:16
**vehicle** 226:12
237:11
**veins** 199:5
**vendor** 89:20 90:3
92:2,8,10,11 97:4
97:5 99:1,3,25
124:19 168:7,9,25
169:9,15 170:13
**vendors** 168:19



**venous** 198:22
  199:3,15,24
**version** 32:12 96:17
  96:19,22,22,23
  110:2
**versus** 5:4
**vertebrae** 156:13
**VIDEO** 2:13
**videographer** 5:1,9
  5:17 58:25 59:3
  112:1,4 154:2,5
  199:6,9,12 251:4
  251:7,10,12
  255:21,24 257:15
**VIDEOTAPED**
  1:10,14
**view** 214:6
**visit** 16:12 80:24
  102:14 166:19,23
  171:22 172:4
  188:25 217:24
  224:9
**visits** 172:8 188:21
  192:3 219:10
  226:12
**VS** 1:4

————————
**W**
**waist** 27:4,10 76:22
  132:17 238:2
**wait** 107:19 184:4
  207:4 221:8,10
**waived** 257:3,6
**waiving** 257:7
**walk** 132:18 133:6
**walking** 40:3
  157:13 160:20
  199:18
**Wall** 8:10 18:19,22
**want** 22:16 40:13
  40:22 41:24 42:5
  48:15 53:3 56:10
  56:11 62:17 65:1
  92:22 93:25 94:23
  97:23 107:2,5,16
  108:5 111:11,21

115:10,12 116:10
  116:11 135:16,17
  136:15 151:24
  153:7 159:25
  160:11 161:20,25
  162:5,20 164:4
  173:15 176:25
  177:25 180:5
  182:18,21,23,24
  184:4 185:3 186:6
  202:12 221:4
  233:9 240:7,13
  244:25 250:17
  252:8,18 255:19
  257:2
**wanted** 110:13
  113:17
**wanting** 144:5
  229:13
**wants** 94:23 220:14
  229:8,13
**warranted** 159:9
  198:25
**wasn't** 16:20,21
  17:14 19:8 31:11
  32:21 36:2 63:1
  88:12,12 102:8
  144:6 161:18
  165:5,9 167:20,21
  176:12 177:15
  254:25
**way** 15:3,7 28:11
  36:18 43:25 47:3
  57:24 73:25 80:2
  90:5 94:5 120:7
  121:6 122:12
  136:3 143:13
  145:6,6 147:12
  151:4,5,10,14,14
  157:3 169:14
  177:25 178:4
  190:4 195:8
  196:23 197:13
  201:19 202:11
  218:9 227:8 245:3
**week** 36:23 37:4,8

37:21,21 87:21
  185:18 215:17
  219:13,14,16,16
  246:14
**weekly** 130:20
**weeks** 82:25 219:14
  219:15,16
**weigh** 153:20
**weighs** 137:8
**weight** 140:8
  153:10,12,15,22
  153:22 227:7,8,19
**weight-loss** 228:18
**went** 27:22 88:10
  155:20 231:1,18
  238:3
**we'll** 23:19 208:7
  224:2
**what-ifs** 250:14
  251:1
**wheel** 247:7,7
**wheelchair** 129:18
  132:16 192:18,21
  193:16 194:3,5
  236:3,5,8 237:3,6
  237:13 238:24
  239:1,4,10 240:2
  240:6,8,8,9,17,20
  240:25 241:24
  242:8,9,12,14,17
  242:18 246:20,23
  247:4,12,19,20,21
  248:3,6,8 250:4,8
  253:8,10
**Whitmarsh** 1:18
  260:3,21
**wide** 124:24
**wiggle** 238:14
**Williams** 44:20
  51:12
**willing** 80:12 187:5
  256:9
**WiMs** 61:21,24
  62:8,12 66:9,17
  66:17 67:19,21,21
  67:21 68:5,5

69:15,16 74:9
  75:1,4,17,21
  76:13 88:3 96:15
**wish** 150:1 180:3
**witness** 1:15 5:18
  6:1,4 13:22 21:4
  33:23 34:4,24
  42:3 60:7 64:3
  78:10 100:5
  153:18 198:8
  233:8 258:2 260:5
**witness's** 56:8
  68:17
**wondering** 22:25
**word** 98:5
**wording** 92:23
  97:23 117:3,14
**words** 27:16
**work** 6:20 8:2,7,18
  8:20,21,21 9:23
  12:3 21:18 37:12
  43:7 45:12,18,24
  46:2,17 67:24
  70:24 73:14 89:19
  89:19 96:14 100:9
  100:9
**worked** 11:22 12:2
  91:24
**workers** 38:10
**working** 11:25
  47:23 96:20
**works** 10:15,16
  68:2
**worries** 79:14
**worse** 26:16 27:16
  27:25 140:6
  203:15
**worsening** 188:23
  193:3,6 194:11,24
  197:3 216:18
**worthy** 159:19
**wouldn't** 72:10,16
  112:19 123:10
  143:24 158:12
  200:5 202:8 216:3
  221:22 241:3

248:2
**wound** 140:3,4
  191:9 221:12
**wounds** 120:25
  132:4 138:24
  139:4,16,17,19
  140:6,15,23,24,25
  141:5,14,19 142:8
  142:17,18,23,25
  143:3,9 171:10
  172:13 232:18
  235:8
**write** 34:6 38:1
  88:8 103:8 104:12
**writing** 47:21
  104:21 121:8
  164:22
**written** 57:4,8,15
  57:18 74:1,5
  101:6 103:19
  176:16,21
**wrong** 108:2
  175:11 247:15
**wrote** 16:5 44:6,12
  44:16 47:18,20
  91:8 100:10,22
  103:11,24 104:2
  110:5 115:18
  124:15 126:23
  127:1,4,7 138:2
  218:17 254:1,7
  255:4
**www.MagnaLS.c...**
  1:25 260:25
**W9** 147:16

————————
**X**
**X** 192:8,11 194:14
  194:21,22 195:4,5
  195:10,12,12,21
  195:25 196:1,2,3
  196:6,13,19,24
  197:14,16 198:3
  202:6,12

————————
**Y**



**yeah** 10:4 14:15,21
 18:22 19:8 22:23
 35:16 37:13,15,15
 38:21 43:17 45:6
 45:15 48:1,9,12
 48:19,21 50:3,3,8
 53:19,21 54:8
 58:16 62:6 63:3
 63:16 64:24,25
 68:10 69:20 75:4
 78:20 79:7 81:20
 82:11 83:20 85:3
 90:17 93:10 94:9
 95:15 96:8,15,21
 96:24 98:9,20
 100:4 101:19
 106:5 110:8
 111:23,24,24,24
 112:22 118:6
 119:5,7 121:15
 123:2 129:12,25
 134:11,11 137:13
 137:23 138:14
 139:21 140:11
 141:6 142:11,11
 146:16,16 147:20
 148:7,20,22,23
 149:18 158:3,12
 158:16 161:14
 165:7 168:2
 172:19 174:12,17
 175:25 177:17
 178:24 185:12
 191:7,7,22 192:4
 193:12 194:21,21
 198:9,10 203:22
 207:20 210:8
 213:9,21 215:3
 223:20 226:1
 227:10 229:1,24
 230:2,9 233:11
 242:16 243:9,9
 248:16 249:4,17
 252:15 253:3,15
 255:7,20
**year** 20:8 46:11

172:6,25 173:20
 173:25 189:18
 191:13,19,24
 206:7 210:6,9,22
 215:7,14,25 216:2
 216:24 218:10,11
 219:11 220:5
 221:1,2 223:16
 242:24
**yearly** 46:7,15
 212:7
**years** 25:12 31:19
 33:3 37:22 41:9
 41:22 86:19
 118:10 143:2
 163:25 175:5,6,6
 175:19,23,23
 181:6,19 188:21
 190:8,24 192:10
 195:9,13,22
 197:11,14,17
 198:5,25 199:21
 199:23 201:2,18
 209:17,24,25
 210:2,13 214:20
 214:22 221:25
 223:16 232:20
 238:12 242:6
**yesterday** 21:10,11
 24:16,17,22 69:20
 96:6,7 208:5
**York** 174:23 175:1
**young** 210:23
**younger** 38:7

───────────────
**$**
───────────────
**$1** 78:8
**$1,000** 77:21
**$1,500** 83:8 84:18
**$10,853** 79:19
**$2,000** 82:15
**$3,000** 81:25 83:23
 84:24
**$34.91** 247:14
**$50.40** 81:15
**$500** 61:1,6 80:6

82:16 83:11
**$708.77** 247:19
**$9,250** 60:21 83:5

───────────────
**0**
───────────────
**0.2** 210:4
**0.5** 210:4

───────────────
**1**
───────────────
**1** 4:2,18 5:2 12:11
 12:12 14:2 81:14
 96:22 124:13
 131:8,9 193:9
 208:15 248:17
**1st** 15:8 22:6 26:7
 77:10 100:24
 101:23,25 110:6
 111:7 137:20
 138:2,8 141:4
 145:24,25 146:4
 154:10 159:6
 205:13 245:23
 246:2 253:12
**1,500** 85:1
**1/16/2017** 78:7
**1/2** 81:24
**1/26/2017** 81:10
**1:32** 199:10,11
**1:34** 199:11,13
**10** 4:12 37:4 59:13
 59:14 72:6 79:15
 81:6,8,9,13,21
 93:6 175:18,24,25
 176:1,9,14,17
 177:6,12,19 178:4
 179:16,19 207:17
 208:1
**10th** 19:13
**10,853** 84:22
**10:29** 59:1,2
**10:42** 59:2,4
**100** 4:19 9:23 10:3
 37:7,17 49:15
 83:16 84:15 99:20
 132:21 248:21
**103** 78:8,22

**1099** 9:6
**11** 4:7,13 27:7,9,17
 28:19,25 45:1
 95:3,4,16 100:19
 101:1 123:22
 131:13 149:1
 153:10,13 161:4
 191:17 200:16,17
 200:18 208:18
 211:3,18 218:4
 221:16 222:11
 223:5 226:25
 228:7,20 229:18
 249:9
**11th** 128:14 146:7
 221:16 238:19
**11-page** 14:17
**11/14/16** 61:20
**11/16** 61:21
**11:37** 112:2,3
**11:46** 112:3,5
**12** 4:2,14 206:7
 215:7,13 219:10
 219:15,16 257:18
**12/31/17** 260:22
**12:32** 154:3,4
**12:43** 154:4,6
**13th** 131:12
**13,853** 84:24
**1301** 2:10
**1321** 18:17
**14** 4:3 238:2
**1400** 1:21 2:5,10
**14770** 8:5
**15** 168:2 190:3
 223:14,15
**15,353** 85:2
**16** 79:20 149:2
 200:20
**17** 4:4,5 100:19
**19** 118:10 181:6
 206:24 207:14,23
 209:10
**19th** 149:6
**19-year** 118:12

───────────────
**2**
───────────────
**2** 3:2 4:3,19 14:10
 14:11,25 31:9,14
 59:23 96:22
 124:21 138:19
 146:1 147:2
 175:21 205:12
**2,000** 82:7
**2.1.1** 101:20
**2.11** 101:20
**2:36** 255:22,23
**2:44** 255:23,25
**2:45** 1:18 257:16,17
**20** 37:3,5 47:25
 226:17 239:13
**20s** 48:12,12
**2000** 131:12 228:8
**2009** 174:11,18
**2011** 174:24
**2012** 8:13 33:5,5
 85:23 175:1
**2013** 26:12 27:7,9
 27:17 28:14,19,25
 33:5 100:19
 128:14,19 129:5
 131:13 132:17
 146:7 149:1
 153:10,13 161:5
 161:11,12 172:9
 191:17 200:17,18
 211:3,18 218:4
 221:16 222:11
 223:5 228:20
 229:18 249:9
**2014** 12:7 31:11,18
 32:5 48:1 90:23
 91:5 103:13,19,20
 103:22 104:1,2
 140:25 141:5,16
 142:12 205:20
 228:1
**2015** 31:11,18
 47:14 104:16
 226:13,17,18
**2016** 14:2 15:8 16:5



19:4,13 22:6 26:7
28:25 31:11,19,24
32:3,8 34:15
43:15 44:21 60:21
77:10 100:20,24
101:23 102:2,6
110:6 111:8
127:24,25 128:8
129:5,6 137:20,20
138:2,8,13 139:11
140:1,20 141:4,17
142:7,12 149:5,6
151:24 152:4
154:10 159:6
168:2 200:16
205:14 206:11
208:15 216:21
218:5,18,25 219:2
219:2 221:17
222:12 223:6
225:22 227:1
228:8,21 229:18
237:5 238:21
244:8,14,17,20
245:6,24 246:2,16
247:9 248:17
253:12
**2017** 1:12,17 5:7
22:3 25:17 45:1
60:9 69:24,24
70:24 71:8 72:6,7
72:22 77:21 79:20
138:6,11 153:16
165:25 184:13
260:19
**21st** 60:21
**216** 153:19
**23** 48:20
**23-25** 4:19
**24** 145:22
**24-hour** 25:23 26:5
27:1 28:12,17,17
29:1
**250** 83:25 84:5
**257** 4:14
**258** 3:6

**26** 22:3 44:21 47:14
48:3 49:2,4,10
72:7 77:21 138:6
138:10 153:16
165:25 184:13
**260** 3:7
**28** 146:19
**29** 4:6

**3**

**3** 4:4 15:3 16:25
17:1 21:20 78:1
96:23 97:21 98:8
98:9 126:23 131:3
134:1 154:9
160:15,22,24
163:10,16 165:16
166:8 182:11
183:4
**3,000** 82:6
**30** 4:8 54:22,22
86:18 238:9
**30th** 19:4,5
**31** 4:9
**34** 4:18
**3986** 260:22

**4**

**4** 1:12 4:5,19 17:6,8
17:12,12 18:8
29:7 154:9 183:5
229:18 244:8,14
245:6 246:16
**4th** 1:17 5:7 149:5
216:21 221:17
222:11 223:5
225:22 227:1
228:8,20 238:19
244:17,20
**4,050** 61:10
**4/4/17** 81:24
**4:00** 19:13
**4:16-cv-00118** 1:4
5:3
**40** 240:12
**400** 83:17 84:12,13

**42** 4:10
**440** 1:20 2:5
**46** 157:25

**5**

**5** 3:3 4:6 29:21,23
32:25 69:25
101:20 145:21,21
160:5
**5-23** 4:18
**5.2** 160:4
**5:15** 24:22
**50** 37:7 46:1,3,3
**50/50** 46:6,13,15
61:13
**500** 61:11 82:8
83:16,17 84:6
85:16,17,17
**58** 4:11
**59** 4:12

**6**

**6** 3:5 4:7,8 30:5,6,7
168:5 203:5
**633** 260:24
**65** 132:21,23
209:17,21 210:25
214:20,22
**65-year-old** 118:9
118:13,15

**7**

**7** 4:7,9 31:1,2 42:6
42:21,24
**70** 210:14
**70-year-old** 212:23
**708.77** 247:21
**713-322-4878** 2:6
**713-587-9086** 2:6
**713-599-0700** 2:11
**713-599-0777** 2:11
**75** 132:24 238:1
**750** 82:5,10 83:23
**76** 97:11
**76-page** 95:5
**77002** 2:5

**77010** 2:10
**77079** 8:6,11

**8**

**8** 4:10 42:19,20,25
43:12,19,23 49:3
49:8 54:11 55:10
57:25
**814** 8:10 18:19,22
**8223** 61:20 81:8
**84** 239:13
**866)624-6221** 1:24
260:24
**8900** 77:19 81:9

**9**

**9** 4:7,11 58:5,7 59:8
60:5 77:18 78:6
79:17,19 81:8,9
**9th** 149:6
**9:32** 1:18 5:8
**90** 81:14
**9019** 78:7
**9124** 81:13
**95** 4:13
**99** 4:19

