# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

GUSTAVO AGUILAR          §
    Plaintiff          §
                  §
        V.          §          Case No. 4:16-cv-00118
                  §
ALLIANCE RESIDENTIAL,    §
LLC                      §
    Defendant          §


ORAL DEPOSITION

OF

JASON T. ENGLISH, M.S., CSP, P.E.

FEBRUARY 3, 2017

VOLUME 1 OF 1


     Oral deposition of Jason T. English, M.S., CSP, P.E., produced as a witness at the instance of the defendant, and duly sworn, was taken in the above-styled and numbered cause on the 3rd day of February, 2017, from 10:15 a.m. to 2:13 p.m., before Camille A. Bruess, CSR, RPR, in and for the State of Texas, reported by steno-graphic method, at the Daspit Law Firm located at The Lyric Centre, 440 Louisiana Street, Suite 1400, Houston, Harris County, Texas 77002, pursuant to notice and in accordance with the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.



Page 2

```
 1          A P P E A R A N C E S
 2
 3
 4
 5   COUNSEL FOR THE PLAINTIFF:
 6       Mr. Kiernan A. McAlpine
         Attorney at Law
 7       DASPIT LAW FIRM
         The Lyric Centre
 8       440 Louisiana Street #1400
         Houston, Texas 77002
 9       Phone:   713-322-4878
         Fax:     713-587-9086
10       E-mail:  Kier@daspitlaw.com
11
     COUNSEL FOR THE DEFENDANT:
12
         Mr. Timothy W. Hassinger
13       Attorney at Law
         GALLOWAY, JOHNSON, TOMPKINS,
14       BURR & SMITH
         3 Sanctuary Boulevard, 3rd Floor
15       Mandeville, Louisiana 70471
         Phone:   985-674-6680
16       Fax:     985-674-6681
         E-mail:  THassinger@gallowayjohnson.com
17
18
19
20
21
22
23
24
25   * * * * * * * * * * * *
```

Page 3

```
 1               INDEX
 2                              PAGE
 3   Appearances......................  2
 4   Stipulations.....................  4
 5   JASON T. ENGLISH, M.S., CSP, P.E.
       Examination by Mr. Hassinger.........   5
 6     Examination by Mr. McAlpine..........  111
       Examination by Mr. Hassinger.........  129
 7     Examination by Mr. McAlpine..........  142
 8
     Deposition concluded.....................  143
 9
     Witness' Signature page..................  143
10
     Reporter's Certificate...................  144
11
12             EXHIBIT INDEX
13                              PAGE
     NUMBER  DESCRIPTION            MARKED
14   1   Report dated 12/1/16 from Mr. English   6
         addressed to Mr. McAlpine in letter
15       form summarizing his findings on the
         analysis of an injury event (6 pgs.)
16
     2   Curriculum vitae of Mr. English         7
17       (8 pgs.)
18   3   Appendix A, Attachment to the report    9
         of Jason T. English, M.S., CSP, P.E.
19       dated 12/1/16 (7 pgs.)
20   4   Invoice #1444 dated 12/9/16 to Mr.     10
         McAlpine from Mr. English (1 pg.)
21
     5   Photos of the scene where the          93
22       accident took place and adjacent
         surroundings (28 pgs.)
23
     6   Hand drawn sketch of accident          98
24       location with measurements (2 pgs.)
25   7   Handwritten notes (1 pg.)             104
```

Page 4

```
 1                STIPULATIONS
 2          THE REPORTER:  Today's date is February 3rd,
 3   2017 and the time is 10:15 a.m.  My name is Camille
 4   Bruess of Magna Legal Services and I will be taking the
 5   Oral Deposition of Jason English pursuant to the Federal
 6   Rules of Civil Procedure at the Daspit Law Firm located
 7   at The Lyric Centre, 440 Louisiana Street, Suite 1400,
 8   Houston, Harris County, Texas 77002.  The style of the
 9   case is:  In the United States District Court for the
10   Southern District of Texas, Houston Division, Case No.
11   4:16-cv-00118, Gustavo Aguilar versus Alliance
12   Residential, LLC.
13          Would counsel present please identify
14   themselves and who they are representing?
15          MR. McALPINE:  Kiernan McAlpine, attorney
16   for the plaintiff, Gustavo Aguilar.
17          MR. HASSINGER:  And Tim Hassinger for
18   Alliance Residential.
19          THE REPORTER:  Are there any stipulations
20   counsel would like to make at this time?
21          MR. McALPINE:  Yes.  We are going to
22   stipulate to reserving objections except as to form,
23   responsiveness, and leading until trial and same basis --
24   and reserve stating the basis until called upon to
25   provide the basis by opposing counsel.
```

Page 5

```
 1          MR. HASSINGER:  You said we're --
 2          MR. McALPINE:  Let me try to not do
 3   shorthand.  The parties agree to waive the
 4   contemporaneousness requirement for objections under Rule
 5   30(c)(2).  The parties agree to reserve all objections
 6   except as to the form of a question, responsiveness, and
 7   leading until the time of trial.  Parties may further
 8   agree to reserve -- parties do further agree to reserve
 9   stating the basis for objections until the time of trial
10   unless called upon by opposing counsel to state the basis
11   for a particular objection.  Plaintiff agrees.
12          MR. HASSINGER:  That's fine.
13          JASON T. ENGLISH, M.S., CSP, P.E.,
14   having been first duly sworn, testified as follows:
15                EXAMINATION
16   BY MR. HASSINGER:
17      Q.  Can you tell us your name and address for the
18   record, please?
19      A.  Yes.  Jason English.  Address is 543 William D.
20   Fitch Parkway, Suite 112, College Station, Texas 77845.
21      Q.  Mr. English, you've been deposed before.
22      A.  Yes.
23      Q.  Okay.  You know all the ground rules?
24      A.  Yes.
25      Q.  Just as a reminder, if you could let me finish
```



Page 6

1  my question for the court reporter's benefit, I'll extend
2  you the same courtesy of letting you finish your answer
3  before I move on to the next question.  Okay?
4      A.  Yes.
5      Q.  You were hired by the plaintiff in this case; is
6  that right?
7      A.  Plaintiff's counsel, yes.
8      Q.  Plaintiff's counsel.  You've never spoken to the
9  plaintiff, Mr. Aguilar, have you?
10     A.  No, I've not personally spoken with him.
11     Q.  You've never read his deposition testimony in
12  this case?
13     A.  I have, yes.
14     Q.  You didn't read his deposition before you issued
15  your report in this case, true?
16     A.  That is true.  That's correct.
17     Q.  What we received in discovery is or in the
18  course of this case an expert report from you.  I want to
19  show it to you and confirm that this is the report that
20  you issued, if you wouldn't mind.
21     A.  Yes, this is my report minus the, uh -- it
22  doesn't have the attached appendix, but that's the report
23  portion.
24     Q.  I'm going to attach this as Exhibit 1.
25         (Whereupon, Exhibit No. 1 was marked.)

Page 7

1      Q.  And then we also received your CV that has with
2  it a list of publications, deposition, and trials list
3  for the past four years.  I'm going to show you this, if
4  you wouldn't mind.
5          MR. McALPINE:  May I?
6          THE WITNESS:  (Witness complies.)
7          MR. McALPINE:  All right.
8      A.  Yes, these are items that would have been
9  included as part of the Appendix A to my report.
10     Q.  I'm going to attach this as Exhibit 2.
11         (Whereupon, Exhibit No. 2 was marked.)
12     Q.  We also had issued a subpoena for your file and
13  you provided us a response to that subpoena, did you not?
14     A.  I did, yes.
15     Q.  The file materials that we received in response
16  to our subpoena are about half of an inch thick and I'm
17  looking at what may be five to ten times that in front of
18  you today.  Why do you have so much more than I have?
19         MR. McALPINE:  Object to the form.
20     A.  Uh, well, 'cause I didn't supply all the
21  materials that I had received.  I referenced my
22  documented lists that were in, uh, my report, Appendix A
23  that I had and then also in the cover letters that were
24  supplied that listed out a listing of the documents since
25  those were documents that -- discovery documents or

Page 8

1  things produced in the case that my assumption was that
2  both parties already had in their possession, so I didn't
3  produce a second copy of them.
4      Q.  So, whatever you listed as the documents that
5  you reviewed, you have in front of you today.
6      A.  Yes.
7      Q.  And the reason it may be thicker than what I
8  have as far as your subpoena response is because you
9  didn't supply a second copy of our discovery responses.
10     A.  That's correct.
11         MR. McALPINE:  May I make a brief remark off
12  the record?
13         MR. HASSINGER:  Sure.
14         (Discussion off the record)
15     Q.  We had a discussion off the record, but let me
16  show you what is Appendix A which includes data and other
17  information considered in forming your opinions, exhibits
18  that will be used to summarize and support opinions,
19  which are actually listed on the first page of what's
20  within Exhibit A.  Yes?
21     A.  Yes, as far as references which I may have
22  obtained exhibit information from.
23     Q.  Appendix A also includes your CV that we've
24  attached as Exhibit 2.
25     A.  Yes.

Page 9

1      Q.  And that it includes a fee schedule as part of
2  that packet that's known as Exhibit A.
3      A.  Correct.  And it also is part of the appendix,
4  that depo and trial list that you have as part of the
5  next two -- I mean Exhibit 2, I'm sorry.
6      Q.  Okay.  'Cause that goes with your CV.  Yes?
7      A.  Yes.
8      Q.  Okay.  So, let's attach Appendix A that we've
9  now referenced as Exhibit 3.
10         (Whereupon, Exhibit No. 3 was marked.)
11     Q.  So, we have Exhibit 1, your report, Exhibit 2,
12  your CV, which is actually within part of -- within
13  Appendix A, and then we've got Appendix A as Exhibit 3.
14  Just so we have them all there.  Is that right?
15     A.  Yes.
16     Q.  You also issued an invoice in connection with
17  the work that you did in this case, true?
18     A.  Yes.
19     Q.  Is this the invoice that you issued
20  (indicating)?
21     A.  Yes.
22     Q.  And this invoice reflects the work that you
23  actually did before you issued your report that we've
24  attached as Exhibit 1.
25     A.  Yes, that up through my report, yes, including



Page 10

1  my report.
2    Q. If we could attach the invoice as Exhibit --
3  mark it as Exhibit 4.
4        (Whereupon, Exhibit No. 4 was marked.)
5        MR. McALPINE: Thank you, sir. Yeah.
6    Q. You're being offered as an expert in this case
7  in what areas?
8    A. Well, I can tell you my areas of specialty. I
9  don't -- I did not --
10   Q. That's not my question.
11   A. Well ...
12   Q. The question is, what are you being offered as
13 an expert in as far as this case is concerned?
14   A. Well, I'm not the one that prepared the
15 designation. I can tell you my areas of expertise that
16 I'm offering myself in.
17   Q. Okay. Tell me what you think you're an expert
18 in in connection with this case.
19   A. I would say generally the field of safety
20 engineering, and within that general subheading includes
21 safety management, fall prevention, the walking surface
22 safety including accessibility and design.
23   Q. Anything else?
24   A. There's a lot of subheadings. Premises safety
25 would fall under there. I mean these are all under the

Page 11

1  general heading of safety engineering - human factors,
2  ergonomics, code administration. I think those are the
3  high points I would say.
4    Q. So, you're an expert in eight different areas:
5  safety engineering, safety management, fall prevention,
6  walking surface safety, accessibility design, premises
7  safety, human factors/ergonomics, and code
8  administration; is that right?
9        MR. McALPINE: Object to form.
10   A. Those are the -- those are the areas that I'm
11 applying in this particular evaluation. I have expertise
12 beyond that, but that's what I would consider most
13 relevant to this particular evaluation.
14   Q. How long have you been acting as an expert
15 witness?
16   A. I've been offering services in that area for
17 around maybe 12 years or more, somewhere in there.
18   Q. If I had a case where a, uh, patron was walking
19 into a grocery store and slipped and fell on water, you
20 could be an expert for me or a lawyer in connection with
21 that case?
22   A. I have expertise to evaluate that, yes.
23   Q. If I have a case where a, uh -- or if a lawyer
24 has a case where there's a handrail issue in connection
25 with entering an office building, you could be an expert

Page 12

1  in that?
2    A. That's within my area of expertise, yes.
3    Q. And if I had a case where someone's using a
4  ladder at a parade and a child falls from the ladder, you
5  could be an expert in that as well?
6    A. I would probably have to know more about the
7  case. I do have expertise in ladders, but as far as a
8  parade and children and how it was being utilized, I
9  would probably need more information to make that
10 determination.
11   Q. If I had a -- if there was a worker who was
12 using scaffolding in connection with construction or
13 renovations to an office building and fell because of
14 some defect with respect to the scaffolding, do you have
15 expertise in that area?
16   A. It depends on the defect, but I do have
17 expertise in scaffolding, not all areas. So, it would
18 depend on the specific areas that were involved.
19   Q. You've been retained as an expert in connection
20 with offshore cases, too?
21   A. Occasionally, yes.
22   Q. So, if I have a rig worker who's on an offshore
23 platform and slips and falls on a rig -- slips and falls
24 on the rig floor, you would have expertise in that?
25   A. Yes, I would have expertise to evaluate that.

Page 13

1    Q. And if we have a, uh, welder who's welding a
2  piece of equipment on a land based oil field or well site
3  and is injured in some fashion, you'd have expertise in
4  that type of case, too?
5        MR. McALPINE: Object to the form.
6    A. Certain areas, possibly, not all. As far as
7  workplace safety, yes. As far as some of the specifics
8  of welding, possibly not. It depends on the
9  circumstances.
10   Q. So, tell me some cases that you've been retained
11 as an expert in. You want me to go through the list,
12 this four-year list?
13   A. I'm here to answer your questions. So, however
14 you feel it's best to.
15   Q. Ernest Myers, Representative of the Estate of
16 Sherrie Myers, Deceased -- Ernest Myers, et al. vs. AFS
17 Northwest Business Park, what was that case about?
18   A. That was a -- a fall, a trip and fall at a
19 business strip center.
20   Q. And who were you retained by?
21   A. The plaintiff's counsel.
22   Q. Martha Rubio versus HEB Grocery Company, what
23 was the subject matter of that case?
24   A. From recollection it was a workplace injury at a
25 grocery store involving a falling object falling and



1  landing on her head I believe.
2      Q.  And you were retained to offer expertise in
3  connection with what issue?
4      A.  Uh, the material storage, the type of racking
5  systems that were -- that's part of that storage, also
6  workplace safety and also the issues of falling objects.
7      Q.  Who were you retained by in that case?
8      A.  Plaintiff's counsel.
9      Q.  On this list that's the list of Deposition and
10  Trials List for the past four years that's part of
11  Exhibit 2, there are two and a half pages or so of cases.
12  Have you been retained by the plaintiff in every one of
13  those cases?
14      A.  Uh, likely not.  I don't know.  I'd have to take
15  a closer look at it.  And some of these are up to four
16  years old, so I may not remember on all of them.
17      Q.  Sarah Thomas vs. Regency Crossing, third case on
18  the list, what was the subject of that case?
19      A.  Uh, sitting here, I don't recall the specifics
20  of that case.
21      Q.  Who were you retained by?
22      A.  That case is not coming to mind.  So, I don't
23  recall on that one.
24      Q.  Next one, Yen Nguyen vs. Tien Quang Bui,
25  T-i-e-n, Q-u-a-n-g, B-u-i, who were you retained by?

1      A.  I believe on that one it was plaintiff's
2  counsel.
3      Q.  And what was the issue in that case?
4      A.  It was a fall down a residential stairway.
5      Q.  Can you just look at these two and a half pages
6  (indicating) and tell me were any of these cases -- in
7  any of these cases that you have listed were you retained
8  by the defendant?
9      A.  (Witness reading.)  In answer to your question,
10  it would be yes.
11      Q.  And which ones?
12      A.  There's one on page two.  It's Sandra Stewart
13  vs. Michael's Stores.  And when I got to that one, I
14  stopped.  The ones that I recognize, some of these like
15  the one we spoke of earlier I don't quite have a
16  recollection of the details or who I was working for
17  based on the names, but I can continue down the list so
18  that way if I come to some, do you want me just to name
19  those?
20      Q.  Yes, if you wouldn't mind.
21      A.  Okay.  There's a Vicky Wright vs. D&B Patels.
22  (Witness reading.)  I have one that's a little different
23  where I was retained by a plaintiff and one of the
24  defendants.  It's the Diane Tomlinson vs. Safeway vs.
25  Stonebriar Hotel.  (Witness reading.)  Those are the ones

1  that I recognize.
2      Q.  I counted the cases and there's a total of 76
3  cases on your list for the last four years.  Does that
4  sound right?
5      A.  I have not counted them.  So, if you counted
6  them, then I'll trust your number.
7      Q.  Okay.  And you have 2 of the 76 where you were
8  retained by the defendant?
9          MR. McALPINE:  Object to the form.
10      A.  I did not count the ones that I read off.  I
11  thought there was three or four, but I didn't -- I wasn't
12  counting.  Do you want me to go back through it again?
13      Q.  Yeah.  You said -- you listed two and then you
14  said there was one where it was a plaintiff and a
15  defendant.  So, it's either two or three.
16      A.  I don't know.  Again, I really wasn't paying
17  attention to that.  So, I mean if you were, then that's
18  fine.
19      Q.  Sandra Stewart case, that was one, right?
20      A.  Yes.
21      Q.  And then the next one was -- that was the first
22  one that you noticed.  And then what was the second one?
23      A.  (Witness reading.)  The Vicky Wright vs. D&B
24  Patel.
25      Q.  Was that just for the defendant or for plaintiff

1  and defendant?
2      A.  That's just the defendant.
3      Q.  Okay.  So, that's two.
4      A.  Then, yeah, I guess you're right, and then the
5  one that Tomlinson vs. Stonebriar that I was retained by
6  one defendant and the plaintiff as well.
7      Q.  Okay.  So, out of 76 cases, 2 to 3 of those were
8  for a defendant in some capacity.
9      A.  As far as the ones that I've recognized, one and
10  then also two that I've -- the cases which I've evaluated
11  where I've actually gone far enough to provide testimony,
12  then that's correct.
13      Q.  So, in the last four years where you've given a
14  deposition or trial testimony, if you do the math it's 96
15  to 97 percent on behalf of the plaintiff.
16          MR. McALPINE:  Object to the form.
17      A.  Of the ones I've recognized in there, that's
18  correct.  It's the number that we have here.
19      Q.  Tell me a case on that list, the two and a half
20  pages, where you offered expertise in any fashion in
21  connection with the Americans with Disabilities Act.
22      A.  Ernest Myers vs. the AFS Business Park.  Alice
23  Rohr vs. A.V.L.  Naomi Woosley vs. Golden Royal d/b/a
24  Best Western.  (Witness reading.)  Vicky Wright vs. D&B
25  Patel.  (Witness reading.)  George Caballero vs. Denny's.



Page 18

1   Robert -- Dr. Robert Brace vs. The City of McAllen.
2   Those are the ones that I recognize.
3      Q.  I counted six as you were naming them.
4      A.  I'll go with that.  I wasn't counting them and
5   you counted them right last time.  So ...
6      Q.  Did any of the six involve ADA issues in
7   connection with a parking lot?
8      A.  (Laughs) I wasn't -- I wasn't paying attention
9   to what they were about as a just --
10     Q.  Myers case?
11     A.  Uh, it was a transition from a parking lot to a
12  walkway.  So, I guess kind of, sort of.
13     Q.  It's not a parking space issue.
14     A.  That's correct, not a parking space.
15     Q.  The Rohr case, the second one you named?
16     A.  And your question is, is it having to do with a
17  parking space?
18     Q.  Yes.
19     A.  No, it was not a parking space.
20     Q.  Woosley?
21     A.  No, that was not dealing with a parking space.
22     Q.  Wright?
23     A.  That was not dealing with a parking space.
24     Q.  Caballero?
25     A.  That one was dealing with a parking space, yes.

Page 19

1      Q.  What was the issue?
2      A.  Uh, it was a drainage issue for their roof.  A
3   condensate drain for their HVAC was draining right down
4   the striping of the -- of the, uh, ADA parking space and
5   creating a mildew -- or mold buildup that was slippery
6   and the individual, as they were getting out of their car
7   in the handicapped parking space, slipped as soon as they
8   stepped down out of their car.
9      Q.  Where was the location of that incident?
10     A.  Uh, it was here in the Houston area.  It seems
11  like it was on 1960 area between --
12     Q.  Better question if you don't mind?
13     A.  Okay.
14     Q.  Was it a shopping center, a residential area, an
15  apartment complex, what?
16     A.  You mean Caballero?
17     Q.  Yes.
18     A.  It was a restaurant.
19     Q.  A restaurant.
20     A.  Yes.
21     Q.  A parking lot in front of a restaurant?
22     A.  Serving the restaurant, yes.
23     Q.  And then the last one case that you mentioned,
24  was it Brace?
25     A.  Yes, that's one of them.

Page 20

1      Q.  What -- did that involve a parking space or a
2   parking lot?
3      A.  No.
4      Q.  Have you ever testified as an expert witness in
5   connection with ADA issues or Texas Accessibility
6   Standards issues in connection with a parking space at an
7   apartment complex before this case?
8      A.  Yes.
9      Q.  What case?
10     A.  On one of these had testified?
11     Q.  Yes.
12     A.  I don't recall if I've provided testimony or
13  not, nothing that I recognize at least in the past four
14  years.
15     Q.  Okay.  What case are you thinking of?
16     A.  Uh, well, the one case that popped in my head
17  was in -- where was it at -- I think Corpus Christi, an
18  apartment complex that was involving accessible parking
19  at a -- at an apartment complex.
20     Q.  What was the issue in that case?
21     A.  There was a fall of an individual trying to get
22  to and from one of the apartment units.
23     Q.  How did he fall or she fall?
24     A.  Well, they didn't have any accessible parking on
25  that entire side of the complex and they were

Page 21

1   attempting -- and the way they had it configured, instead
2   of it being even a normal curb, it was actually kind of
3   two steps and they fell trying to get -- I can't remember
4   if it was going -- I think it was coming -- I can't
5   remember if it was coming and going to or coming back,
6   but they fell trying to get either from their car or to
7   their car.  I can't remember which.
8      Q.  And how did that person fall?
9      A.  While they were attempting to either go up or
10  down the curb or the two steps leading from the parking
11  lot to the sidewalk that then goes to the apartment unit.
12     Q.  What's the name of that case?
13     A.  I don't recall off the top of my head.
14     Q.  And what was your opinion essentially in that
15  case concerning that incident?
16     A.  Well, I don't remember all the details, but I
17  know one of it was a lack of adequate handicapped parking
18  to serve the tenants and the, uh, visitors for the
19  complex was I think one of the primary issues.
20     Q.  The lack of, I'm sorry?
21     A.  Accessible parking.
22     Q.  Because they didn't have any, right?
23     A.  At least on that entire side of the complex,
24  that is correct.  They did have a spot at the leasing
25  office which was at the opposite side of the property and



Page 22

1  they may have -- I was trying to remember -- I think they
2  maybe had another one that was on a different
3  (indicating) side of the complex.
4      Q.  Have you ever offered an expert opinion that a
5  business didn't do something wrong?
6      A.  Yes.
7      Q.  When was the last time?
8      A.  I don't have an answer for that.  I mean I
9  don't -- my memory's not quite that good as far as giving
10 you a specific time that I offered testimony.
11     Q.  Can you tell me the case?
12     A.  As far as you're saying where I actually
13 testified?
14     Q.  Do it either way.  When's the last time you
15 offered an opinion in any fashion, an expert opinion that
16 a business owner did not do something wrong?
17     A.  Probably within the last week.
18     Q.  What case was that?
19     A.  It was a case which -- I'm trying to evaluate
20 how much information I can give out.  It was the initial
21 evaluation of a case that somebody had contacted me about
22 to ask if I could assist.  And essentially my answer was
23 no, but I don't feel at liberty to give any details about
24 the case since I'm not involved and it's a, uh, client of
25 mine.

Page 23

1      Q.  Okay.  Let's just talk about cases where you
2  were actually retained as an expert and offered actual
3  expert opinions in the form of a report or testimony.
4  So, can you tell me the last time you offered an expert
5  opinion either in report form or via testimony that a
6  business owner did not do something wrong?
7      A.  As far as a report form, I don't know the exact
8  date, but I'd say within the last two or three months.
9  As far as testimony, it would have been one of the ones
10 likely that was on this list since that list the cases in
11 which I've testified in the last four years.  So, I guess
12 that would have been the Tomlinson vs. Safeway, which was
13 in March of last year.
14     Q.  And the one you were retained recently in, what
15 does that involve?
16     A.  It was a fall on a stairway.
17     Q.  And what's the issue?
18     A.  I was evaluating the stairway retained by the
19 defendants that owned the premises or owned or operated
20 the premises to evaluate the stairway and I did not find
21 anything wrong with it relative to the incident that
22 occurred.
23     Q.  The one ADA case that you mentioned involving
24 the apartment complex --
25     A.  Yes.

Page 24

1      Q.  -- how many years ago was that?
2      A.  Well, I'm not very good at estimating time, but
3  I would say probably within the last two or three years,
4  somewhere in there.
5      Q.  Is that on your list?
6      A.  I did not recognize it, but I in the same sense
7  as I sit here, I can't even remember what the names of
8  the parties were.  I just remember going and looking at
9  the apartment complex.
10     Q.  Is that the only other case where you've offered
11 expert opinion in report form or testimony concerning ADA
12 issues with respect to an apartment complex, and more
13 specifically parking spaces at the apartment complex?
14     A.  You said in written form or testimony?
15     Q.  Yes, sir.
16     A.  As I sit here, I don't recall.  I know I've had
17 other evaluations, but whether I issued a report or
18 provided testimony, I don't recall.
19     Q.  And how many cases have you been retained as an
20 expert by the Daspit Law Firm or one of its lawyers?
21     A.  At least from recollection I believe this is the
22 first.
23     Q.  You're not an architect?
24     A.  No.
25     Q.  You don't consider yourself an expert in the

Page 25

1  Americans with Disabilities Act, do you?
2      A.  I do, yes.
3      Q.  Okay.  That wasn't on the list of the eight
4  things you mentioned at the beginning.
5      A.  I think I -- well, it falls under several of
6  those headings.  I think one of those was accessibility
7  design.  That would include the ADA, TAS, and ANSI A117.
8  with a host of other authoritative references on the
9  subject matter.
10     Q.  And you consider yourself an expert in the Texas
11 Accessibility Standards as well?
12     A.  Relative to certain areas, yes.
13     Q.  Where have you studied or received training in
14 the Americans with Disabilities Act?
15     A.  As far as my course work for not only safety
16 engineering but also I took a post graduate course from
17 the Department of Architecture at Texas A&M relative to
18 these issues, not only including accessibility and design
19 but also other things as far as just normal building code
20 compliance relative to walking, all means of egress which
21 includes stairways, ramps, level surfaces, any type of
22 walking surface.
23     Q.  When's the last time you've had any type of
24 training in the ADA?
25     A.  You mean as far as attending like a seminar or a



Page 26

1  course or something?
2     Q. Yes.
3     A. I haven't updated my CV in a while, but just
4  looking at that, the first one listed is in 2014,
5  "Prevention Through Design - Slips, Trips, and Falls"
6  from the American Society of Safety Engineers.  I think
7  there's been another seminar I went to since then as
8  well, but I don't have it listed on my CV.  And then it
9  looks like that course I was speaking of was from 2001.
10    Q. When I hear someone say they're an expert in the
11 Americans with Disabilities Act, that means to me that
12 they know when the ADA applies.  Would you agree with
13 that?
14    A. Yes.
15    Q. And the same thing with respect to the Texas
16 Accessibility Standards, when I hear someone say that
17 they're an expert in that, then the expert should know
18 when those standards apply, true?
19    A. Yes.
20    Q. You've never designed a parking lot, have you?
21    A. You mean as from all aspects?
22    Q. Any aspect.
23    A. Uh, from the ground up, no.  I've evaluated
24 designs, but, no, I've not done the actual ground up
25 design, no.

Page 27

1     Q. In connection with this case, the Aguilar case,
2  you didn't conduct any testing, did you?
3     A. There wasn't any required outside of taking
4  measurements.
5     Q. Okay.  You didn't perform any testing?
6     A. That's true because none was required.
7     Q. You didn't perform any calculations, did you?
8        MR. McALPINE:  Object to the form.
9     A. Well, other than adding and subtracting
10 dimensions, I would say no, none.  No calculations were
11 required other than simple addition and subtraction.
12    Q. Before you issued your report in this case, you
13 had no idea what Mr. Aguilar testified to, did you?
14    A. Prior to issuing my report, is that what you're
15 asking?
16    Q. Yes.
17    A. Only through the information supplied through
18 discovery which included the incident report and then a
19 written statement which I now understand to be prepared
20 by his daughter and then signed by Mr. Aguilar.
21    Q. My question was before you issued your report,
22 you had no idea what Mr. Aguilar testified to, did you?
23    A. Well, at that time I thought the information had
24 come from him.  So, I would say yes.  But are you talking
25 about through his deposition?

Page 28

1     Q. You know what testimony is?
2     A. Somebody relaying some information verbally.
3     Q. Okay.  If you need me to be more specific,
4  before you issued your report in this case, you had no
5  idea what Mr. Aguilar's testimony under oath was, did
6  you?
7     A. Well, that's a different question.  Under oath,
8  no.
9     Q. Do you know the difference between testimony and
10 a statement?
11    A. Apparently I don't -- I'm not coherent or we're
12 not on the same page as far as your use of the terms.
13 Testimony in my mind can mean anybody relaying something
14 verbally.  It doesn't necessarily have to be under oath.
15 So, I would consider it possibly being the same, falling
16 under the same category, but ...  So, if you want to
17 clarify your definitions, then I may be able to answer
18 that.
19    Q. Who gave you permission to actually perform any
20 type of inspection at the Broadstone New Territory
21 Apartment complex?
22    A. That was arranged by Mr. McAlpine.
23    Q. My question was who gave you permission to
24 actually enter the premises and conduct any form of
25 inspection of the apartment complex?

Page 29

1     A. I met Mr. McAlpine at the site.  So, that was
2  arranged by him.  I was just told to be there.
3     Q. So, you actually met the attorney for
4  Mr. Aguilar at the apartment complex to inspect it?
5     A. Yes.
6     Q. How did you enter the apartment complex?
7     A. Just through their gate.
8     Q. Through their gate?
9     A. Yes.
10    Q. Did they have someone at the gate?
11    A. No.
12    Q. You just drove in?
13    A. Yes.
14    Q. Did you ever advise Mr. McAlpine or anyone else
15 that if you were going to do any form of inspection, that
16 counsel for Alliance Residential should be notified so
17 there could be a joint inspection?
18    A. I'm not an attorney on this case.  That's not
19 part of the scope of my work is arranging between legal
20 counsel any part of this case.  So, no.
21    Q. You've never done a joint inspection with other
22 experts?
23    A. Have I?  Yes.
24    Q. Okay.  That's a common theme, is it not?
25    A. I would say only a small fraction.  Maybe ten



Page 30

```
 1  percent of the cases have both -- more than one expert at
 2  a site inspection that I'm involved with.
 3      Q.  Have you ever been on a case before this one
 4  where you actually entered property through a gate to
 5  inspect the property without the attorney or
 6  representative for the property owner being present?
 7      A.  Yes.
 8      Q.  Did you have permission in those other cases?
 9      A.  I was not the one arranging the inspection.  So,
10  I -- again, that's not part of my job is -- I arrange it
11  with my client and as far as how they do things legally,
12  that's not my responsibility.
13      Q.  Was Mr. Aguilar present when you were performing
14  your inspection?
15      A.  No.
16      Q.  How do you know where he allegedly fell?
17      A.  Uh, Mr. McAlpine informed me of that
18  information.
19      Q.  The lawyer told you?
20      A.  At that time, yes.
21      Q.  You're saying at that time.  At that time before
22  you issued your report, you hadn't -- you'd never spoken
23  to anybody else besides the lawyer, right?
24      A.  That's correct.
25      Q.  You'd never spoken to a human being in this case
```

Page 31

```
 1  in connection with any of your opinions in this case
 2  besides Mr. McAlpine, the lawyer, right?
 3      A.  That's true, yes.
 4      Q.  And if we look at your invoice that's attached
 5  as Exhibit 4, you have .3 hours which is 18 minutes with
 6  an initial phone consultation and reviewing photos,
 7  right?
 8      A.  Yes.
 9      Q.  And the initial phone consultation would have
10  been with the lawyer.  Yes?
11      A.  Yes.
12      Q.  Then you traveled from College Station to Sugar
13  Land for an hour and -- 1.4 hours.  Yes?
14      A.  Correct.
15      Q.  You conduct a physical inspection of the fall
16  location on October 13th, 2016 and photographed -- it
17  says, "Photographic record and measurements taken 1.0."
18  So, that's one hour?
19      A.  Yes.
20      Q.  Were you there for actually an hour or is that
21  just a round number?
22      A.  Uh, I would say -- I mean I didn't have a timer,
23  but I would say it's close to an hour.
24      Q.  So, when you entered the gate of the defendant's
25  property in this particular case, you parked your car, or
```

Page 32

```
 1  are you in the same car with the lawyer or did you come
 2  separately?
 3      A.  We came separately.
 4      Q.  So, do you enter first or does he meet you
 5  somewhere else and then y'all go in together?
 6      A.  Uh, no, we met at the property.
 7      Q.  And you get out and you talk to the lawyer about
 8  the case on the defendant's property.  Yes?
 9      A.  Yes.
10      Q.  And then how long are you actually performing
11  some type of measurements?
12      A.  I did not track timing and that sort of detail.
13  I don't know how much time was actually spent measuring.
14      Q.  Okay.  So, certainly less than an hour because
15  you only billed an hour in total, right?
16      A.  Yes.
17      Q.  Would you agree with me that you probably took
18  measurements for no more than five minutes?
19          MR. McALPINE:  Object to the form.
20      A.  Actually, there was quite a few measurements.
21  So, I would say it took longer than that.
22      Q.  Ten minutes?
23          MR. McALPINE:  Object to the form.
24      A.  I didn't track the specific time, but I'd say I
25  spent probably equal time taking -- or more time taking
```

Page 33

```
 1  measurements than I did photographs.
 2      Q.  And then you spend 1.3 hours reviewing various
 3  discovery documents including the defendant's disclosures
 4  and discovery responses.  Yes?
 5      A.  Yes.
 6      Q.  You spent 2.4 hours reviewing literature and
 7  standards and start preparing your report, right?
 8      A.  Yes.
 9      Q.  You have one more phone consultation for .3
10  hours -- that's 18 minutes -- with the lawyer, right?
11      A.  Yes.
12      Q.  And then you complete preparation of your report
13  for 2.1 hours.  Yes?
14      A.  Yes.
15      Q.  Do you actually physically type up the report
16  yourself?
17      A.  Yes.
18      Q.  From start to finish?
19      A.  Yes.
20      Q.  In this case you didn't type up this report from
21  start to finish because the only thing new in your report
22  from all the other reports that you issued starts on page
23  five, right, the "SUMMARY OPINIONS AND CONCLUSIONS"?
24          MR. McALPINE:  Object to the form.
25      A.  Well, I -- some of the report -- some of the
```



Page 34

1  information in my reports are consistent from one report
2  to the other.  So, yes, I don't type every word, but as
3  far as preparing the entire report myself which is how I
4  took your question to be, then the answer to that is yes.
5  I didn't have somebody else working on this report.  I
6  did it all myself.
7       Q.  For example, if we were to look at page one of
8  your report, the first paragraph is new because that's
9  the way you have to do the intro describing what this
10 case is, right?
11      A.  Yes.
12      Q.  The next two paragraphs on page one are a cut
13 and paste from your other reports.  Yes?
14      A.  Uh, for the most part, yes, that's my
15 methodology.  So, I use the same methodology for all
16 evaluations.  So, while I may edit that as time goes on
17 minor for the most part.  Once I prepared it initially,
18 I've used the same thing from one report to the other.
19      Q.  And then on page two, everything on page two is
20 the same from previous reports that you have issued.
21 Yes?  It's a cut and paste?
22      A.  Uh, not fully.  As far as my -- when I list a
23 summary of my qualifications, then I -- there is a
24 portion of that information I bring out that's as far as
25 I highlight certain aspects of my qualifications that are

Page 35

1  more specific to my evaluation in a particular case.  So,
2  that may change depending on the subject matter.
3       Q.  So, just minor editing?
4       A.  Uh, yes.  I mean it's just essentially outlining
5  a summary of my qualifications.  So, that really hasn't
6  changed much.
7       Q.  So, when you're actually typing up or preparing
8  this report that you've issued that we've attached as
9  Exhibit 1, do you start with a report that you issued in
10 another slip and fall case and edit that report for
11 Aguilar?
12      A.  Uh, sometimes if I -- if I, uh, have, you know,
13 similar reports.  I either may insert some of that
14 information or just use that report as a beginning -- as
15 a starting point and then delete and edit as necessary.
16      Q.  I mean, that's what you did in this case.  You
17 used another -- a report from another case as a starting
18 point and edited that other report to make it the Aguilar
19 case.  Yes?
20      A.  I don't recall exactly what method.  I prepare a
21 lot of reports.  As far as what method I may have used
22 with this, I do agree that not all of this information
23 was typed originally for this report, but how I --
24 whether I took -- started with the previous report or
25 just copied some of the other reports into a new

Page 36

1  document, I don't recall.  I've done it both ways.
2       Q.  On page three of your report, the only thing
3  different on -- for this report than you used in your
4  other reports is the paragraph "BRIEF SYNOPSIS OF INJURY
5  EVENT," right?
6       A.  Well, you're -- if you're lumping all my other
7  reports into one heading, then I would say all of my
8  questions going back would be, no, not all my reports
9  follow this same format, but the majority of them do
10 follow a similar format.  That's just how I do my
11 reports.  So, of the reports similar to this, then, yes,
12 the only thing on this page that would be different for
13 the most part would be the "BRIEF SYNOPSIS OF INJURY
14 EVENT."
15      Q.  And everything in this paragraph (indicating),
16 the "BRIEF SYNOPSIS OF INJURY EVENT," is what you got
17 from the lawyer, right?
18      A.  No.  I had received all the (pointing) -- all
19 this information, discovery documents prior to preparing
20 the report.  So, again as far as describing the incident
21 event I had photographs, I had the incident report from
22 the apartment complex, I had the handwritten statement
23 which I now know to be from Mr. Aguilar's daughter.  I
24 also had some e-mail correspondence that discussed what
25 occurred.  So, I had all that information prior to

Page 37

1  preparing the report.
2       Q.  When you write in "BRIEF SYNOPSIS OF INJURY
3  EVENT" that it's generally understood that on October
4  11th, 2013, what's generally understood?
5       A.  Well, that's -- essentially, I put that in there
6  so that I'm not sitting here quoting all the information
7  from the file.  This is -- I reviewed the file and this
8  is my general summary or synopsis just to give the reader
9  an orientation of what happened.  I'm not trying to quote
10 every word and every document I reviewed.  It's my
11 general understanding based on the materials I reviewed.
12      Q.  The third sentence you write that "Due to
13 Mr. Aguilar's mobility impairment, Alliance Residential
14 converted an existing parking space to a handicap
15 reserved parking space near Mr. Aguilar's apartment unit
16 as an accommodation."  Did I read that right?
17      A.  Yes.
18      Q.  Where are you getting that from?
19      A.  I was actually trying to remember this morning
20 where I got that from.  I thought I remembered reviewing
21 a document relative to that or -- I don't remember
22 exactly where I got that.  I couldn't find.  But either
23 they apparently -- 'cause they knew of his disability
24 based on the documents I reviewed.  So, it's either they
25 created the handicapped parking space or they assigned



Page 38

1  him a unit that was near a pre-existing parking space.
2  As I sit here, I don't know what case the scenario was.
3      Q.  You don't know one way or the other what they
4  did, do you?
5          MR. McALPINE:  Object to the form.
6      Q.  Do you agree with me that words have meaning in
7  your expert reports?  Do you agree with that?
8      A.  Words have meanings.  I agree.
9      Q.  Yes.  And you wrote that "Due to Mr. Aguilar's
10  mobility impairment, Alliance Residential converted an
11  existing parking space ..."  So, let's stop there at that
12  clause.  What evidence do you have anywhere in your file
13  that Alliance Residential converted an existing parking
14  space due to Mr. Aguilar's mobility impairment?
15      A.  Well, I have information relative to their
16  knowledge of his disability and he was assigned an
17  apartment that was either near a pre-existing space or
18  that space was converted.  Part of that's physical
19  evidence meaning that it was the same, that the parking
20  space dimensions are the same as all the other parking
21  spaces in that area.  The only thing different is that
22  they added a sign and they added a symbol on the
23  concrete.  So, it was not done anything special.
24          So, that's just based on the information I
25  have.  That's the reason I put it's my general

Page 39

1  understanding.  That may change as more information is
2  provided.  I don't have testimony from the apartment
3  complex representatives at this point.  So, as this -- if
4  they are deposed in this case, then my understanding may
5  change.  That's the reason I put it's my general
6  understanding at this time as I prepare the report.
7  That's based on the information I had.
8      Q.  Okay.  My question is what evidence do you have
9  that due to Mr. Aguilar's mobility impairment, Alliance
10  Residential converted an existing parking space to a
11  handicapped reserved parking space?
12      A.  I can't answer that question any better than
13  what I've just answered it.
14      Q.  You haven't answered it.  So, tell me what
15  documents you have in front of you as part of your file,
16  what evidence you have in front of you that shows that
17  Alliance Residential converted an existing parking space
18  to a handicapped reserved parking space due to
19  Mr. Aguilar's mobility impairment?
20          MR. McALPINE:  Object to the form.
21      A.  As I sit here, I can't point to a specific
22  document.  Again, that's just a -- that's the reason I
23  refer to this as my general understanding.  As I'm
24  sitting here, I'm saying it was either they converted an
25  existing parking space or he was assigned an apartment

Page 40

1  near a pre-existing handicapped parking space.
2      Q.  Okay.  So, tell me where in your report you
3  wrote that he was assigned an apartment near an existing
4  parking space.  Where is that?
5      A.  (Witness reading.)  Well, in that same
6  sentence -- as far as you're just asking where I state
7  that it's near his apartment?
8      Q.  No.  You said that it was either one of two
9  things.  Either Alliance Residential converted an
10  existing parking space to a handicapped reserved parking
11  space due to Mr. Aguilar's mobility impairment or he was
12  assigned an apartment near an existing handicapped
13  parking space, right?  You said those only two things,
14  one or the other.  Yes?
15      A.  Well, or just by chance -- I mean all I -- I
16  was -- I know what apartment number he used or that he
17  was living in for 10 years and I know where the
18  handicapped parking space was that he had been using
19  during that time.  So, as far as the proximity, I mean
20  that's based on physical evidence I mean in looking at
21  it.
22      Q.  You don't know whether Alliance converted a
23  parking space to handicapped, an existing parking space
24  to a handicapped space, do you?
25      A.  As I sit here, no, not without information from

Page 41

1  them.  That's correct.
2      Q.  You don't know why Mr. Aguilar was assigned the
3  apartment that he had, do you?
4      A.  Again, I have not received testimony from the
5  representatives of the apartment.  So, no, that's --
6  that's typical in the apartment complex management world
7  as far as if you have a disabled resident, potential
8  tenant that you either provide an accommodation with a
9  parking spot or you place them in a unit that's near an
10  existing parking space.  So, I don't have specific
11  information from this complex on how they manage that
12  situation, but that is what's typical in the industry.
13      Q.  So, when you wrote in your report on page three
14  that "Due to Mr. Aguilar's mobility impairment, Alliance
15  Residential converted an existing parking space to a
16  handicap reserved parking space near Mr. Aguilar's
17  apartment unit as an accommodation," you made that up,
18  right?
19          MR. McALPINE:  Object to form.
20      A.  No, I did not make that up.  That's based on the
21  evidence that I have.  That's what it appears from the
22  physical evidence because basically all they did was put
23  up a sign in a parking space that was the same as all the
24  others and that's the same thing that I viewed at other
25  spaces in their complex.



Page 42

1      Q. When did they put up the sign?
2      A. I don't have that information.
3      Q. When did they paint that parking space to make
4    it a handicapped parking space?
5      A. According to Mr. Aguilar, I believe he said two
6    or three years prior to his incident.
7      Q. Yeah, but you didn't know any of that before you
8    issued your report, right?  You didn't know what he said
9    one way or the other, did you?
10     A. That's correct.
11     Q. You have no evidence that they did anything in
12   connection with that parking space to make it an
13   accommodation for Mr. Aguilar, do you?
14          MR. McALPINE:  Object to the form.
15     A. As far as what they may have done specifically
16   to that parking space?
17     Q. Yes, for Mr. Aguilar as an accommodation.  You
18   don't know, do you?
19     A. Not at this time, no.
20     Q. You then write on page 3 that "... at the time
21   of Mr. Aguilar's arrival to the apartment complex from
22   work on October 11th, 2013, the parking space was in the
23   process of being repainted as general maintenance."
24   Where did you get that from?
25     A. Uh, from the incident report and the e-mail

Page 43

1    correspondence that was I assume produced through
2    discovery.
3      Q. You then write that "Accordingly, Mr. Aguilar
4    parked in the nearest available parking space to his
5    apartment unit, which was just across the driveway from
6    the handicap space that was being ..." repainted.  Is
7    that what you wrote?
8      A. Yes.
9      Q. How many other handicapped parking spaces were
10   there in that area around Mr. Aguilar's apartment?
11     A. Well, can you further define what you mean by
12   that area?  How big an area are you speaking of?
13     Q. In the immediate vicinity that he could have
14   used.
15     A. Well, again that's a loose term.  I mean that
16   was -- the one that he had been using for ten years was
17   the closest one to his apartment complex.  The nearest --
18   the next nearest one was over across the driveway at the
19   leasing office.
20     Q. How far away?
21     A. How far away from the other parking space or
22   from his apartment unit?
23     Q. How far away from the parking space where he
24   would often park and couldn't on the day of this incident
25   according to him was another handicapped parking space?

Page 44

1      A. (Witness reading.) Estimating from my
2    measurements about 70 feet.
3      Q. And within that 70 -- within a 70-foot radius or
4    a radius of 70 feet, how many handicapped parking spaces
5    were there?
6      A. Including the one he normally parked in?
7      Q. Yes.
8      A. Just those two.
9      Q. And within a radius of 70 feet, how many
10   parking -- handicapped parking spaces were there from
11   around Mr. Aguilar's apartment unit?
12          MR. McALPINE:  Object to the form.
13     A. I think I got lost in your question.  Can you
14   re-ask it?
15     Q. That's all right.  I'll rephrase.  If you're
16   standing at Mr. Aguilar's apartment unit where he lived,
17   within a radius of 70 feet how many handicapped parking
18   spaces were there?
19          MR. McALPINE:  Object to the form.
20     A. To my knowledge just one, the one that he
21   normally parked in.
22     Q. You've read Mr. Aguilar's testimony now that
23   there was another handicapped parking space 30 feet or so
24   away from where he parked?
25     A. Well, if he was referring to the, uh,

Page 45

1    handicapped parking space at the leasing office, then his
2    estimate of the distance would be incorrect.
3      Q. And your estimate of the distance is what?
4      A. Based on my measurements I took -- I didn't take
5    a direct measurement, but trying to add the measurements
6    I did take, I would estimate about 70 feet.
7      Q. How many parked -- handicapped parking spaces
8    were there along this same strip of parking spaces where
9    Mr. Aguilar's apartment unit was located?
10     A. Well, there was a space at a -- at another
11   building that's a little further down on that same side,
12   but I didn't continue any further past that one.  That
13   one (pointing) was approximately -- that was probably --
14   based on my measurements that would be close.  It would
15   be about 73 feet from the (pointing) space that he
16   normally utilized.
17     Q. Okay.  So, within 73 feet of the space that he
18   normally utilized, there were 2 other handicapped parking
19   spaces?
20     A. Based on my estimating of distance to the
21   leasing office then, yes.
22     Q. And you don't know whether there were any others
23   along the same strip of parking spaces near his unit?
24     A. I did not go further than the one that was 73
25   feet away.  His building as you enter the entrance was


MAGNA
LEGAL SERVICES

Page 46

1   the first (indicating) unit on the right.  So, you'd have
2   to go across (indicating), you know, the entrance
3   driveway with two gates before you got to the other side
4   of the complex.  So, again I didn't go further than that
5   distance of 73 feet of that same side of the road that he
6   was on.  So, I don't know what may have been further
7   around in that complex.
8       Q.  You then -- you continue on on page three by
9   writing that "... Mr. Aguilar parked in the nearest
10  available parking space to his apartment unit, which was
11  just across the driveway from the handicap space that was
12  being painted."  Where did you get that information from?
13      A.  I believe that was information that was relayed
14  at the time -- at this time from, uh, Mr. McAlpine
15  through his conversations with Mr. Aguilar.
16      Q.  The lawyer told you?
17      A.  Yes.
18      Q.  The next sentence is that "The available parking
19  space bordered a curb and grassy area along the driver's
20  side of the vehicle."  Where are you getting that from?
21      A.  From my inspection of the site.
22      Q.  Next sentence, "Mr. Aguilar exited his vehicle,
23  and due to the narrowness of the parking space and the
24  limited space between his vehicle and the curb, it is
25  understood Mr. Aguilar was attempting to maneuver in the

Page 47

1   limited space requiring him to negotiate the curb as he
2   opened the back door of his vehicle to retrieve ..." the
3   "walker from the backseat, and while attempting to remove
4   his walker, Mr. Aguilar lost his grasp of the walker,
5   causing him to lose his balance and fall backwards
6   landing on the curb, which is understood to have resulted
7   in injury, to include paralysis."  There's a lot of
8   information in that one sentence.  Where did you get any
9   of that information from, the lawyer?
10      A.  Most all of that information -- part of that was
11  my assessment.  The first part of the sentence as far as
12  the size, narrowness of the parking space and the limited
13  space between the vehicle and the curb, that was based on
14  my inspection.  The rest of that information as far as
15  retrieving his walker and attempt to remove it, that was
16  through the incident report and the handwritten statement
17  that I was supplied.
18      Q.  So, what you came up with is that -- is the part
19  of that sentence that says, "... due to the narrowness of
20  the parking space and the limited space between his
21  vehicle and the curb ..."  Is that right?
22      A.  Yes, based on my inspection.
23      Q.  You don't know how close he parked his car to
24  that curb, do you?
25      A.  Only based on the photographs that I had

Page 48

1   received.
2       Q.  What photographs?  I'm talking about on the day
3   of this incident.  You don't know how far he parked his
4   car away from the curb, do you?
5       A.  Uh, and maybe I'm -- maybe I could be
6   misinterpreting as some of the file, but I was thinking
7   that some of these photographs were taken as part of the
8   incident report (indicating).
9       Q.  I'm just asking you what you know.
10      A.  It'd be based on the photographs showing a blue
11  car with a handicapped license plate that's parked in the
12  space, if those are not from the -- if that's not his
13  car, which he did describe as a blue car.  So, that's
14  what I was basing what -- how he was parked.  And also
15  you can only park if you're within the lines.  It's an
16  eight foot space.  So, you don't really have much room to
17  park if you park within the actual parking space.
18      Q.  Oh, so that space where he parked is 96 inches?
19      A.  Close.  It would be a little less than 94 to the
20  center line.
21      Q.  So, when you write on page five of your report
22  in the second to last paragraph that "The parking space
23  Alliance Residential provided for Mr. Aguilar was 92
24  inches wide, and had no access aisle," which space are
25  you referring to?

Page 49

1       A.  Actually both of them.  That was -- I guess that
2   was a transcribing error in my report because I had
3   measured the space to the interior dimension of the line.
4   The space he normally parked in was 92 inches to that
5   point and the space where he parked on the date of the
6   incident was 91 and 9/16ths inches, but there is a 4-inch
7   line.  So, to the centerline would add another two
8   inches.  So, it would be approximately 94 inches.
9       Q.  So, when you wrote on page 5 of your report that
10  it was 92 inches, that was a mistake?
11      A.  Well, I transcribed it wrong from my notes and
12  failed to incorporate the extra two inches to the
13  centerline of the four-inch line.
14      Q.  Okay.  We call that a mistake.  Was that a
15  mistake?
16      A.  Uh, yes, it's a transcription mistake in my
17  report.
18      Q.  Another mistake that you made in connection with
19  the report that you issued is concluding that the ADA
20  even applied to the parking spaces in this case, true?
21          MR. McALPINE:  Object to the form.
22      A.  Well, apply can be used in two different ways.
23  So, in my opinion it does apply by content and the
24  subject matter, but from -- if you're talking about
25  enforcement from some governmental entity, then, no, it



Page 50

1  would not be enforced in this particular situation except
2  at the parking space for the leasing office because
3  that's a public accommodation.
4      Q.  Where do you have in your report that the ADA
5  doesn't apply for enforcement purposes?
6      A.  Well, I didn't list that out.  I just -- I mean
7  in paragraph 3 on page 5 is where I speak of the ADA, the
8  Texas Accessibility Standards, and ANSI A117.1.
9      Q.  Do you agree that the Americans with
10 Disabilities Act does not apply to the apartment complex
11 parking spaces in this case, Broadstone New Territory
12 Apartments?
13         MR. McALPINE:  Object to the form.
14     A.  It applies by subject matter and content, but as
15 I stated before, as far as being enforceable by some type
16 of governmental entity, then no.
17     Q.  When you say it applies by subject matter and
18 content but not by enforcement, what do you mean?
19     A.  Well, we're speaking of an accessible parking
20 space and the ADA is a well researched and authoritative
21 resource for the design of accessibility components to
22 include accessible parking spaces.  So, it's an
23 authoritative resource that if you're wanting to design
24 an accessible route or accessible parking space no matter
25 whether some governmental entity is going to force you to

Page 51

1  do so, if I want to go and even if at my house I want to
2  put in an ADA or accessible parking space, that would be
3  a viable resource to go to from a design perspective to
4  say how do I need to design this and install an ADA
5  parking space because that's specifically the subject
6  matter that that particular resource contains.  So, by
7  the content it would be directly applicable to the
8  evaluation design of an accessible parking space no
9  matter whether a governmental entity is going to force me
10 to install the space at my home or if I'm doing it just
11 because I want to because I have a need for that.
12     Q.  When did you first figure out that the ADA --
13 compliance with the ADA was not required for this
14 apartment complex?
15     A.  Well, I knew that before I ever -- the first
16 conver- -- I've known that for a long period of time well
17 before this case ever came into being.
18     Q.  Okay.  So, your testimony under oath today is
19 that you knew from the moment you were contacted in
20 connection with this case that the Americans with
21 Disabilities Act did not apply to the parking spaces at
22 the apartment complex.
23         MR. McALPINE:  Object to the form.
24     A.  Well, to clarify, as an enforceable requirement
25 except at the leasing office because that is considered a

Page 52

1  public accommodation but for the parking space that we're
2  speaking of that Mr. Aguilar had been suing for 10 years,
3  then as a enforceable requirement, that's correct.  It
4  does not apply.
5      Q.  And you knew that from the very beginning.
6      A.  Yes.
7      Q.  And you never advised the court or counsel
8  anywhere in this written report that the ADA did not
9  apply to the parking spaces from an enforcement
10 standpoint.
11     A.  Well, also I did not state in there that -- I
12 did not say that it didn't, but I also did not say that
13 it did.  So, I guess that's why we have depositions to
14 clarify the information.  I did inform during our
15 conversation Mr. McAlpine.
16     Q.  And when did you inform him of that?
17     A.  I believe we discussed that in our initial
18 conversation.
19     Q.  So, you'd agree with me that there's no way that
20 there could ever be a violation of the Americans with
21 Disabilities Act by the defendant in this case because
22 the ADA doesn't apply as far as violations or enforcement
23 are concerned to this apartment complex parking lot.
24     A.  I don't agree with that because it does apply
25 and can be enforced at places of public accommodation to

Page 53

1  include their leasing office.
2      Q.  Okay.  I'm going to make it more specific then.
3  And I understand that.  You're saying it applies by the
4  leasing office, but as far as where Mr. Aguilar was
5  parking, both the space he intended to park in and the
6  space that he actually parked in, the ADA did not have
7  to -- requirements did not have to be followed by
8  Alliance Residential, true?
9      A.  From an enforcement standpoint, that's correct.
10     Q.  And when you say from an enforcement standpoint,
11 you mean that the apartment complex owner, Alliance
12 Residential, could never be deemed to have violated the
13 ADA in connection with Mr. Aguilar's parking space and
14 his accident?
15         MR. McALPINE:  Object to the form.
16     A.  As I understand your question as far as -- I
17 would say, yes, if you're speaking from whether they
18 could be fined or forced to create those spaces.  That's
19 correct.
20     Q.  So, if there's been an allegation in the
21 complaint in this case that there was a violation of the
22 Americans with Disabilities Act, that's not true,
23 correct?
24     A.  Well, it depends on how they intended that in
25 their wording of a violation.  I mean is it a violation



Page 54

1    of their provisions of that act, yes, but from an
2    enforcement standpoint, no.
3         Q.  There's an allegation in the complaint in this
4    case that the conduct of the defendant, Alliance
5    Residential, violates 42 U.S.C. (A) Section 12182 in its
6    implementing regulations.  Is that true or not?
7              MR. McALPINE:  Object to the form.
8         A.  What was the, uh, site again?
9         Q.  42 U.S.C. (A) Section 12182.
10        A.  I don't know.  I did not prepare the complaint.
11   So, I'd need to look at that to see what the content was
12   for that particular provision.
13        Q.  There's an allegation that the defendant's
14   conduct in failing to provide an accessible handicapped
15   parking space was discriminatory and denied the plaintiff
16   the opportunity to park safely and walk to and from his
17   place of residence safely under the Americans with
18   Disabilities Act.  True or not?
19        A.  I did not evaluate this as from a discrimination
20   standpoint.  So, I'm not offering opinions as far as
21   discrimination.
22        Q.  In any respect?
23             MR. McALPINE:  Object to the form.
24        A.  As far as using those terms, that's correct.
25        Q.  The defendant's voluntary construction

Page 55

1    renovation, repair and/or alteration activities on the
2    day in question failed to conform with ADA Accessibility
3    Guidelines according to the amended complaint.  Is that
4    true or not?
5         A.  Just so I can -- do you mind if I pull out my
6    copy of that --
7         Q.  Oh, sure.
8         A.  -- so I can read along with you so I can get a
9    better understanding of what you're reading from?  You're
10   reading from the original petition?
11        Q.  The amended.
12        A.  Okay.  So, where are you at in here?  Sorry.
13        Q.  Okay.  It starts on the bottom of page four.
14   This is under Count 2, Violation of the Americans with
15   Disabilities Act.  Do you see that?
16        A.  Yes.
17        Q.  Paragraph 35.
18        A.  I agree with paragraph 35.
19        Q.  You agree with it?
20        A.  Yes.
21        Q.  From a standard standpoint but not from a
22   violation standpoint, true?
23        A.  Well, as its written as far as that their
24   voluntary construction, renovation, repair or alteration
25   failed to conform with ADA Accessibility Guidelines,

Page 56

1    that's true.
2         Q.  Okay.  And the follow-up question is that the
3    ADA Accessibility Guidelines did not apply, were not
4    applicable to that, uh -- to the parking space at issue,
5    right?
6         A.  Well, it depends on how you use the term
7    applicable.  From an enforcement standpoint, that's
8    correct, but by content, yes, they are applicable.
9         Q.  When you're saying by content they're
10   applicable, you mean that if somebody wanted to actually
11   make it comply with the ADA, they could, but they didn't
12   have to; right?
13        A.  Right.  There's no entity that would require
14   them to do that in this situation.
15        Q.  And then it never, ever could be a violation of
16   the ADA by the defendant in this case in connection with
17   the parking spaces that Mr. Aguilar used on the day or
18   intended to use on the day of the incident, right?
19        A.  From a statutory standpoint that you're speaking
20   of, that's correct, yes, unless the law changes, but as
21   of now, no.
22        Q.  And paragraph 36 of the amended complaint that
23   says:  The aforementioned conduct violates 42 U.S.C. (A)
24   Section 12182 and its implementing regulations, that's
25   not true, is it?

Page 57

1              MR. McALPINE:  Object to the form.
2         A.  As far as the 42 U.S.C. (A) 12182, I'd have to
3    look at that on there.  Those numbers are not coming to
4    the top of my head at the moment.  So, I --
5         Q.  You're an expert in this stuff.  You don't know
6    what that statute says?
7         A.  Not off the top of my head.  I --
8         Q.  You're an expert in the ADA, aren't you?
9         A.  Well, the 42 -- 36 -- again by that numbering
10   system, I don't recognize that as far as from the ADA
11   standpoint.
12        Q.  You have no idea what that statute says.
13             MR. McALPINE:  Object to the form.
14        A.  Again, unless -- if that's a -- 'cause sometimes
15   things can be in the U.S. code that are equivalent to
16   something else in federal requirements.  So, do I know
17   what the content is?  Possibly.  But I don't recognize
18   that numbering.  I mean I deal with thousands of
19   provisions and building codes, accessibility standards,
20   federal workplace standards, and to memorize every
21   specific number without having what the particular
22   provision is saying, I can't say.  I mean they all start
23   running together to some degree.
24             So, without seeing the content do I know
25   about it?  Possibly.  But that's the reason I'm saying



Page 58

1   just looking at the numbers, they're -- I don't -- I'm
2   not remembering those particular numbers.
3       Q.   You can't tell us what it says.
4            MR. McALPINE:  Object to the form.
5       A.   You're asking me as far as off the top of my
6   head what the -- this particular provision in the U.S.C.
7   (A) says?  Off the top of my head, no, I don't have it
8   memorized.
9       Q.   Do you agree with me that the apartment complex
10  at issue in this case was not required to comply with the
11  ADA or the Texas Accessibility Standards?
12           MR. McALPINE:  Object to the form.
13      A.   As you state your question, I don't agree with
14  that.
15      Q.   So, tell me what provision under the ADA or the
16  Texas Accessibility Standards that required as a matter
17  of law the defendant, Alliance Residential, to comply
18  with either the ADA or the Texas Accessibility Standards.
19      A.   Any place of public accommodation is covered by
20  the ADA and the Texas Accessibility Standards.  So, when
21  you mention the apartment complex, generally there are
22  requirements, but if you're limiting it to that
23  particular parking space, then no.
24      Q.   Let me ask a better question, and that's
25  actually a fair answer.  What you're talking about again

Page 59

1   is the parking space near the leasing office because
2   that's a public accommodation, right?
3       A.   Yes.
4       Q.   Let's limit it to the parking space where
5   Mr. Aguilar intended to park that was being painted and
6   then the parking space where he actually parked at the
7   time of the incident.  Okay?
8       A.   Okay.
9       Q.   Do you agree with me that the defendant,
10  Alliance Residential, was not required to comply with the
11  ADA or the Texas Accessibility Standards as far as those
12  two parking spaces are concerned?
13      A.   That's correct.
14      Q.   Do you agree with me that the identification of
15  accessible spaces was not required under the ADA?
16      A.   Are we still talking about limiting those two
17  parking spaces?
18      Q.   Yes, sir.
19      A.   Then, yes, that's correct.
20      Q.   Do you agree with me that the Fair Housing Act
21  does not address maintenance of parking spaces?
22      A.   I would say generally that's correct.
23      Q.   Do you agree with me that even though the ADA
24  didn't apply to those two parking spaces, the one where
25  he intended to park and the one where he actually parked,

Page 60

1   that the ADA nonetheless still allows isolated or
2   temporary interruptions in service or access?
3       A.   I may have to have you repeat that question, but
4   going back to your previous one just to clarify my
5   answer, as far as maintenance, do they address how the
6   maintenance is done or when?  No.  But part of providing
7   an accessibility component between the parking spaces is
8   maintaining them.  So, you can't just provide it on day
9   one and never do anything for the rest of the time
10  because essentially that -- it essentially goes away
11  because of lack of maintenance.  So, is there maintenance
12  required, yes, but it doesn't go into detail about how it
13  should be done.
14      Q.   Do you agree with me that even though the ADA
15  didn't apply to the parking space where he intended to
16  park on the day of the incident or the parking space
17  where he actually parked, that the ADA nonetheless still
18  allows isolated or temporary interruptions in service or
19  access?
20      A.   Again, I assume you're talking about from a
21  statutory standpoint as far as application, but there can
22  be temporary interruption in -- in service as long as
23  it's done reasonably.
24      Q.   Do you agree with me that in connection with
25  Mr. Aguilar's accident, that there was no violation of

Page 61

1   the ADA or the Texas Accessibility Standards by Alliance
2   Residential?
3       A.   From a statutory standpoint, I would agree with
4   that, yes.
5            MR. McALPINE:  Can we go off the record for
6   a second?  Well, I need to take a break.
7            MR. HASSINGER:  Absolutely.
8            (Short recess)
9       Q.   Okay.  We're back on the record, Mr. English.
10  I'm still looking at the amended complaint and this is on
11  page five.  It's count three, the violation of the Texas
12  Accessibility Standards.  Do you see that?
13      A.   Yes.
14      Q.   Do you agree with me that there has been no
15  violation of the Texas Accessibility Standards in
16  connection with this accident?
17      A.   If you're speaking from a statutory standpoint,
18  then yes.
19      Q.   And you've dealt with a lot of premises
20  liability cases, true?
21      A.   Yes.
22      Q.   Would you agree with me that there was no defect
23  in the premises that caused Mr. Aguilar's accident?
24           MR. McALPINE:  Object to the form.
25      A.   I don't agree with that.



Page 62

1    Q.  In your opinion where do you offer any opinion
2  whatsoever in your report that we've attached as Exhibit
3  1 that there was a defect in the premises?
4    A.  I don't typically use the term defect.  So,
5  likely it doesn't use that term in there.  But I did
6  outline my opinions relative to what I thought was
7  lacking or wrong with the premises.
8    Q.  For example, in paragraph or -- paragraph three
9  or opinion and conclusion three on page five of your
10  report, that's where you talk about the Americans with
11  Disabilities Act or ADA and the Texas Accessibility
12  Standards, true?
13    A.  Among other things, yes.
14    Q.  And you opined that "... other than installing
15  the handicap reserved signage, Alliance Residential
16  failed to provide a space that complies with the safe
17  design" of ... accessible parking space -- "of a
18  accessible parking space as published within the
19  Americans with Disabilities Act - Standards for
20  Accessible Design, the Texas Accessibility Standards, or
21  ANSI A117.1 - Accessible and Usable Buildings and
22  Facilities."  Did I read that correctly?
23    A.  Yes.
24    Q.  But we now know as we've covered in this
25  deposition that the parking spaces at issue in this case

Page 63

1  did not have to comply with the ADA, Texas Accessibility
2  Standards, or ANSI, true?
3    A.  True from a statutory standpoint relative to the
4  ADA and the Texas Accessibility Standards, but ANSI
5  A117.1 is enforceable through the Fair Housing Act.
6    Q.  And ANSI A117.1, Accessible and Usable Buildings
7  and Facilities says what?
8    A.  Well, it says a lot of things.  Are you speaking
9  of relative to parking?
10    Q.  Relative to the reason that you cited it in your
11  report.
12    A.  Well, one, it speaks to the requirement for an
13  access aisle, not only a 96-inch wide or 8-foot parking
14  space, but also in combination with that also required is
15  a minimum 60-inch wide access aisle relative to the
16  accessible parking space as far as that requirement.  And
17  that's also outlined in the Fair Housing Act.
18    Q.  So, a 60-inch access aisle?
19    A.  Yes.
20    Q.  That's the reason that you cited ANSI A117.1 in
21  connection with this case?
22    A.  That's correct.
23    Q.  The lack of an access aisle that's 60 inches
24  wide had nothing to do with Mr. Aguilar's accident, true?
25    A.  I disagree.

Page 64

1    Q.  And the reason you disagree is because the
2  parking space that he decided to park in didn't have an
3  access aisle, right?
4        MR. McALPINE:  Object to the form.
5    A.  Well, none of the handicapped parking spaces I
6  viewed had access aisles except for the one at the
7  leasing office.
8    Q.  You only viewed the two.
9    A.  There are three in that area.
10    Q.  Or three.  Yes?
11    A.  That's correct.
12    Q.  You viewed three?
13    A.  In that area, yes.
14    Q.  And you don't know whether the -- whether there
15  were other handicapped parking spaces available for
16  Mr. Aguilar to use on the day of this incident, do you?
17    A.  Uh, there were none for his building.
18    Q.  Because the one for his building was being
19  painted at the time.
20    A.  Right.  And my understanding based on his
21  testimony is that the only -- that there were none other
22  available.
23    Q.  That's not what he said in his deposition.
24    A.  It is.
25    Q.  Where is it?

Page 65

1    A.  (Witness reading.)  On page 30 speaking --
2  answering whether there was a handicapped parking space
3  available, he says, "I believe it was taken.  ...
4  Because if it had been available, I believe I would have
5  parked there rather than ..." a "regular one because I
6  had done that before," is what he answered.  I don't know
7  if you want me to keep reading, but that's where I'm
8  basing my information from.
9    Q.  Yeah, you didn't read the rest of it?
10    A.  Yes.  You want me to continue?
11    Q.  No, I'm asking whether before you just made that
12  statement under oath a minute ago, whether you had
13  actually read the rest of his testimony.
14    A.  I read his testimony, yes.
15    Q.  And you read the part of his testimony on page
16  30 where I asked him this question, "You're saying you
17  believe you would have, but is it fair to say that you
18  don't know whether that one was available or not?"  And
19  he answered, "I don't know."
20    A.  Right.  It was his recollection three years
21  after the incident, but he also -- I can't ignore what he
22  had on page 30 in the same sentence.
23    Q.  It's not the same sentence.  It's a different
24  question.
25    A.  It's speaking on the same topic.



Page 66

1    Q. Do you agree with me that he ultimately
2  testified that he didn't know whether another parking
3  space was available or not?
4    A. I'm not disagreeing with that, but he also
5  testified as I mentioned on page 30 that he believed it
6  was taken and gave the reason why, but at his
7  recollection three years after the fact he can't
8  remember for sure. That's how I read all -- all of it on
9  that line of questioning.
10    Q. Okay. So, if there was another handicapped
11  parking space available for him to use, do you agree with
12  me that that's significant in connection with this case?
13    A. It depends on what space was available.
14    Q. Let's assume that the space that was available
15  was the one by the leasing office. Do you agree that
16  that's a significant fact?
17    A. Uh, yes, in the fact that that would be an
18  alternative for him to park there, although he also
19  testified that generally that's not -- tenants were not
20  supposed to park there, although he had before when his
21  space was not available.
22    Q. And he doesn't recall whether the other
23  handicapped parking space was available, too, either,
24  does he?
25    A. Well, I mean his testimony -- we already

Page 67

1  reviewed what his testimony was, but it wouldn't matter
2  relative to access aisle because that didn't have an
3  access aisle either. So, it was not compliant as well.
4    Q. But the access aisle didn't cause him to fall,
5  did it?
6    A. I disagree.
7    Q. Because again he parked in a space that he chose
8  to park in that didn't have an access aisle, right?
9    MR. McALPINE: Object to the form.
10    A. Because based on the evidence likely there was
11  not an alternative, a viable alternative available.
12    Q. Based on what evidence there likely was not a
13  viable alternative available?
14    A. His testimony and also just the -- the physical
15  availability at the parking space. There was only one
16  parking space that was actually of proper design and that
17  was at the leasing office, which his understanding is
18  that tenants were not supposed to use even though he had
19  in the past because other ones were not available, but
20  there was only one in the entire facility of proper
21  design that I viewed, or other ones I viewed only that
22  one was the proper design.
23    Q. And you're basing that opinion on his testimony
24  that he believes he would have parked in another one, but
25  doesn't recall whether it was available or not?

Page 68

1    MR. McALPINE: Object to the form.
2    A. I mean I read the testimony that I was basing my
3  opinion on. So, yes, the fact that he believes it was
4  taken because otherwise he would have parked there as he
5  had done in the past, but I agree he says he doesn't have
6  a -- three years later he doesn't recall specifically.
7    Q. And you also read his testimony where he said
8  that he just simply looked over to the side and saw the
9  first available parking spot and parked there?
10    A. Well, that's true, but it happened so that that
11  one at the leasing office was in that same area. He
12  would have passed it before he passed the other one.
13    Q. He would have -- he would have passed the other
14  handicapped parking space near the leasing office before
15  he passed which parking space?
16    A. The one that he normally parks in or the one
17  that he ultimately parked in. As he entered the
18  facility, you first -- or you first pass the leasing
19  office before you get to the two parking spaces, the one
20  that he normally parked in (indicating) that's marked as
21  handicapped, and the one that he ultimately parked in
22  (indicating). So, he would have already passed it.
23    Q. And where is the third available handicapped
24  parking space?
25    A. About 73 feet down further. That would have

Page 69

1  been on his right. So, he hadn't got to that one yet.
2    Q. And never did, did he?
3    A. I don't know other than the fact that -- I have
4  no evidence that he went that far, but I don't know.
5  That's a good distance down.
6    Q. Do you agree with me that if the handicapped
7  parking space that he normally parked in was being
8  painted or wasn't available for some reason, then he
9  should have tried to park in another handicapped parking
10  space before simply looking to his left and parking where
11  he did?
12    A. Well, in my opinion the only safe parking space
13  in that area is the one at the leasing office. The one
14  that he was normally parked in was not safe for a person
15  with a disability nor the one further down was safe
16  because neither one of them had an access aisle, which is
17  a very important component and a required component for
18  an accessible parking space.
19    Q. How many years had he parked in the parking
20  space that he was intending to park in on the day of the
21  incident?
22    A. Well, he'd lived in the apartment complex almost
23  10 years.
24    Q. And how many times did he park in that parking
25  space?



Page 70

1     A.  I mean he estimated hundreds, but I don't think
2  anybody has a specific number of times.
3     Q.  And how many times did he fall while using that
4  parking space where he normally parked?
5     A.  To my knowledge, I'm not aware of any.
6     Q.  So, the fact that that parking space had no
7  access aisle never played a role in any accidents with
8  respect to Mr. Aguilar in the past, true?
9     A.  Not to my knowledge, but it would be a
10  significant risk just waiting for the right circumstances
11  to occur.
12     Q.  And if Mr. Aguilar had actually parked in one of
13  the other available handicapped parking spaces, then we
14  wouldn't be here today.  Do you agree with that?
15     A.  No.  Again, without having an access aisle, it
16  is noncompliant with any accessibility standards relative
17  to parking, whether you're looking at the ADA, the Texas
18  Accessibility Standards, or the ANSI A117 under the Fair
19  Housing Act.  It's noncompliant with any of those and so
20  there's an unreasonable risk associated with that parking
21  space whether an accident occurs or not.  And so,
22  therefore, if an accident had occurred even in the
23  parking space that he normally parked in, I would still
24  be critical because it didn't have an access aisle and
25  that's a significant design feature that it was missing.

Page 71

1     Q.  As far as ANSI is concerned?
2     A.  Well, of all of the standards that I've
3  mentioned I mean 'cause all those are what I considered
4  good practice or industry standards relative to the safe
5  design of accessible features, whether it be parking
6  ramps, water fountains, whatever it may be, doorways.
7  So, those are all authoritative standards of care.  And
8  really ANSI and ADA lead the way as far as the research.
9  Texas Accessibility normally just takes whatever the ADA
10  publishes and puts it in their standards.
11     Q.  And those are for handicapped parking spaces.
12  Yes?
13     A.  As far as the standards themselves?
14     Q.  Yes.
15     A.  Well, that's one component within those
16  standards.  They've applied to a lot of different areas.
17     Q.  And he didn't park in a handicapped parking
18  space on the day of this accident, right?
19     A.  That's correct.
20     Q.  And the parking space that he parked in wasn't
21  required to have an access aisle with 60-inches wide, was
22  it?
23     A.  That's true.
24     Q.  Let's talk about your opinions starting with
25  number one.  You write that "Alliance Residential knew

Page 72

1  or ... should have known of their responsibility to
2  exercise reasonable care to establish, monitor, and
3  maintain their commercial multi-family residential
4  premises free of hazards likely to cause serious
5  physical" injury -- "harm to tenants, guests,
6  employees ... and "other persons."  Did I read that
7  correctly?
8     A.  As far as that portion of one, yes.
9     Q.  And what was the hazard in connection with
10  Mr. Aguilar's accident, the curb in the nonhandicapped
11  parking space?
12     A.  Well, I stepped a little bit further back than
13  that (indicating) to the degree that they -- in my
14  opinion they did not provide a adequate accommodation for
15  a known disabled tenant at their facility which
16  ultimately led to the space that nearest his apartment
17  unit that was generally designated by signage at least as
18  an accessible parking space being unavailable for his use
19  which ultimately led for him to park in the parking space
20  that he did which was unsafe given his disability.
21     Q.  Alliance Residential didn't provide an
22  accommodation for him as far as a parking space is
23  concerned that he could use.  Is that your testimony?
24     A.  For that specific tenant, that's correct.
25     Q.  For that specific tenant in the sense of having

Page 73

1  a reserved sign up saying Gustavo Aguilar on it?
2     A.  It doesn't have to say his name, but as far as
3  having a -- if you're providing accommodations for a
4  specific tenant because of his disability, then to have a
5  reserved space for that tenant, whether it be based on
6  the apartment unit or however -- there are different ways
7  you can do the signage, but to reserve it for that
8  tenant, because otherwise if it's just a general
9  accessible space, anybody can park there that comes in
10  that has proper tags, whether it be a visitor, tenant
11  from anywhere in the facility, and then Mr. Aguilar is
12  left just as he was to this day without a place to park
13  by his assigned apartment unit.  So, that's where --
14     Q.  He never had an assigned parking space.
15     A.  That's correct.  That's my complaint.  I said
16  his assigned apartment unit.
17     Q.  He never had an assigned parking space at this
18  complex, true?
19     A.  That's correct.
20     Q.  And there's no statute or standard that required
21  Alliance Residential to provide him with an assigned
22  parking space, correct?
23        MR. McALPINE:  Object to the form.
24     A.  From a statutory standpoint, that's correct.
25     Q.  And you don't have any evidence that the parking



Page 74

1  space that he usually parked in was a specific
2  accommodation for Mr. Aguilar, do you?
3          MR. McALPINE:  Object to the form.
4      A.  Well, he -- it was known of his disability.  He
5  was a long-term tenant.  So, either it was just a major
6  coincidence that his apartment unit was right by that
7  parking space or it was done intentionally.  Hopefully,
8  it was done intentionally out of good faith by the
9  apartment complex either to provide the space or provide
10  a unit near a space for handicaps.
11     Q.  My question was you don't have any evidence that
12  Alliance Residential provided a specific accommodation to
13  Mr. Aguilar in particular as far as that parking space is
14  concerned, do you?
15     A.  Well, that's true, but they should have if they
16  didn't.
17     Q.  But there was a parking space there available
18  for him to use near his unit when he needed to use it,
19  true?
20     A.  No.
21     Q.  Because it was being painted at the moment that
22  he drove up?
23     A.  Well, on that occasion it was because it was
24  being painted.  On other occasions it's because other
25  people were parked there.

Page 75

1      Q.  And --
2      A.  So, it's not always available for him to
3  utilize.
4      Q.  And he testified in his deposition that when it
5  wasn't available in the past, that he had used other
6  handicapped parking spaces on multiple occasions, true?
7      A.  Yes.
8      Q.  And that was safe practice and a reasonable
9  thing for him to do.  Yes?
10     A.  In my opinion, no.
11     Q.  Okay.  So, what standard or statute required
12  Alliance Residential to have more than one handicapped
13  parking space in front of his unit?
14     A.  There's not a statute or a standard from that
15  standpoint that requires them where somebody's going to
16  come in and fine the apartment complex for not doing it.
17  It's more from just an ordinary care, good practice
18  standpoint of accommodating your tenants at your
19  particular complex.
20     Q.  So, there was no legal requirement for them to
21  do that whatsoever.
22         MR. McALPINE:  Object to the form.
23     A.  Well, by doing that, you mean providing
24  additional parking spaces at that particular building?
25     Q.  Yes.

Page 76

1      A.  By legal meaning an enforceable requirement,
2  then that's correct.
3      Q.  How long was the contractor painting the parking
4  space that Mr. Aguilar was going to park in on the day of
5  the incident?
6      A.  As far as the total time he had spent doing
7  that, I don't have information on that other than
8  information provided in the incident report that said he
9  had about 10 minutes left.
10     Q.  You don't have any other information besides
11  that whatsoever.  You don't know whether he had 10
12  seconds left, 5 minutes left or 10 minutes left.
13     A.  I would say based on the fact that the photographs
14  that were provided show it only half painted, that it
15  would be more than 10 seconds, but more specifically
16  other than the 10 minutes mentioned in the incident
17  report, no, I don't have information how long it would --
18  specifically how long it would take him to paint the
19  remaining half of the symbol and also to get his
20  equipment out of the way.  I can't give you a specific
21  amount of time other than the apartment complex
22  estimating in their incident report 10 minutes.
23     Q.  And there's no statute or standard that
24  prevented Alliance Residential, the defendant in this
25  case, from performing temporary maintenance to that

Page 77

1  particular parking space in the form of painting, true?
2          MR. McALPINE:  Object to the form.
3      A.  That's true.
4      Q.  Your opinion number two in your report on page
5  five, you write that to fulfill -- "In order to fulfill
6  such responsibility, Alliance Residential knew or should
7  have known that it is necessary to establish and
8  implement a proper safety program to identify, evaluate,
9  and correct hazards with the reasonable potential to
10  cause serious injury."  Did I read that correctly?
11     A.  The first sentence of number two, yes.
12     Q.  Do you know whether Alliance Residential had a
13  safety program in any respect?
14     A.  Only based on the documents I've been provided,
15  yes, they had some safety program.
16     Q.  Okay.  What was it?
17     A.  Well, I mean it covered several different acts.
18  I mean did it have -- are you speaking more specifically
19  to providing accessible parking or are you just saying
20  generally?
21     Q.  I don't know what you're saying 'cause I'm
22  reading opinion number two in your report and it just
23  vaguely says that they knew or should have known that it
24  was necessary to establish and implement a proper safety
25  program.  But you don't say anything more in connection



Page 78

1   with what a proper safety program would have been, should
2   have been, or that they failed to do.
3       A. Well, I disagree with your assessment of my
4   report because the following sentence outlined what it
5   should be. And then the following paragraph is more
6   specific to Alliance Residential's specific Fair Housing
7   policy and in my opinion that they failed to comply with.
8       Q. And that's the paragraph in section two or
9   opinion number two that "... 'Alliance Residential will
10  make every attempt to accommodate a disabled resident.'"
11  Did I read that correctly?
12      A. Yes.
13      Q. And how did they not do that in this case?
14      A. Well, by multiple ways. One, they did not give
15  him a specific accommodation that would be available to
16  him at all times, meaning a specific spot assigned to
17  him.
18      Q. Okay. Let me stop you there 'cause you continue
19  on in that same sentence 'cause you're quoting from it,
20  from the Fair Housing policy that "' ... Requests from a
21  disabled resident, such as a reserved parking space near
22  his or her apartment home, should be accommodated as soon
23  as possible.'" Did I read that correctly?
24      A. Yes.
25      Q. You don't have any evidence that Mr. Aguilar

Page 79

1   made a request for a reserved parking space, do you?
2       A. I don't have information one way or the other at
3   this time.
4       Q. And in connection with your opinion number two
5   concerning hazards, the only hazard that you've
6   identified that played any role in Mr. Aguilar's accident
7   is the curb in the parking space that he decided to park
8   in, correct?
9           MR. McALPINE: Object to the form.
10      A. Uh, no, I disagree with that. I list out a
11  number of issues in my report involving, one, the lack of
12  an assigned space specifically available to Mr. Aguilar;
13  of the space that he frequently utilized, it being of
14  improper design without an access aisle; the fact that
15  their knowledge that he commonly and most often utilized
16  that space due to his disability and the location of his
17  apartment unit, failed to inform him that they were going
18  to be performing maintenance so that either he could make
19  proper plans or they could make proper plans and when
20  they performed that maintenance. So, essentially to
21  inform their tenant with a known disability who they knew
22  parked in that space and relied on that space that they
23  were going to be taking it out of service in my opinion
24  is a serious problem. And then also providing him a
25  alternative while that space is out of service if they're

Page 80

1   not going to schedule it during a time when it's -- like
2   when he's at work, when he's not needing it, or another
3   planned time with their tenant's schedule.
4       Q. Let's talk about these. The lack of an assigned
5   space. There's nothing as far as statute or standard is
6   concerned that required Alliance Residential to provide
7   him an assigned space, true?
8           MR. McALPINE: Object to form.
9       A. Well, it depends on from what perspective. From
10  ADA and TAS, that's correct. By their own policies it
11  says "'... such as a reserved parking space near his or
12  her apartment home ...'"
13      Q. No, you left out the first part of the sentence,
14  Mr. English. The sentence says, and it's in your report,
15  "'... Requests from a disabled resident ...'"
16      A. That's true.
17      Q. Why did you leave that out?
18      A. Well, 'cause at this time I don't know what
19  requests were there, but regardless of whether requests
20  were made, they knew that he was a disabled resident. He
21  had lived there for 10 years and based on their own
22  documents, it seems like there's no question that they
23  knew of his disability and knew that he relied on that
24  parking space near his residence.
25      Q. And this is my question. Okay? There's no

Page 81

1   statute or standard that required Alliance Residential to
2   provide him with an assigned parking space, true?
3           MR. McALPINE: Object to the form.
4       A. If you're talking about some entity that would
5   come in and fine them or make them do it, then that is
6   correct.
7       Q. And you don't have any evidence that he
8   requested a reserved parking space near his or her
9   apartment, do you?
10          MR. McALPINE: Object to the form.
11      A. Not at this time.
12      Q. And there's nothing as far as a statute or a
13  standard that required Alliance Residential
14  if there was a -- if there was temporary maintenance
15  being performed to notify Mr. Aguilar that that was being
16  done, correct?
17          MR. McALPINE: Object to form.
18      A. Again, are you speaking from a statutory
19  standpoint where you're meaning they could be fined or
20  forced to do it?
21      Q. I'm talking about any statute whatsoever.
22      A. Not -- there's not a requirement meaning that
23  they're going to be forced to do that or that they're in
24  violation where they're going to be fined, that's
25  correct, but from a -- from a good safety standpoint as a



Page 82

1   premises owner of an apartment complex to notify their
2   tenant who they know relies upon such a space, I think
3   that's industry and good practice.
4       Q.  But there's no requirement legally for them to
5   do that, correct?
6           MR. McALPINE:  Object to the form.
7       A.  All I can speak -- I can't speak legally.  I'm
8   not an attorney.  But from a standpoint of my knowledge
9   of somebody coming in there and forcing them to do that
10  or fining them in some form or fashion, then no.
11      Q.  And there's no requirement from a statutory or
12  standard standpoint that for them, Alliance Residential,
13  to have informed him that the parking space was going to
14  be painted on the day of the incident, was there?
15          MR. McALPINE:  Object to the form.
16      A.  Just so I'm clear, is that somehow different
17  than what your prior question was?  I just want to make
18  sure I'm answering it correctly.
19      Q.  The question I'm asking you now, there's no
20  statute or standard that required Alliance Residential to
21  inform Mr. Aguilar that they were going to be painting
22  his parking space or the parking space that he intended
23  to use on the day of the incident, is there?
24          MR. McALPINE:  Object to the form.
25      A.  As I understand your question, that's true.

Page 83

1   There's no entity that would require them or force them
2   to do that or fine them for not doing it.
3       Q.  And there's no statute or standard that required
4   Alliance Residential to mark some alternative parking
5   space specifically for him because the one he was going
6   to use was being painted.
7           MR. McALPINE:  Object to the form.
8       Q.  True?
9       A.  As far as requiring that, then that's correct.
10  That's in my opinion just good practice to comply with
11  their own policy.
12      Q.  Good practice according to you, but you can't
13  cite a standard, a publication, or a statute in support
14  of your opinion, correct?
15      A.  I don't agree with that, but I -- you're
16  speaking -- there's two different ways to look at this.
17  One is from a regulatory meaning that some entity,
18  governmental entity has the power to come in there and
19  force them to do something or will require them to do
20  something or fine them for not doing it.  There's another
21  aspect.  What's required of a good premises owner to
22  accommodate a disabled tenant at their facility so that
23  he can be safe while using and on their premises.  So,
24  there's two different things.  And I've agreed with you a
25  hundred times that there's no statutory requirement that

Page 84

1   some entity is going to come in there and force them to
2   provide an assigned space or force them to inform him
3   they're having maintenance, but in my opinion that's good
4   safe practice under these circumstances as a premises
5   owner with a disabled tenant at their facility.
6       Q.  And your opinion is based on what standard,
7   treatise, or publication?
8       A.  Well, it's -- I mean it's based on a number of
9   things, one, the Fair Housing Act as far as accommodating
10  residents.  And I agree that there's not specific
11  requirements just like building codes don't cover
12  everything in the built environment.  Everything in this
13  building is not addressed in the building code, but yet
14  there's established good safe practices that are done
15  even though it may not be in the building codes.  And as
16  far as a multifamily apartment premises as far as good
17  safe practice when you're accommodating a disabled
18  resident for their safety, not everything may be
19  published in detail in every -- in the Texas
20  Accessibility Standards, the ADA, or even the Fair
21  Housing Act, but yet it's still safe practice and good
22  practice for that industry in those circumstances.
23          So, yes, that's the reason to -- I speak in
24  number two about having a safety program to identify
25  hazards on your premises under the circumstances,

Page 85

1   establish policies to put in place so that way you can
2   have a safe premises for all your tenants whether they're
3   disabled or not.  And so that's kind of what number two
4   talks about.  It goes beyond (indicating) just what's
5   required by governmental entities as far as safe
6   practice.  And so I'm speaking in terms of both.
7       Q.  Okay.  I understand what you're saying.  You're
8   saying there's no law that requires them to do it,
9   there's no statute that requires them to do it despite
10  you citing the statutes and the standards in your report,
11  but that it's just a good safe thing for them to do,
12  right?
13      A.  Well, I cite the standards because they failed.
14  Even what they provided was not safe because that -- or I
15  cite the standards as an example and as good practice
16  relative to the safe design providing parking for
17  disabled people.  So, that's how I'm utilizing that, not
18  from a statutory standpoint.
19      Q.  And I'm -- my question was tell me a standard, a
20  publication, or a treatise that says it's safe practice
21  for Mr. Aguilar to have been informed that a handicapped
22  parking space was being temporarily taken out of use
23  because it was being painted.
24      A.  Again, that's -- it's not discussed in the
25  references that I've spoken of.



Page 86

1    Q.  Okay.  So, there are none.
2    A.  As far as --
3         MR. McALPINE:  Objection, form.
4    A.  As far as you're speaking of in that specific
5    detail in these documents, then no.
6    Q.  And in none of the publications that you've
7    referenced as an attachment to your report, it's not --
8    it's in none of those either, right?
9    A.  As far as requiring them to inform him of doing
10   maintenance --
11   Q.  Yes.
12   A.  -- on the parking spot?
13   Q.  Yes.
14   A.  That's correct.
15   Q.  Or requiring Alliance Residential to provide
16   another specific parking space for him because the one he
17   was using was being painted when they had others
18   available at the time.
19        MR. McALPINE:  Object to the form.
20   A.  Well, I would say that your last part of that
21   question when others were available at the time is an
22   assumption on your part.
23   Q.  When others could have been available at the
24   time.
25   A.  But there's no evidence that others were

Page 87

1    available at the time.
2    Q.  There's no evidence that others weren't
3    available either.
4         MR. McALPINE:  Object to the side bar.
5    A.  Well, I disagree --
6    Q.  Yes.
7    A.  -- 'cause there is some evidence from Mr.
8    Aguilar's testimony that others were not available 'cause
9    otherwise he said he would have used them.
10   Q.  But then he said he didn't know.
11   A.  Well, that's correct, but he said that he didn't
12   remember two years later, but you can't negate his other
13   testimony or ignore it.
14   Q.  You also write in your report in opinion number
15   four that "... Alliance ... failed to properly install
16   signage to reserve the space specifically for their
17   tenant, Mr. Aguilar, such as," quote, Reserved Handicap
18   Parking - Apartment 12108 only, unquote.  Did I read that
19   correctly?
20   A.  As far as the portion that you read, yes.
21   Q.  There's no statute or standard, no publication
22   or treatise that you can cite to us to support that
23   requirement, true?
24   A.  No.  That's based on good practice and the
25   practice I've seen in place at other apartment complexes,

Page 88

1    and also partially on their own policy.
2    Q.  Based on a request by him, which you don't have
3    any evidence of, right?
4    A.  In my opinion it doesn't matter whether he
5    requested it.  They had knowledge of his disability.  So,
6    they should be wanting to supply -- accommodate him
7    regardless of whether he makes a specific written request
8    or not.
9    Q.  And he said that he had been at that apartment
10   complex for 10 years and had only parked in other
11   handicapped parking spaces, what, 10 to 15 times?
12   A.  I think he said up to 20.  That was his
13   estimate.
14   Q.  So, if that's true, then there was no reason to
15   have to provide any other handicapped parking space
16   specifically for him, correct?
17   A.  Well, except for the fact that 1 of those 20
18   times led to him being paralyzed.
19   Q.  Well, no, it led to him deciding to park in a
20   nonhandicapped parking space when others could have been
21   available, right?
22   A.  Well, that's a bit -- I'd say that's a major
23   assumption when their evidence states that if one was
24   available, he would have utilized it.
25   Q.  Did you ever at any point ask the lawyer, the

Page 89

1    only human being you spoke to in connection with your
2    report, to talk to Mr. Aguilar?
3    A.  Not at this time, no.
4    Q.  You didn't?  Not at this time.  Before you
5    issued your report, did you ever ask the lawyer to talk
6    to Mr. Aguilar about what actually happened?
7    A.  Uh, not that I recall, but I don't recall all of
8    our conversations.
9    Q.  And there's no standard, statute, publication,
10   or treatise that provides a temporary alternative
11   reserved space was required for Mr. Aguilar since the
12   parking space on the date of the incident was being
13   painted, correct?
14   A.  Not in those specific terms, no.
15   Q.  There's no statute or standard, treatise or
16   publication that you can cite to us or the court where a
17   temporary alternative reserved space for Mr. Aguilar was
18   required because the handicapped parking space on the
19   date of the accident was being painted, happened?
20   A.  I'm sorry, you may have to repeat that question.
21   Q.  Let me repeat it again.  Is there any standard,
22   publication, treatise, or statute that you can cite that
23   required a temporary alternative reserved space be
24   provided to Mr. Aguilar when the parking space on the
25   date of the incident was being painted?



Page 90

1    A. Not --
2    Q. Or because the parking space on the date of the
3  incident was being painted.
4    A. Not by statute, no.
5    Q. Or standard?
6    A. Not specifically, no.
7    Q. Or treatise?
8    A. I will say that the documents that you're
9  referencing that I have referenced are relative to
10  general handicapped parking spaces for the general
11  public, not a specific accommodation for a specific
12  tenant. So, we have a little bit different circumstances
13  than what those standards were written. So, again just
14  like building codes, they may not cover every detail.
15  So, therefore, that's the importance of having a safety
16  program to identify hazards, evaluate them, and make
17  proper choices for the safety of the people who are
18  utilizing your premises. So, again not everything's
19  going to be written in the standards. Sometimes you
20  actually have to think beyond them.
21    Q. And there's no treatise or publication that you
22  can cite to us that provides when a parking space, a
23  handicapped parking space is being painted, the apartment
24  complex must provide a temporary alternative reserved
25  space for the tenant.

Page 91

1    A. That's correct. Unless it will be out of
2  service for an extended period of time.
3    Q. And then you write in opinion number six that
4  "... Alliance Residential failed to meet the standard of
5  care necessary to provide a reasonably safe handicap
6  parking accommodation for the disabled tenant ..." Did I
7  read that correctly?
8    A. As discussed within this report, that's correct.
9    Q. And the standard of care is not from a statute,
10  any ANSI standard or other standard, publication or
11  treatise, right?
12    A. I disagree with that statement. Part of it is
13  and part of it is not.
14    Q. What part is?
15    A. The specific requirements for a safe accessible
16  parking space.
17    Q. You're talking about the 60-inch access aisle?
18    A. Yes.
19    Q. Which didn't cause him to fall on the day of the
20  accident, right?
21    MR. McALPINE: Object to form.
22    A. I disagree with that.
23    Q. The lack of a 60-inch access aisle didn't cause
24  Mr. Aguilar to fall, did it?
25    MR. McALPINE: Object to the form.

Page 92

1    A. In my opinion that is a causative factor.
2    Q. A 60-inch access aisle wasn't required in the
3  nonhandicapped parking space where he decided to park,
4  correct?
5    MR. McALPINE: Object to the form.
6    A. Well, there's more than one causative factor. I
7  mean the first causative factor is the fact that the --
8  they didn't provide a parking space for him that had an
9  access aisle, period. The one they did provide was not
10  available which led to him parking where he did. That
11  did not have adequate space for him to exit his vehicle
12  with a walker which ultimately led to him falling and
13  becoming injured. So, again, they all tie in as far as
14  being positive factors of his particular fall.
15    Q. But none of it ties in if there were in fact
16  other handicapped parking spaces available for him on the
17  day of the incident, right?
18    A. Well, again, the ones I viewed there was only
19  one that actually had an access aisle which was one that
20  tenants were not supposed to use and that was at the
21  leasing office. So, he would not have been in any better
22  situation other than not having to deal with the curb if
23  he had parked in the one if it was available that was
24  further down at a different building.
25    Q. So, he was in a much better situation because

Page 93

1  there would have been no curb, right?
2    A. That would have been a safer situation than what
3  he was at the time, but in my opinion it still was not
4  safe because it didn't have an access aisle.
5    Q. I'm going to ask you if you would identify these
6  for me. We have some photographs that were produced to
7  us. These are Aguilar 203 through 205, Aguilar 319, and
8  then a stack of photographs that have no Bates numbers.
9  So we can break these down for us, of the stack that have
10  no Bates numbers photographs that you took?
11    MR. McALPINE: Can I see these real quick?
12    THE WITNESS: (Witness complies.)
13    Q. And these were provided to us in connection with
14  the subpoena.
15    MR. McALPINE: Thank you. Here you go.
16    A. All right. This stack that you handed me
17  appears to be the photographs that I took during my
18  inspection.
19    MR. HASSINGER: Okay. If we could attach
20  those as -- all of those as Exhibit 5?
21    (Whereupon, Exhibit No. 5 was marked.)
22    Q. I'll show you another stack of colored
23  photographs. Are these additional photos you took during
24  your inspection?
25    A. They appear to be photographs I took, but



MAGNA

LEGAL SERVICES

Page 94

1  whether they're duplicates or additional to what was
2  marked as three, I don't -- I'm not sure.
3      Q.  It's marked as five.  Why don't you --
4      A.  Oh, five, I'm sorry.
5      Q.  -- just include them all.
6          MR. HASSINGER:  Is that okay, Kiernan, one
7  packet, all of those as Exhibit 5?
8      Q.  The first one in Exhibit 5, which parking space
9  is this (pointing)?
10     A.  That is the parking space in front of or
11 generally serving the leasing office.
12         MR. HASSINGER:  Can we just number them at
13 the bottom here?
14         MR. McALPINE:  Be my guest.
15     Q.  It's numbered at the bottom.  There's 1 through
16 28.  Number 3 of Exhibit 5, which parking space is this
17 (pointing)?
18     A.  That is the parking space nearest his particular
19 apartment unit that my understanding is he normally
20 parked in.
21     Q.  And this is, uh, number nine.  What parking
22 space is this, this handicapped parking space
23 (indicating)?
24     A.  In the nearest view in the photograph, it would
25 be the one that was also shown in whatever that previous

Page 95

1  number, number three is.  It's the one that's nearest his
2  apartment unit.
3      Q.  And then No. 11 (indicating)?
4      A.  That's the same parking space.
5      Q.  Number 15 (indicating)?
6      A.  Uh, it's focusing on the parking space that I
7  understood that he parked in at the time of the incident
8  that would be across the driveway from the parking --
9  from the space that we just discussed in the previous
10 photographs.
11     Q.  And No. 16 (indicating), that's the handicapped
12 parking space?
13     A.  Yes.  That camera view is directed more toward
14 the handicapped parking space at the leasing office.
15     Q.  So, if we were to look at photograph No. 16, to
16 the right of the photograph is where he actually parked
17 (pointing).  Yes?
18     A.  Yes.
19     Q.  And his testimony is that he saw the gentleman
20 painting the parking space, the handicapped parking space
21 when he drove in which would have -- which would be to
22 the right (pointing) or the bottom of this photograph
23 (pointing), photograph 16.  Yes?
24     A.  Yes, it would be to the bottom in that
25 photograph.

Page 96

1      Q.  Out of view (pointing).
2      A.  Yes.
3      Q.  And his testimony was that he simply looked to
4  the left and decided to park in this parking space at the
5  top right (pointing) of this photograph because it was
6  available.  Yes?
7          MR. McALPINE:  Object to the form.
8      A.  He said he did look to the left and the parking
9  space to the left, but as far as all of his testimony,
10 I -- I can't regurgitate that.
11     Q.  His testimony was that he simply looked to the
12 left, saw that parking space available, and decided to
13 park there, true?
14     A.  I don't know if that's an accurate -- accurate
15 reflection of all of his testimony, but in a general
16 sense that's what ultimately happened in he did park
17 there.
18     Q.  You read his testimony where he's said that he
19 didn't have a conversation with the painting contractor
20 in any fashion?
21     A.  Yes.
22     Q.  You read his testimony where he said he never
23 even rolled down his window to speak to the painting
24 contractor?
25     A.  I read all of his testimony.  I didn't commit it

Page 97

1  to memory.  I know that he said he didn't speak to him.
2  I don't recall specifically about the window aspect of
3  it.
4      Q.  And the painting contractor never told him where
5  to park, did he?
6          MR. McALPINE:  Object to the form.
7      A.  Well, he -- I mean his testimony is that he did
8  not talk to him.  So, I would say that's correct.
9      Q.  He testified on pages 28 to 29 that when he
10 pulled in and saw the space he wanted to park in was
11 being painted, he looked over to his left and saw that
12 one was available.  So, he decided to park there.  Do you
13 see that?
14         MR. McALPINE:  What's the page and line?
15     Q.  Pages 28 and 29.  Do you see that, Mr. English?
16     A.  I see where you're reading from, yes.
17     Q.  Okay.  And the -- if we're again looking at No.
18 16 to Exhibit 5, where he parked is in the top right
19 (pointing) and another handicapped parking space is to
20 the left here (pointing) by the leasing office, correct?
21     A.  Yes.
22     Q.  Okay.  I'm going to finish up, Mr. English.  One
23 other thing.  In connection with the documents that you
24 gave us, you have a, uh, a sketch that shows some
25 measurements that you took; is that right?



Page 98

1    A. Yes.
2         MR. HASSINGER:  If you'd attach that as
3    Exhibit 6?
4    Q. Is this it (indicating)?
5    A. I think that's the second page to it.
6    Q. Okay.  It's two pages.
7    A. Yes.
8    Q. Do you have any photographs whatsoever that show
9    the tape measure you used and the actual measurements
10   that you took?
11        (Whereupon, Exhibit No. 6 was marked.)
12   A. The majority of these measurements, if not all
13   of them, were not used with a traditional tape measure.
14   It was a digital distance tool.
15   Q. And is that one that you roll on the ground or
16   you shoot from point to point?
17   A. It's -- you shoot it from point to point.  It's
18   laser.
19   Q. What's it called?
20   A. I have two of them and I believe I used the
21   Bosch.  I don't know if I have the model number committed
22   to memory, but I can get that information, but it's a
23   distance measurer.  I could probably find it on the web.
24   Q. So, if you wanted to measure the parking space
25   where he actually parked, how do you physically -- how

Page 99

1    did you physically do that with that tool that you have
2    or you were using?
3    A. Uh, his foot -- which parking space were you
4    referring?  Either?
5    Q. Any of them?
6    A. Well, as far as the width, I measured from the
7    interior (indicating) of the line --
8    Q. Can I interrupt you on purpose?  I'm talking
9    about physically how did you do that?  Are there things
10   you lay down and shoot from point to point?
11   A. It could be depending on if there's something --
12   like I could use -- if I'm getting the width, I can use
13   the curb as the end point.  So, that would be one.  If
14   there's not, then I have a little tool that I can sit
15   down like a little tripod (indicating) that I would use
16   that as the measurement.
17   Q. What did you do?
18   A. I used the curb for some of the measurements and
19   other of the measurements I used my little tripod tool to
20   get it.
21   Q. So, if we're looking at Exhibit 6, what are the
22   spaces here (pointing)?  Can you identify these for us?
23   If we go to the top left, what space is that (pointing)?
24   A. That's actually indicating the width of the
25   access aisle from the curb.  The crosshatch area is the

Page 100

1    access aisle.
2    Q. In connection with what space?
3    A. Oh, the, uh -- in front of the -- the one
4    nearest the leasing office, the access aisle for the
5    handicapped parking at the leasing office.
6    Q. And then this that says 16 feet here, what is
7    that?
8    A. The distance across what I refer to as a parking
9    lot island or the grassy area between the space that he
10   ultimately parked in and then the access aisle for the
11   handicapped parking space of the leasing office.
12   Q. And then this one in the top right is the space
13   he actually parked in (pointing)?
14   A. Yes.
15   Q. That's not measured?
16   A. It actually is.  I had started writing
17   measurements on a different piece of paper and then I
18   switched to my book.  And so the -- that space (pointing)
19   was -- I measured from the line as 91 and 9/16th's
20   inches.  The line itself is four inches.  So, I should
21   have added even to that.  It is a mistake in my report.
22   I should have added two inches 'cause it should be to the
23   centerline of the, uh, actual marked line.
24   Q. What are you referring to?
25   A. What am I referring to?

Page 101

1    Q. Right now.  To those notes?
2    A. Those handwritten notes, yes.
3    Q. We didn't receive those.  Did you give those,
4    produce those to us?
5    A. Uh, I'm not sure.  If I didn't, it was
6    oversight.  I intended to.
7    Q. Can I see --
8    A. Sure.
9    Q. -- those if you don't mind?
10   A. (Witness complies.)  You know, I meant to
11   transfer those on these other graphical or graphic paper
12   note, but I guess I failed to do that when I returned to
13   the office.
14   Q. It says:  From SI:.  What's SI?
15   A. Let me -- let me see how I have it.
16        MR. McALPINE:  You know --
17   A. Oh --
18        MR. McALPINE:  I'm sorry.  Go ahead.
19   A. SI stands for site inspection.
20        MR. McALPINE:  Let me go ahead and copy that
21   before we label it.
22        MR. HASSINGER:  I'm not going to label it,
23   the original.
24        MR. McALPINE:  Well, I'm just going to give
25   you a copy.



Page 102

1    Q.  Reserve HC space (pointing), what is that?
2    A.  Let me look -- can I look at that real quickly?
3  Uh, that is -- would be -- I'm referring to the one that
4  he normally would park in that's nearest his apartment
5  unit.
6    Q.  What's HC?
7    A.  A short acronym for handicapped.
8    Q.  And you have the width as seven feet, eight
9  inches.
10   A.  Yes.
11   Q.  How much is seven feet, eight inches?
12   A.  Ninety-two inches.
13   Q.  That's the space that he normally parked in?
14   A.  Wait, I'm sorry.  Let me -- let me make sure I'm
15  looking at it.  Yes, that's correct.
16   Q.  And you measured it as being 92 inches?
17   A.  Yes, from the interior edge of the white line to
18  the curb.  And that's also measured in approximately the
19  area where an individual would be entering and exiting
20  their vehicle.
21   Q.  And that should be another measurement you're
22  saying?
23   A.  Well, to get the full width I should have added
24  another two inches 'cause there was a four-inch wide line
25  to get to the centerline.  So, it technically would be 94

Page 103

1  inches is what I would consider the full width of that
2  parking space.
3    Q.  And then you have space where parked 7 feet 7
4  and 9/16th's inches which equals 91 and 9/16th's inches;
5  is that right?
6    A.  Yes.
7    Q.  Is that an accurate measurement?
8    A.  Yes.
9    Q.  Have you looked at Mr. DiNicola's
10  measurements --
11   A.  Yes.
12   Q.  -- where he actually lays down a tape measure?
13   A.  Yes.
14   Q.  Do you disagree with any of his measurements?
15   A.  Well, from what aspect, that his tool's not
16  right or as far as the location that he measured or what
17  aspect?
18   Q.  Any aspect that he's not measuring properly in
19  some or that the measurements are wrong.
20   A.  Uh, yes, I do disagree with his measurements.
21   Q.  Okay.  We're going to talk about it in a second.
22  You then have ANSI, ADA, TAS required width 96 inches,
23  access aisle 60 inches, and then HUD, Housing and Urban
24  Development; is that right?
25   A.  Yes.

Page 104

1        MR. HASSINGER:  Can we make a copy of this
2  and attach this as Exhibit 7?
3        (Whereupon, Exhibit No. 7 was marked.)
4    Q.  Do you have any other notes or anything else
5  that you didn't give to us in connection with the
6  subpoena that we issued?
7    A.  Well, I thought I had provided everything.  If I
8  didn't provide those, then I guess it was oversight, but
9  apparently you have other inspection notes.  I think
10  that's the only handwritten items I have.
11   Q.  Do you have any other inspection notes?
12   A.  No, I don't.  Those are the only two things.
13   Q.  Mr. DiNicola in his report writes that the
14  accessible space was 86 -- 97 inches wide, 8 feet 1 inch
15  wide.  Do you see that?
16   A.  Yes.
17   Q.  Do you disagree with that measurement?
18   A.  Uh, well, as far as the 97 inches, yes, because
19  that's to the far end of the line (indicating).  So, for
20  example, if I was going to be measuring the adjacent
21  parking spot and if I went to the exterior of the line,
22  then I'm essentially counting four inches twice.  So, it
23  should really be to the centerline 'cause half of that
24  line is the adjacent space.  I don't know if that makes
25  sense.

Page 105

1    Q.  I understand what you're saying, but what tells
2  you as far as the standard is concerned or a statute that
3  you're supposed to measure to the middle of the white
4  line and not the edge?
5    A.  Okay.  Then what edge do you measure it to?  I
6  guess I would have to use what would be good practice and
7  that would be to the centerline.
8    Q.  I'm just asking you is there a statute or a
9  standard that tells you, Mr. English, only measure to the
10  middle of the white line as far as measuring the width of
11  a parking space is concerned and measuring the width of a
12  parking space?
13   A.  It doesn't specify, but it wouldn't be -- it
14  wouldn't make sense because, for example, in some
15  situations you may have a parking space and an access
16  aisle that's shared by another accessible parking space
17  on the other side of the access aisle.  So, by measuring
18  according to Mr. DiNicola's method, you would be
19  essentially adding an extra eight inches to that space
20  that doesn't really exist because you're measuring the
21  four-inch line twice.  So, you're not -- you don't really
22  have 96, 60, and 96 because you measured 8 inches twice.
23   Q.  He has on page six of his -- and I understand
24  that's your opinion, but you can't tell me that there's a
25  standard or a statute that tells you how to do it, right?

Page 106

1    It's just the way you do it.
2        A.  No, it's -- I guess it's just you can't say
3    there's 60 inches between here and there (indicating) if
4    there's actually not.  And so you have to count the
5    available space.  You can't count 4 inches twice and say,
6    okay, well, I realize I measured 4 inches twice, but it's
7    60 inches if I say that I'm going to duplicate 4 inches.
8    So, it's really just by I guess good engineering is that
9    you don't -- you can't say it's this wide if you count a
10   measurement twice.  So, by in practice and really this is
11   pretty standard in engineering and architecture is that
12   you measure to the centerline, whether it be measuring
13   between studs or whatever.  So -- but it does not specify
14   how to measure it, but I'm just saying from practice in
15   engineering and architecture, it would be to the
16   centerline.
17       Q.  On page six of his report he writes that the
18   space used by Mr. Aguilar was eight feet wide.  Do you
19   disagree with that or agree with it?
20       A.  Well, I disagree to the extent that he measured
21   it differently than what I would and what I think is
22   proper practice.
23       Q.  Because of the centerline issue?
24       A.  Yes, and also the fact that his tape measure is
25   not straight which can affect your measurements, and also

Page 107

1    he measured at the very tail end of the parking space
2    where there is a curb flare.  So -- and it's also not
3    where people exit their cars unless they're exiting from
4    the trunk.  So, I wouldn't consider that to be a very
5    viable place to put a measurement in my opinion, but
6    that's just how I try and conduct my inspections no
7    matter who hires me to do it.
8        Q.  You don't know where his tape measure starts in
9    the bottom left photo, do you?
10       A.  Uh, well, it shows, yeah, on -- you're speaking
11   of page six?  Am I looking at the right photograph?
12       Q.  Yes.
13       A.  Yes, it starts at the curb.
14       Q.  Do you know if it's touching the curb or out
15   further?
16       A.  I mean I can't tell from the photograph.  I
17   would say it's good practice if you're trying to measure
18   the width that it would be touching the curb.
19       Q.  If you can turn with me to page nine of his
20   report.  He writes that the ADA only applies to public
21   and common used spaces available to the general public.
22   Do you agree with that?
23            MR. McALPINE:  Wait, which page?
24            MR. HASSINGER:  Nine.
25            MR. McALPINE:  Sorry.

Page 108

1        A.  Or is he speaking to the, uh -- to apartment
2    complexes or in what sense?  I mean from a statutory
3    standpoint, then, yes, it's to public -- places of public
4    accommodation and commercial facilities.  If that's what
5    he's referring to, then that's correct as far as from a
6    statutory standpoint.
7        Q.  Page 11 of his report at the bottom he writes
8    that the ADA did not require accessible parking spaces
9    to be assigned even when the other parking spaces were
10   assigned.  Do you agree with that?
11       A.  (Witness reading.)  As far as the ADA requiring
12   accessible -- I'm just trying to understand what he's
13   trying to say here and it's not overly clear.  If he's
14   speaking of as far as being assigned to a specific
15   person, then he's correct.  The ADA does not require that
16   if that's what he's trying to say.
17       Q.  On page 14 of his report he writes that
18   residential units were not covered by TAS, the Texas
19   Accessibility Standards.  Do you agree with that?
20       A.  Speaking from a statutory standpoint, that's
21   what we've already discussed, yes.
22       Q.  On page 15 of his report he writes that the Fair
23   Housing Act does not address maintenance and that Section
24   36.211(b) of the ADA states that interruptions due to
25   maintenance were not prohibited.  Do you agree with that?

Page 109

1        A.  Reasonable interruptions, that's correct.
2        Q.  And in performing temporary maintenance to a
3    parking space by painting the parking space is a
4    reasonable interruption, is it not?
5        A.  Uh, well, that's necessary maintenance at times.
6    So, depending on the length of time, then I would say
7    yes.
8        Q.  And you don't have any evidence as far as this
9    case is concerned that the interruption was unreasonable
10   as far as the length of time is concerned, do you?
11       A.  No, but I don't know exactly how much time was
12   spent parking with it in progress.
13       Q.  On page 19 of his report he writes in the middle
14   that the ADA and TAS do not apply to apartment complexes.
15   Apartment complexes are covered by the Fair Housing Act.
16   Do you agree with that?
17       A.  Not fully, no.
18       Q.  Not fully in the sense of you agree that there's
19   no statutory requirement that the apartment complexes
20   apply as far as -- or comply with ADA and TAS except for
21   near the leasing office, for example, where a public
22   accommodation is present.
23       A.  Yes, that's correct relative to ADA and TAS.
24       Q.  On page 20 of his report he writes that the Fair
25   Housing Act has no reference to marking accessible spaces

MAGNA
LEGAL SERVICES

Page 110

1  to individuals. Do you agree with that?
2      A. If he's referring to -- for a specific
3  individual, then that's correct.
4      Q. Do you agree that Mr. Aguilar could have backed
5  into the space he chose to park in to avoid the curb?
6      A. Uh, well, you'd have to ask Mr. Aguilar what he
7  feels comfortable in his abilities with backing into an
8  eight foot wide parking space. I can't answer that. Is
9  it physically possible? Yes. Whether he's comfortable
10 doing that, that's a question for him.
11     Q. Another option he would have had on the day of
12 the incident was to park in a nonhandicapped parking
13 space that had no curb to the left.
14     A. If one was available.
15     Q. That's all I have. Thank you, Mr. English.
16 Appreciate your time today.
17         MR. McALPINE: Can we have a 10-minute
18 break?
19         (Short recess)
20         MR. McALPINE: All right. This is Kiernan
21 McAlpine, attorney for plaintiff, Gustavo Aguilar. I've
22 been advised that Mr. Hassinger has a 3:35 approximately
23 flight and I'm going to ask a fewer number of questions
24 than I had originally intended so that he can make that
25 time commitment.

Page 111

1              EXAMINATION
2  BY MR. McALPINE:
3      Q. All right. Mr. English, good afternoon. It is
4  now afternoon.
5      A. Good afternoon.
6      Q. I wanted to follow up on one question that was
7  asked of you earlier which is about the reasonableness of
8  maintenance and disruptions based on maintenance. Do you
9  think that the disruption to Mr. Aguilar's access to the
10 space that he was accustomed to was reasonable or
11 unreasonable in this case?
12         MR. HASSINGER: Objection, form.
13     A. Given the circumstances in this case, in my
14 opinion it was unreasonable.
15     Q. Why is -- why do you think that it was
16 unreasonable?
17     A. Well, because that was the space that was
18 nearest his unit that he was known to routinely use, and
19 given the environment being a long-term tenant at this
20 apartment complex, one, it would have been very easy to
21 notify him of the maintenance and to schedule around his
22 schedule when he doesn't need the space considering he
23 would teach most of the day or to provide even an
24 adjacent space temporarily by marking it with the cones
25 so that way if it needs to be done when he needs it, it

Page 112

1  would be -- they could -- it would be an available space.
2  So, one, there was reasonable alternatives to just taking
3  the space that he uses out of service. And given the
4  circumstances of his needs, in my opinion I think it's
5  unreasonable.
6      Q. Are those things that you think that Alliance
7  could have done instead?
8      A. Yes.
9      Q. Do you think that if Alliance had done those
10 things, this accident would or would not have happened?
11         MR. HASSINGER: Objection to the form.
12     A. In my opinion it would have prevented this
13 incident or at least had the higher likelihood of
14 preventing the incident.
15     Q. What is the economic burden in your assessment
16 posed to Alliance or similarly situated property managers
17 in asking that they notify their tenants of maintenance
18 such as restriping the parking lot?
19     A. I'd say it's a very minimal burden, if any, and
20 it's commonly done on a wide range of issues, whether it
21 be from maintenance that needs to be done inside their
22 unit, notifying them of that. Many times they have
23 little clips at the doors that they will stick a
24 notification there on the door, or there's multiple ways
25 that the complexes go about notifying tenants. So, I'd

Page 113

1  say it's a common practice and a very limited or minimal
2  effort to do that.
3      Q. In your opinion is the requirement that they
4  notify tenants of disruption to, for instance,
5  accommodated spaces an extension of, for example, the TAS
6  or, excuse me, the Fair Housing Act, an ANSI standard
7  that would require them to provide the accommodated space
8  to begin with?
9          MR. HASSINGER: Objection, norm.
10     Q. I'll withdraw that question. That didn't come
11 out right. Are you aware that Mr. DiNicola's argument is
12 that they don't have to notify their tenants?
13     A. Yes.
14     Q. So, you're aware of that being his contention?
15         MR. HASSINGER: Objection, leading.
16     A. That's what I got out of his report, yes, one of
17 his opinions.
18     Q. As a safety engineer do you find Mr. DiNicola's
19 argument that they aren't expressly required to notify
20 persuasive?
21     A. I do not, no. I differ in that opinion.
22     Q. Why are you not persuaded by that argument?
23     A. Well, I would say it seems to me that
24 Mr. DiNicola is strictly speaking from a statutory
25 requirement standpoint what is somebody forced to do by

MAGNA
LEGAL SERVICES

Page 114

1    some entity or be at risk for being penalized with a fine
2    or whatever it may be if they don't comply with that
3    versus I'm looking at it beyond what's required by
4    statute of what would be good reasonable practice for the
5    safety of their tenant.
6        Q.  Do you think that it would have been reasonable
7    for Alliance to coordinate with Mr. Aguilar --
8        A.  My opinion --
9        Q.  -- in regards to the maintenance?
10       A.  In my opinion, yes.
11       Q.  What's your assessment of the economic burden
12   that this would pose on Alliance?
13       A.  As far as the notification?
14       Q.  Coordination with him.
15           MR. HASSINGER:  Objection, form.
16       A.  I would say virtually none, I mean especially
17   considering his unit is directly across the driveway from
18   the leasing office.
19       Q.  Was it foreseeable that Mr. Aguilar or another
20   tenant could be seriously injured if they did not take
21   these steps?
22           MR. HASSINGER:  Objection, form.
23       A.  In my opinion, yes.
24       Q.  Why was it foreseeable?
25       A.  Well, they -- they had the knowledge of his

Page 115

1    disability, the knowledge that he relied on that space
2    for easy access and safe access into his apartment unit,
3    and had knowledge of -- that it was going to essentially
4    be taken out of service and did not provide reasonable
5    alternatives or even notified Mr. Aguilar of such -- of
6    such condition.
7        Q.  Will you agree or disagree that a reasonably
8    prudent premises owner will not needlessly endanger the
9    public?
10           MR. HASSINGER:  Objection, form.
11       A.  I agree with that statement, yes.
12       Q.  Would you agree or disagree that, generally
13   speaking, the second safest option causes needless
14   danger?
15           MR. HASSINGER:  Objection, form.
16       A.  What are you referring to as the second safest
17   option?
18       Q.  Well, there can be -- is it true that there can
19   be more than one way to -- in any situation there can be
20   more than one course of action that you can take?
21           MR. HASSINGER:  Objection, form.
22       A.  That's true.
23       Q.  An option -- well, let me just move on from
24   there.  How would you characterize your differences of
25   opinion at the most general level with Mr. DiNicola's

Page 116

1    report?
2        A.  From the most general level, I'm looking at it
3    as a -- what a reasonable apartment premises owner and
4    manager should do for the safety of their tenants,
5    regardless of what a particular standard or code or
6    regulation may require them to do, but what would be good
7    prudent practice where Mr. DiNicola is -- generally
8    appears to be strictly looking at what's statutorily
9    required of the apartment complex, meaning that they're
10   forced to do to be in -- to not get in trouble or
11   penalized in some form or fashion is the most general
12   difference between our analysis, you know.  And then
13   beyond that is, you know, as far as just evaluating the
14   handicapped parking space itself, he speaks to the terms
15   of it being 8-foot wide, but yet ignores the information
16   even in his own report that it should also have a 60-inch
17   access aisle.  That's a clear violation of the, uh, of
18   the housing code and also of which references ANSI A117.1
19   and there's also a violation of authoritative references
20   such as ADA and the Texas Accessibility Standards.  You
21   know, it's just from a straightforward difference in our
22   opinions, but I would say that's the most general areas
23   that we differ.
24       Q.  Are you a safety engineer?
25       A.  Yes.

Page 117

1        Q.  How would you characterize safety engineering at
2    the most general level?
3        A.  It's really applying basic scientific and
4    technical principles to eliminate or minimize hazards
5    that may cause injury to people, damage to equipment or
6    facilities, even environmental damage through a basic
7    process of hazard identification, evaluation, and then
8    control.
9        Q.  As a safety engineer are you able to appreciate
10   a distinction between reasonable and prudent practice and
11   minimum statutory requirements?
12       A.  Yes.
13       Q.  Is it your opinion or is it not that minimum
14   statutory requirements in many cases do not rise to the
15   level of reasonable and prudent practice?
16           MR. HASSINGER:  Objection, form, leading.
17       A.  In many circumstances I would agree with that,
18   yes.
19       Q.  Is it important to prevent falls?
20       A.  Yes.
21       Q.  Why is that important?
22       A.  Well, falls themselves are the leading cause of
23   injury, unintentional injury in the United States based
24   on statistics taken in why people go to the emergency
25   room.  It's by far the leading cause, almost double the

Page 118

1    second leading cause, which is automobile accidents,
2    which a lot of people find that surprising.  So, if
3    you're looking about if you're concerned with how do I
4    prevent injury with my facility, well, that's where you
5    want to start because that's going to be more often than
6    not your leading cause of injury.  And by just starting
7    with addressing falls is a critical aspect of any safety
8    program, especially from a premises safety standpoint.
9        Q.  In what type of a circumstance would you
10   incorporate testing into your methodology?
11       A.  Anytime it's required to properly evaluate
12   the -- the circumstances surrounding a particular event.
13   So, for example, if it was a slip and fall, then I might
14   test the surface for coefficient of friction or slip
15   resistance with an instrument.  Other times, say if it
16   was a scaffold collapse, I may -- and there may be a
17   defect with the metal -- I may want to test the strength
18   of the metals, but ...  So, if it's necessary as part of
19   the evaluation, then testing needs to be done, but not
20   all evaluations require testing.  I mean a lot such as in
21   this case, you know, really you take the measurements,
22   document the scene, and that's what you need to evaluate
23   it in comparison to various types of requirements.  So,
24   it does not require any specific more technical testing.
25       Q.  How do you define ergonomics?

Page 119

1        A.  I kind of view human factors of ergonomics as
2    one.  Some people try and separate them, but it's really
3    the study of human characteristics and human tendencies,
4    and based on the understanding of those characteristics
5    and tendencies designing products, facilities, equipment,
6    items that people use and deal with in their environments
7    so that it's safe and efficient for their use.  So, for
8    example, you know, even chairs, you have ergonomic chairs
9    and chairs that aren't so ergonomic.  So, eventually
10   you're taking your knowledge of human characteristics,
11   which is their physical characteristics, their size,
12   their strengths, things like that, and also their
13   tendencies, how they utilize those chairs and you take
14   that and say how can I design a chair that's ergonomic to
15   be able to fit that person and make it comfortable for
16   them to sit in over a -- especially over a period of time
17   so that way it doesn't lead to discomfort or injuries?
18       So, that's like a simple common example of
19   humor factors of ergonomics, but that extends well beyond
20   that into the walking process of figuring how people
21   interact in various environments and what their
22   tendencies are in situations like that.  So, it's really
23   applied very broadly in my words as a safety engineer as
24   something that's very important.
25       Q.  Do principles of ergonomics have anything to say

Page 120

1    about the curb that Mr. Aguilar was standing on?
2              MR. HASSINGER:  Objection, form.
3        A.  Yes.
4        Q.  What are those?
5        A.  Well, I mean just as far as how a curb interacts
6    within a person's environment as they're entering and
7    exiting a car in a parking lot in this situation.  I mean
8    curbs can play a role in other situations from a fall
9    standpoint as well, but to the degree that based on just
10   again human characteristics and environmental
11   characteristics such as the dimensions of people and
12   dimensions of walkers and wheelchairs, how much space is
13   needed for people to safely enter and exit their
14   vehicles.  And really based on that ergonomic type of
15   data that's the reason we have or these situations from a
16   fall standpoint is that -- or these situations developed
17   of providing accessible parking for people with
18   disabilities because they need that extra space based on
19   their -- the requirements to enter and exit their cars
20   with their disabilities or with necessary mobility
21   equipment such as walkers or wheelchairs or whatever it
22   may be.
23       Q.  Does the FHA or ADA or TAS specify what side of
24   a vehicle an access aisle needs to be on?
25       A.  Uh, no, it does not specify the side.  More

Page 121

1    often than not, if there's only one space it's typically
2    on the driver's side.  If there's two -- if there's two
3    handicapped parking spaces, they can share an access
4    aisle.  So, there's definitely figures that are listed in
5    those documents that illustrate that, but as far as where
6    it actually specifies that to be on one side or the
7    other, it does not.
8        Q.  More likely than not, in all probability had
9    there been an access aisle adjacent to the space
10   Mr. Aguilar parked in immediately prior to the incident,
11   where would the access aisle be relative to that space?
12             MR. HASSINGER:  Objection, form.
13       A.  And you're speaking, just to clarify, the space
14   that he ended up parking in?
15       Q.  Correct.
16             MR. HASSINGER:  Objection, form.
17       A.  Given the direction of that head in parking
18   which is the most common direction people pull into
19   parking spaces (indicating) is to go in forward, it would
20   be to the driver's side.  So, it would be to the left.
21       Q.  Is that or is that not where the curb was
22   located that he was standing on?
23       A.  That is in this situation the same side that the
24   curb was on, yes.
25       Q.  Did you perform a site visit in this case?



Page 122

1    A. Yes.
2    Q. Did you physically examine the location of the
3  parking space that he parked in on the day of his injury?
4    A. Yes.
5    Q. In your assessment of that space was the curb he
6  stood on visible to Mr. Aguilar before he pulled in to
7  park there?
8        MR. HASSINGER:  Objection, form.
9    A. I would say it was likely visible, yes.
10   Q. If he could see it in all probability and he got
11  hurt because he stood on the curb, why was it or was it
12  not his fault that he got hurt for parking there?
13        MR. HASSINGER:  Objection, form.
14   A. Well, I don't -- again, as far as being hurt
15  because he stood on the curb, I don't know if I'd
16  necessarily agree with that assessment.  More so, he was
17  standing on the curb because he lacked adequate space to
18  maneuver with -- between the car and the curb leading to
19  him standing on the curb in order to get his walker out
20  and open it up.  So, it's really the lack of space that
21  would force somebody in that situation and even without a
22  disability, even myself, to maybe have to use the curb,
23  but it's -- for a disabled person it's even a more
24  dangerous situation.
25   Q. Why didn't -- would you characterize the danger

Page 123

1  to a disabled person that's posed by the curb and the
2  space between the car and the curb as obvious or
3  nonobvious to a normal person?
4    A. I would say that I wouldn't consider it obvious.
5  A lot of people don't recognize that until they're in the
6  process of actually having to try and maneuver between
7  the car and the curb.  And then so you see an open
8  parking spot and you say, great, there's a parking spot
9  and you may not realize that, wow, when I get out, I
10  don't have much space to maneuver.  So, I would not
11  consider it to be obvious.
12   Q. Well, if it's not obvious to a normal person,
13  why wasn't it Alliance's responsibility to appreciate the
14  danger?
15        MR. HASSINGER:  Objection, form.
16   A. Well, applying it to these particular
17  circumstances, I mean they knew that Mr. Aguilar had a
18  disability and that he relied on even the parking space
19  they gave him that was not adjacent to a curb on the
20  driver's side and, therefore, just enforces their
21  responsibility to provide notification of reasonable
22  alternatives if that space is going to be taken out of
23  service and not going to be available for his use.
24   Q. Why are we looking at ADA standards in this type
25  of a case?

Page 124

1    A. Well, regardless of whether the enforcement
2  aspect of them, they are authoritative documents on the
3  subject matter from an accessibility standpoint, just the
4  same thing as the Texas Accessibility Standards, ANSI
5  A117.1.  A lot of research has gone into the preparation
6  and production of those documents and so they are
7  authoritative resources on the subject matter, regardless
8  of whether some entity has the power to enforce them or
9  not.  That would be a valid and reasonable source anybody
10  interested in that subject would rely upon.
11   Q. Are the ADA standards generally accepted as
12  authoritative in the community of safety engineers
13  regarding the specifications of handicapped
14  accommodation?
15   A. Yes.
16        MR. HASSINGER:  Objection, form.
17   A. Yes.
18   Q. How would you characterize any distinction
19  between the ADA standard applicable to this incident and
20  the FHA and ANSI standard, if any?
21        MR. HASSINGER:  Objection to form.
22   A. As far as characterizing their differences?
23   Q. Correct.
24   A. Well, the FHA --
25        MR. HASSINGER:  Objection, form.

Page 125

1    A. -- essentially references the ANSI for the
2  detailed design requirements for accessible spaces.  ANSI
3  was actually in existence well before ADA was ever
4  developed in the early '90s.  ANSI goes way back.  I
5  think their first publication was 1960.  And so AD -- the
6  Department of Justice actually took a lot of what ANSI
7  had already researched and developed and incorporated
8  that into the creation of the ADA as far as the design
9  guidelines.  And then kind of the Texas Accessibility
10  Standards also kind of did the same thing, either taking
11  that information from ANSI or the ADA.
12        So, essentially on most all provisions
13  they're almost identical as far as what they require.  As
14  far as actual content, there's not a whole lot of
15  difference between the three different resources.
16  They're very consistent.
17   Q. Would you accept the FHA as the code that is
18  quote, unquote code and directly applicable to the area
19  of the lot where the incident occurred?
20   A. Yes, that would be the code that could be
21  enforceable, meaning that if there was a complaint filed,
22  they would investigate and could actually force the
23  apartment to make changes or there could be some
24  penalties relative to that.
25        MR. HASSINGER:  What code?

1      MR. McALPINE:  The FHA.  It's -- that's the
2  quote, unquote code I guess if that makes sense.  It's
3  the code that's -- anyway, I think he answered the
4  question.
5      Q.  All right.  So, after you read Mr. DiNicola's
6  report, did you do any additional research into FHA
7  requirements as applied here?
8      MR. HASSINGER:  Objection.  It's outside the
9  scope of his written report in this case.  He has no
10  right to supplement and offer new opinions.
11      MR. McALPINE:  He has no right?  So, he's
12  not allowed to do any research on the subject matter
13  after he's received another report?
14      MR. HASSINGER:  Not if he's going to issue
15  new opinions.  He can't issue new opinions outside the
16  scope of his report.  That's why we have reports.  We're
17  in federal court.
18      MR. McALPINE:  Let me see the documents.
19      A.  Which ones, these?
20      Q.  These ones.  How would you summarize the
21  findings that you've made regarding what the FHA
22  required?
23      A.  Well, I mean I spoke in my report as far as
24  compliance with ADA, TAS, and then more specifically the
25  ANSI A117.1.  The FHA essentially refers you to the ANSI

1  document or others as the specifications for accessible
2  routes.  And so I guess I just went straight to the
3  source that the FHA references.  I was familiar with the
4  FHA before that.  I did go back to look at a couple of
5  specific provisions that, uh, Mr. DiNicola referenced
6  after -- after I received his report just to verify a
7  couple of things including one of the figures that he,
8  uh, put in his report which in my opinion is incomplete
9  because he didn't put the whole figure in there.
10      Q.  Is it true that the ANSI standards you
11  referenced in your report are incorporated by reference
12  into the FHA requirements including those directly cited
13  in Mr. DiNicola's report?
14      MR. HASSINGER:  Objection, form.
15      A.  Yes.
16      Q.  In your assessment of the parking space
17  Mr. Aguilar used on the date in question -- well,
18  actually let me strike that question.
19      If Mr. Aguilar had access to the space that
20  he ordinarily used on the day in question, is it more
21  probable or less probable that the accident would have
22  happened as it did?
23      MR. HASSINGER:  Objection, form.
24      A.  If he had access to his normal spot, it would be
25  less probable that the accident happened as it ended up

1  happening.
2      Q.  Why is the curb dangerous?
3      MR. HASSINGER:  Objection, form.
4      A.  Uh, primarily because it actually further limits
5  the space that you had to maneuver next to your vehicle
6  by -- and what I mean by that is that if, for example, he
7  had parked in the normal spot he utilizes, not only he
8  has the space that's between the line, the white line and
9  his vehicle, but he also has the spaces on the other side
10  of that white line that's not taken up by a vehicle in an
11  adjacent spot.  So, you'd have more space to maneuver
12  versus in the space that he parked, that white line is
13  essentially the curb.  So, you're now limited and have
14  less space to maneuver when you're -- without having to,
15  you know, deal with the curb, meaning either stand on the
16  curb or in the grass or go back and forth across it,
17  which is a much higher risk.  So, there's essentially no
18  change of elevation if there's not the curb there in a
19  parking space such as what he normally would park in.
20      Q.  Would that curb be dangerous to a regular
21  nonhandicapped person?
22      MR. HASSINGER:  Objection, form.
23      A.  It's a -- it's a higher risk than a parking
24  space without it because again there's -- you're having
25  to deal with an elevated surface and less room to

1  maneuver getting in, but not to the degree that it is for
2  somebody with a mobility impairment or disability.
3      Q.  For someone with mobility impairment is the
4  danger posed by the curb next to the spot Mr. Aguilar
5  parked in reasonable or unreasonable?
6      A.  Unreasonable.
7      Q.  And why is that?
8      MR. HASSINGER:  Objection, form.
9      A.  Well, somebody such as Mr. Aguilar who has a
10  disability or a mobility impairment and even more
11  importantly that has -- that is relying on a mobility
12  aide such as a walker, I would say it's unlikely the
13  walker would even fit between if he unfolded it and set
14  it down between the car and the curb.  So, it's just not
15  enough space to be able to safely exit the vehicle and
16  obtain and actually utilize your mobility aide such as a
17  walker or wheelchair, scooter or whatever it may be to
18  safely exit or enter your car.  So, it's just not enough
19  space in that situation.
20      MR. McALPINE:  Pass the witness.
21      EXAMINATION
22  BY MR. HASSINGER:
23      Q.  Mr. English, Mr. Aguilar never should have
24  parked in the parking space that he parked in on the day
25  of this incident, correct?

MAGNA ►
LEGAL SERVICES

Page 130

1      A.  I agree that it's not a safe parking space for
2  somebody and under those circumstances.
3      Q.  And the only person who made a decision to park
4  in the parking space that he parked in was Mr. Aguilar,
5  true?
6      A.  Uh, I would say in some aspects, yes, but also
7  sometimes decisions are dictated by the environment in
8  which you're presented.  So ...  So, I would say
9  ultimately did he make a decision?  Yes.  But if there
10  were not any viable safer alternatives, then it wasn't
11  really much of a decision to make.
12      Q.  And you don't know whether there were viable
13  safer alternatives or not --
14          MR. McALPINE:  Object to the form.
15      Q.  -- do you?
16          MR. McALPINE:  Object to the form.
17      A.  All I can say is that I would say the evidence
18  points toward that there were not, but I can't go further
19  beyond what the evidence indicates.
20      Q.  You don't know whether other parking spaces were
21  available without a curb to the left of the car, do you?
22      A.  I can't speak to that 'cause I wasn't there at
23  the time.
24      Q.  So, the answer is you don't know.
25      A.  I don't know.

Page 131

1      Q.  You don't know whether other handicapped parking
2  spaces were available for him to use or not, do you?
3          MR. McALPINE:  Object to the form.
4      A.  Based on his historical practice, I would say
5  likely not since he had utilized the one near the leasing
6  office before.  Whether there was others throughout the
7  complex, I don't know one way or the other, but those
8  would be putting him at additional risk due to the length
9  of travel he'd have to go between the parking spaces and
10  his unit.
11      Q.  And if -- and the parking space, the handicapped
12  parking space in front of the leasing office if we are to
13  look at Exhibit 5, photograph 16 (indicating), is
14  diagonally across from the handicapped parking space
15  where he normally parked.
16          MR. McALPINE:  Object to the form.
17      A.  I agree.  Diagonally across the driveway, yes.
18      Q.  So, it's reasonable for Alliance Residential to
19  assume that if the handicapped parking space where he
20  normally parked was being painted for a small period of
21  time, that there's another handicapped parking space
22  (indicating) diagonally across from the one being
23  painted, correct?
24          MR. McALPINE:  Object to form.
25      A.  You're asking it's reasonable for them to assume

Page 132

1  what?
2      Q.  That there's another available handicapped
3  parking space diagonally across from the one he normally
4  parked.
5      A.  Well, I guess physical I mean it is what it is.
6  There is a space there, but it's also Mr. Aguilar
7  testified that it's generally -- that that is not
8  supposed to -- that tenants are not supposed to park
9  there.
10      Q.  There's no sign on that for that parking space
11  that says tenants shall not park there, is there?
12      A.  No.
13      Q.  There's nothing whatsoever as far as that
14  parking space by the leasing office is concerned that
15  whether tenants are told don't park in this parking
16  space, true?
17      A.  Are you speaking from signage?
18      Q.  Yes.
19      A.  I did not see any signage that indicated that,
20  no.
21      Q.  There's not a document you've seen in this case
22  that indicates that tenants aren't supposed to park in
23  this parking space in Exhibit 16, the handicapped parking
24  space in front of the leasing office, is there?
25      A.  That would be through Mr. Aguilar's testimony as

Page 133

1  far as his understanding.  And I will also say from my
2  experience it's not unusual that tenants are discouraged
3  from parking at the leasing office, whether it's the
4  handicapped parking or the other parking, because that's
5  intended for future tenants and visitors.
6      Q.  There's no sign here that says visitor parking
7  only, is there?
8      A.  I did not see any sign as to indicate that, no.
9      Q.  So, back to my question, if the handicapped
10  parking space where he normally parked was being painted
11  temporarily, how long do you think it would take to paint
12  that parking space?
13          MR. McALPINE:  Object to the form.
14      A.  I don't know what methods that were being
15  utilized to do that.  I'm sorry.
16      Q.  How about a paint brush and a roller.  How long
17  would it take to paint that parking space?
18      A.  I can't answer that question.  I can't give you
19  a specific time.
20      Q.  You don't know one way or the other, do you?
21      A.  It depends on -- I mean there's people that have
22  different methods and use different equipment.  So, I --
23  I mean it depends on how it was being done.
24      Q.  Less than an hour?
25      A.  I don't have that information.



Page 134

1      Q.  Less than an hour?
2          MR. McALPINE:  Object to form.
3      A.  I would say for a single parking space likely
4  less than an hour, but I can't give you a specific time.
5      Q.  You don't know whether it would take 10 minutes,
6  30 minutes, or 45 minutes, do you?
7          MR. McALPINE:  Object to the form.
8      A.  In my opinion it would likely take more than 10
9  minutes which I think is also evidenced through the
10 incident reports that he had 10 minutes left and he was
11 only halfway done.
12     Q.  So, 20 minutes at most?
13         MR. McALPINE:  Object to the form.
14     A.  Again, it could vary depending on the methods
15 utilized and who was doing it.  So, I can't tell you how
16 long their particular maintenance person may have taken
17 to do it and I don't --
18     Q.  Based on the evidence that you have in front of
19 you, which is all you have concerning the painting of
20 that parking space, it was going to be 20 minutes in
21 total to paint that parking space, right?
22         MR. McALPINE:  Object to the form.
23     A.  I can't agree or disagree to 20 minutes in total
24 'cause I don't know exactly what methods were being
25 utilized.  I agree it's not going to be an extended

Page 135

1  length of time, but as far as pinning down it's going to
2  take this exact amount of time, I'm not here to testify
3  about that.
4      Q.  I'm here to ask you about it 'cause that's all
5  you have and you have a statement or an incident report
6  that says he was halfway done and had 10 minutes more.
7  So, it would have taken 20 minutes according to the
8  evidence you have and you don't have anything else to the
9  contrary, do you?
10         MR. McALPINE:  Object to the form.
11     A.  Well, as far as being halfway done, that's based
12 on the photographs showing that it's half painted.  The
13 incident report just said he had about 10 minutes left.
14     Q.  Okay.  So, if it's halfway painted and he had 10
15 minutes left, then it would have taken 20 minutes in
16 total to paint the parking space, correct?
17     A.  You could -- that would be one assessment
18 possibly, yes.
19     Q.  And 20 minutes to paint a handicapped parking
20 space is not an unreasonable period of time, is it?
21         MR. McALPINE:  Object to form.
22     A.  It depends on the circumstances.
23     Q.  I'm talking about these circumstances --
24     A.  In my opinion --
25     Q.  -- the circumstances in this particular case

Page 136

1  where 20 minutes to paint a handicapped parking space at
2  this particular apartment complex, that's not
3  unreasonable, is it?
4      A.  Given the circumstances in this case in my
5  opinion, yes, it is.
6      Q.  It was certainly reasonable for Alliance to
7  assume that if that parking space was being painted and
8  it would have only taken 20 minutes, that there's another
9  parking space, another handicapped parking space
10 diagonally across the way, true?
11     A.  Well, there's no evidence in the record that
12 they made that assumption, one, but again, that's a space
13 that they knew Mr. Aguilar relied upon as far as
14 accessing his apartment for almost 10 years and I think
15 it's unreasonable to take that away.  And this is a spot
16 that a known tenant routinely utilized versus just a
17 general spot that is available for anybody.  And so,
18 therefore, without providing any notification that this
19 is going to occur or trying to schedule it when he's not
20 going to be there, which would be very reasonable in my
21 opinion, given the entire circumstances with this
22 situation, I believe even the 20 minutes taking it out of
23 service was unnecessary and unreasonable.
24     Q.  You don't know anything about what Alliance knew
25 or didn't know, do you?

Page 137

1          MR. McALPINE:  Object to the form.
2      A.  Not at this time.  And as I stated in my report
3  if they -- I don't know if they're going to be giving
4  deposition testimony or not, but I reserve the right to
5  alter my opinions based on new evidence that comes to
6  light including additional testimony.
7      Q.  You don't have that right and you didn't ask for
8  any testimony from Alliance before you issued a report,
9  did you?
10         MR. McALPINE:  Object to the form.  He
11 doesn't do that.  I did that.  And this is harassing.
12         MR. HASSINGER:  It's not harassing.
13         MR. McALPINE:  Yes, it is.
14         MR. HASSINGER:  I'm asking him a question
15 about what he asked for before he issued opinions in this
16 case.
17         MR. McALPINE:  It's not his role to do that.
18         MR. HASSINGER:  You never --
19         MR. McALPINE:  It's an improper question.
20         MR. HASSINGER:  You never requested -- your
21 testimony is improper.  If you have an objection, please
22 state it.
23     Q.  You didn't ask that anyone from Alliance be
24 deposed or statements be obtained before you issued your
25 opinions in Exhibit 1, true?

MAGNA▶
LEGAL SERVICES

Page 138

1    MR. McALPINE: Object to the form.
2    A. I did ask if there was any representatives from
3 the apartment complex that had been deposed and the
4 answer was, no, I don't have the right to schedule
5 depositions or even to -- to call the apartment manager
6 on the phone and start asking her questions considering
7 this is in litigation.  So -- but I do have the right as
8 new information becomes available to evaluate that
9 information and alter my opinions, if necessary.  So, I
10 don't know where you get the right -- where you get the
11 opinion that I don't have that right 'cause that is a
12 right as a Professional Engineer for me to alter my
13 opinions as new information becomes available.
14    Q. There's nothing in your report -- well, let me
15 back up.  You didn't believe you had the right to
16 actually contact anyone from Alliance talk to them, but
17 you believe you had the right to actually go over to
18 their location and conduct an inspection without anyone
19 present from Alliance or without Alliance being notified?
20    MR. McALPINE: Object to the form.
21    A. Well, first of all, I didn't know who was or was
22 not going to be there.  I was -- my client scheduled with
23 me to meet at the site at a particular time.  I'm not
24 responsible for scheduling with other parties.  I'm not
25 an attorney in this case.  So, that's what I did.

Page 139

1    Q. There's nothing in your report -- in any of your
2 opinions in your report about any economic burden issues,
3 is there?
4    A. I don't think I used those terms, no.
5    Q. There's nothing in your report as far as your
6 expert opinions are concerned pertaining to anything
7 having to do with a second safest option, is there?
8    A. I did not use those terms, no.
9    Q. There's nothing in your report as far as your
10 expert opinions are concerned pertaining to anything
11 being a needless danger to the public, is there?
12    A. I did not use those terms, no.
13    Q. You're certainly not here today to tell us that
14 Mr. Aguilar has no fault in connection with what
15 happened, are you?
16    MR. McALPINE: Object to the form.
17    A. If asked, I would offer my opinions.
18    Q. Would you agree with me that Mr. Aguilar has a
19 certain level of responsibility with respect to what
20 happened in this case for the decisions that he made?
21    A. Uh, the same as others in those -- presented
22 with those same circumstances, yes.
23    MR. McALPINE: Object to the responsiveness.
24    Q. Okay.  Just for clarity, do you agree with me
25 that Mr. Aguilar is at fault in connection with the

Page 140

1 accident in this case?
2    A. I don't view that he viewed anything -- did
3 anything unreasonable relative to this incident, no.
4    Q. And your expert opinion under oath today is that
5 Mr. Aguilar's decision to park in a nonhandicapped
6 parking space instead of talking to the contractor to ask
7 him how long he was going to be, that that wasn't
8 unreasonable?
9    MR. McALPINE: Object to the form.
10    A. I don't feel like given the situation he was
11 presented that his actions were unreasonable, no.
12    Q. And your testimony today under oath is that
13 Mr. Aguilar wasn't unreasonable for parking in a
14 nonhandicapped parking space with a curb to the left of
15 it when other parking spaces were available.
16    A. Well, first of all, there's no evidence that
17 other parking spaces were available.  And to the
18 contrary, Mr. Aguilar said that it's typical practice if
19 the one he normally parks in is not available is that he
20 would utilize the one at the leasing office and,
21 therefore, likely it was not available on this particular
22 date.
23    Q. Well, that's not what he said.  I know that's
24 what you read into it.
25    MR. McALPINE: Object to the side bar.

Page 141

1    Q. But he ultimately testified that he didn't know,
2 right?
3    MR. McALPINE: Object to the form.
4    A. Yeah, three years after the fact he said he
5 didn't recall.  That's correct.
6    Q. And in your report on page three concerning your
7 synopsis of the injury event, you don't mention anything
8 about the curb causing him to fall, do you?
9    A. He mentioned (witness reading) -- I'd speak to
10 the narrowness of the parking space and the limited space
11 between his vehicle and the curb.  And again, that pretty
12 clear section is speaking to my general understanding of
13 what happened and the conditions present.
14    Q. And to the best of your knowledge, the reason he
15 lost his balance is because he lost his grasp of the
16 walker quote, unquote, lost his grasp of the walker.
17    A. As far as the reasoning why he lost his balance,
18 not necessarily, but as far as my understanding based on
19 the information I had at that time is, yes, he was in the
20 process of trying to remove the walker from his car and
21 lost his grasp.
22    Q. And what you have on page three is that
23 Mr. Aguilar lost his grasp of the walker causing him to
24 lose his balance.  Did I read that correctly?
25    A. Yes.



Page 142

1    Q.  Okay.  Thank you, Mr. English.  I appreciate all
2    your time --
3            MR. McALPINE:  I have one more question.
4    Q.  -- today.  Thank you.  I have no more --
5            MR. McALPINE:  I have one more question.
6    Sorry.  Can I see Exhibit 5?
7            EXAMINATION
8    BY MR. McALPINE:
9    Q.  All right.  Did you take what's been marked as
10   No. 10, photograph 10 from Exhibit 5?
11   A.  Yes.
12   Q.  And do you see a fire hydrant (pointing)?
13   A.  Yes.
14   Q.  And what appears to be directly across from that
15   fire hydrant, is that the space that in your
16   understanding Mr. Aguilar parked in on the day he was
17   injured?
18           MR. HASSINGER:  Objection, leading.
19   A.  Yes.
20   Q.  (Pointing)  The space -- where is the leasing
21   office space located in relation to the space that you
22   just identified?
23   A.  It's across a parking -- what I would refer to
24   as a parking lot island to the left of that space as
25   shown in that photograph.  So, it's to the -- across a

Page 143

1    grassy kind of median area.
2    Q.  Does anything impair one's visibility of the
3    leasing office space from the space we previously
4    identified?
5    A.  Uh, primarily just vegetation.
6    Q.  And in all reasonable probability, he would
7    have -- is it true or not true that he would have been
8    able to see whether there was another vehicle in the
9    leasing office handicapped spot?
10           MR. HASSINGER:  Objection, form.
11   A.  It would be clearly visible.  I mean there's
12   not -- it's a tree, but it's a trunk as far as that
13   aspect of it.  So, yes, it would be visible.
14           MR. McALPINE:  Nothing further.  Reserve
15   remaining questions.
16           MR. HASSINGER:  Thank you very much.
17           THE WITNESS:  You're welcome.
18           MR. HASSINGER:  Thank you.  Sorry to leave
19   quickly, but I appreciate all your time.
20           MR. McALPINE:  Hey, no problem.
21           (Deposition concluded at 2:13 p.m.)
22           (Signature waived.)
23
24
25

Page 144

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION
3
     GUSTAVO AGUILAR        §
4        Plaintiff          §
                            §
5        V.          §   Case No. 4:16-cv-00118
                            §
6    ALLIANCE RESIDENTIAL,  §
     LLC             §
7        Defendant          §
8
             ORAL DEPOSITION
9
                  OF
10
     JASON T. ENGLISH, M.S., CSP, P.E.
11
         FEBRUARY 3, 2017
12
         VOLUME 1 OF 1
13
14   I, Camille A. Bruess, Certified Shorthand
15   Reporter in and for the State of Texas and Registered
16   Professional Reporter, hereby certify to the following:
17       That the witness, JASON T. ENGLISH, M.S., CSP,
18   P.E., was duly sworn by the officer and that the
19   transcript of the oral deposition is a true record of the
20   testimony given by the witness;
21       I further certify that pursuant to FRCP Rule
22   30(f)(1) that the signature of the deponent:
23       _____ was requested by the deponent or a party
24   before the completion of the deposition and _____ was or
25   _____ was not returned within 30 days from date of

Page 145

1    receipt of the transcript.  If returned, the attached
2    Changes and Signature Page contains any changes and the
3    reasons therefor:
4        __X__ was not requested by the deponent or a
5    party before the completion of the deposition.
6        I further certify that I am neither attorney nor
7    counsel for, related to, nor employed by any of the
8    parties in the action in which this testimony was taken.
9        Further, I am not a relative or employee of any
10   attorney of record in this cause, nor am I financially or
11   otherwise interested in the outcome of the action.
12       Subscribed and sworn to on this 13th day of
13   February, 2017.
14
15
16
17
18   _____
     CAMILLE A. BRUESS, RPR, Texas CSR #3824
19   Expiration Date:  12/31/18
     MAGNA LEGAL SERVICES
20    Firm Registration No. 633
     7 Penn Center
21   1635 Market Street, 8th Floor
     Philadelphia, Pennsylvania 19103
22   (866) 624-6221
23
24
25



**A**

**a117** 25:7 50:8
  62:21 63:5,6,20
  70:18 116:18
  124:5 126:25
**abilities** 110:7
**able** 28:17 117:9
  119:15 129:15
  143:8
**abovestyled** 1:17
**absolutely** 61:7
**accept** 125:17
**accepted** 124:11
**access** 48:24 60:2
  60:19 63:13,15,18
  63:23 64:3,6 67:2
  67:3,4,8 69:16
  70:7,15,24 71:21
  79:14 91:17,23
  92:2,9,19 93:4
  99:25 100:1,4,10
  103:23 105:15,17
  111:9 115:2,2
  116:17 120:16,24
  121:3,9,11 127:19
  127:24
**accessibility** 10:22
  11:6 20:5 25:6,11
  25:18 26:16 50:8
  50:21 55:2,25
  56:3 57:19 58:11
  58:16,18,20 59:11
  60:7 61:1,12,15
  62:11,20 63:1,4
  70:16,18 71:9
  84:20 108:19
  116:20 124:3,4
  125:9
**accessible** 20:18,24
  21:21 50:19,22,24
  50:24 51:2,8
  54:14 59:15 62:17
  62:18,20,21 63:6
  63:16 69:18 71:5
  72:18 73:9 77:19

91:15 104:14
  105:16 108:8,12
  109:25 120:17
  125:2 127:1
**accessing** 136:14
**accident** 3:22,23
  53:14 60:25 61:16
  61:23 63:24 70:21
  70:22 71:18 72:10
  79:6 89:19 91:20
  112:10 127:21,25
  140:1
**accidents** 70:7
  118:1
**accommodate**
  78:10 83:22 88:6
**accommodated**
  78:22 113:5,7
**accommodating**
  75:18 84:9,17
**accommodation**
  37:16 41:8,17
  42:13,17 50:3
  52:1,25 58:19
  59:2 72:14,22
  74:2,12 78:15
  90:11 91:6 108:4
  109:22 124:14
**accommodations**
  73:3
**accurate** 96:14,14
  103:7
**accustomed** 111:10
**acronym** 102:7
**act** 17:21 25:1,14
  26:11 50:10 51:21
  52:21 53:22 54:1
  54:18 55:15 59:20
  62:11,19 63:5,17
  70:19 84:9,21
  108:23 109:15,25
  113:6
**acting** 11:14
**action** 115:20 145:8
  145:11
**actions** 140:11

**activities** 55:1
**acts** 77:17
**actual** 23:2 26:24
  48:17 98:9 100:23
  125:14
**ad** 125:5
**ada** 18:6 19:4 20:5
  23:23 24:11 25:7
  25:24 26:12 49:19
  50:4,7,20 51:2,4
  51:12,13 52:8,22
  53:6,13 55:2,25
  56:3,11,16 57:8
  57:10 58:11,15,18
  58:20 59:11,15,23
  60:1,14,17 61:1
  62:11 63:1,4
  70:17 71:8,9
  80:10 84:20
  103:22 107:20
  108:8,11,15,24
  109:14,20,23
  116:20 120:23
  123:24 124:11,19
  125:3,8,11 126:24
**add** 45:5 49:7
**added** 38:22,22
  100:21,22 102:23
**adding** 27:9 105:19
**addition** 27:11
**additional** 75:24
  93:23 94:1 126:6
  131:8 137:6
**address** 5:17,19
  59:21 60:5 108:23
**addressed** 3:14
  84:13
**addressing** 118:7
**adequate** 21:17
  72:14 92:11
  122:17
**adjacent** 3:22
  104:20,24 111:24
  121:9 123:19
  128:11
**administration**

11:2,8
**advise** 29:14
**advised** 52:7
  110:22
**affect** 106:25
**aforementioned**
  56:23
**afs** 13:16 17:22
**afternoon** 111:3,4,5
**ago** 24:1 65:12
**agree** 5:3,5,8,8
  26:12 32:17 35:22
  38:6,7,8 50:9
  52:19,24 55:18,19
  58:9,13 59:9,14
  59:20,23 60:14,24
  61:3,14,22,25
  66:1,11,15 68:5
  69:6 70:14 83:15
  84:10 106:19
  107:22 108:10,19
  108:25 109:16,18
  110:1,4 115:7,11
  115:12 117:17
  122:16 130:1
  131:17 134:23,25
  139:18,24
**agreed** 83:24
**agrees** 5:11
**aguilar** 1:3 4:11,16
  6:9 27:1,13,20,22
  29:4 30:13 35:11
  35:18 41:2 42:5
  42:13,17 43:3
  46:9,15,22,25
  47:4 48:23 52:2
  53:4 56:17 59:5
  64:16 70:8,12
  73:1,11 74:2,13
  76:4 78:25 79:12
  81:15 82:21 85:21
  87:17 89:2,6,11
  89:17,24 91:24
  93:7,7 106:18
  110:4,6,21 114:7
  114:19 115:5

120:1 121:10
  122:6 123:17
  127:17,19 129:4,9
  129:23 130:4
  132:6 136:13
  139:14,18,25
  140:13,18 141:23
  142:16 144:3
**aguilars** 28:5 36:23
  37:13,15 38:9,14
  39:9,19 40:11
  41:14,16 42:21
  43:10 44:11,16,22
  45:9 53:13 60:25
  61:23 63:24 72:10
  79:6 87:8 111:9
  132:25 140:5
**ahead** 101:18,20
**aide** 129:12,16
**aisle** 48:24 63:13,15
  63:18,23 64:3
  67:2,3,4,8 69:16
  70:7,15,24 71:21
  79:14 91:17,23
  92:2,9,19 93:4
  99:25 100:1,4,10
  103:23 105:16,17
  116:17 120:24
  121:4,9,11
**aisles** 64:6 120:16
**al** 13:16
**alice** 17:22
**allegation** 53:20
  54:3,13
**allegedly** 30:16
**alliance** 1:6 4:11,18
  29:16 37:13 38:10
  38:13 39:9,17
  40:9,22 41:14
  48:23 53:8,11
  54:4 58:17 59:10
  61:1 62:15 71:25
  72:21 73:21 74:12
  75:12 76:24 77:6
  77:12 78:6,9 80:6
  81:1,13 82:12,20



83:4 86:15 87:15
91:4 112:6,9,16
114:7,12 131:18
136:6,24 137:8,23
138:16,19,19
144:6
**alliances** 123:13
**allowed** 126:12
**allows** 60:1,18
**alter** 137:5 138:9
138:12
**alteration** 55:1,24
**alternative** 66:18
67:11,11,13 79:25
83:4 89:10,17,23
90:24
**alternatives** 112:2
115:5 123:22
130:10,13
**amended** 55:3,11
56:22 61:10
**american** 26:6
**americans** 17:21
25:1,14 26:11
50:9 51:20 52:20
53:22 54:17 55:14
62:10,19
**amount** 76:21
135:2
**analysis** 3:15
116:12
**ansi** 25:7 50:8
62:21 63:2,4,6,20
70:18 71:1,8
91:10 103:22
113:6 116:18
124:4,20 125:1,2
125:4,6,11 126:25
126:25 127:10
**answer** 6:2 13:13
15:9 22:8,22
28:17 34:4 39:12
58:25 60:5 110:8
130:24 133:18
138:4
**answered** 39:13,14

65:6,19 126:3
**answering** 65:2
82:18
**anybody** 28:13
30:23 70:2 73:9
124:9 136:17
**anytime** 118:11
**anyway** 126:3
**apartment** 19:15
20:7,18,19,22
21:11 23:24 24:9
24:12,13 28:21,25
29:4,6 36:22
37:15 38:17 39:2
39:25 40:3,7,12
40:16 41:3,5,6,17
42:21 43:5,10,17
43:22 44:11,16
45:9 46:10 50:10
51:14,22 52:23
53:11 58:9,21
69:22 72:16 73:6
73:13,16 74:6,9
75:16 76:21 78:22
79:17 80:12 81:9
82:1 84:16 87:18
87:25 88:9 90:23
94:19 95:2 102:4
108:1 109:14,15
109:19 111:20
115:2 116:3,9
125:23 136:2,14
138:3,5
**apartments** 50:12
**apparently** 28:11
37:23 104:9
**appear** 93:25
**appearances** 3:2
**appears** 41:21
93:17 116:8
142:14
**appendix** 3:18 6:22
7:9,22 8:16,23 9:3
9:8,13,13
**applicable** 51:7
56:4,7,8,10

124:19 125:18
**application** 60:21
**applied** 49:20
71:16 119:23
126:7
**applies** 26:12 50:14
50:17 53:3 107:20
**apply** 26:18 49:22
49:23 50:5,10
51:21 52:4,9,22
52:24 56:3 59:24
60:15 109:14,20
**applying** 11:11
117:3 123:16
**appreciate** 110:16
117:9 123:13
142:1 143:19
**approximately**
45:13 49:8 102:18
110:22
**architect** 24:23
**architecture** 25:17
106:11,15
**area** 11:16 12:2,15
19:10,11,14 38:21
43:10,12,12 46:19
64:9,13 68:11
69:13 99:25 100:9
102:19 125:18
143:1
**areas** 10:7,8,15
11:4,10 12:17,18
13:6 25:12 71:16
116:22
**arent** 57:8 113:19
119:9 132:22
**argument** 113:11
113:19,22
**arrange** 30:10
**arranged** 28:22
29:2
**arranging** 29:19
30:9
**arrival** 42:21
**asked** 65:16 111:7
137:15 139:17

**asking** 27:15 40:6
48:9 58:5 65:11
82:19 105:8
112:17 131:25
137:14 138:6
**aspect** 26:22 83:21
97:2 103:15,17,18
118:7 124:2
143:13
**aspects** 26:21 34:25
130:6
**assessment** 47:11
78:3 112:15
114:11 122:5,16
127:16 135:17
**assigned** 37:25
38:16 39:25 40:3
40:12 41:2 73:13
73:14,16,17,21
78:16 79:12 80:4
80:7 81:2 84:2
108:9,10,14
**assist** 22:22
**associated** 70:20
**assume** 43:1 60:20
66:14 131:19,25
136:7
**assumption** 8:1
86:22 88:23
136:12
**attach** 6:24 7:10
9:8 10:2 93:19
98:2 104:2
**attached** 1:25 6:22
8:24 9:24 31:4
35:8 62:2 145:1
**attachment** 3:18
86:7
**attempt** 47:15
78:10
**attempting** 21:1,9
46:25 47:3
**attending** 25:25
**attention** 16:17
18:8
**attorney** 2:6,13

4:15 29:3,18 30:5
82:8 110:21
138:25 145:6,10
**authoritative** 25:8
50:20,23 71:7
116:19 124:2,7,12
**automobile** 118:1
**availability** 67:15
**available** 43:4
46:10,18 64:15,22
65:3,4,18 66:3,11
66:13,14,21,23
67:11,13,19,25
68:9,23 69:8
70:13 74:17 75:2
75:5 78:15 79:12
86:18,21,23 87:1
87:3,8 88:21,24
92:10,16,23 96:6
96:12 97:12 106:5
107:21 110:14
112:1 123:23
130:21 131:2
132:2 136:17
138:8,13 140:15
140:17,19,21
**avoid** 110:5
**aware** 70:5 113:11
113:14

___

**B**

**b** 15:21 16:23 17:23
17:24 108:24
**back** 16:12 21:5
36:8 47:2 60:4
61:9 72:12 125:4
127:4 128:16
133:9 138:15
**backed** 110:4
**backing** 110:7
**backseat** 47:3
**backwards** 47:5
**balance** 47:5
141:15,17,24
**bar** 87:4 140:25
**based** 13:2 15:17



37:11,24 38:24
39:7 40:20 41:20
45:4,14,20 47:13
47:22,25 48:10
64:20 67:10,12
73:5 76:13 77:14
80:21 84:6,8
87:24 88:2 111:8
117:23 119:4
120:9,14,18 131:4
134:18 135:11
137:5 141:18
**basic** 117:3,6
**basically** 41:22
**basing** 48:14 65:8
67:23 68:2
**basis** 4:23,24,25 5:9
5:10
**bates** 93:8,10
**becoming** 92:13
**beginning** 25:4
35:14 52:5
**behalf** 17:15
**believe** 14:1 15:1
24:21 42:5 46:13
52:17 65:3,4,17
98:20 136:22
138:15,17
**believed** 66:5
**believes** 67:24 68:3
**benefit** 6:1
**best** 13:14 17:24
141:14
**better** 19:12 39:12
55:9 58:24 92:21
92:25
**beyond** 11:12 85:4
90:20 114:3
116:13 119:19
130:19
**big** 43:12
**billed** 32:15
**bit** 72:12 88:22
90:12
**blue** 48:10,13
**book** 100:18

**bordered** 46:19
**bosch** 98:21
**bottom** 55:13 94:13
94:15 95:22,24
107:9 108:7
**boulevard** 2:14
**brace** 18:1 19:24
**break** 61:6 93:9
110:18
**brief** 8:11 36:4,13
36:16 37:2
**bring** 34:24
**broadly** 119:23
**broadstone** 28:20
50:11
**bruess** 1:19 4:4
144:14 145:18
**brush** 133:16
**bui** 14:24,25
**building** 11:25
12:13 25:19 45:11
45:25 57:19 64:17
64:18 75:24 84:11
84:13,13,15 90:14
92:24
**buildings** 62:21
63:6
**buildup** 19:5
**built** 84:12
**burden** 112:15,19
114:11 139:2
**burr** 2:14
**business** 13:17,19
17:22 22:5,16
23:6

――――――――――
**C**
**c** 2:1 5:5 54:5,9
56:23 57:2 58:6
**caballero** 17:25
18:24 19:16
**calculations** 27:7
27:10
**call** 49:14 138:5
**called** 4:24 5:10
98:19

**camera** 95:13
**camille** 1:19 4:3
144:14 145:18
**cant** 21:3,4,7 24:7
39:12,21 57:22
58:3 60:8 65:21
66:7 76:20 82:7
83:12 87:12 96:10
105:24 106:2,5,9
107:16 110:8
126:15 130:18,22
133:18,18 134:4
134:15,23
**capacity** 17:8
**car** 19:6,8 21:6,7
31:25 32:1 47:23
48:4,11,13,13
120:7 122:18
123:2,7 129:14,18
130:21 141:20
**care** 71:7 72:2
75:17 91:5,9
**cars** 107:3 120:19
**case** 1:5 4:9,10 6:5
6:12,15,18 8:1
9:17 10:6,13,18
11:18,21,23,24
12:3,7 13:4,17,23
14:7,17,18,20,22
15:3 16:19 17:19
18:10,15 19:23
20:7,9,15,16,20
21:12,15 22:11,18
22:19,21,24 23:23
24:10 27:1,1,12
28:4 29:18,20
30:3,25 31:1,25
32:8 33:20 34:10
35:1,10,16,17,19
38:2 39:4 49:20
50:11 51:17,20
52:21 53:21 54:4
56:16 58:10 62:25
63:21 66:12 76:25
78:13 109:9
111:11,13 118:21

121:25 123:25
126:9 132:21
135:25 136:4
137:16 138:25
139:20 140:1
144:5
**cases** 12:20 13:10
14:11,13 15:6,7
16:2,3 17:7,10
23:1,10 24:19
30:1,8 61:20
117:14
**category** 28:16
**causative** 92:1,6,7
**cause** 1:18 7:20 9:6
37:23 57:14 67:4
71:3 72:4 77:10
77:21 78:18,19
80:18 87:7,8
91:19,23 100:22
102:24 104:23
117:5,22,25 118:1
118:6 130:22
134:24 135:4
138:11 145:10
**caused** 61:23
**causes** 115:13
**causing** 47:5 141:8
141:23
**center** 13:19 19:14
48:20 145:20
**centerline** 49:7,13
100:23 102:25
104:23 105:7
106:12,16,23
**centre** 1:22 2:7 4:7
**certain** 13:6 25:12
34:25 139:19
**certainly** 32:14
136:6 139:13
**certificate** 3:9
**certified** 144:14
**certify** 144:16,21
145:6
**chair** 119:14
**chairs** 119:8,8,9,13

**chance** 40:15
**change** 35:2 39:1,5
128:18
**changed** 35:6
**changes** 56:20
125:23 145:2,2
**characteristics**
119:3,4,10,11
120:10,11
**characterize**
115:24 117:1
122:25 124:18
**characterizing**
124:22
**child** 12:4
**children** 12:8
**choices** 90:17
**chose** 67:7 110:5
**christi** 20:17
**circumstance** 118:9
**circumstances** 13:9
70:10 84:4,22,25
90:12 111:13
112:4 117:17
118:12 123:17
130:2 135:22,23
135:25 136:4,21
139:22
**cite** 83:13 85:13,15
87:22 89:16,22
90:22
**cited** 63:10,20
127:12
**citing** 85:10
**city** 18:1
**civil** 1:24 4:6
**clarify** 28:17 51:24
52:14 60:4 121:13
**clarity** 139:24
**clause** 38:12
**clear** 82:16 108:13
116:17 141:12
**clearly** 143:11
**client** 22:24 30:11
138:22
**clips** 112:23



**close** 31:23 45:14
  47:23 48:19
**closer** 14:15
**closest** 43:17
**code** 11:2,7 25:19
  57:15 84:13 116:5
  116:18 125:17,18
  125:20,25 126:2,3
**codes** 57:19 84:11
  84:15 90:14
**coefficient** 118:14
**coherent** 28:11
**coincidence** 74:6
**collapse** 118:16
**college** 5:20 31:12
**colored** 93:22
**com** 2:10,16
**combination** 63:14
**come** 15:18 27:24
  32:1 75:16 81:5
  83:18 84:1 113:10
**comes** 73:9 137:5
**comfortable** 110:7
  110:9 119:15
**coming** 14:22 21:4
  21:5,5 57:3 82:9
**commercial** 72:3
  108:4
**commit** 96:25
**commitment**
  110:25
**committed** 98:21
**common** 29:24
  107:21 113:1
  119:18 121:18
**commonly** 79:15
  112:20
**community** 124:12
**company** 13:22
**comparison** 118:23
**complaint** 53:21
  54:3,10 55:3
  56:22 61:10 73:15
  125:21
**complete** 33:12
**completion** 144:24

145:5
**complex** 19:15 20:7
  20:18,19,25 21:19
  21:23 22:3 23:24
  24:9,12,13 28:21
  28:25 29:4,6
  36:22 39:3 41:6
  41:11,25 42:21
  43:17 46:4,7
  50:10 51:14,22
  52:23 53:11 58:9
  58:21 69:22 73:18
  74:9 75:16,19
  76:21 82:1 88:10
  90:24 111:20
  116:9 131:7 136:2
  138:3
**complexes** 87:25
  108:2 109:14,15
  109:19 112:25
**compliance** 25:20
  51:13 126:24
**compliant** 67:3
**complies** 7:6 62:16
  93:12 101:10
**comply** 56:11 58:10
  58:17 59:10 63:1
  78:7 83:10 109:20
  114:2
**component** 60:7
  69:17,17 71:15
**components** 50:21
**concerned** 10:13
  52:23 59:12 71:1
  72:23 74:14 80:6
  81:13 105:2,11
  109:9,10 118:3
  132:14 139:6,10
**concerning** 21:15
  24:11 79:5 134:19
  141:6
**concluded** 3:7
  143:21
**concluding** 49:19
**conclusion** 62:9
**conclusions** 33:23

**concrete** 38:23
**condensate** 19:3
**condition** 115:6
**conditions** 141:13
**conduct** 27:2 28:24
  31:15 54:4,14
  56:23 107:6
  138:18
**cones** 111:24
**configured** 21:1
**confirm** 6:19
**conform** 55:2,25
**connection** 9:16
  10:18 11:20,24
  12:12,19 14:3
  17:21 18:7 20:5,6
  27:1 31:1 42:12
  49:18 51:20 53:13
  56:16 60:24 61:16
  63:21 66:12 72:9
  77:25 79:4 89:1
  93:13 97:23 100:2
  104:5 139:14,25
**consider** 11:12
  24:25 25:10 28:15
  103:1 107:4 123:4
  123:11
**considered** 8:17
  51:25 71:3
**considering** 111:22
  114:17 138:6
**consistent** 34:1
  125:16
**construction** 12:12
  54:25 55:24
**consultation** 31:6,9
  33:9
**contact** 138:16
**contacted** 22:21
  51:19
**contains** 51:6 145:2
**contemporaneou...**
  5:4
**content** 49:23
  50:14,18 51:7
  54:11 56:8,9

57:17,24 125:14
**contention** 113:14
**continue** 15:17
  45:12 46:8 65:10
  78:18
**contractor** 76:3
  96:19,24 97:4
  140:6
**contrary** 135:9
  140:18
**control** 117:8
**conver** 51:16
**conversation** 52:15
  52:18 96:19
**conversations**
  46:15 89:8
**converted** 37:14
  38:10,13,18 39:10
  39:17,24 40:9,22
  41:15
**coordinate** 114:7
**coordination**
  114:14
**copied** 35:25
**copy** 8:3,9 55:6
  101:20,25 104:1
**corpus** 20:17
**correct** 6:16 8:10
  9:3 17:12,18
  18:14 21:24 30:24
  31:14 41:1 42:10
  52:3 53:9,19,23
  54:24 56:8,20
  59:13,19,22 63:22
  64:11 71:19 72:24
  73:15,19,22,24
  76:2 77:9 79:8
  80:10 81:6,16,25
  82:5 83:9,14
  86:14 87:11 88:16
  89:13,19 91:1,8
  92:4 97:8,20
  102:15 108:5,15
  109:1,23 110:3
  121:15 124:23
  129:25 131:23

135:16 141:5
**correctly** 62:22
  72:7 77:10 78:11
  78:23 82:18 87:19
  91:7 141:24
**correspondence**
  36:24 43:1
**couldnt** 37:22
  43:24
**counsel** 2:5,11 4:13
  4:20,25 5:10 6:7,8
  13:21 14:8 15:2
  29:16,20 52:7
  145:7
**count** 16:10 55:14
  61:11 106:4,5,9
  18:3,5
**counting** 16:12
  18:4 104:22
**county** 1:23 4:8
**couple** 127:4,7
**course** 6:18 25:15
  25:16 26:1,9
  115:20
**court** 1:1 4:9 6:1
  52:7 89:16 126:17
  144:1
**courtesy** 6:2
**cover** 7:23 84:11
  90:14
**covered** 58:19
  62:24 77:17
  108:18 109:15
**create** 53:18
**created** 37:25
**creating** 19:5
**creation** 125:8
**critical** 70:24 118:7
**crosshatch** 99:25
**crossing** 14:17
**csp** 1:12,15 3:4,18
  5:13 144:10,17
**csr** 1:19 145:18
**curb** 21:2,10 46:19
  46:24 47:1,6,13



47:21,24 48:4
72:10 79:7 92:22
93:1 99:13,18,25
102:18 107:2,13
107:14,18 110:5
110:13 120:1,5
121:21,24 122:5
122:11,15,17,18
122:19,22 123:1,2
123:7,19 128:2,13
128:15,16,18,20
129:4,14 130:21
140:14 141:8,11
**curbs** 120:8
**curriculum** 3:16
**cut** 34:12,21
**cv** 7:1 8:23 9:6,12
26:3,8

**D**

**d** 5:19 15:21 16:23
17:23,24
**damage** 117:5,6
**danger** 115:14
122:25 123:14
129:4 139:11
**dangerous** 122:24
128:2,20
**daspit** 1:21 2:7 4:6
24:20
**daspitlaw** 2:10
**data** 8:16 120:15
**date** 4:2 23:8 49:5
89:12,19,25 90:2
127:17 140:22
144:25 145:19
**dated** 3:14,19,20
**daughter** 27:20
36:23
**day** 1:18 43:24 48:2
55:2 56:17,18
60:8,16 64:16
69:20 71:18 73:12
76:4 82:14,23
91:19 92:17
110:11 111:23

122:3 127:20
129:24 142:16
145:12
**days** 144:25
**deal** 57:18 92:22
119:6 128:15,25
**dealing** 18:21,23,25
**dealt** 61:19
**deceased** 13:16
**decided** 64:2 79:7
92:3 96:4,12
97:12
**deciding** 88:19
**decision** 130:3,9,11
140:5
**decisions** 130:7
139:20
**deemed** 53:12
**defect** 12:14,16
61:22 62:3,4
118:17
**defendant** 1:7,17
2:11 15:8 16:8,15
16:25 17:1,2,6,8
52:21 54:4 56:16
58:17 59:9 76:24
144:7
**defendants** 15:24
23:19 31:24 32:8
33:3 54:13,25
**define** 43:11 118:25
**definitely** 121:4
**definitions** 28:17
**degree** 57:23 72:13
120:9 129:1
**delete** 35:15
**denied** 54:15
**dennys** 17:25
**department** 25:17
125:6
**depend** 12:18
**depending** 35:2
99:11 109:6
134:14
**depends** 12:16 13:8
53:24 56:6 66:13

80:9 133:21,23
135:22
**depo** 9:4
**deponent** 144:22
144:23 145:4
**deposed** 5:21 39:4
137:24 138:3
**deposition** 1:10,15
3:7 4:5 6:11,14
7:2 14:9 17:14
27:25 62:25 64:23
75:4 137:4 143:21
144:8,19,24 145:5
**depositions** 52:13
138:5
**describe** 48:13
**describing** 34:9
36:20
**description** 3:13
**design** 10:22 11:6
25:7,18 26:5,25
50:21,23 51:3,4,8
62:17,20 67:16,21
67:22 70:25 71:5
79:14 85:16
119:14 125:2,8
**designated** 72:17
**designation** 10:15
**designed** 26:20
**designing** 119:5
**designs** 26:24
**despite** 85:9
**detail** 32:12 60:12
84:19 86:5 90:14
**detailed** 125:2
**details** 15:16 21:16
22:23
**determination**
12:10
**developed** 120:16
125:4,7
**development**
103:24
**diagonally** 131:14
131:17,22 132:3
136:10

**diane** 15:24
**dictated** 130:7
**didnt** 6:14 7:20 8:2
8:9 16:11 20:24
21:22 22:5 27:2,5
27:7 31:22 32:24
33:20 34:5 42:7,8
45:4,12 46:4 50:6
52:12 56:11 59:24
60:15 64:2 65:9
66:2 67:2,4,8
70:24 71:17 72:21
74:16 87:10,11
89:4 91:19,23
92:8 93:4 96:19
96:25 97:1 101:3
101:5 104:5,8
113:10 122:25
127:9 136:25
137:7,23 138:15
138:21 141:1,5
**differ** 113:21
116:23
**difference** 28:9
116:12,21 125:15
**differences** 115:24
124:22
**different** 11:4
15:22 22:2 28:7
36:3,12 38:21
49:22 65:23 71:16
73:6 77:17 82:16
83:16,24 90:12
92:24 100:17
125:15 133:22,22
**differently** 106:21
**digital** 98:14
**dimension** 49:3
**dimensions** 27:10
38:20 120:11,12
**dinicola** 104:13
113:24 116:7
127:5
**dinicolas** 103:9
105:18 113:11,18
115:25 126:5

127:13
**direct** 45:5
**directed** 95:13
**direction** 121:17,18
**directly** 51:7
114:17 125:18
127:12 142:14
**disabilities** 17:21
25:1,14 26:11
50:10 51:21 52:21
53:22 54:18 55:15
62:11,19 120:18
120:20
**disability** 37:23
38:16 69:15 72:20
73:4 74:4 79:16
79:21 80:23 88:5
115:1 122:22
123:18 129:2,10
**disabled** 41:7 72:15
78:10,21 80:15,20
83:22 84:5,17
85:3,17 91:6
122:23 123:1
**disagree** 63:25 64:1
67:6 78:3 79:10
87:5 91:12,22
103:14,20 104:17
106:19,20 115:7
115:12 134:23
**disagreeing** 66:4
**disclosures** 33:3
**discomfort** 119:17
**discouraged** 133:2
**discovery** 6:17 7:25
8:9 27:18 33:3,4
36:19 43:2
**discrimination**
54:19,21
**discriminatory**
54:15
**discussed** 36:24
52:17 85:24 91:8
95:9 108:21
**discussion** 8:14,15
**disruption** 111:9



113:4
**disruptions** 111:8
**distance** 45:2,3,20
46:5 69:5 98:14
98:23 100:8
**distinction** 117:10
124:18
**district** 1:1,1 4:9,10
144:1,1
**division** 1:2 4:10
144:2
**document** 36:1
37:10,21 39:22
118:22 127:1
132:21
**documented** 7:22
**documents** 7:24,25
7:25 8:4 33:3
36:19 37:24 39:15
77:14 80:22 86:5
90:8 97:23 121:5
124:2,6 126:18
**doesnt** 6:22 28:14
50:5 52:22 60:12
62:5 66:22 67:25
68:5,6 73:2 88:4
105:13,20 111:22
119:17 137:11
**doing** 51:10 75:16
75:23 76:6 83:2
83:20 86:9 110:10
134:15
**dont** 10:9 14:14,19
14:22 15:15 16:16
19:12 20:12 21:13
21:16 22:8,9,23
23:7 24:16,18,25
26:8 28:11 32:13
34:2 35:20 36:1
37:21 38:2,3 39:2
40:22 41:2,10
42:2,18 45:22
46:6 47:23 48:3
48:16 52:24 54:10
57:5,10,17 58:1,7
58:13 61:25 62:4

64:14 65:6,18,19
69:3,4 70:1 73:25
74:11 76:7,10,11
76:17 77:21,25
78:25 79:2 80:18
81:7 83:15 84:11
88:2 89:7 94:2,3
96:14 97:2 98:21
101:9 104:12,24
105:21 106:9
107:8 109:8,11
113:12 114:2
122:14,15 123:5
123:10 130:12,20
130:24,25 131:1,7
132:15 133:14,20
133:25 134:5,17
134:24 135:8
136:24 137:3,7
138:4,10,11 139:4
140:2,10 141:7
**door** 47:2 112:24
**doors** 112:23
**doorways** 71:6
**double** 117:25
**dr** 18:1
**drain** 19:3
**drainage** 19:2
**draining** 19:3
**drawn** 3:23
**drivers** 46:19 121:2
121:20 123:20
**driveway** 43:5,18
46:3,11 95:8
114:17 131:17
**drove** 29:12 74:22
95:21
**due** 37:12 38:9,14
39:9,18 40:11
41:14 46:23 47:19
79:16 108:24
131:8
**duly** 1:17 5:14
144:18
**duplicate** 106:7
**duplicates** 94:1

| E |
| --- |

**e** 1:12,16 2:1,1 3:4
3:18 5:13 144:10
144:18
**earlier** 15:15 111:7
**early** 125:4
**easy** 111:20 115:2
**economic** 112:15
114:11 139:2
**edge** 102:17 105:4
105:5
**edit** 34:16 35:10,15
**edited** 35:18
**editing** 35:3
**efficient** 119:7
**effort** 113:2
**egress** 25:20
**eight** 11:4 25:3
48:16 102:8,11
105:19 106:18
110:8
**either** 16:15 21:6,9
22:14 23:5 35:13
37:22,24 38:17
39:24 40:8,9 41:8
58:18 66:23 67:3
74:5,9 79:18 86:8
87:3 99:4 125:10
128:15
**elevated** 128:25
**elevation** 128:18
**eliminate** 117:4
**email** 2:10,16 36:24
42:25
**emergency** 117:24
**employed** 145:7
**employee** 145:9
**employees** 72:6
**endanger** 115:8
**ended** 121:14
127:25
**enforce** 124:8
**enforceable** 50:15
51:24 52:3 63:5
76:1 125:21

**enforced** 50:1
52:25
**enforcement** 49:25
50:5,18 52:9,22
53:9,10 54:2 56:7
124:1
**enforces** 123:20
**engineer** 113:18
116:24 117:9
119:23 138:12
**engineering** 10:20
11:1,5 25:16
106:8,11,15 117:1
**engineers** 26:6
124:12
**english** 1:12,15 3:4
3:14,16,18,20 4:5
5:13,19,21 61:9
80:14 97:15,22
105:9 110:15
111:3 129:23
142:1 144:10,17
**enter** 28:24 29:6
32:4 45:25 120:13
120:19 129:18
**entered** 30:4 31:24
68:17
**entering** 11:25
102:19 120:6
**entire** 20:25 21:23
34:3 67:20 136:21
**entities** 85:5
**entity** 49:25 50:16
50:25 51:9 56:13
81:4 83:1,17,18
84:1 114:1 124:8
**entrance** 45:25
46:2
**environment** 84:12
111:19 120:6
130:7
**environmental**
117:6 120:10
**environments**
119:6,21
**equal** 32:25

**equals** 103:4
**equipment** 13:2
76:20 117:5 119:5
120:21 133:22
**equivalent** 57:15
**ergonomic** 119:8,9
119:14 120:14
**ergonomics** 11:2,7
118:25 119:1,19
119:25
**ernest** 13:15,16
17:22
**error** 49:2
**especially** 114:16
118:8 119:16
**essentially** 21:14
22:22 35:4 37:5
60:10,10 79:20
104:22 105:19
115:3 125:1,12
126:25 128:13,17
**establish** 72:2 77:7
77:24 85:1
**established** 84:14
**estate** 13:15
**estimate** 45:2,3,6
88:13
**estimated** 70:1
**estimating** 24:2
44:1 45:20 76:22
**et** 13:16
**evaluate** 11:22
12:25 22:19 23:20
54:19 77:8 90:16
118:11,22 138:8
**evaluated** 17:10
26:23
**evaluating** 23:18
116:13
**evaluation** 11:11
11:13 22:21 35:1
51:8 117:7 118:19
**evaluations** 24:17
34:16 118:20
**event** 3:15 36:5,14
36:16,21 37:3



118:12 141:7
**eventually** 119:9
**everythings** 90:18
**evidence** 38:12,19
    39:8,16 40:20
    41:21,22 42:11
    67:10,12 69:4
    73:25 74:11 78:25
    81:7 86:25 87:2,7
    88:3,23 109:8
    130:17,19 134:18
    135:8 136:11
    137:5 140:16
**evidenced** 134:9
**exact** 23:7 135:2
**exactly** 35:20 37:22
    109:11 134:24
**examination** 3:5,5
    3:6,6 5:15 111:1
    129:21 142:7
**examine** 122:2
**example** 34:7 62:8
    85:15 104:20
    105:14 109:21
    113:5 118:13
    119:8,18 128:6
**excuse** 113:6
**exercise** 72:2
**exhibit** 3:12 6:24
    6:25 7:10,11 8:20
    8:22,24 9:2,5,9,10
    9:11,11,13,24
    10:2,3,4 14:11
    31:5 35:9 62:2
    93:20,21 94:7,8
    94:16 97:18 98:3
    98:11 99:21 104:2
    104:3 131:13
    132:23 137:25
    142:6,10
**exhibits** 8:17
**exist** 105:20
**existence** 125:3
**existing** 37:14
    38:11,13 39:10,17
    39:25 40:3,10,12

40:23 41:10,15
**exit** 92:11 107:3
    120:13,19 129:15
    129:18
**exited** 46:22
**exiting** 102:19
    107:3 120:7
**experience** 133:2
**expert** 6:18 10:6,13
    10:17 11:4,14,20
    11:25 12:5,19
    13:11 20:4 22:4
    22:15 23:2,3,4
    24:11,20,25 25:10
    26:10,17,17 30:1
    38:7 57:5,8 139:6
    139:10 140:4
**expertise** 10:15
    11:11,22 12:2,7
    12:15,17,24,25
    13:3 14:2 17:20
**experts** 29:22
**expiration** 145:19
**expressly** 113:19
**extend** 6:1
**extended** 91:2
    134:25
**extends** 119:19
**extension** 113:5
**extent** 106:20
**exterior** 104:21
**extra** 49:12 105:19
    120:18

---
### F
**f** 144:22
**facilities** 62:22 63:7
    108:4 117:6 119:5
**facility** 67:20 68:18
    72:15 73:11 83:22
    84:5 118:4
**fact** 66:7,16,17 68:3
    69:3 70:6 76:13
    79:14 88:17 92:7
    92:15 106:24
    141:4

**factor** 92:1,6,7
**factors** 11:1,7
    92:14 119:1,19
**failed** 49:12 55:2,25
    62:16 78:2,7
    79:17 85:13 87:15
    91:4 101:12
**failing** 54:14
**fair** 58:25 59:20
    63:5,17 65:17
    70:18 78:6,20
    84:9,20 108:22
    109:15,24 113:6
**faith** 74:8
**fall** 10:21,25 11:5
    13:18,18 15:4
    20:21,23,23 21:8
    23:16 31:15 35:10
    47:5 67:4 70:3
    91:19,24 92:14
    118:13 120:8
    141:8
**falling** 13:25,25
    14:6 28:15 92:12
**falls** 12:4,23,23
    25:5 26:5 117:19
    117:22 118:7
**familiar** 127:3
**far** 8:8,21 10:13
    12:7 13:6,7 17:9
    17:11 22:9,12
    23:7,9 25:15,19
    25:25 28:12 30:11
    34:3,22,24 35:21
    36:20 40:6,19
    41:7 42:15 43:20
    43:21,23 47:11,14
    48:3 50:15 52:22
    53:4,16 54:20,24
    55:23 57:2,10
    58:5 59:11 60:5
    60:21 63:16 69:4
    71:1,8,13 72:8,22
    73:2 74:13 76:6
    80:5 81:12 83:9
    84:9,16,16 85:5

86:2,4,9 87:20
    92:13 96:9 99:6
    103:16 104:18,19
    105:2,10 108:5,11
    108:14 109:8,10
    109:20 114:13
    116:13 117:25
    120:5 121:5
    122:14 124:22
    125:8,13,14
    126:23 132:13
    133:1 135:1,11
    136:13 139:5,9
    141:17,18 143:12
**fashion** 13:3 17:20
    22:15 82:10 96:20
    116:11
**fault** 122:12 139:14
    139:25
**fax** 2:9,16
**feature** 70:25
**features** 71:5
**february** 1:13,18
    4:2 144:11 145:13
**federal** 1:24 4:5
    57:16,20 126:17
**fee** 9:1
**feel** 13:14 22:23
    140:10
**feels** 110:7
**feet** 44:2,4,9,17,23
    45:6,15,17,25
    46:5 68:25 100:6
    102:8,11 103:3
    104:14 106:18
**fell** 11:19 12:13
    21:3,6 30:16
**fewer** 110:23
**fha** 120:23 124:20
    124:24 125:17
    126:1,6,21,25
    127:3,4,12
**field** 10:19 13:2
**figure** 51:12 127:9
**figures** 121:4 127:7
**figuring** 119:20

**file** 7:12,15 37:7,7
    38:12 39:15 48:6
**filed** 125:21
**financially** 145:10
**find** 23:20 37:22
    98:23 113:18
    118:2
**findings** 3:15
    126:21
**fine** 5:12 16:18
    75:16 81:5 83:2
    83:20 114:1
**fined** 53:14 81:19
    81:24
**fining** 82:10
**finish** 5:25 6:2
    33:18,21 97:22
**fire** 142:12,15
**firm** 1:21 2:7 4:6
    24:20 145:20
**first** 5:14 8:19
    16:21 24:22 26:4
    32:4 34:8 46:1
    47:11 51:12,15
    68:9,18,18 77:11
    80:13 92:7 94:8
    125:5 138:21
    140:16
**fit** 119:15 129:13
**fitch** 5:20
**five** 7:17 32:18
    33:23 48:21 61:11
    62:9 77:5 94:3,4
**flare** 107:2
**flight** 110:23
**floor** 2:14 12:24
    145:21
**focusing** 95:6
**follow** 36:9,10
    111:6
**followed** 53:7
**following** 78:4,5
    144:16
**follows** 5:14
**followup** 56:2
**foot** 48:16 99:3


MAGNA
LEGAL SERVICES

110:8
**force** 50:25 51:9
  83:1,19 84:1,2
  122:21 125:22
**forced** 53:18 81:20
  81:23 113:25
  116:10
**forcing** 82:9
**foreseeable** 114:19
  114:24
**form** 3:15 4:22 5:6
  7:19 11:9 13:5
  16:9 17:16 23:3,5
  23:7 24:11,14
  27:8 28:24 29:15
  32:19,23 33:24
  38:5 39:20 41:19
  42:14 44:12,19
  49:21 50:13 51:23
  53:15 54:7,23
  57:1,13 58:4,12
  61:24 64:4 67:9
  68:1 73:23 74:3
  75:22 77:1,2 79:9
  80:8 81:3,10,17
  82:6,10,15,24
  83:7 86:3,19
  91:21,25 92:5
  96:7 97:6 111:12
  112:11 114:15,22
  115:10,15,21
  116:11 117:16
  120:2 121:12,16
  122:8,13 123:15
  124:16,21,25
  127:14,23 128:3
  128:22 129:8
  130:14,16 131:3
  131:16,24 133:13
  134:2,7,13,22
  135:10,21 137:1
  137:10 138:1,20
  139:16 140:9
  141:3 143:10
**format** 36:9,10
**forming** 8:17

**forth** 128:16
**forward** 121:19
**fountains** 71:6
**four** 7:3 14:10,15
  16:3,11 17:13
  20:13 23:11 55:13
  87:15 100:20
  104:22
**fourinch** 49:13
  102:24 105:21
**fouryear** 13:12
**fraction** 29:25
**frcp** 144:21
**free** 72:4
**frequently** 79:13
**friction** 118:14
**front** 7:17 8:5
  19:21 39:15,16
  75:13 94:10 100:3
  131:12 132:24
  134:18
**fulfill** 77:5,5
**full** 102:23 103:1
**fully** 34:22 109:17
  109:18
**further** 5:7,8 43:11
  45:11,12,24 46:4
  46:6 68:25 69:15
  72:12 92:24
  107:15 128:4
  130:18 143:14
  144:21 145:6,9
**future** 133:5

---

**G**

**galloway** 2:13
**gallowayjohnson**
  2:16
**gate** 29:7,8,10 30:4
  31:24
**gates** 46:3
**general** 10:20 11:1
  37:8,11 38:25
  39:5,23 42:23
  73:8 90:10,10
  96:15 107:21

115:25 116:2,11
  116:22 117:2
  136:17 141:12
**generally** 10:19
  37:3,4 58:21
  59:22 66:19 72:17
  77:20 94:11
  115:12 116:7
  124:11 132:7
**gentleman** 95:19
**george** 17:25
**getting** 19:6 37:18
  46:20 99:12 129:1
**give** 22:20,23 37:8
  76:20 78:14 101:3
  101:24 104:5
  133:18 134:4
**given** 17:13 72:20
  111:13,19 112:3
  121:17 136:4,21
  140:10 144:20
**giving** 22:9 137:3
**go** 13:11 16:12 18:4
  21:9 32:5 45:24
  46:2,4 51:1,3
  60:12 61:5 93:15
  99:23 101:18,20
  112:25 117:24
  121:19 127:4
  128:16 130:18
  131:9 138:17
**goes** 9:6 21:11
  34:16 60:10 85:4
  125:4
**going** 4:21 6:24 7:3
  7:10 21:4,5 24:8
  29:15 36:8 50:25
  51:9 53:2 60:4
  75:15 76:4 79:17
  79:23 80:1 81:23
  81:24 82:13,21
  83:5 84:1 90:19
  93:5 97:22 101:22
  101:24 103:21
  104:20 106:7
  110:23 115:3

118:5 123:22,23
  126:14 134:20,25
  135:1 136:19,20
  137:3 138:22
  140:7
**golden** 17:23
**good** 22:9 24:2 69:5
  71:4 74:8 75:17
  81:25 82:3 83:10
  83:12,21 84:3,14
  84:16,21 85:11,15
  87:24 105:6 106:8
  107:17 111:3,5
  114:4 116:6
**governmental**
  49:25 50:16,25
  51:9 83:18 85:5
**graduate** 25:16
**graphic** 1:21
  101:11
**graphical** 101:11
**grasp** 47:4 141:15
  141:16,21,23
**grass** 128:16
**grassy** 46:19 100:9
  143:1
**great** 123:8
**grocery** 11:19
  13:22,25
**ground** 5:23 26:23
  26:24 98:15
**guess** 17:4 18:12
  23:11 49:1 52:13
  101:12 104:8
  105:6 106:2,8
  126:2 127:2 132:5
**guest** 94:14
**guests** 72:5
**guidelines** 55:3,25
  56:3 125:9
**gustavo** 1:3 4:11,16
  73:1 110:21 144:3

---

**H**

**hadnt** 30:22 69:1
**half** 7:16 14:11

15:5 17:19 76:14
  76:19 104:23
  135:12
**halfway** 134:11
  135:6,11,14
**hand** 3:23
**handed** 93:16
**handicap** 37:14
  41:16 43:6 46:11
  62:15 87:17 91:5
**handicapped** 19:7
  21:17 37:25 39:11
  39:18 40:1,10,12
  40:18,23,24 42:4
  43:9,25 44:4,10
  44:17,23 45:1,7
  45:18 48:11 54:14
  64:5,15 65:2
  66:10,23 68:14,21
  68:23 69:6,9
  70:13 71:11,17
  75:6,12 85:21
  88:11,15 89:18
  90:10,23 92:16
  94:22 95:11,14,20
  97:19 100:5,11
  102:7 116:14
  121:3 124:13
  131:1,11,14,19,21
  132:2,23 133:4,9
  135:19 136:1,9
  143:9
**handicaps** 74:10
**handrail** 11:24
**handwritten** 3:25
  36:22 47:16 101:2
  104:10
**happened** 37:9
  68:10 89:6 96:16
  112:10 127:22,25
  139:15,20 141:13
**happening** 128:1
**harassing** 137:11
  137:12
**harm** 72:5
**harris** 1:23 4:8



**hasnt** 35:5
**hassinger** 2:12 3:5
3:6 4:17,17 5:1,12
5:16 8:13 61:7
93:19 94:6,12
98:2 101:22 104:1
107:24 110:22
111:12 112:11
113:9,15 114:15
114:22 115:10,15
115:21 117:16
120:2 121:12,16
122:8,13 123:15
124:16,21,25
125:25 126:8,14
127:14,23 128:3
128:22 129:8,22
137:12,14,18,20
142:18 143:10,16
143:18
**havent** 26:3 39:14
**hazard** 72:9 79:5
117:7
**hazards** 72:4 77:9
79:5 84:25 90:16
117:4
**hc** 102:1,6
**head** 14:1 20:16
21:13 57:4,7 58:6
58:7 121:17
**heading** 11:1 36:7
**headings** 25:6
**hear** 26:10,16
**heb** 13:22
**hed** 69:22 131:9
**hereto** 1:25
**hes** 80:2,2 96:18
103:18 108:5,12
108:13,15,16
110:2,9 126:11,13
126:14 136:19
**hey** 143:20
**high** 11:3
**higher** 112:13
128:17,23
**highlight** 34:25

**hired** 6:5
**hires** 107:7
**historical** 131:4
**home** 51:10 78:22
80:12
**hopefully** 74:7
**host** 25:8
**hotel** 15:25
**hour** 31:13,18,20
31:23 32:14,15
133:24 134:1,4
**hours** 31:5,13 33:2
33:6,10,13
**house** 51:1
**housing** 59:20 63:5
63:17 70:19 78:6
78:20 84:9,21
103:23 108:23
109:15,25 113:6
116:18
**houston** 1:2,22 2:8
4:8,10 19:10
144:2
**hud** 103:23
**human** 11:1,7
30:25 89:1 119:1
119:3,3,10 120:10
**humor** 119:19
**hundred** 83:25
**hundreds** 70:1
**hurt** 122:11,12,14
**hvac** 19:3
**hydrant** 142:12,15

**———————**
**I**
**———————**
**id** 14:14 23:8 32:24
54:11 57:2 88:22
112:19,25 122:15
141:9
**idea** 27:13,22 28:5
57:12
**identical** 125:13
**identification** 59:14
117:7
**identified** 79:6
142:22 143:4

**identify** 4:13 77:8
84:24 90:16 93:5
99:22
**ignore** 65:21 87:13
**ignores** 116:15
**ill** 6:1 16:6 18:4
44:15 93:22
113:10
**illustrate** 121:5
**im** 6:24 7:3,10,16
9:5 10:14,16
11:10 13:13 21:20
22:19,24 24:2
28:11 29:18 30:2
37:6,9 39:23,24
48:2,5,9 51:10
53:2 54:20 57:25
58:1 61:10 65:7
65:11 66:4 70:5
77:21 81:21 82:7
82:16,18,19 85:6
85:17,19 89:20
93:5 94:2,4 97:22
99:8,12 101:5,18
101:22,24 102:3
102:14,14 104:22
105:8 106:7,14
108:12 110:23
114:3 116:2
133:15 135:2,4,23
137:14 138:23,24
**immediate** 43:13
**immediately**
121:10
**impair** 143:2
**impairment** 37:13
38:10,14 39:9,19
40:11 41:14 129:2
129:3,10
**implement** 77:8,24
**implementing** 54:6
56:24
**importance** 90:15
**important** 69:17
117:19,21 119:24
**importantly** 129:11

**improper** 79:14
137:19,21
**inch** 7:16 104:14
**inches** 48:18,24
49:4,6,8,8,10,12
63:23 100:20,20
100:22 102:9,11
102:12,16,24
103:1,4,4,22,23
104:14,18,22
105:19,22 106:3,5
106:6,7,7
**incident** 19:9 21:15
23:21 27:18 36:20
36:21 42:6,25
43:24 47:16 48:3
48:8 49:6 56:18
59:7 60:16 64:16
65:21 69:21 76:5
76:8,16,22 82:14
82:23 89:12,25
90:3 92:17 95:7
110:12 112:13,14
121:10 124:19
125:19 129:25
134:10 135:5,13
140:3
**include** 25:7 47:7
50:22 53:1 94:5
**included** 7:9 27:18
**includes** 8:16,23
9:1 10:20 25:21
**including** 9:25
10:22 25:18 33:3
44:6 127:7,12
137:6
**incomplete** 127:8
**incorporate** 49:12
118:10
**incorporated** 125:7
127:11
**incorrect** 45:2
**index** 3:1,12
**indicate** 133:8
**indicated** 132:19
**indicates** 130:19

132:22
**indicating** 9:20
15:6 22:3 36:15
46:1,2 48:8 68:20
68:22 72:13 85:4
94:23 95:3,5,11
98:4 99:7,15,24
104:19 106:3
121:19 131:13,22
**individual** 19:6
20:21 102:19
110:3
**individuals** 110:1
**industry** 41:12 71:4
82:3 84:22
**inform** 52:14,16
79:17,21 82:21
84:2 86:9
**information** 8:17
8:22 12:9 22:20
27:17,23 28:2
30:18 34:1,24
35:14,22 36:19,25
37:6 38:15,24
39:1,7 40:25
41:11 42:2 46:12
46:13 47:8,9,10
47:14 52:14 65:8
76:7,8,10,17 79:2
98:22 116:15
125:11 133:25
138:8,9,13 141:19
**informed** 30:17
82:13 85:21
**initial** 22:20 31:6,9
52:17
**initially** 34:17
**injured** 13:3 92:13
114:20 142:17
**injuries** 119:17
**injury** 3:15 13:24
36:4,13,16 37:2
47:7 72:5 77:10
117:5,23,23 118:4
118:6 122:3 141:7
**insert** 35:13



**inside** 112:21
**inspect** 29:4 30:5
**inspection** 28:20,25
  29:15,17,21 30:2
  30:9,14 31:15
  46:21 47:14,22
  93:18,24 101:19
  104:9,11 138:18
**inspections** 107:6
**install** 51:4,10
  87:15
**installing** 62:14
**instance** 1:16 113:4
**instrument** 118:15
**intended** 53:5,24
  56:18 59:5,25
  60:15 82:22 101:6
  110:24 133:5
**intending** 69:20
**intentionally** 74:7,8
**interact** 119:21
**interacts** 120:5
**interested** 124:10
  145:11
**interior** 49:3 99:7
  102:17
**interrupt** 99:8
**interruption** 60:22
  109:4,9
**interruptions** 60:2
  60:18 108:24
  109:1
**intro** 34:9
**investigate** 125:22
**invoice** 3:20 9:16
  9:19,22 10:2 31:4
**involve** 18:6 20:1
  23:15
**involved** 12:18
  22:24 30:2
**involving** 13:25
  20:18 23:23 79:11
**island** 100:9 142:24
**isolated** 60:1,18
**issue** 11:24 14:3
  15:3 18:13 19:1,2

20:20 23:17 56:4
  58:10 62:25
  106:23 126:14,15
**issued** 6:14,20 7:12
  9:16,19,23 24:17
  27:12,21 28:4
  30:22 33:22 34:20
  35:8,9 42:8 49:19
  89:5 104:6 137:8
  137:15,24
**issues** 14:6 18:6
  20:5,6 21:19
  24:12 25:18 79:11
  112:20 139:2
**issuing** 27:14
**itd** 48:10
**items** 7:8 104:10
  119:6
**ive** 6:10 11:16 17:9
  17:10,10,11,17
  20:12 23:11 24:16
  26:23,24 34:18
  36:1 39:13 51:16
  71:2 77:14 83:24
  85:25 87:25
  110:21

─────────────

**J**

**jason** 1:12,15 3:4
  3:18 4:5 5:13,19
  144:10,17
**job** 30:10
**johnson** 2:13
**joint** 29:17,21
**justice** 125:6

─────────────

**K**

**keep** 65:7
**kier** 2:10
**kiernan** 2:6 4:15
  94:6 110:20
**kind** 18:12 21:2
  85:3 119:1 125:9
  125:10 143:1
**knew** 37:23 51:15
  51:19 52:5 71:25

77:6,23 79:21
  80:20,23,23
  123:17 136:13,24
**know** 5:23 12:6
  14:14 16:16 21:17
  23:7 24:16 26:12
  26:17 28:1,9
  30:16 32:13 35:12
  36:23 38:2,3
  40:16,17,22 41:2
  42:7,8,18 45:22
  46:2,6 47:23 48:3
  48:9 54:10 57:5
  57:16,24 62:24
  64:14 65:6,18,19
  66:2 69:3,4 76:11
  77:12,21 80:18
  82:2 87:10 96:14
  97:1 98:21 101:10
  101:16 104:24
  107:8,14 109:11
  116:12,13,21
  118:21 119:8
  122:15 128:15
  130:12,20,24,25
  131:1,7 133:14,20
  134:5,24 136:24
  136:25 137:3
  138:10,21 140:23
  141:1
**knowledge** 38:16
  44:20 70:5,9
  79:15 82:8 88:5
  114:25 115:1,3
  119:10 141:14
**known** 9:2 51:16
  72:1,15 74:4 77:7
  77:23 79:21
  111:18 136:16

─────────────

**L**

**l** 17:23
**label** 101:21,22
**lack** 21:17,20 60:11
  63:23 79:11 80:4
  91:23 122:20

**lacked** 122:17
**lacking** 62:7
**ladder** 12:4,4
**ladders** 12:7
**land** 13:2 31:13
**landing** 14:1 47:6
**laser** 98:18
**laughs** 18:8
**law** 1:21 2:6,7,13
  4:6 24:20 56:20
  58:17 85:8
**lawyer** 11:20,23
  30:19,23 31:2,10
  32:1,7 33:10
  36:17 46:16 47:9
  88:25 89:5
**lawyers** 24:20
**lay** 99:10
**lays** 103:12
**lead** 71:8 119:17
**leading** 4:23 5:7
  21:10 113:15
  117:16,22,25
  118:1,6 122:18
  142:18
**leasing** 21:24 43:19
  45:1,21 50:2
  51:25 53:1,4 59:1
  64:7 66:15 67:17
  68:11,14,18 69:13
  92:21 94:11 95:14
  97:20 100:4,5,11
  109:21 114:18
  131:5,12 132:14
  132:24 133:3
  140:20 142:20
  143:3,9
**leave** 80:17 143:18
**led** 72:16,19 88:18
  88:19 92:10,12
**left** 68:8 69:10
  73:12 76:9,12,12
  76:12 80:13 96:4
  96:8,9,12 97:11
  97:20 99:23 107:9
  110:13 121:20

130:21 134:10
  135:13,15 140:14
  142:24
**legal** 4:4 29:19
  75:20 76:1 145:19
**legally** 30:11 82:4,7
**length** 109:6,10
  131:8 135:1
**letter** 3:14
**letters** 7:23
**letting** 6:2
**level** 25:21 115:25
  116:2 117:2,15
  139:19
**liability** 61:20
**liberty** 22:23
**license** 48:11
**light** 137:6
**likelihood** 112:13
**limit** 59:4
**limited** 46:24 47:1
  47:12,20 113:1
  128:13 141:10
**limiting** 58:22
  59:16
**limits** 128:4
**line** 48:20 49:3,7,13
  66:9 97:14 99:7
  100:19,20,23
  102:17,24 104:19
  104:21,24 105:4
  105:10,21 128:8,8
  128:10,12
**lines** 48:15
**list** 7:2,2 9:4 13:11
  13:12 14:9,9,10
  14:18 15:17 16:3
  17:19 23:10,10
  24:5 25:3 34:22
  50:6 79:10
**listed** 7:24 8:4,19
  15:7 16:13 26:4,8
  121:4
**listing** 7:24
**lists** 7:22
**literature** 33:6



**litigation** 138:7
**little** 15:22 45:11
  48:19 72:12 90:12
  99:14,15,19
  112:23
**lived** 44:16 69:22
  80:21
**living** 40:17
**llc** 1:6 4:12 144:6
**located** 1:21 4:6
  45:9 121:22
  142:21
**location** 3:24 19:9
  31:16 79:16
  103:16 122:2
  138:18
**long** 11:14 32:10
  51:16 60:22 76:3
  76:17,18 133:11
  133:16 134:16
  140:7
**longer** 32:21
**longterm** 74:5
  111:19
**look** 14:15 15:5
  31:4 34:7 54:11
  57:3 83:16 95:15
  96:8 102:2,2
  127:4 131:13
**looked** 68:8 96:3,11
  97:11 103:9
**looking** 7:17 24:8
  26:4 40:20 58:1
  61:10 69:10 70:17
  97:17 99:21
  102:15 107:11
  114:3 116:2,8
  118:3 123:24
**looks** 26:9
**loose** 43:15
**lose** 47:5 141:24
**lost** 44:13 47:4
  141:15,15,16,17
  141:21,23
**lot** 10:24 18:7,11
  19:21 20:2 21:11

26:20 35:21 47:7
52:23 61:19 63:8
71:16 100:9
112:18 118:2,20
120:7 123:5 124:5
125:6,14,19
142:24
**louisiana** 1:22 2:8
  2:15 4:7
**lumping** 36:6
**lyric** 1:22 2:7 4:7

_____
**M**
**m** 1:12,15,19,19 3:4
  3:18 4:3 5:13
  25:17 143:21
  144:10,17
**magna** 4:4 145:19
**maintain** 72:3
**maintaining** 60:8
**maintenance** 42:23
  59:21 60:5,6,11
  60:11 76:25 79:18
  79:20 81:14 84:3
  86:10 108:23,25
  109:2,5 111:8,8
  111:21 112:17,21
  114:9 134:16
**major** 74:5 88:22
**majority** 36:9
  98:12
**manage** 41:11
**management** 10:21
  11:5 41:6
**manager** 116:4
  138:5
**managers** 112:16
**mandeville** 2:15
**maneuver** 46:25
  122:18 123:6,10
  128:5,11,14 129:1
**march** 23:13
**mark** 10:3 83:4
**marked** 3:13 6:25
  7:11 9:10 10:4
  68:20 93:21 94:2

94:3 98:11 100:23
104:3 142:9
**market** 145:21
**marking** 109:25
  111:24
**martha** 13:22
**material** 14:4
**materials** 7:15,21
  37:11
**math** 17:14
**matter** 13:23 25:9
  35:2 49:24 50:14
  50:17,24 51:6,9
  58:16 67:1 88:4
  107:7 124:3,7
  126:12
**mcallen** 18:1
**mcalpine** 2:6 3:5,6
  3:14,20 4:15,15
  4:21 5:2 7:5,7,19
  8:11 10:5 11:9
  13:5 16:9 17:16
  27:8 28:22 29:1
  29:14 30:17 31:2
  32:19,23 33:24
  38:5 39:20 41:19
  42:14 44:12,19
  46:14 49:21 50:13
  51:23 52:15 53:15
  54:7,23 57:1,13
  58:4,12 61:5,24
  64:4 67:9 68:1
  73:23 74:3 75:22
  77:2 79:9 80:8
  81:3,10,17 82:6
  82:15,24 83:7
  86:3,19 87:4
  91:21,25 92:5
  93:11,15 94:14
  96:7 97:6,14
  101:16,18,20,24
  107:23,25 110:17
  110:20,21 111:2
  126:1,11,18
  129:20 130:14,16
  131:3,16,24

133:13 134:2,7,13
134:22 135:10,21
137:1,10,13,17,19
138:1,20 139:16
139:23 140:9,25
141:3 142:3,5,8
143:14,20
**mean** 9:5 10:25
  16:17 19:16 22:8
  25:25 26:21 28:13
  31:22 35:4,16
  40:15,19,20 43:11
  43:15 50:6,18
  53:11,25 56:10
  57:18,22 66:25
  68:2 70:1 71:3
  75:23 77:17,18
  84:8 92:7 97:7
  107:16 108:2
  114:16 118:20
  120:5,7 123:17
  126:23 128:6
  132:5 133:21,23
  143:11
**meaning** 38:6,19
  76:1 78:16 81:19
  81:22 83:17 116:9
  125:21 128:15
**meanings** 38:8
**means** 25:20 26:11
**meant** 101:10
**measure** 98:9,13,24
  103:12 105:3,5,9
  106:12,14,24
  107:8,17
**measured** 49:3
  99:6 100:15,19
  102:16,18 103:16
  105:22 106:6,20
  107:1
**measurement** 45:5
  99:16 102:21
  103:7 104:17
  106:10 107:5
**measurements** 3:24
  27:4 31:17 32:11

32:18,20 33:1
44:2 45:4,5,14
97:25 98:9,12
99:18,19 100:17
103:10,14,19,20
106:25 118:21
**measurer** 98:23
**measuring** 32:13
  103:18 104:20
  105:10,11,17,20
  106:12
**median** 143:1
**meet** 32:4 91:4
  138:23
**memorize** 57:20
**memorized** 58:8
**memory** 97:1 98:22
**memorys** 22:9
**mention** 58:21
  141:7
**mentioned** 19:23
  23:23 25:4 66:5
  71:3 76:16 141:9
**met** 29:1,3 32:6
**metal** 118:17
**metals** 118:18
**method** 1:21 35:20
  35:21 105:18
**methodology** 34:15
  34:15 118:10
**methods** 133:14,22
  134:14,24
**michaels** 15:13
**middle** 105:3,10
  109:13
**mildew** 19:5
**mind** 6:20 7:4
  14:22 15:20 19:12
  28:13 55:5 101:9
**mine** 22:25
**minimal** 112:19
  113:1
**minimize** 117:4
**minimum** 63:15
  117:11,13
**minor** 34:17 35:3



minus 6:21
minute 65:12
minutes 31:5 32:18
  32:22 33:10 76:9
  76:12,12,16,22
  134:5,6,6,9,10,12
  134:20,23 135:6,7
  135:13,15,15,19
  136:1,8,22
misinterpreting
  48:6
missing 70:25
mistake 49:10,14
  49:15,16,18
  100:21
mobility 37:13
  38:10,14 39:9,19
  40:11 41:14
  120:20 129:2,3,10
  129:11,16
model 98:21
mold 19:5
moment 51:19 57:4
  74:21
monitor 72:2
months 23:8
morning 37:19
move 6:3 115:23
multifamily 72:3
  84:16
multiple 75:6 78:14
  112:24
myers 13:15,16,16
  17:22 18:10

**N**
n 2:1
name 4:3 5:17
  15:18 21:12 73:2
named 18:15
names 15:17 24:7
naming 18:3
naomi 17:23
narrowness 46:23
  47:12,19 141:10
near 37:15 38:1,17

40:1,3,7,12 41:9
41:16 45:23 59:1
68:14 74:10,18
78:21 80:11,24
81:8 109:21 131:5
nearest 43:4,17,18
  46:9 72:16 94:18
  94:24 95:1 100:4
  102:4 111:18
necessarily 28:14
  122:16 141:18
necessary 35:15
  77:7,24 91:5
  109:5 118:18
  120:16,20 138:9
need 12:9 28:3 51:4
  51:11 54:11 61:6
  111:22 118:22
  120:16,18
needed 74:18
  120:13
needing 80:2
needless 115:13
  139:11
needlessly 115:8
needs 111:25,25
  112:4,21 118:19
  120:24
negate 87:12
negotiate 47:1
neither 69:16 145:6
never 6:8,11 26:20
  29:21 30:22,25
  52:7 53:12 56:15
  60:9 69:2 70:7
  73:14,17 96:22
  97:4 129:23
  137:18,20
new 28:20 33:21
  34:8 35:25 50:11
  126:10,15,15
  137:5 138:8,13
nguyen 14:24
nine 94:21 107:19
  107:24
ninetytwo 102:12

noncompliant
  70:16,19
nonhandicapped
  72:10 88:20 92:3
  110:12 128:21
  140:5,14
nonobvious 123:3
norm 113:9
normal 21:2 25:19
  123:3,12 127:24
  128:7
normally 44:6,21
  45:16,18 49:4
  68:16,20 69:7,14
  70:4,23 71:9
  94:19 102:4,13
  128:19 131:15,20
  132:3 133:10
  140:19
northwest 13:17
note 101:12
notes 3:25 49:11
  101:1,2 104:4,9
  104:11
notice 1:23
noticed 16:22
notification 112:24
  114:13 123:21
  136:18
notified 29:16
  115:5 138:19
notify 81:15 82:1
  111:21 112:17
  113:4,12,19
notifying 112:22,25
number 3:13 16:6
  17:18 31:21 40:16
  57:21 70:2 71:25
  77:4,11,22 78:9
  79:4,11 84:8,24
  85:3 87:14 91:3
  94:12,16,21 95:1
  95:1,5 98:21
  110:23
numbered 1:18
  94:15

numbering 57:9,18
numbers 57:3 58:1
  58:2 93:8,10

**O**
oath 28:5,7,14
  51:18 65:12 140:4
  140:12
object 7:19 11:9
  13:5,25 16:9
  17:16 27:8 32:19
  32:23 33:24 38:5
  39:20 41:19 42:14
  44:12,19 49:21
  50:13 51:23 53:15
  54:7,23 57:1,13
  58:4,12 61:24
  64:4 67:9 68:1
  73:23 74:3 75:22
  77:2 79:9 80:8
  81:3,10,17 82:6
  82:15,24 83:7
  86:19 87:4 91:21
  91:25 92:5 96:7
  97:6 130:14,16
  131:3,16,24
  133:13 134:2,7,13
  134:22 135:10,21
  137:1,10 138:1,20
  139:16,23 140:9
  140:25 141:3
objection 5:11 86:3
  111:12 112:11
  113:9,15 114:15
  114:22 115:10,15
  115:21 117:16
  120:2 121:12,16
  122:8,13 123:15
  124:16,21,25
  126:8 127:14,23
  128:3,22 129:8
  137:21 142:18
  143:10
objections 4:22 5:4
  5:5,9
objects 14:6

obtain 129:16
obtained 8:22
  137:24
obvious 123:2,4,11
  123:12
occasion 74:23
occasionally 12:21
occasions 74:24
  75:6
occur 70:11 136:19
occurred 23:22
  36:25 70:22
  125:19
occurs 70:21
october 31:16 37:3
  42:22
offer 14:2 62:1
  126:10 139:17
offered 10:6,12
  17:20 22:4,10,15
  23:2,4 24:10
offering 10:16
  11:16 54:20
office 11:25 12:13
  21:25 43:19 45:1
  45:21 50:2 51:25
  53:1,4 59:1 64:7
  66:15 67:17 68:11
  68:14,19 69:13
  92:21 94:11 95:14
  97:20 100:4,5,11
  101:13 109:21
  114:18 131:6,12
  132:14,24 133:3
  140:20 142:21
  143:3,9
officer 144:18
offshore 12:20,22
oh 48:18 55:7 94:4
  100:3 101:17
oil 13:2
okay 5:23 6:3 9:6,8
  10:17 15:21 16:7
  17:3,7 19:13
  20:15 23:1 25:3
  27:5 28:3 29:24



32:14 39:8 40:2
45:17 49:14 51:18
53:2 55:12,13
56:2 59:7,8 61:9
66:10 75:11 77:16
78:18 80:25 85:7
86:1 93:19 94:6
97:17,22 98:6
103:21 105:5
106:6 135:14
139:24 142:1
**old** 14:16
**once** 34:17
**ones** 15:11,14,25
16:10 17:9,17
18:2 23:9 67:19
67:21 92:18
126:19,20 143:2
**open** 122:20 123:7
**opened** 47:2
**operated** 23:19
**opined** 62:14
**opinion** 21:14 22:4
22:15,15 23:5
24:11 49:23 62:1
62:1,9 67:23 68:3
69:12 72:14 75:10
77:4,22 78:7,9
79:4,23 83:10,14
84:3,6 87:14 88:4
91:3 92:1 93:3
105:24 107:5
111:14 112:4,12
113:3,21 114:8,10
114:23 115:25
117:13 127:8
134:8 135:24
136:5,21 138:11
140:4
**opinions** 8:17,18
23:3 31:1 33:23
54:20 62:6 71:24
113:17 116:22
126:10,15,15
137:5,15,25 138:9
138:13 139:2,6,10

139:17
**opportunity** 54:16
**opposing** 4:25 5:10
**opposite** 21:25
**option** 110:11
115:13,17,23
139:7
**oral** 1:10,15 4:5
144:8,19
**order** 77:5 122:19
**ordinarily** 127:20
**ordinary** 75:17
**orientation** 37:9
**original** 55:10
101:23
**originally** 35:23
110:24
**outcome** 145:11
**outline** 62:6
**outlined** 63:17 78:4
**outlining** 35:4
**outside** 27:3 126:8
126:15
**overly** 108:13
**oversight** 101:6
104:8
**owned** 23:19,19
**owner** 22:16 23:6
30:6 53:11 82:1
83:21 84:5 115:8
116:3

---

**P**

**p** 1:12,16,19 2:1,1
3:4,18 5:13
143:21 144:10,18
**packet** 9:2 94:7
**page** 3:2,8,13 8:19
15:12 28:12 33:22
34:7,12,19,19
36:2,12 41:13
42:20 46:8 48:21
49:9 50:7 55:13
61:11 62:9 65:1
65:15,22 66:5
77:4 97:14 98:5

105:23 106:17
107:11,19,23
108:7,17,22
109:13,24 141:6
141:22 145:2
**pages** 14:11 15:5
17:20 97:9,15
98:6
**paint** 42:3 76:18
133:11,16,17
134:21 135:16,19
136:1
**painted** 46:12 59:5
64:19 69:8 74:21
74:24 76:14 82:14
83:6 85:23 86:17
89:13,19,25 90:3
90:23 97:11
131:20,23 133:10
135:12,14 136:7
**painting** 76:3 77:1
82:21 95:20 96:19
96:23 97:4 109:3
134:19
**paper** 100:17
101:11
**parade** 12:4,8
**paragraph** 34:8
36:4,15 48:22
50:7 55:17,18
56:22 62:8,8 78:5
78:8
**paragraphs** 34:12
**paralysis** 47:7
**paralyzed** 88:18
**park** 13:17 17:22
43:24 48:15,17,17
53:5 54:16 59:5
59:25 60:16 64:2
66:18,20 67:8
69:9,20,24 71:17
72:19 73:9,12
76:4 79:7 88:19
92:3 96:4,13,16
97:5,10,12 102:4
110:5,12 122:7

128:19 130:3
132:8,11,15,22
140:5
**parked** 31:25 43:4
44:6,21,24 45:7
46:9 47:23 48:3
48:11,14,18 49:4
49:5 53:6 59:6,25
60:17 65:5 67:7
67:24 68:4,9,17
68:20,21 69:7,14
69:19 70:4,12,23
71:20 74:1,25
79:22 88:10 92:23
94:20 95:7,16
97:18 98:25
100:10,13 102:13
103:3 121:10
122:3 128:7,12
129:5,24,24 130:4
131:15,20 132:4
133:10 142:16
**parking** 18:7,11,13
18:14,17,19,21,23
18:25 19:4,7,21
20:1,2,6,18,24
21:10,17,21 24:13
26:20 37:14,15,25
38:1,11,13,19,20
39:10,11,17,18,25
40:1,4,10,10,13
40:18,23,23 41:9
41:10,15,16,23
42:3,4,12,16,22
43:4,9,21,23,25
44:4,10,10,17,23
45:1,7,8,18,23
46:10,18,23 47:12
47:20 48:17,22
49:20 50:2,11,19
50:22,24 51:2,5,8
51:21 52:1,9,23
53:5,13 54:15
56:4,17 58:23
59:1,4,6,12,17,21
59:24 60:7,15,16

62:17,18,25 63:9
63:13,16 64:2,5
64:15 65:2 66:2
66:11,23 67:15,16
68:9,14,15,19,24
69:7,9,10,12,18
69:19,24 70:4,6
70:13,17,20,23
71:5,11,17,20
72:11,18,19,22
73:14,17,22,25
74:7,13,17 75:6
75:13,24 76:3
77:1,19 78:21
79:1,7 80:11,24
81:2,8 82:13,22
82:22 83:4 85:16
85:22 86:12,16
87:18 88:11,15,20
89:12,18,24 90:2
90:10,22,23 91:6
91:16 92:3,8,10
92:16 94:8,10,16
94:18,21,22 95:4
95:6,8,12,14,20
95:20 96:4,8,12
97:19 98:24 99:3
100:5,8,11 103:2
104:21 105:11,12
105:15,16 107:1
108:8,9 109:3,3
109:12 110:8,12
112:18 116:14
120:7,17 121:3,14
121:17,19 122:3
122:12 123:8,8,18
127:16 128:19,23
129:24 130:1,4,20
131:1,9,11,12,14
131:19,21 132:3
132:10,14,15,23
132:23 133:3,4,4
133:6,10,12,17
134:3,20,21
135:16,19 136:1,7
136:9,9 140:6,13



140:14,15,17
141:10 142:23,24
**parks** 68:16 140:19
**parkway** 5:20
**part** 7:9 9:1,3,4,12
14:5,10 29:19,20
30:10 34:14,17
36:13 38:18 39:15
47:10,11,18 48:7
60:6 65:15 80:13
86:20,22 91:12,13
91:14 118:18
120:16
**partially** 88:1
**particular** 5:11
11:11,13 31:25
35:1 50:1 51:6
54:12 57:21 58:2
58:6,23 74:13
75:19,24 77:1
92:14 94:18 116:5
118:12 123:16
134:16 135:25
136:2 138:23
140:21
**parties** 5:3,5,7,8
8:2 24:8 138:24
145:8
**party** 144:23 145:5
**pass** 68:18 129:20
**passed** 68:12,12,13
68:15,22
**paste** 34:13,21
**patel** 16:24 17:25
**patels** 15:21
**patron** 11:18
**paying** 16:16 18:8
**penalized** 114:1
116:11
**penalties** 125:24
**penn** 145:20
**pennsylvania**
145:21
**people** 74:25 85:17
90:17 107:3 117:5
117:24 118:2

119:2,6,20 120:11
120:13,17 121:18
123:5 133:21
**percent** 17:15 30:1
**perform** 27:5,7
28:19 121:25
**performed** 79:20
81:15
**performing** 30:13
32:10 76:25 79:18
109:2
**period** 51:16 91:2
92:9 119:16
131:20 135:20
**permission** 28:19
28:23 30:8
**person** 21:8 69:14
108:15 119:15
122:23 123:1,3,12
128:21 130:3
134:16
**personally** 6:10
**persons** 72:6 120:6
**perspective** 51:3
80:9
**persuaded** 113:22
**persuasive** 113:20
**pertaining** 139:6
139:10
**petition** 55:10
**pg** 3:20,25
**pgs** 3:15,17,19,22
3:24
**philadelphia**
145:21
**phone** 2:9,15 31:6,9
33:9 138:6
**photo** 107:9
**photograph** 94:24
95:15,16,22,23,25
96:5 107:11,16
131:13 142:10,25
**photographed**
31:16
**photographic**
31:17

**photographs** 33:1
36:21 47:25 48:2
48:7,10 76:13
93:6,8,10,17,23
93:25 95:10 98:8
135:12
**photos** 3:21 31:6
93:23
**physical** 31:15
38:18 40:20 41:22
67:14 72:5 119:11
132:5
**physically** 33:15
98:25 99:1,9
110:9 122:2
**piece** 13:2 100:17
**pinning** 135:1
**place** 3:22 41:9
54:17 58:19 73:12
85:1 87:25 107:5
**places** 52:25 108:3
**plaintiff** 1:4 2:5
4:16 5:11 6:5,9
14:12 15:23 16:14
16:25 17:6,15
54:15 110:21
144:4
**plaintiffs** 6:7,8
13:21 14:8 15:1
**planned** 80:3
**plans** 79:19,19
**plate** 48:11
**platform** 12:23
**play** 120:8
**played** 70:7 79:6
**please** 4:13 5:18
137:21
**point** 35:15,18 39:3
39:21 49:5 88:25
98:16,16,17,17
99:10,10,13
**pointing** 36:18
45:13,15 94:9,17
95:17,22,23 96:1
96:5 97:19,20
99:22,23 100:13

100:18 102:1
142:12,20
**points** 11:3 130:18
**policies** 80:10 85:1
**policy** 78:7,20
83:11 88:1
**popped** 20:16
**portion** 6:23 34:24
72:8 87:20
**pose** 114:12
**posed** 112:16 123:1
129:4
**positive** 92:14
**possession** 8:2
**possible** 78:23
110:9
**possibly** 13:6,8
28:15 57:17,25
135:18
**post** 25:16
**potential** 41:7 77:9
**power** 83:18 124:8
**practice** 71:4 75:8
75:17 82:3 83:10
83:12 84:4,17,21
84:22 85:6,15,20
87:24,25 105:6
106:10,14,22
107:17 113:1
114:4 116:7
117:10,15 131:4
140:18
**practices** 84:14
**preexisting** 38:1,17
40:1
**premises** 10:24
11:6 23:19,20
28:24 61:19,23
62:3,7 72:4 82:1
83:21,23 84:4,16
84:25 85:2 90:18
115:8 116:3 118:8
**preparation** 33:12
124:5
**prepare** 35:20 39:6
54:10

**prepared** 10:14
27:19 34:17
**preparing** 33:7
34:3 35:7 36:19
37:1
**present** 4:13 30:6
30:13 109:22
138:19 141:13
**presented** 130:8
139:21 140:11
**pretty** 106:11
141:11
**prevent** 117:19
118:4
**prevented** 76:24
112:12
**preventing** 112:14
**prevention** 10:21
11:5 26:5
**previous** 34:20
35:24 60:4 94:25
95:9
**previously** 143:3
**primarily** 128:4
143:5
**primary** 21:19
**principles** 117:4
119:25
**prior** 27:14 36:19
36:25 42:6 82:17
121:10
**probability** 121:8
122:10 143:6
**probable** 127:21,21
127:25
**probably** 12:6,9
22:17 24:3 32:17
32:25 45:13 98:23
**problem** 79:24
143:20
**procedure** 1:24 4:6
117:7 119:20
123:6 141:20
**process** 42:23
**produce** 8:3 101:4
**produced** 1:16 8:1



43:1 93:6
**production** 124:6
**products** 119:5
**professional** 138:12
144:16
**program** 77:8,13
77:15,25 78:1
84:24 90:16 118:8
**progress** 109:12
**prohibited** 108:25
**proper** 67:16,20,22
73:10 77:8,24
78:1 79:19,19
90:17 106:22
**properly** 87:15
103:18 118:11
**property** 21:25
30:4,5,6 31:25
32:6,8 112:16
**provide** 4:25 17:11
41:8 54:14 60:8
62:16 72:14,21
73:21 74:9,9 80:6
81:2 84:2 86:15
88:15 90:24 91:5
92:8,9 104:8
111:23 113:7
115:4 123:21
**provided** 7:13
20:12 24:18 39:2
48:23 74:12 76:8
76:14 77:14 85:14
89:24 93:13 104:7
**provides** 89:10
90:22
**providing** 60:6
73:3 75:23 77:19
79:24 85:16
120:17 136:18
**provision** 54:12
57:22 58:6,15
**provisions** 1:25
54:1 57:19 125:12
127:5
**proximity** 40:19
**prudent** 115:8

116:7 117:10,15
**public** 50:3 52:1,25
58:19 59:2 90:11
107:20,21 108:3,3
109:21 115:9
139:11
**publication** 83:13
84:7 85:20 87:21
89:9,16,22 90:21
91:10 125:5
**publications** 7:2
86:6
**published** 62:18
84:19
**publishes** 71:10
**pull** 55:5 121:18
**pulled** 97:10 122:6
**purpose** 99:8
**purposes** 50:5
**pursuant** 1:23 4:5
144:21
**put** 37:5 38:25 39:5
41:22 42:1 51:2
85:1 107:5 127:8
127:9
**puts** 71:10
**putting** 131:8

_____

**Q**

**qualifications**
34:23,25 35:5
**quang** 14:24,25
**question** 5:6 6:1,3
10:10,12 15:9
18:16 19:12 27:21
28:7,23 34:4 39:8
39:12 44:13 53:16
55:2 56:2 58:13
58:24 60:3 65:16
65:24 74:11 80:22
80:25 82:17,19,25
85:19 86:21 89:20
110:10 111:6
113:10 126:4
127:17,18,20
133:9,18 137:14

137:19 142:3,5
**questioning** 66:9
**questions** 13:13
36:8 110:23 138:6
143:15
**quick** 93:11
**quickly** 102:2
143:19
**quite** 15:15 22:9
32:20
**quote** 37:9 87:17
125:18 126:2
141:16
**quoting** 37:6 78:19

_____

**R**

**r** 2:1
**racking** 14:4
**radius** 44:3,4,9,17
**ramps** 25:21 71:6
**range** 112:20
**read** 6:11,14 16:10
37:16 44:22 55:8
62:22 65:9,13,14
65:15 66:8 68:2,7
72:6 77:10 78:11
78:23 87:18,20
91:7 96:18,22,25
126:5 140:24
141:24
**reader** 37:8
**reading** 15:9,22,25
16:23 17:24,25
40:5 44:1 55:9,10
65:1,7 77:22
97:16 108:11
141:9
**real** 93:11 102:2
**realize** 106:6 123:9
**really** 16:16 35:5
48:16 71:8 104:23
105:20,21 106:8
106:10 117:3
118:21 119:2,22
120:14 122:20
130:11

**reask** 44:14
**reason** 8:7 38:25
39:5,22 57:25
63:10,20 64:1
66:6 69:8 84:23
88:14 120:15
141:14
**reasonable** 72:2
75:8 77:9 109:1,4
111:10 112:2
114:4,6 115:4
116:3 117:10,15
123:21 124:9
129:5 131:18,25
136:6,20 143:6
**reasonableness**
111:7
**reasonably** 60:23
91:5 115:7
**reasoning** 141:17
**reasons** 145:3
**recall** 14:19,23
20:12 21:13 24:16
24:18 35:20 36:1
66:22 67:25 68:6
89:7,7 97:2 141:5
**receipt** 145:1
**receive** 101:3
**received** 6:17 7:1
7:15,21 25:13
36:18 41:4 48:1
126:13 127:6
**recess** 61:8 110:19
**recognize** 15:14
16:1 18:2 20:13
24:6 57:10,17
123:5
**recognized** 17:9,17
**recollection** 13:24
15:16 24:21 65:20
66:7
**record** 1:25 5:18
8:12,14,15 31:17
61:5,9 136:11
144:19 145:10
**refer** 39:23 100:8

142:23
**reference** 109:25
127:11
**referenced** 7:21 9:9
86:7 90:9 127:5
127:11
**references** 8:21
25:8 85:25 116:18
116:19 125:1
127:3
**referencing** 90:9
**referring** 44:25
48:25 99:4 100:24
100:25 102:3
108:5 110:2
115:16
**refers** 126:25
**reflection** 96:15
**reflects** 9:22
**regarding** 124:13
126:21
**regardless** 80:19
88:7 116:5 124:1
124:7
**regards** 114:9
**regency** 14:17
**registered** 144:15
**registration** 145:20
**regular** 65:5
128:20
**regulation** 116:6
**regulations** 54:6
56:24
**regulatory** 83:17
**regurgitate** 96:10
**related** 145:7
**relation** 142:21
**relative** 23:21
25:12,17,20 37:21
38:15 62:6 63:3,9
63:10,15 67:2
70:16 71:4 85:16
90:9 109:23
121:11 125:24
140:3 145:9
**relayed** 46:13



**relaying** 28:2,13
**relevant** 11:13
**relied** 79:22 80:23
　115:1 123:18
　136:13
**relies** 82:2
**rely** 124:10
**relying** 129:11
**remaining** 76:19
　143:15
**remark** 8:11
**remember** 14:16
　21:3,5,7,16 22:1
　24:7,8 37:19,21
　66:8 87:12
**remembered** 37:20
**remembering** 58:2
**reminder** 5:25
**remove** 47:3,15
　141:20
**renovation** 55:1,24
**renovations** 12:13
**repainted** 42:23
　43:6
**repair** 55:1,24
**repeat** 60:3 89:20
　89:21
**rephrase** 44:15
**report** 3:14,18 6:15
　6:18,19,21,22 7:9
　7:22 9:11,23,25
　10:1 23:3,5,7
　24:11,17 27:12,14
　27:18,21 28:4
　30:22 33:7,12,15
　33:20,21,25 34:1
　34:3,5,8,18 35:8,9
　35:10,14,17,18,23
　35:24 36:2,3,20
　36:21 37:1 39:6
　40:2 41:13 42:8
　42:25 47:16 48:8
　48:21 49:2,9,17
　49:19 50:4 52:8
　62:2,10 63:11
　76:8,17,22 77:4

77:22 78:4 79:11
80:14 85:10 86:7
87:14 89:2,5 91:8
100:21 104:13
106:17 107:20
108:7,17,22
109:13,24 113:16
116:1,16 126:6,9
126:13,16,23
127:6,8,11,13
135:5,13 137:2,8
138:14 139:1,2,5
139:9 141:6
**reported** 1:20
**reporter** 4:2,19
144:15,16
**reporters** 3:9 6:1
**reports** 33:22 34:1
34:13,20 35:13,21
35:25 36:4,7,8,11
36:11 38:7 126:16
134:10
**representative**
13:15 30:6
**representatives**
39:3 41:5 138:2
**representing** 4:14
**request** 79:1 88:2,7
**requested** 81:8
88:5 137:20
144:23 145:4
**requests** 78:20
80:15,19,19
**require** 56:13 83:1
83:19 108:8,15
113:7 116:6
118:20,24 125:13
**required** 27:3,6,11
51:13 58:10,16
59:10,15 60:12
63:14 69:17 71:21
73:20 75:11 80:6
81:1,13 82:20
83:3,21 85:5
89:11,18,23 92:2
103:22 113:19

114:3 116:9
118:11 126:22
**requirement** 5:4
51:24 52:3 63:12
63:16 75:20 76:1
81:22 82:4,11
83:25 87:23
109:19 113:3,25
**requirements** 53:7
57:16 58:22 84:11
91:15 117:11,14
118:23 120:19
125:2 126:7
127:12
**requires** 75:15 85:8
85:9
**requiring** 47:1 83:9
86:9,15 108:11
**research** 71:8
124:5 126:6,12
**researched** 50:20
125:7
**reserve** 4:24 5:5,8,8
73:7 87:16 102:1
137:4 143:14
**reserved** 37:15
39:11,18 40:10
41:16 62:15 73:1
73:5 78:21 79:1
80:11 81:8 87:17
89:11,17,23 90:24
**reserving** 4:22
**residence** 54:17
80:24
**resident** 41:7 78:10
78:21 80:15,20
84:18
**residential** 1:6 4:12
4:18 15:4 19:14
29:16 37:13 38:10
38:13 39:10,17
40:9 41:15 48:23
53:8,12 54:5
58:17 59:10 61:2
62:15 71:25 72:3
72:21 73:21 74:12

75:12 76:24 77:6
77:12 78:9 80:6
81:1,13 82:12,20
83:4 86:15 91:4
108:18 131:18
144:6
**residentials** 78:6
**residents** 84:10
**resistance** 118:15
**resource** 50:21,23
51:3,6
**resources** 124:7
125:15
**respect** 12:14 24:12
26:15 54:22 70:8
77:13 139:19
**response** 7:13,15
8:8
**responses** 8:9 33:4
**responsibility**
30:12 72:1 77:6
123:13,21 139:19
**responsible** 138:24
**responsiveness**
4:23 5:6 139:23
**rest** 47:14 60:9 65:9
65:13
**restaurant** 19:18
19:19,21,22
**restriping** 112:18
**resulted** 47:6
**retained** 12:19
13:10,20 14:2,7
14:12,21,25 15:7
15:23 16:8 17:5
23:2,14,18 24:19
**retrieve** 47:2
**retrieving** 47:15
**returned** 101:12
144:25 145:1
**reviewed** 8:5 37:7
37:10,11,24 67:1
**reviewing** 31:6
33:2,6 37:20
**rig** 12:22,23,24
**right** 6:6 7:7 9:14

11:8 16:4,19 17:4
18:5 19:3 21:22
30:23 31:2,7
32:15 33:7,10,23
34:10 36:5,17
37:16 40:13 41:18
42:8 44:15 46:1
47:21 56:5,12,13
56:18 59:2 64:3
64:20 65:20 67:8
69:1 70:10 71:18
74:6 85:12 86:8
88:3,21 91:11,20
92:17 93:1,16
95:16,22 96:5
97:18,25 100:12
101:1 103:5,16,24
105:25 107:11
110:20 111:3
113:11 126:5,10
126:11 134:21
137:4,7 138:4,7
138:10,11,12,15
138:17 141:2
142:9
**rise** 117:14
**risk** 70:10,20 114:1
128:17,23 131:8
**road** 46:5
**robert** 18:1,1
**rohr** 17:23 18:15
**role** 70:7 79:6
120:8 137:17
**roll** 98:15
**rolled** 96:23
**roller** 133:16
**roof** 19:2
**room** 48:16 117:25
128:25
**round** 31:21
**route** 50:24
**routes** 127:2
**routinely** 111:18
136:16
**royal** 17:23
**rpr** 1:20 145:18



MAGNA
LEGAL SERVICES

**rubio** 13:22
**rule** 5:4 144:21
**rules** 1:24 4:6 5:23
**running** 57:23

**S**

**s** 1:12,15 2:1 3:4,18
5:13 54:5,9 56:23
57:2,15 58:6
144:10,17
**safe** 62:16 69:12,14
69:15 71:4 75:8
83:23 84:4,14,17
84:21 85:2,5,11
85:14,16,20 91:5
91:15 93:4 115:2
119:7 130:1
**safely** 54:16,17
120:13 129:15,18
**safer** 93:2 130:10
130:13
**safest** 115:13,16
139:7
**safety** 10:19,21,22
10:24 11:1,5,5,6,7
13:7 14:6 25:15
26:6 77:8,13,15
77:24 78:1 81:25
84:18,24 90:15,17
113:18 114:5
116:4,24 117:1,9
118:7,8 119:23
124:12
**safeway** 15:24
23:12
**sanctuary** 2:14
**sandra** 15:12 16:19
**sarah** 14:17
**saw** 68:8 95:19
96:12 97:10,11
**saying** 22:12 30:21
39:24 53:3 56:9
57:22,25 65:16
73:1 77:19,21
85:7,8 102:22
105:1 106:14

**says** 31:17 47:19
56:23 57:6,12
58:3,7 63:7,8 65:3
68:5 77:23 80:11
80:14 85:20 100:6
101:14 132:11
133:6 135:6
**scaffold** 118:16
**scaffolding** 12:12
12:14,17
**scenario** 38:2
**scene** 3:21 118:22
**schedule** 9:1 80:1,3
111:21,22 136:19
138:4
**scheduled** 138:22
**scheduling** 138:24
**scientific** 117:3
**scooter** 129:17
**scope** 29:19 126:9
126:16
**second** 8:3,9 16:22
18:15 48:22 61:6
98:5 103:21
115:13,16 118:1
139:7
**seconds** 76:12,15
**section** 54:5,9
56:24 78:8 108:23
141:12
**see** 54:11 55:15
61:12 93:11 97:13
97:15,16 101:7,15
104:15 122:10
123:7 126:18
132:19 133:8
142:6,12 143:8
**seeing** 57:24
**seen** 87:25 132:21
**seminar** 25:25 26:7
**sense** 24:6 72:25
96:16 104:25
105:14 108:2
109:18 126:2
**sentence** 37:12 40:6
46:18,22 47:8,11

47:19 65:22,23
77:11 78:4,19
80:13,14
**separate** 119:2
**separately** 32:2,3
**serious** 72:4 77:10
79:24
**seriously** 114:20
**serve** 21:18
**service** 60:2,18,22
79:23,25 91:2
112:3 115:4
123:23 136:23
**services** 4:4 11:16
145:19
**serving** 19:22 94:11
**set** 129:13
**seven** 102:8,11
**share** 121:3
**shared** 105:16
**sherrie** 13:16
**shoot** 98:16,17
99:10
**shopping** 19:14
**short** 61:8 102:7
110:19
**shorthand** 5:3
144:14
**show** 6:19 7:3 8:16
76:14 93:22 98:8
**showing** 48:10
135:12
**shown** 94:25
142:25
**shows** 39:16 97:24
107:10
**si** 101:14,14,19
**side** 20:25 21:23,25
22:3 45:11 46:3,5
46:20 87:4 105:17
120:23,25 121:2,6
121:20,23 123:20
128:9 140:25
**sidewalk** 21:11
**sign** 38:22 41:23
42:1 73:1 132:10

133:6,8
**signage** 62:15
72:17 73:7 87:16
132:17,19
**signature** 3:8
143:22 144:22
145:2
**signed** 27:20
**significant** 66:12
66:16 70:10,25
**similar** 35:13 36:10
36:11
**similarly** 112:16
**simple** 27:11
119:18
**simply** 68:8 69:10
96:3,11
**single** 134:3
**sir** 10:5 24:15 59:18
**sit** 24:7,16 38:2
39:21 40:25 99:14
119:16
**site** 13:2 29:1 30:2
46:21 54:8 101:19
121:25 138:23
**sitting** 14:19 37:6
39:24
**situated** 112:16
**situation** 41:12
50:1 56:14 92:22
92:25 93:2 115:19
120:7 121:23
122:21,24 129:19
136:22 140:10
**situations** 105:15
119:22 120:8
**six** 18:3,6 91:3
105:23 106:17
107:11
**size** 47:12 119:11
**sketch** 3:23 97:24
**slip** 35:10 118:13
118:14
**slipped** 11:19 19:7
**slippery** 19:5
**slips** 12:23,23 26:5

**small** 29:25 131:20
**smith** 2:14
**society** 26:6
**somebody** 22:21
28:2 34:5 56:10
82:9 113:25
122:21 129:2,9
130:2
**somebodys** 75:15
**someones** 12:3
**soon** 19:7 78:22
**sorry** 9:5 21:20
55:12 89:20 94:4
101:18 102:14
107:25 133:15
142:6 143:18
**sort** 18:12 32:12
**sound** 16:4
**source** 124:9 127:3
**southern** 1:1 4:10
144:1
**space** 18:13,14,17
18:19,21,23,25
19:4,7 20:1,6
37:14,15,25 38:1
38:11,14,17,18,20
39:10,11,17,18,25
40:1,4,10,11,13
40:18,23,23,24
41:10,15,16,23
42:3,4,12,16,22
43:4,6,21,23,25
44:23 45:1,10,15
45:17 46:10,11,19
46:23,24 47:1,12
47:13,20,20 48:12
48:16,17,18,22,24
49:3,4,5 50:2,20
50:24 51:2,5,8,10
52:1 53:5,6,13
54:15 56:4 58:23
59:1,4,6 60:15,16
62:16,17,18 63:14
63:16 64:2 65:2
66:3,11,13,14,21
66:23 67:7,15,16



68:14,15,24 69:7
69:10,12,18,20,25
70:4,6,21,23
71:18,20 72:11,16
72:18,19,22 73:5
73:9,14,17,22
74:1,7,9,10,13,17
75:13 76:4 77:1
78:21 79:1,7,12
79:13,16,22,22,25
80:5,7,11,24 81:2
81:8 82:2,13,22
82:22 83:5 84:2
85:22 86:16 87:16
88:15,20 89:11,12
89:17,18,23,24
90:2,22,23,25
91:16 92:3,8,11
94:8,10,16,18,22
94:22 95:4,6,9,12
95:14,20,20 96:4
96:9,12 97:10,19
98:24 99:3,23
100:2,9,11,12,18
102:1,13 103:2,3
104:14,24 105:11
105:12,15,16,19
106:5,18 107:1
109:3,3 110:5,8
110:13 111:10,17
111:22,24 112:1,3
113:7 115:1
116:14 120:12,18
121:1,9,11,13
122:3,5,17,20
123:2,10,18,22
127:16,19 128:5,8
128:11,12,14,19
128:24 129:15,19
129:24 130:1,4
131:11,12,14,19
131:21 132:3,6,10
132:14,16,23,24
133:10,12,17
134:3,20,21
135:16,20 136:1,7

136:9,9,12 140:6
140:14 141:10,10
142:15,20,21,21
142:24 143:3,3
**spaces** 24:13 38:21
41:25 43:9 44:4
44:10,18 45:7,8
45:19,23 49:20
50:11,22 51:21
52:9 53:18 56:17
59:12,15,17,21,24
60:7 62:25 64:5
64:15 68:19 70:13
71:11 75:6,24
88:11 90:10 92:16
99:22 107:21
108:8,9 109:25
113:5 121:3,19
125:2 128:9
130:20 131:2,9
140:15,17
**speak** 50:7 82:7,7
84:23 96:23 97:1
130:22 141:9
**speaking** 26:9
43:12 50:19 52:2
53:17 56:19 61:17
63:8 65:1,25
77:18 81:18 83:16
85:6 86:4 107:10
108:1,14,20
113:24 115:13
121:13 132:17
141:12
**speaks** 63:12
116:14
**special** 38:23
**specialty** 10:8
**specific** 12:18
22:10 28:3 32:24
35:1 39:21 41:10
53:2 57:21 70:2
72:24,25 73:4
74:1,12 76:20
78:6,6,15,16
84:10 86:4,16

88:7 89:14 90:11
90:11 91:15
108:14 110:2
118:24 127:5
133:19 134:4
**specifically** 24:13
42:15 51:5 68:6
76:15,18 77:18
79:12 83:5 87:16
88:16 90:6 97:2
126:24
**specifications**
124:13 127:1
**specifics** 13:7 14:19
**specifies** 121:6
**specify** 105:13
106:13 120:23,25
**spend** 33:2
**spent** 32:13,25 33:6
76:6 109:12
**spoke** 15:15 89:1
126:23
**spoken** 6:8,10
30:22,25 85:25
**spot** 21:24 41:9
68:9 78:16 86:12
104:21 123:8,8
127:24 128:7,11
129:4 136:15,17
143:9
**stack** 93:8,9,16,22
**stairway** 15:4
23:16,18,20
**stairways** 25:21
**stand** 128:15
**standard** 55:21
73:20 75:11,14
76:23 80:5 81:1
81:13 82:12,20
83:3,13 84:6
85:19 87:21 89:9
89:15,21 90:5
91:4,9,10,10
105:2,9,25 106:11
113:6 116:5
124:19,20

**standards** 20:6
25:11 26:16,18
33:7 50:8 57:19
57:20 58:11,16,18
58:20 59:11 61:1
61:12,15 62:12,19
62:20 63:2,4
70:16,18 71:2,4,7
71:10,13,16 84:20
85:10,13,15 90:13
90:19 108:19
116:20 120:15
123:24 124:4,11
125:10 127:10
**standing** 44:16
120:1 121:22
122:17,19
**standpoint** 52:10
53:9,10 54:2,20
55:21,22 56:7,19
57:11 60:21 61:3
61:17 63:3 73:24
75:15,18 81:19,25
82:8,12 85:18
108:3,6,20 113:25
118:8 120:9 124:3
**stands** 101:19
**start** 37:3,18,21
35:9 57:22 118:5
138:6
**started** 35:24
100:16
**starting** 35:15,17
71:24 118:6
**starts** 33:22 55:13
107:8,13
**state** 1:20 5:10 40:6
52:11 58:13
137:22 144:15
**stated** 1:25 50:15
137:2
**statement** 27:19
28:10 36:22 47:16
65:12 91:12
115:11 135:5
**statements** 137:24

**states** 1:1 4:9 88:23
108:24 117:23
144:1
**stating** 4:24 5:9
**station** 5:20 31:12
**statistics** 117:24
**statute** 57:6,12
73:20 75:11,14
76:23 80:5 81:1
81:12,21 82:20
83:3,13 85:9
87:21 89:9,15,22
90:4 91:9 105:2,8
105:25 114:4
**statutes** 85:10
**statutorily** 116:8
**statutory** 56:19
60:21 61:3,17
63:3 73:24 81:18
82:11 83:25 85:18
108:2,6,20 109:19
113:24 117:11,14
**steno** 1:20
**stepped** 19:8 72:12
**steps** 21:3,10
114:21
**stewart** 15:12
16:19
**stick** 112:23
**stipulate** 4:22
**stipulations** 3:3 4:1
4:19
**stonebriar** 15:25
17:5
**stood** 122:6,11,15
**stop** 38:11 78:18
**stopped** 15:14
**storage** 14:4,5
**store** 11:19 13:25
**stores** 15:13
**straight** 106:25
127:2
**straightforward**
116:21
**street** 1:22 2:8 4:7
145:21



**strength** 118:17
**strengths** 119:12
**strictly** 113:24
  116:8
**strike** 127:18
**strip** 13:19 45:8,23
**striping** 19:4
**studied** 25:13
**studs** 106:13
**study** 119:3
**stuff** 57:5
**style** 4:8
**subheading** 10:20
**subheadings** 10:24
**subject** 13:23 14:18
  25:9 35:2 49:24
  50:14,17 51:5
  124:3,7,10 126:12
**subpoena** 7:12,13
  7:16 8:8 93:14
  104:6
**subscribed** 145:12
**subtracting** 27:9
**subtraction** 27:11
**sugar** 31:12
**suite** 1:22 4:7 5:20
**summarize** 8:18
  126:20
**summarizing** 3:15
**summary** 33:23
  34:23 35:5 37:8
**supplement** 126:10
**supplied** 7:24 27:17
  47:17
**supply** 7:20 8:9
  88:6
**support** 8:18 83:13
  87:22
**supposed** 66:20
  67:18 92:20 105:3
  132:8,8,22
**sure** 8:13 55:7 66:8
  82:18 94:2 101:5
  101:8 102:14
**surface** 10:21 11:6
  25:22 118:14

128:25
**surfaces** 25:21
**surprising** 118:2
**surrounding**
  118:12
**surroundings** 3:22
**switched** 100:18
**sworn** 1:17 5:14
  144:18 145:12
**symbol** 38:22 76:19
**synopsis** 36:4,13,16
  37:2,8 141:7
**system** 57:10
**systems** 14:5

─────────
**T**
**t** 1:12,15 3:4,18
  5:13 144:10,17
**tags** 73:10
**tail** 107:1
**take** 14:14 45:4,6
  61:6 76:18 114:20
  115:20 118:21
  119:13 133:11,17
  134:5,8 135:2
  136:15 142:9
**taken** 1:17 31:17
  48:7 65:3 66:6
  68:4 85:22 115:4
  117:24 123:22
  128:10 134:16
  135:7,15 136:8
  145:8
**takes** 71:9
**talk** 23:1 32:7
  62:10 71:24 80:4
  89:2,5 97:8
  103:21 138:16
**talking** 27:24 48:2
  49:24 58:25 59:16
  60:20 81:4,21
  91:17 99:8 135:23
  140:6
**talks** 85:4
**tape** 98:9,13 103:12
  106:24 107:8

**tas** 25:7 80:10
  103:22 108:18
  109:14,20,23
  113:5 120:23
  126:24
**teach** 111:23
**technical** 117:4
  118:24
**technically** 102:25
**tell** 5:17 10:8,15,17
  13:10 15:6 17:19
  22:11 23:4 39:14
  40:2 58:3,15
  85:19 105:24
  107:16 134:15
  139:13
**tells** 105:1,9,25
**temporarily** 85:22
  111:24 133:11
**temporary** 60:2,18
  60:22 76:25 81:14
  89:10,17,23 90:24
  109:2
**ten** 7:17 29:25
  32:22 43:16
**tenant** 41:8 72:15
  72:24,25 73:4,5,8
  73:10 74:5 79:21
  82:2 83:22 84:5
  87:17 90:12,25
  91:6 111:19 114:5
  114:20 136:16
**tenants** 21:18 66:19
  67:18 72:5 75:18
  80:3 85:2 92:20
  112:17,25 113:4
  113:12 116:4
  132:8,11,15,22
  133:2,5
**tendencies** 119:3,5
  119:13,22
**term** 43:15 56:6
  62:4,5
**terms** 28:12 54:24
  85:6 89:14 116:14
  139:4,8,12

**territory** 28:20
  50:11
**test** 118:14,17
**testified** 5:14 20:4
  20:10 22:13 23:11
  27:13,22 66:2,5
  66:19 75:4 97:9
  132:7 141:1
**testify** 135:2
**testimony** 6:11
  17:11,14 20:12
  22:10 23:3,5,9
  24:11,14,18 28:1
  28:5,9,13 39:2
  41:4 44:22 51:18
  64:21 65:13,14,15
  66:25 67:1,14,23
  68:2,7 72:23 87:8
  87:13 95:19 96:3
  96:9,11,15,18,22
  96:25 97:7 132:25
  137:4,6,8,21
  140:12 144:20
  145:8
**testing** 27:2,5
  118:10,19,20,24
**texas** 1:1,20,23 2:8
  4:8,10 5:20 20:5
  25:10,17 26:15
  50:8 58:11,16,18
  58:20 59:11 61:1
  61:11,15 62:11,20
  63:1,4 70:17 71:9
  84:19 108:18
  116:20 124:4
  125:9 144:1,15
  145:18
**thank** 10:5 93:15
  110:15 142:1,4
  143:16,18
**thassinger** 2:16
**thats** 5:12 6:16,22
  8:10 9:2 10:10
  11:12 12:2 14:5,9
  14:10 15:22 16:17
  17:2,3,12,17

18:14 19:25 27:6
28:7 29:18,24
30:10,12,24 31:3
31:4,18 33:10
34:8,14,24 35:16
36:10 37:5 38:18
38:24,25 39:5,7
39:22,22 40:20
41:1,5,6,9,20,21
41:24 42:10 43:15
44:15 45:11 48:11
48:12,13 50:3
51:5 52:3,13 53:9
53:18,22 54:24
56:1,7,20,24
57:14,25 58:24
59:2,13,19,22
62:10 63:17,20,22
63:23 64:11,23
65:7 66:8,12,16
66:19 68:10,20
69:5 70:25 71:15
71:19,23 72:24
73:13,15,15,19,24
74:15 76:2 77:3
78:8 80:10,16
81:24 82:3,25
83:9,10 84:3,23
85:3,17,24 86:14
87:11,24 88:14,22
88:22 90:15 91:1
91:8 95:1,4,11
96:14,16 97:8
98:5 99:24 100:15
102:4,13,15,18
104:10,19 105:16
105:24 107:6
108:4,5,16,20
109:1,5,23 110:3
110:10,15 113:16
115:22 116:17,22
118:4,5,22 119:14
119:18,24 120:15
123:1 126:1,3,16
128:8,10 133:4
135:4,11 136:2,12



138:25 140:23,23
141:5
**theme** 29:24
**therefor** 145:3
**theres** 10:24 11:24
15:12,21 16:2
26:7 47:7 52:19
53:20 54:3,13
56:13 70:20 73:20
75:14 76:23 80:5
80:22,25 81:12,22
82:4,11,19 83:1,3
83:16,20,24,25
84:10,14 85:8,9
86:25 87:2,21
89:9,15 90:21
92:6 94:15 99:11
99:14 105:24
106:3,4 109:18
112:24 116:19
121:1,2,2,4 123:8
125:14 128:17,18
128:24 131:21
132:2,10,13,21
133:6,21 136:8,11
138:14 139:1,5,9
140:16 143:11
**theyre** 26:10,17
56:9 58:1 79:25
81:23,23,24 84:3
85:2 94:1 107:3
116:9 120:6 123:5
125:13,16 137:3
**theyve** 71:16
**thick** 7:16
**thicker** 8:7
**thing** 26:15 33:21
34:18 36:2,12
38:21 41:24 75:9
85:11 97:23 124:4
125:10
**things** 8:1 25:4,19
30:11 40:9,13
57:15 62:13 63:8
83:24 84:9 99:9
104:12 112:6,10

119:12 127:7
**think** 10:17 11:2
20:17 21:4,19
22:1 25:5,6 26:6
44:13 70:1 82:2
88:12 90:20 98:5
104:9 106:21
111:9,15 112:4,6
112:9 114:6 125:5
126:3 133:11
134:9 136:14
139:4
**thinking** 20:15 48:6
**third** 14:17 37:12
68:23
**thomas** 14:17
**thought** 16:11
27:23 37:20 62:6
104:7
**thousands** 57:18
**three** 16:11,15 23:8
24:3 36:2 41:13
42:6 46:8 61:11
62:8,9 64:9,10,12
65:20 66:7 68:6
94:2 95:1 125:15
141:4,6,22
**tie** 92:13
**tien** 14:24,25
**ties** 92:15
**tim** 4:17
**time** 4:3,20 5:7,9
18:5 22:7,10,14
23:4 24:2 25:23
27:23 30:20,21,21
32:13,24,25,25
34:16 39:6 40:19
42:19,20 46:14,14
51:16 59:7 60:9
64:19 76:6,21
79:3 80:1,3,18
81:11 86:18,21,24
87:1 89:3,4 91:2
93:3 95:7 109:6
109:10,11 110:16
110:25 119:16

130:23 131:21
133:19 134:4
135:1,2,20 137:2
138:23 141:19
142:2 143:19
**timer** 31:22
**times** 7:17 69:24
70:2,3 78:16
83:25 88:11,18
109:5 112:22
118:15
**timing** 32:12
**timothy** 2:12
**today** 7:18 8:5
51:18 70:14
110:16 139:13
140:4,12 142:4
**todays** 4:2
**told** 29:2 30:19
46:16 97:4 132:15
**tomlinson** 15:24
17:5 23:12
**tompkins** 2:13
**tool** 98:14 99:1,14
99:19
**tools** 103:15
**top** 21:13 57:4,7
58:5,7 96:5 97:18
99:23 100:12
**topic** 65:25
**total** 16:2 32:15
76:6 134:21,23
135:16
**touching** 107:14,18
**track** 32:12,24
**traditional** 98:13
**training** 25:13,24
**transcribed** 49:11
**transcribing** 49:2
**transcript** 144:19
145:1
**transcription** 49:16
**transfer** 101:11
**transition** 18:11
**travel** 131:9
**traveled** 31:12

**treatise** 84:7 85:20
87:22 89:10,15,22
90:7,21 91:11
**tree** 143:12
**trial** 4:23 5:7,9 9:4
17:14
**trials** 7:2 14:10
**tried** 69:9
**trip** 13:18
**tripod** 99:15,19
**trips** 26:5
**trouble** 116:10
**true** 6:15,16 9:17
26:18 27:6 31:3
49:20 53:8,22
54:6,18 55:4,22
56:1,25 61:20
62:12 63:2,3,24
68:10 70:8 71:23
73:18 74:15,19
75:6 77:1,3 80:7
80:16 81:2 82:25
83:8 87:23 88:14
96:13 115:18,22
127:10 130:5
132:16 136:10
137:25 143:7,7
144:19
**trunk** 107:4 143:12
**trust** 16:6
**try** 5:2 107:6 119:2
123:6
**trying** 20:21 21:3,6
22:1,19 37:9,19
45:5 107:17
108:12,13,16
136:19 141:20
**turn** 107:19
**twice** 104:22
105:21,22 106:5,6
106:10
**two** 9:5 14:11 15:5
15:12 16:13,15
17:3,10,19 21:3
21:10 23:8 24:3
34:12,19,19 40:8

40:13 42:5 44:8
46:3 49:7,12,22
59:12,16,24 64:8
68:19 77:4,11,22
78:8,9 79:4 83:16
83:24 84:24 85:3
87:12 98:6,20
100:22 102:24
104:12 121:2,2
**type** 13:4 14:4
25:21,23 28:20
32:11 33:15,20
34:2 50:15 118:9
120:14 123:24
**typed** 35:23
**types** 118:23
**typical** 41:6,12
140:18
**typically** 62:4
121:1
**typing** 35:7

**U**

**u** 54:5,9 56:23 57:2
57:15 58:6
**uh** 6:21 7:20,22
11:18,23 13:1
14:4,14,19 18:11
19:2,4,10 20:16
21:18 22:24 26:23
30:17 31:22 32:6
34:14,22 35:4,12
35:12 42:25 44:25
46:14 48:5 49:16
54:8 56:4 64:17
66:17 79:10 89:7
94:21 95:6 97:24
99:3 100:3,23
101:5 102:3
103:20 104:18
107:10 108:1
109:5 110:6
116:17 120:25
127:5,8 128:4
130:6 139:21
143:5



**ultimately** 66:1
68:17,21 72:16,19
92:12 96:16
100:10 130:9
141:1
**unavailable** 72:18
**understand** 27:19
53:3,16 82:25
85:7 105:1,23
108:12
**understanding**
37:11 39:1,4,6,23
55:9 64:20 67:17
94:19 119:4 133:1
141:12,18 142:16
**understood** 37:3,4
46:25 47:6 95:7
**unfolded** 129:13
**unintentional**
117:23
**unit** 21:11 37:15
38:1 41:9,17 43:5
43:22 44:11,16
45:9,23 46:1,10
72:17 73:6,13,16
74:6,10,18 75:13
79:17 94:19 95:2
102:5 111:18
112:22 114:17
115:2 131:10
**united** 1:1 4:9
117:23 144:1
**units** 20:22 108:18
**unnecessary**
136:23
**unquote** 87:18
125:18 126:2
141:16
**unreasonable**
70:20 109:9
111:11,14,16
112:5 129:5,6
135:20 136:3,15
136:23 140:3,8,11
140:13
**unsafe** 72:20

**unusual** 133:2
**updated** 26:3
**urban** 103:23
**usable** 62:21 63:6
**use** 28:12 34:15
35:14 56:6,18
62:4,5 64:16
66:11 67:18 72:18
72:23 74:18,18
82:23 83:6 85:22
92:20 99:12,12,15
105:6 111:18
119:6,7 122:22
123:23 131:2
133:22 139:8,12
**uses** 112:3
**usually** 74:1
**utilize** 75:3 119:13
129:16 140:20
**utilized** 12:8 45:16
45:18 79:13,15
88:24 131:5
133:15 134:15,25
136:16
**utilizes** 128:7
**utilizing** 85:17
90:18

_____
**V**
**v** 1:5 17:23 144:5
**vaguely** 77:23
**valid** 124:9
**various** 33:2
118:23 119:21
**vary** 134:14
**vegetation** 143:5
**vehicle** 46:20,22,24
47:2,13,21 92:11
102:20 120:24
128:5,9,10 129:15
141:11 143:8
**vehicles** 120:14
**verbally** 28:2,14
**verify** 127:6
**versus** 4:11 13:22
114:3 128:12

136:16
**viable** 51:3 67:11
67:13 107:5
130:10,12
**vicinity** 43:13
**vicky** 15:21 16:23
17:24
**view** 94:24 95:13
96:1 119:1 140:2
**viewed** 41:24 64:6
64:8,12 67:21,21
92:18 140:2
**violated** 53:12
**violates** 54:5 56:23
**violation** 52:20
53:21,25,25 55:14
55:22 56:15 60:25
61:11,15 81:24
116:17,19
**violations** 52:22
**virtually** 114:16
**visibility** 143:2
**visible** 122:6,9
143:11,13
**visit** 121:25
**visitor** 73:10 133:6
**visitors** 21:18 133:5
**vitae** 3:16
**volume** 1:14 144:12
**voluntary** 54:25
55:24
**vs** 13:16 14:17,24
15:13,21,24,24
16:23 17:5,22,23
17:23,24,25 18:1
23:12

_____
**W**
**w** 2:12
**wait** 102:14 107:23
**waiting** 70:10
**waive** 5:3
**waived** 143:22
**walk** 54:16
**walker** 47:3,4,4,15
92:12 122:19

129:12,13,17
141:16,16,20,23
**walkers** 120:12,21
**walking** 10:21 11:6
11:18 25:20,22
119:20
**walkway** 18:12
**want** 6:18 13:11
15:18 16:12 28:16
51:1,1,11 65:7,10
82:17 118:5,17
**wanted** 56:10 97:10
98:24 111:6
**wanting** 50:23 88:6
**wasnt** 16:11,16
18:4,8,8 25:3 27:3
69:8 71:20 75:5
92:2 130:10,22
140:7,13
**water** 11:19 71:6
**way** 15:18 21:1
22:14 34:9 38:3
42:9 52:19 71:8
76:20 79:2 85:1
106:1 111:25
115:19 119:17
125:4 131:7
133:20 136:10
**ways** 36:1 49:22
73:6 78:14 83:16
112:24
**web** 98:23
**week** 22:17
**welcome** 143:17
**welder** 13:1
**welding** 13:1,8
**went** 26:7 69:4
104:21 127:2
**western** 17:24
**weve** 8:23 9:8,13,23
35:8 62:2,24
108:21
**whats** 8:19 21:12
23:17 37:4 41:12
83:21 85:4 97:14
98:19 101:14

102:6 114:3,11
116:8 142:9
**whatsoever** 62:2
75:21 76:11 81:21
98:8 132:13
**wheelchair** 129:17
**wheelchairs** 120:12
120:21
**whens** 22:14 25:23
**white** 102:17 105:3
105:10 128:8,10
128:12
**whos** 12:22 13:1
**wide** 48:24 63:13
63:15,24 71:21
102:24 104:14,15
106:9,18 110:8
112:20 116:15
**width** 99:6,12,24
102:8,23 103:1,22
105:10,11 107:18
**william** 5:19
**window** 96:23 97:2
**withdraw** 113:10
**witness** 1:16 3:8 7:6
7:6 11:15 15:9,22
15:25 16:23 17:24
17:25 20:4 40:5
44:1 65:1 93:12
93:12 101:10
108:11 129:20
141:9 143:17
144:17,20
**woosley** 17:23
18:20
**word** 34:2 37:10
**wording** 53:25
**words** 38:6,8
119:23
**work** 9:17,22 25:15
29:19 42:22 80:2
**worker** 12:11,22
**working** 15:16 34:5
**workplace** 13:7,24
14:6 57:20
**world** 41:6



**wouldnt** 6:20 7:4
   15:20 67:1 70:14
   105:13,14 107:4
   123:4
**wow** 123:9
**wright** 15:21 16:23
   17:24 18:22
**write** 37:2,12 42:20
   43:3 48:21 71:25
   77:5 87:14 91:3
**writes** 104:13
   106:17 107:20
   108:7,17,22
   109:13,24
**writing** 46:9 100:16
**written** 24:14 27:19
   52:8 55:23 88:7
   90:13,19 126:9
**wrong** 22:5,16 23:6
   23:21 49:11 62:7
   103:19
**wrote** 38:9 40:3
   41:13 43:7 49:9

**X**

**x** 145:4

**Y**

**yall** 32:5
**yeah** 10:5 16:13
   17:4 42:7 65:9
   107:10 141:4
**year** 23:13
**years** 7:3 11:17
   14:10,16 16:3
   17:13 20:14 23:11
   24:1,3 40:17 42:6
   43:16 52:2 65:20
   66:7 68:6 69:19
   69:23 80:21 87:12
   88:10 136:14
   141:4
**yen** 14:24
**youd** 13:3 30:22,25
   46:1 52:19 98:2
   110:6 128:11

**youre** 10:6,17 11:4
   17:4 22:12 24:23
   27:14 30:21 35:7
   36:6,6 40:6 44:15
   48:15 49:24 50:23
   53:3,17 55:9,9
   56:9,19 57:5,8
   58:5,22,25 60:20
   61:17 65:16 67:23
   70:17 73:3 77:21
   78:19 81:4,19
   83:15 84:17 85:7
   85:7 86:4 90:8
   91:17 97:16
   102:21 105:1,3,20
   105:21 107:10,17
   113:14 118:3,3
   119:10 121:13
   128:13,14,24
   130:8 131:25
   139:13 143:17
**youve** 5:21 6:8,11
   12:19 13:10 17:13
   24:10 25:23 26:20
   29:21 35:8 44:22
   61:19 79:5 86:6
   126:21 132:21

**Z**

**0**

**0** 31:17

**1**

**1** 1:14,14 3:14,14
   3:19,20,25 6:24
   6:25 9:11,24 25:7
   31:13,17 33:2,13
   35:9 50:8 62:3,21
   63:5,6,20 88:17
   94:15 104:14
   116:18 124:5
   126:25 137:25
   144:12,12,22
**10** 1:19 3:20 4:3
   40:17 52:2 69:23

76:9,11,12,15,16
   76:22 80:21 88:10
   88:11 134:5,8,10
   135:6,13,14
   136:14 142:10,10
**104** 3:25
**10minute** 110:17
**11** 95:3 108:7
**111** 3:5
**112** 5:20
**11th** 37:4 42:22
**12** 3:14,19,20 11:17
   145:19
**12108** 87:18
**12182** 54:5,9 56:24
   57:2
**129** 3:6
**13** 1:19 143:21
**13th** 31:16 145:12
**14** 108:17
**1400** 1:22 2:8 4:7
**142** 3:6
**143** 3:7,8
**144** 3:9
**1444** 3:20
**15** 1:19 4:3 88:11
   95:5 108:22
**16** 3:14,19,20 95:11
   95:15,23 97:18
   100:6 131:13
   132:23
**1635** 145:21
**16cv00118** 1:5 4:11
   144:5
**16ths** 49:6 100:19
   103:4,4
**18** 31:5 33:10
   145:19
**19** 109:13
**19103** 145:21
**1960** 19:11 125:5

**2**

**2** 1:19 3:2,16,24 5:5
   7:10,11 8:24 9:5
   9:11 14:11 16:7

17:7 33:6,13
   45:18 55:14
   143:21
**20** 88:12,17 109:24
   134:12,20,23
   135:7,15,19 136:1
   136:8,22
**2001** 26:9
**2013** 37:4 42:22
**2014** 26:4
**2016** 31:16
**2017** 1:13,18 4:3
   144:11 145:13
**203** 93:7
**205** 93:7
**211** 108:24
**28** 3:22 94:16 97:9
   97:15
**29** 97:9,15

**3**

**3** 1:13 2:14 3:18 9:9
   9:10,13 17:7 31:5
   33:2,9 42:20 50:7
   94:16 110:22
   144:11
**30** 5:5 44:23 65:1
   65:16,22 66:5
   134:6 144:22,25
**31** 145:19
**319** 93:7
**35** 55:17,18 110:22
**36** 56:22 57:9
   108:24
**3824** 145:18
**3rd** 1:18 2:14 4:2

**4**

**4** 1:5 3:3,20 4:11
   10:3,4 31:5,13
   33:6 106:5,6,7
   144:5
**42** 54:5,9 56:23
   57:2,9
**440** 1:22 2:8 4:7
**45** 134:6

**4inch** 49:6

**5**

**5** 3:5,21 49:9 50:7
   76:12 93:20,21
   94:7,8,16 97:18
   131:13 142:6,10
**543** 5:19

**6**

**6** 3:14,15,23 98:3
   98:11 99:21
**60** 63:23 103:23
   105:22 106:3,7
**60inch** 63:15,18
   91:17,23 92:2
   116:16
**60inches** 71:21
**6246221** 145:22
**633** 145:20

**7**

**7** 3:16,19,25 103:3
   103:3 104:2,3
   145:20
**70** 44:2,3,4,9,17
   45:6
**70471** 2:15
**70foot** 44:3
**7133224878** 2:9
**7135879086** 2:9
**73** 45:15,17,24 46:5
   68:25
**76** 16:2,7 17:7
**77002** 1:23 2:8 4:8
**77845** 5:20

**8**

**8** 3:17 104:14
   105:22
**86** 104:14
**866** 145:22
**8foot** 63:13 116:15
**8th** 145:21

**9**



**9** 3:18,20 49:6
   100:19 103:4,4
**90s** 125:4
**91** 49:6 100:19
   103:4
**92** 48:23 49:4,10
   102:16
**93** 3:21
**94** 48:19 49:8
   102:25
**96** 17:14 48:18
   103:22 105:22,22
**96inch** 63:13
**97** 17:15 104:14,18
**98** 3:23
**9856746680** 2:15
**9856746681** 2:16

